Marlan B. Wilbanks, Georgia Bar No. 758223
mbw@wilbanks-bridgeslaw.com
Susan S. Gouinlock, Georgia Bar No. 303217
ssg@wilbanks-bridgeslaw.com
WILBANKS & BRIDGES, LLP
3414 Peachtree Road, NE
Suite 1075
Atlanta, Georgia  30326
(404) 842-1075 (tel)
(404) 842-0559 (fax)
*(subject to pro hac vice admission)*

Scott C. Withrow, Georgia Bar No. 772330
swithrow@wmolaw.com
WITHROW, MCQUADE & OLSEN, LLP
3379 Peachtree Road, NE
Suite 970
Atlanta, Georgia  30326
(404) 814-0200 (tel)
(404) 814-0009 (fax)
*(subject to pro hac vice admission)*

Michael A. Hirst, Esq. CA Bar #131034
michael.hirst@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, CA 95616
(530) 756-7700 (tel)
(530) 756-7707 (fax)

Attorneys for Relator

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA and the STATE OF CALIFORNIA** *ex. rel.* **LAURIE M. HANVEY,** | |
| **Relator,** | **CASE NO. _____** |
| **vs.** | **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729** *et seq.***) AND** |

1

SUTTER HEALTH;

SUTTER HEALTH SACRAMENTO SIERRA
REGION d/b/a Sutter Medical Center,
Sacramento, a/k/a Sutter Roseville Medical
Center, a/k/a Sutter Amador Hospital, a/k/a
Sutter Auburn Faith Hospital, a/k/a Sutter Davis
Hospital, a/k/a Sutter Solano Medical Center;

SUTTER MEDICAL FOUNDATION;

SUTTER EAST BAY HOSPITALS d/b/a Alta
Bates Summit Medical Center, a/k/a Sutter Delta
Medical Center;

EAST BAY PERINATAL CENTER d/b/a Alta
Bates Summit Perinatal Center;

EAST BAY CARDIAC SURGERY CENTER
MEDICAL GROUP;

SUTTER MEDICAL CENTER, CASTRO
VALLEY d/b/a Eden Medical Center;

EDEN MEDICAL CENTER d/b/a San Leandro
Hospital;

SUTTER EAST BAY MEDICAL
FOUNDATION;

SUTTER CENTRAL VALLEY HOSPITALS
d/b/a Memorial Medical Center, a/k/a Memorial
Hospital Los Banos, a/k/a Sutter Tracy
Community Hospital;

SUTTER GOULD MEDICAL FOUNDATION;

SUTTER CONNECT, LLC d/b/a Sutter
Physician Services;

SUTTER MEDICAL GROUP, A CALIFORNIA
CORPORATION;

CALIFORNIA FALSE CLAIMS ACT
(CAL. GOV'T CODE §§ 12650 *et seq.*)

FILED UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2) AND CAL.
GOV'T CODE § 12652(c)(2)

[FALSE CLAIMS ACT –*QUI TAM*]

DEMAND FOR JURY TRIAL

2

COMPLAINT AND
DEMAND FOR JURY TRIAL

**SUTTER INDEPENDENT PHYSICIANS, A MEDICAL CORPORATION;**

**EAST BAY PHYSICIANS MEDICAL GROUP, INC.;**

**SACRAMENTO CARDIOVASCULAR SURGEONS MEDICAL GROUP, INC.;**

**EAST BAY PERINATAL MEDICAL ASSOCIATES;**

**BAY AREA SURGICAL SPECIALISTS, INC., A MEDICAL CORPORATION, f/k/a East Bay Vascular Group;**

**STEPHEN K. LIU, M.D., PROFESSIONAL CORPORATION; and**

**CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP, A PROFESSIONAL CORPORATION, f/k/a Sutter Emergency Medical Associates,**

                    **Defendants.**

_____

## COMPLAINT

     **COMES NOW**, LAURIE M. HANVEY, ("Relator") in the above-styled action, by and through her counsel of record, WILBANKS & BRIDGES, L.L.P., WITHROW, MCQUADE & OLSEN, LLP, and HIRST LAW GROUP, P.C., and states that this is an action brought on behalf of the United States of America and the State of California by Relator against SUTTER HEALTH; SUTTER HEALTH SACRAMENTO SIERRA REGION d/b/a Sutter Medical Center, Sacramento, a/k/a Sutter Roseville Medical Center, a/k/a Sutter Amador Hospital, a/k/a Sutter Auburn Faith Hospital, a/k/a Sutter Davis Hospital, a/k/a Sutter Solano Medical Center; SUTTER MEDICAL

3

FOUNDATION; SUTTER EAST BAY HOSPITALS d/b/a Alta Bates Summit Medical Center, a/k/a Sutter Delta Medical Center; EAST BAY PERINATAL CENTER d/b/a Alta Bates Summit Perinatal Center; SUTTER MEDICAL CENTER, CASTRO VALLEY d/b/a Eden Medical Center; EDEN MEDICAL CENTER d/b/a San Leandro Hospital; SUTTER EAST BAY MEDICAL FOUNDATION; SUTTER CENTRAL VALLEY HOSPITALS d/b/a Memorial Medical Center, a/k/a Memorial Hospital Los Banos, a/k/a Sutter Tracy Community Hospital; SUTTER GOULD MEDICAL FOUNDATION; and SUTTER CONNECT, LLC d/b/a Sutter Physician Services (hereinafter sometimes collectively referred to as "SUTTER HEALTH"), and against SUTTER MEDICAL GROUP, A CALIFORNIA CORPORATION; SUTTER INDEPENDENT PHYSICIANS, A MEDICAL CORPORATION; EAST BAY PHYSICIANS MEDICAL GROUP, INC.; SACRAMENTO CARDIOVASCULAR SURGEONS MEDICAL GROUP, INC.;  EAST BAY PERINATAL MEDICAL ASSOCIATES; EAST BAY CARDIAC SURGERY CENTER MEDICAL GROUP; BAY AREA SURGICAL SPECIALISTS, INC., A MEDICAL CORPORATION, f/k/a East Bay Vascular Group; STEPHEN K. LIU, M.D., PROFESSIONAL CORPORATION; and CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP, A PROFESSIONAL CORPORATION, f/k/a Sutter Emergency Medical Associates (hereinafter sometimes collectively referred to as "PHYSICIAN ENTITIES") pursuant to the *Qui Tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729-33 *et. seq*., and the California False Claims Act ("CFCA"), Cal Gov't Code §§ 12650 *et seq.*

As will be set forth hereafter with greater specificity, SUTTER HEALTH has routinely paid or provided unlawful kickbacks, excessive compensation, free employees and other illegal incentives to physicians who refer patients to SUTTER HEALTH in violation of federal and California law.

4

By knowingly submitting claims for reimbursement to government payers based on referrals generated by physicians who received kickbacks, compensation, free employees and other incentives under illegal financial relationships, SUTTER HEALTH violated 42 U.S.C. § 1395nn (commonly known as the "Stark Law"),  42 U.S.C. § 1320a-7b(b) (commonly known as the federal Anti-Kickback Statute or "AKS"), California Business and Professions Code, section 650 (prohibiting inducements for referring patients), California Welfare and Institutions, section 14107.2(b) (prohibiting payments for referrals for services to Medicaid patients), the FCA and the CFCA. PHYSICIAN ENTITIES conspired with SUTTER HEALTH regarding the fraudulent billing of Medicare and Medicaid and the improper payment or provision of excessive compensation and illegal incentives to physicians in a position to refer and/or influence referrals of Medicare and Medical patients to SUTTER HEALTH in violation of the FCA and CFCA.

## I.    NATURE OF ACTION AND SUMMARY OF FRAUD

1.    Relator brings this action on behalf of the United States of America and the State of California (hereafter collectively "Government") to recover treble damages and civil monetary penalties under the FCA and CFCA arising from false and fraudulent statements, records and claims made and caused to be made by Defendants to the Government.

2.    Within the time frames detailed below, Defendants knowingly submitted thousands of false claims to the United States and the State of California which resulted in millions of dollars of government reimbursement that would not have been paid but for Defendants' misconduct.

3.    The fraudulent schemes described hereafter in greater specificity in this Complaint include:

A.      SUTTER HEALTH knowingly paid Sacramento Cardiovascular Surgeons Medical Group, Inc., a group of three cardiovascular surgeons in Sacramento, over $1.9 million annually to induce referrals by stacking preferential arrangements providing for exclusive cardiac call coverage and duplicative medical directorships and SUTTER HEALTH provided free employees in the form of payments for four full-time Physician Assistants who billed payers such as Medicare and Medicaid for the financial benefit of the physicians.  See ¶¶86-120 below.

B.      SUTTER HEALTH knowingly paid a fourth cardiovascular surgeon in Sacramento, Dr. David K. Roberts, up to $392,040 annually to induce referrals through a duplicative medical directorship requiring 121 hours of service per month, although the physician continued to maintain a full-time private medical practice.  See ¶¶121-127 below.

C.      SUTTER HEALTH knowingly paid East Bay Perinatal Medical Associates, a group of six OB-GYN physicians in Oakland, over $7 million annually to induce referrals by stacking preferential arrangements for exclusive hospital call coverage and exclusive professional services in a SUTTER HEALTH clinic, which included compensation that varied and increased with the volume of deliveries referred by the physicians to Alta Bates Summit Hospital campus in Berkeley.  See ¶¶128-149 below.

D.      SUTTER HEALTH knowingly paid East Bay Cardiac Surgery Center Medical Group, a group of two cardiothoracic surgeons in Oakland, $1 million annually to induce referrals through a preferential arrangement providing for medical directorships, exclusive call coverage and payments for phantom and/or unspecified data collection services.  See ¶¶150-161 below.

E.      SUTTER HEALTH knowingly paid Bay Area Surgical Specialists, Inc., A Medical Corporation, a multi-specialty group of physicians based in Walnut Creek, compensation under exclusive hospital call coverage arrangements to reward the physician group for its high-volume referrers, including Dr. Rajiv Nagesetty who is a major referral source for SUTTER HEALTH and was the highest billing vascular surgeon in the entire State of California with 2012 Medicare billings of $4,176,471.06. See ¶¶162-175 below.

F.      SUTTER HEALTH knowingly paid Dr. Stephen K. Liu, Professional Corporation, the professional corporation of an interventional radiologist in Modesto, up to $438,000 per year for exclusive call coverage for 24 hours per day for all 365 days of the year to reward Dr. Liu for his high-volume of referrals as the highest billing interventional radiologist in the entire State of California with 2012 Medicare billings of $4,604,464.10. See ¶¶176-187 below.

G.      SUTTER HEALTH knowingly paid excessive compensation to California Emergency Physicians Medical Group, A Professional Corporation, an emergency physician staffing company, to induce referrals to SUTTER HEALTH hospitals in Los Banos, Sacramento, Roseville, Antioch, Auburn and Davis. The compensation arrangement also expressly prevented emergency room physicians from providing services at competing hospitals. See ¶¶188-199 below.

## II.     **JURISDICTION AND VENUE**

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367(a) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought under the FCA and related claims brought under the laws of any State. This Court has jurisdiction to entertain a *qui tam* action pursuant to 31 U.S.C. § 3730(b). Relator is an "original

source" and is otherwise authorized to maintain this action in the name of the United States as contemplated by the Civil False Claims Act, 31 U.S.C. § 3729-33.

5.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because one or more of the Defendants resides or transacts business in the Northern District of California.

6.      Venue is proper in the Northern District of California under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because one or more of the Defendants can be found in, resides in, or transacts business in this judicial district.

7.      Relator has made voluntary disclosures to the United States Government prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2), and to the California Attorney General on the same day as this Complaint is filed as required by Cal. Gov't. Code § 12652(c)(3).

## III.   **INTRADISTRICT ASSIGNMENT**

8.      Assignment to a particular division within the Northern District of California under Civil Local Rule 3.2(c) is based on the Courthouse serving the county in which the action arises. This action arises in Alameda County, California because a substantial part of the events or omissions which give rise to the claims in this Complaint occurred in Alameda County, California. According to Civil Local Rule 3-2(d), assignment is proper to the San Francisco Division or the Oakland Division.

## IV.   **THE PARTIES**

9.      Plaintiff-Relator Laurie M. Hanvey is employed by SUTTER HEALTH as the Compliance Officer of Sutter Medical Center, Sacramento.  She has worked with SUTTER HEALTH since December 2012, and previously worked for over 25 years with other hospitals in the

State of California.  She reports directly to top executives at SUTTER HEALTH.  Relator holds a Masters in Business Administration and is certified in Healthcare Compliance. She brings this *qui tam* action based upon direct personal knowledge gained during her employment as a corporate insider and executive with SUTTER HEALTH.

10.     Defendant Sutter Health is a California not-for-profit corporation headquartered in Sacramento, California.  Sutter Health serves as the parent of a health care delivery system that includes a centralized support group and various health care-related businesses operating primarily in five geographic regions, principally in Northern California.  The SUTTER HEALTH system includes 24 acute care hospitals, over 5,000 physicians and over 48,000 employees.  Sutter Health and its affiliates had consolidated gross revenues of $9.6 billion in 2013, and held $5.1 billion in cash and marketable securities as of December 31, 2013.   As a large and sophisticated provider of health care services to Government beneficiaries, SUTTER HEALTH is charged with following the law and implementing policies and procedures that comply with the explicit requirements of the Stark Law, AKS and the FCA.

11.     When this Court unseals this Complaint, Defendant Sutter Health may be served at its registered office located at 2200 River Plaza Drive, Sacramento, California 95833.  Its registered agent is Bonnie George.

12.     Defendant Sutter Health Sacramento Sierra Region is a California not-for-profit corporation with its principal place of business at 2700 Gateway Oaks Boulevard, Suite 2200, Sacramento, California 95833.  Defendant Sutter Health Sacramento Sierra Region does business as Sutter Medical Center, Sacramento (two hospitals totaling 727 beds), Sutter Center for Psychiatry (69-bed hospital), Sutter Roseville Medical Center (328-bed hospital), Sutter Amador Hospital (52-

bed hospital), Sutter Auburn Faith Hospital (69-bed hospital), Sutter Davis Hospital (48-bed hospital) and Sutter Solano Medical Center (102-bed hospital).

13.     Defendant Sutter Medical Foundation is a California not-for-profit corporation with its principal place of business at 2700 Gateway Oaks Boulevard, Suite 1200, Sacramento, California 95833.  Defendant Sutter Medical Foundation is aligned with physicians and mid-level providers of Defendant Sutter Medical Group to provide primary care and specialty care to patients.

14.     Defendant Sutter East Bay Hospitals is a California not-for-profit corporation with its principal place of business at 2450 Ashby Avenue, Berkeley, California 94705.  Defendant Sutter East Bay Hospitals does business as Alta Bates Summit Medical Center (two hospitals totaling 819 beds) and Sutter Delta Medical Center (145-bed hospital).

15.     Defendant East Bay Perinatal Center is a California not-for-profit corporation with its principal place of business at 350 30th Street, Suite 205, Oakland, California 94609.  Defendant East Bay Perinatal Center does business as Alta Bates Summit Perinatal Center and operates a community clinic specializing in maternal-fetal medicine in Oakland, California that serves predominantly Medi-Cal patients.

16.     Defendant Sutter Medical Center, Castro Valley is a California not-for-profit corporation with its principal place of business at 20103 Lake Chabot Road, #103, Castro Valley, California 94546.  Defendant Sutter Medical Center, Castro Valley does business as Eden Medical Center (130-bed hospital).

17.     Defendant Eden Medical Center is a California not-for-profit corporation with its principal place of business at 20103 Lake Chabot Road, Castro Valley, California 94546.  Defendant Eden Medical Center formerly operated a hospital in Castro Valley which has been replaced by the

10

hospital operated by Defendant Sutter Medical Center, Castro Valley.  Defendant Eden Medical Center continues to do business as San Leandro Hospital (93-bed hospital).

18.     Defendant Sutter East Bay Medical Foundation is a California not-for-profit corporation with its principal place of business at 3687 Mt. Diablo Boulevard, #200, Lafayette, California 94549.  Defendant Sutter East Bay Medical Foundation is aligned with physicians and mid-level providers of Defendant East Bay Physicians Medical Group, Inc., to provide primary care and specialty care to patients.

19.     Defendant Sutter Central Valley Hospitals is a California not-for-profit corporation with its principal place of business at 1700 Coffee Road, Modesto, California 95355.  Defendant Sutter Central Valley Hospitals does business as Memorial Medical Center (423-bed hospital), Memorial Hospital Los Banos (46-bed hospital) and Sutter Tracy Community Hospital (82-bed hospital).

20.     Defendant Sutter Connect, LLC, d/b/a Sutter Physician Services is a California limited liability company with its principal place of business at 10470 Old Placerville Road, Suite 100, Sacramento, California 95827.  Defendant Sutter Connect, LLC, d/b/a Sutter Physician Services provides physician billing and other services for physicians, foundations and other providers throughout Sutter Health's system service areas.

21.     Defendant Sutter Medical Group, A California Corporation is a California for-profit professional corporation with its principal place of business at 2700 Gateway Oaks Drive, Suite 1230, Sacramento, California 95833.  Defendant Sutter Medical Group, A California Corporation is a multi-specialty medical group including approximately 470 physicians and 120 allied health professionals.

22.     Defendant Sutter Independent Physicians, A Medical Corporation is a California for-profit professional corporation with its principal place of business at 1201 Alhambra Boulevard, Suite 50, Sacramento, California 95816.  Defendant Sutter Independent Physicians, A Medical Corporation is an independent practice association comprised of more than 500 primary care and specialist physicians.

23.     Defendant East Bay Physicians Medical Group, Inc. is a California for-profit professional corporation with its principal place of business at 3687 Mt. Diablo Boulevard, Suite 200, Lafayette, California 94549.  Defendant East Bay Physicians Medical Group, Inc., is a multi-specialty medical group comprised of physicians practicing in over 20 medical specialties.

24.     Defendant Sacramento Cardiovascular Surgeons Medical Group, Inc., is a California for-profit professional corporation with its principal place of business at 5301 F Street, Suite 111, Sacramento, California 95819.  Defendant Sacramento Cardiovascular Surgeons Medical Group, Inc., is a specialty physician group comprised of three cardiovascular surgeons:  Dr. Michael T. Ingram, Dr. Robert Kincade and Dr. James Longoria.

25.     Defendant East Bay Perinatal Medical Associates is a California professional general partnership with its principal place of business at 350 30th Street, Suite 208, Oakland, California 94609.  Defendant East Bay Perinatal Medical Associates is a specialty physician group providing gynecological, obstetrics and perinatology medical services. Defendant East Bay Perinatal Medical Associates is comprised of six physicians as of July 1, 2014:  Dr. Stuart Lovett, Dr. Jonathan Weiss, Dr. Ralph DePalma, Dr. David Marinoff, Dr. Janet Goldman and Dr. Leon Richmond.

26.     Defendant East Bay Cardiac Surgery Center Medical Group is a California general partnership with its principal place of business at 3300 Webster Street, Suite 500, Oakland,

California 94610.  Defendant East Bay Cardiac Surgery Center Medical Group is a specialty physician group comprised of two cardiovascular surgeons:  Dr. Junaid H. Khan and Dr. Russell D. Stanten.

27.     Defendant Bay Area Surgical Specialists, Inc., A Medical Corporation, f/k/a East Bay Vascular Group, is a California for-profit professional corporation with its principal place of business at 365 Lennon Lane, Suite 250, Walnut Creek, California 94598.  Defendant Bay Area Surgical Specialists, Inc., A Medical Corporation is a multi-specialty medical group comprised of physicians practicing in over 10 medical specialties.  The vascular surgeons comprising Defendant Bay Area Surgical Specialists, Inc., A Medical Corporation include Dr. Rajiv Nagesetty, Dr. Fernando R. Otero, Dr. John D. Bry, Dr. Gonzalo P. Obnial and Dr. Keshav K. Pandurangi.  The thoracic surgeons comprising Defendant Bay Area Surgical Specialists, Inc., A Medical Corporation include Dr. Michaela Straznicka, Dr. Wilson Tsai and Dr. Saurin Shah.

28.     Defendant Stephen K. Liu, M.D., Professional Corporation is a California for-profit professional corporation with its principal place of business at 1552 Coffee Road, Suite 4, Modesto, California 95355.  Defendant Stephen K. Liu, M.D., Professional Corporation is a physician-owned corporation specializing in interventional radiology.  Defendant Stephen K. Liu, M.D., Professional Corporation is comprised of one physician, Dr. Stephen K. Liu.

29.     Defendant California Emergency Physicians Medical Group, A Professional Corporation f/k/a/ Sutter Emergency Medical Associates, is a California for-profit professional corporation with its principal place of business at 2100 Powell Street, Suite 900, Emeryville, California 94608.  Defendant California Emergency Physicians Medical Group, A Professional Corporation f/k/a/ Sutter Emergency Medical Associates provides emergency room staffing services

13

for hospitals, including the SUTTER HEALTH hospitals located in Los Banos, Roseville, Antioch, Sacramento, Auburn and Davis, California.

## V.   THE FALSE CLAIMS ACT AND CALIFORNIA FALSE CLAIMS ACT

30.    The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1). Claims to government payers for reimbursement for healthcare services rendered to patients referred by physicians in violation of the Stark Law (as hereinafter described) are false claims actionable under the FCA.

31.    The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729.[1]  For purposes of the FCA,

---

[1]    The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  Defendant's fraudulent scheme includes false claims made prior to and after that date.  The four pre-amendment subsections relevant to this action are 31 U.S.C. §§ 3729(a)(1), (a)(2), (a)(3) and (a)(7). The relevant post-amendment sections relevant here are 3729(a)(1)(A), 3729(a)(1)(B), 3729(a)(1)(C) and 3729(a)(1)(G). Post-amendment section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the changes to that section applicable to all civil actions pending on or after June 7, 2008.

the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

32**.**     The Social Security Act was amended by the Patient Protection and Affordable Care Act, P.L. 111-148 effective March 23, 2010 ("PPACA"), in an important respect relating to the FCA. PPACA established a deadline for reporting and returning overpayments received or retained under Medicare or Medicaid (generally 60 days after the date on which the overpayment was identified), and PPACA provided that any overpayment retained by a person after the deadline for reporting and returning the overpayments is an obligation as defined in 31 U.S.C. § 3729(b)(3) of the FCA. PPACA § 6402(d), adding § 1128J to the Social Security Act [42 U.S.C. § 1320a-7k].

33.     The CFCA has similar provisions to the FCA addressing the submission of false and fraudulent claims to the State of California.   Cal. Gov't Code § 12651(a)(1), (2), (3) and (7).  The CFCA was amended effective January 1, 2013 to reflect the amendments made to the FCA by FERA and PPACA.  2012 Cal. Legis. Serv. Ch. 647 (A.B. 2492) (WEST).

## VI.     THE MEDICARE PROGRAM

34.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals. The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program, which it does through the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

35.     Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare program primarily covers physician and other ancillary services. *See* 42 U.S.C. § 1395k.

36.     To assist in the administration of Medicare Part A, CMS contracted with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries (typically insurance companies) were responsible for processing and paying claims and cost reports.

37.     To assist in the administration of Medicare Part B, CMS contracted with "carriers." Carriers, typically insurance companies, were responsible for processing and paying Part B claims.

38.     Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the fiscal intermediaries and carriers.  *See* Fed. Reg. 67960, 68181 (Nov. 2006).  The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. *See* 42 § C.F.R. 421.5(b).

39.     Noridian Healthcare Solutions, LLC, became the MAC for the California region in September 2013.  Palmetto GBA served as the MAC for the California region from September 2008 to August 2013.  Prior to September 2008, National Government Services served as the Part A fiscal intermediary and National Heritage Insurance Company served as the Part B carrier for the California region.

40.     Providers who wish to be eligible to participate in Medicare Part A must periodically sign an application to participate in the program. The application, which must be signed by an authorized representative of the provider, contains an express certification that states, "I agree to

16

abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

41.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

42.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92 or UB-04.

43.     As detailed below, at all relevant times, Defendant SUTTER HEALTH was enrolled as a Medicare and Medicaid provider and submitted or caused to be submitted claims to Medicare and Medicaid both for specific inpatient and outpatient services provided to individual beneficiaries as well as claims for general and administrative costs incurred in treating Medicare and Medicaid beneficiaries.

44.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

45.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider

believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

46.     Defendant SUTTER HEALTH was, at all times relevant to this Complaint, required to submit annually hospital cost reports to the fiscal intermediary or MAC.

47.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on government forms UB-92 and UB-04) during the course of the fiscal year. On the hospital cost report, this Medicare Part A liability to the hospital for services is then combined with any Medicare Part A liabilities owed to Medicare from the hospital to determine whether Medicare or the hospital owes the other any funds related to treatment of Medicare Part A beneficiary patients during the course of a fiscal year.

48.     Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, carriers and MACs, had the right to audit the hospital cost reports and to investigate representations made by SUTTER HEALTH in its claims for reimbursement and its cost reports to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made, such as payments for services rendered by physicians and hospitals which are not in compliance with the Stark Law or the AKS. *See* 42 C.F.R. § 413.64(f).

18

49.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

50.     For all relevant years, SUTTER HEALTH was required to expressly certify, and did certify, in relevant part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

51.     For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

52.     Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Statute (described below).

53.     For each of the years at issue, SUTTER HEALTH submitted cost reports to its fiscal intermediary attesting, among other things, to the certification quoted above.

19

54.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its fiscal intermediary or MAC.

55.     In addition to Part A claims, hospitals, doctors or other providers submit Medicare Part B claims to the carrier or MAC for payment.

56.     Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1).  For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. *See* 42 C.F.R. §§ 405.502-504.

## VII.    THE MEDICAID PROGRAM

57.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

58.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 et seq.

59.     In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

60.     In the State of California, provider hospitals participating in the Medicaid program (known as "Medi-Cal") submit claims for hospital services rendered to beneficiaries to the California Department of Health Care Services ("DHCS") for payment.

61.     In addition, DHCS requires hospitals participating in the Medi-Cal program to file a copy of their Medicare cost report with DHCS.

62.     DHCS uses Medi-Cal patient data and the Medicare cost report to determine the reimbursement to which the facility is entitled based in part on the number of Medi-Cal patients treated at the facility.

## VIII.   THE STARK LAW

63.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute" or "Stark Law") prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the Statute) with the hospital, and prohibits Medicare from paying any such claims.

64.     The Stark Statute establishes that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers. The Statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable or improper utilization of designated health services.

65.     The Stark Statute explicitly states that Medicare may not pay for any designated health service provided in violation of the Stark Statute. *See* 42 U.S.C. § 1395nn(g)(1). In addition, the regulations implementing the Stark Statute expressly require that any entity collecting payment

21

for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353 (2006).

66.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applies. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

67.     In 1993, Congress passed Stark II, which extended the Stark Statute to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

68.     The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception applies. "Designated health services" include inpatient and outpatient hospital services reimbursable under Medicare Part A or Part B. *See* 42 U.S.C. § 1395nn(h)(6).

69.     In pertinent part, the Stark Statute provides:

(a)     Prohibition of certain referrals
        (1) In general
        Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then –
        (A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
        (B)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

70.     Moreover, the Stark Statute provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). *See* 42 U.S.C. § 1395nn(g)(1). Numerous physician compensation arrangements orchestrated by Defendant SUTTER HEALTH violate the Stark Law in multiple ways as set forth below.

71.     "Financial relationship" includes a "compensation arrangement," which includes any arrangement involving any remuneration paid directly or indirectly to a referring physician. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

## STARK EXCEPTIONS

72.     The Stark Statute and companion regulations contain exceptions for certain compensation arrangements. These exceptions include, among others, "personal services arrangements," "fair market value arrangements," and "indirect compensation relationships."

73.     In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, inter alia, both of the following statutory requirements: (A) the compensation does not exceed fair market value ("FMV"), *and* (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute). *See* 42 U.S.C. § 1395nn(e)(3)(A)(v).

74.     A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or

limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

75.     To qualify for the Stark Statute's exception for FMV compensation, the arrangement must satisfy each of the following conditions: There must be an agreement in writing; the written agreement must set forth all services to be furnished;  all compensation must be set in advance and consistent with FMV;  the agreement must not take into consideration the volume or value of referrals or other business generated by the referring physician; and the agreement must not violate federal or state law. *See* 42 C.F.R. § 411.357(l).

76.     To qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source (*see* 42 C.F.R. § 411.354(c)(2)), there must be a written agreement, the compensation must be consistent with FMV, the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement cannot violate the Anti-Kickback Statute. *See* 42 C.F.R. § 411.357(p).

77.     The Stark Statute applies to claims for payment under Medicare and Medicaid. *See* 42 U.S.C. § 1396b(s).

## IX.     **FEDERAL ANTI-KICKBACK STATUTE**

78.      The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

(1) to refer an individual to a person for the furnishing of any item or service covered under a

federal health care program; or

COMPLAINT AND
DEMAND FOR JURY TRIAL

(2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item

covered under a federal health care program.

42 U.S.C. § 1320a-7b(b)(1)-(2). The term "any remuneration" encompasses any kickback, bribe, or

rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

79.     The AKS "address[es] Congress' concern that health care decision-making can be

unduly influenced by a profit motive." Medicare and Medicaid Programs; Physicians' Referrals to

Health Care Entities With Which They Have Financial Relationships, 63 Fed. Reg. 1659, 1662 (Jan.

9, 1998).

80.     Any claim submitted to Medicare or Medicaid for items or services resulting from a

violation of the AKS constitutes a "false or fraudulent claim" under the FCA.  Patient Protection and

Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 119 (2010), adding 42 U.S.C. §

1320a-7b(g); *see also McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260

(11th Cir. 2005).

81.     The AKS covers any arrangement where one purpose of the remuneration was to

obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871

F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988

(1985); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*,

132 F.3d 1092, 1094 (5th Cir. 1998).  The AKS is "violated, even if the payments were also intended

to compensate for professional services." *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011)

(quoting *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985)).

82.     The Patient Protection and Affordable Care Act of 2010 clarified the intent

requirement of the AKS by adding a provision stating that actual knowledge of an AKS violation or

the specific intent to commit a violation of the AKS is not necessary for conviction under the statute. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(2), 124 Stat. 119 (2010). The AKS now expressly provides: "With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C. § 1320a-7b(h).

83.    HHS has published safe harbor regulations that define practices not subject to the anti-kickback statute because such practices would be unlikely to result in fraud or abuse. *See* 42 C.F.R. §1001.952. The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

84.    The interplay between the AKS and the Stark Statute has been summarized as follows:

> Both the anti-kickback statute and [Stark] address Congress' concern that health care decisionmaking can be unduly influenced by a profit motive. When physicians have a financial incentive to refer, this incentive can affect utilization, patient choice, and competition. Physicians can overutilize by ordering items and services for patients that, absent a profit motive, they would not have ordered. A patient's choice can be affected when physicians steer patients to less convenient, lower quality, or more expensive providers of health care, just because the physicians are sharing profits with, or receiving remuneration from, the providers. And lastly, where referrals are controlled by those sharing profits or receiving remuneration, the medical marketplace suffers since new competitors can no longer win business with superior quality, service, or price. Although the purposes behind the anti-kickback statute and [Stark] are similar, it is important to analyze them separately. In other words, to operate lawfully under Medicare and Medicaid, one must comply with both statutes.

*Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998).

## X.   **THE FRAUD SCHEME**

85.    Beginning July 1, 2002 and continuing to the present, SUTTER HEALTH devised and implemented a scheme by which it:

> a.    entered into compensation arrangements with physicians in violation of the Stark Statute and the AKS, specifically by paying or providing unlawful kickbacks, excessive compensation, free employees and other illegal incentives to physicians who refer patients to SUTTER HEALTH in violation of federal law; and
>
> b.    submitted and/or caused others to submit false and fraudulent claims for payment to Medicare and Medicaid in violation of FCA, which included claims relating to inpatient and outpatient designated health services rendered to patients referred to SUTTER HEALTH by physicians who had improper financial relationships with Defendant violating the Stark Statute and the AKS.

### A.   **Sacramento Cardiovascular Surgeons Medical Group, Inc. ("SCSMG")**

86.    Beginning July 1, 2006, SUTTER HEALTH entered into a series of agreements with Defendant Sacramento Cardiovascular Surgeons Medical Group, Inc. ("SCSMG") that provided free physician assistants to and for the direct benefit of SCSMG, one purpose of which was to induce referrals from the SCSMG physicians for inpatient and outpatient hospital services at SUTTER HEALTH.  The current version of the agreement for physician assistants is attached as **Exhibit 1** (the "Physician Assistants Agreement").

87.     The Physician Assistants Agreement obligates SUTTER HEALTH to pay SCSMG for four physician assistants at the current rate of $170,000.00 per full time equivalent, or a total of $680,000.00 per year.  **Exhibit 1**, ¶1(a).  The compensation is payable in monthly installments of $56,666.66 each, subject to submission of monthly time reports.  **Exhibit 1**, ¶3(a).

88.     Physician assistants that were paid for by SUTTER HEALTH under the Physician Assistants Agreement include (without limitation):  Christopher J. Davis, Alan J. Fribourg, Mark B. Jones, and Teresa E. North (the "SCSMG Physician Assistants").

89.     The three physicians illegally benefiting from the payments made by SUTTER HEALTH under the Physician Assistants Agreement for the free physician assistants are:  Dr. Michael T. Ingram, Dr. Robert Kincade and Dr. James Longoria (the "SCSMG Physicians").

90.     The Physician Assistants Agreement expressly provides:

c.      **No Billing to Patients or Other Payors.** The parties anticipate that the services to be provided by the Assistants are not chargeable to patients or third party payors.  In the event Group and Hospital determine that some or all of Assistants services are billable to third party payors, the parties shall meet and confer as to what compensation adjustments may be warranted to assure that patients and/or third party payors are not billed for services that are paid for by Hospital pursuant to this Agreement.

**Exhibit 1**, ¶3(c).

91.     Despite the contractual provision to the contrary, SCSMG did in fact bill third party payers, including Medicare, for some of the SCSMG Physician Assistants' services, with the payments on such claims accruing to the benefit of SCSMG and thereby indirectly benefiting the SCSMG Physicians.  See **Exhibit 2** for 2012 Medicare payments for SCSMG Physician Assistants' services paid to SCSMG.

92.     SUTTER HEALTH intended to reward SCSMG for its high-volume referrals with the preferential Physician Assistants Agreement.

93.     Additionally, beginning October 1, 2006, SUTTER HEALTH entered into a series of three Medical Director Agreements with SCSMG that paid SCSMG up to a total of $318,264.00 annually for services allegedly performed by each of the SCSMG Physicians as the "Medical Director" of various services lines.

94.     Dr. Michael T. Ingram is the Medical Director of the Cardiac Intensive Care Unit and the Assistant Medical Director of the Sutter Heart Institute.  SUTTER HEALTH pays SCSMG for Dr. Ingram's services as Medical Director at the hourly rate of $330.55 for up to 120 hours per quarter, or a total of $158,664.00 per year.  **Exhibits 3-1 and 3-2**.  The compensation is payable in monthly installments, subject to submission of monthly time reports.  **Exhibit 3-2**, ¶3(a).

95.     Dr. Robert Kincade is the Medical Director of the Transplant Ventricular Assist Device Program.  SUTTER HEALTH pays SCSMG for Dr. Kincade's services as Medical Director at the hourly rate of $332.50 for up to 20 hours per month, or a total of $79,800.00 per year.  **Exhibit 4**.  The compensation is payable in monthly installments, subject to submission of monthly time reports.  **Exhibit 4**, ¶3(a).

96.     Dr. James Longoria is the Medical Director of the Surgical Ablation Program. SUTTER HEALTH pays SCSMG for Dr. Longoria's services as Medical Director at the hourly rate of $332.50 for up to 20 hours per month, or a total of $79,800.00 per year.  **Exhibit 5**.  The compensation is payable in monthly installments, subject to submission of monthly time reports. **Exhibit 5**, ¶3(a).

97.    SUTTER HEALTH intended to reward SCSMG for its high-volume referrals with the lucrative and duplicative Medical Director Agreements.

98.    Also, beginning July 1, 2008, SUTTER HEALTH entered into a series of Call Coverage Agreements with SCSMG that currently pays SCSMG up to a total of $912,500.00 annually.  The purpose of the Call Coverage Agreements is ostensibly to assure the availability of cardiovascular surgeons to provide emergency services on a 24-hour basis.  See **Exhibits 6-1, 6-2 and 6-3**.

99.    The rate for call coverage paid by SUTTER HEALTH to SCSMG jumped **more than 200 percent** from $1,140 per 24-hour shift in the 2008 Call Coverage Agreement (**Exhibit 6-1**) to $2,500 per 24-hour shift in the 2010 Call Coverage Agreement (**Exhibit 6-2**), and remained at $2,500 per 24-hour shift in the 2012 Call Coverage Agreement (**Exhibit 6-3**).  The rate of $2,500 per 24-hour shift exceeds fair market value and exceeds the rates paid by SUTTER HEALTH to other similar cardiovascular surgeons for call coverage during the same timeframes.

100.    Although not stated in the Call Coverage Agreements, SUTTER HEALTH pays call coverage for cardiovascular surgeons in the Sacramento area exclusively to SCSMG, to the exclusion of all other cardiovascular surgeons who are members of the medical staff at Sutter Memorial Center, Sacramento.  As a result, SUTTER HEALTH pays SCSMG at the rate of $2,500 per shift for all 365 days of the calendar year. See **Exhibit 7** for example of July 2013 call coverage payment.

101.    SUTTER HEALTH intends to reward SCSMG for its high-volume referrals with a preferential and above-market Call Coverage Agreement.

102.     The Call Coverage Agreement specifies that SCSMG Physicians may separately bill and collect charges for any professional services rendered, in addition to the $2,500 per shift. **Exhibit 6-3**, ¶1(h).  Essentially, SCSMG is being paid twice for professional services rendered under the Call Coverage Agreements.

103.     In addition to the compensation paid to SCSMG under the Physician Assistants Agreement, the Medical Director Agreements and the Call Coverage Agreement, SUTTER HEALTH pays SCSMG for medical services provided by SCSMG to patients pursuant to a Specialty Care Clinician Agreement for each of the SCSMG Physicians.  See **Exhibit 8** for example of Specialty Care Agreement for Dr. Michael T. Ingram.  Defendant Sutter Medical Foundation is the entity that actually bills Medicare for the services provided by the SCSMG Physicians.  Defendant Sutter Medical Foundation in turn contracts with various medical groups, including Defendant Sutter Independent Physicians, to obtain physician services.  SCSMG is a member of Defendant Sutter Independent Physicians and receives payments for patient care services through Defendant Sutter Medical Foundation and Sutter Independent Physicians.

104.     SUTTER HEALTH pays SCSMG for patient care services under the Specialty Care Clinician Agreement.  In addition, SUTTER HEALTH pays SCSMG the following compensation under current agreements:

### SCSMG Compensation – Excluding Patient Care Services

| Agreement | Total Annual Compensation |
|---|---|
| Physician Assistants Agreement | $  680,000.00 |
| Medical Director Agreements | 318,264.00 |

| Call Coverage Agreement | 912,500.00 |
|---|---|
| TOTAL ANNUAL COMPENSATION | **$1,910,764.00** |

105.   By stacking the Physician Assistants Agreement, Medical Director Agreements and Call Coverage Agreements with aggregate annual compensation exceeding $1.9 million (excluding patient care services performed by the SCSMG Physicians), SUTTER HEALTH created a financial relationship with the SCSMG Physicians that was commercially unreasonable, grossly in excess of fair market value, and a financial relationship that violates the Stark Statute because no exception applied.

### 1.   SUTTER HEALTH Knew the SCSMG Agreements Were Illegal.

106.   On November 7, 2013, Brooke Haynes, Contract Specialist in Accounts Payable, copied Relator, as Compliance Officer of Sutter Medical Center, Sacramento, on an e-mail sent to Vickie Sexton, who was the Administrative Assistant to Rick Harrell, the cardiovascular service line administrator for SUTTER HEALTH.  Ms. Haynes had questioned payments to SCSMG under the Physician Assistants Agreement because the SCSMG Physician Assistants had not documented the minimum number of hours required under the agreement, and payment would need to be adjusted for the hours actually documented instead of the full payment for each month in the quarter.  **Exhibit 9**.

107.   Rick Harrell, the cardiovascular service line administrator for SUTTER HEALTH, requested that the SCSMG Physician Assistants review and revise their timesheets for missing documentation of the services provided and resubmit the timesheets.  On November 25, 2013, Rick Harrell then sent the revised timesheets to the payment approvers in Accounts Payable for payment,

without involving Relator as Compliance Officer even though Relator had asked Rick Harrell to provide her with the revised timesheets before submitting them for payment.

108.    When Relator learned that the revised timesheets had been submitted to the payment approvers in Accounts Payable without her review, Relator requested copies of the revised timesheets for her review.  Therein, she discovered that the SCSMG Physician Assistants had billed more than 40 hours for 5 full weeks in each month.  She also discovered the timesheets had falsely recorded non-work items such as vacations as being time spent at work.  After review, Relator concluded that the timesheets contained false information that was not supported by accurate data. As a result of Relator's review of the timesheets and after discussion with her superiors, SUTTER HEALTH placed a hold on payments under the Physician Assistants Agreement beginning with the payment for the month of January 2014 pending further investigation.

109.    On February 14, 2014, Relator met with Rick Harrell to discuss her review of the resubmitted timesheets.  As a result of the meeting, Rick Harrell requested a third set of timesheets from the SCSMG Physician Assistants.  The third set of timesheets included estimates of additional duties and hours not historically recorded, such as patient rounding and pre/post procedure time. Relator questioned why payment for the claimed Physician Assistant's services were necessary as the services claimed by the SCSMG Physician Assistants appeared to be compensable duties and part of the surgical global fee paid to the surgeon.  Rick Harrell agreed with Relator that the Physician Assistants' services were compensable as part of the surgical global fee.  Nevertheless, SUTTER HEALTH resumed the $56,666.66 monthly payments to SCSMG under the Physician Assistants Agreement in April 2014.

110.    Relator continued to investigate the billing issues associated with the SCSMG Physician Assistants and discovered that SCSMG was able to bill third party payers, including Medicare, for services provided by the physician assistants.  In March and April 2014, Relator worked with Malcolm Macleod, a reimbursement manager at Defendant Sutter Medical Foundation, to prepare the spreadsheet (**Exhibit 2**) showing that SCSMG could in fact bill under Medicare rules for the work of physician assistants.  Relator presented the information about Medicare rules governing billing for physician assistants to her superiors at SUTTER HEALTH.

111.    On or about July 24, 2014, Rick Harrell queried the CMS Physician Payment Data for 2012 and confirmed that SCSMG had billed Medicare for services performed by the SCSMG Physician Assistants which SUTTER HEALTH funded, in breach of the Physician Assistant Agreement.  Rick Harrell reported this information to his superiors at SUTTER HEALTH. SUTTER HEALTH decided to issue another hold on further payments under the Physician Assistants Agreement pending further investigation.  Relator issued the payment hold on the Physician Assistants Agreement by e-mail on Monday, July 28, 2014 at 9:59 a.m.  **Exhibit 10**. SCSMG was being provided free employees and SCSMG was in fact billing Medicare for the Physician Assistant's services and retaining the payments.  This illegal benefit to SCSMG allowed them to profit from these services which were not connected to personally performed physician services.

112.    Relator also reviewed the timesheets supporting the payments to SCSMG under the Medical Director Agreements.  Relator found duplicative supervision of Dr. Daren Danielson, a Travis Air Force Base physician who is fully credentialed, and duplicative supervision of other ICU staff.  On June 19, 2014, after discussion with Relator's superiors at SUTTER HEALTH, Relator

34

issued a hold on further payments under the Medical Director Agreements pending further investigation. **Exhibit 11**.

        2.      **SUTTER HEALTH Knowingly Paid Kickbacks To Induce Referrals.**

113.    On Thursday, July 31, 2014, Dr. James Longoria called Carol Spangler, Assistant to Patrick Fry, the President and Chief Executive Officer of Sutter Health.  Dr. Longoria left a message with Ms. Spangler because Mr. Fry was not in the office.  Dr. Longoria threatened to shut down the Operating Rooms if the payment stop was not lifted.

114.    SUTTER HEALTH gave in to Dr. Longoria's threat.   Later on Thursday, July 31, 2014, SUTTER HEALTH made a knowing, willful and conscious decision to reissue the $56,666.66 payment for June 2014 to subsidize the SCSMG Physician Assistants who were billing third party payers, including Medicare, for the benefit of the referring SCSMG Physicians in breach of the Physician Assistants Agreement.  One purpose of reissuing the $56,666.66 payment to SCSMG for June 2014 was to continue to induce future referrals to SUTTER HEALTH operating rooms and to maintain the status quo of referrals from SCSMG.  .

115.    Eric Dalton, VP Finance of Sutter Shared Services, ordered Brooke Haynes in Accounts Payable to reissue the check due on the Physician Assistants Agreement and send it to SCSMG via Federal Express immediately.  SUTTER HEALTH sent the $56,666.66 check to SCSMG on July 31, 2014 under Federal Express Tracking Number 770738076893. **Exhibit 12**.

116.    Given that SUTTER HEALTH paid SCSMG to subsidize the SCSMG Physician Assistants, unrelated to the personally performed services of the SCSMG Physicians, SUTTER HEALTH could not reasonably have concluded that the payments under the Physician Assistants Agreement did not violate the Stark Statute. SUTTER HEALTH knew it was in violation of the

35

Stark Law and still knowingly made the payments to SCSMG and submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

117.    Based on the contractual and actual financial relationships between the SCSMG Physicians and SUTTER HEALTH, the Stark Statute was violated because SCSMG and the SCSMG Physicians had compensation arrangements with SUTTER HEALTH and none of the statutory or regulatory exceptions to the Stark Statute apply to the compensation arrangements.

118.    Given that SUTTER HEALTH paid SCSMG to subsidize the SCSMG Physician Assistants, one purpose of which was to induce future referrals to SUTTER HEALTH, SUTTER HEALTH could not reasonably have concluded that the payments under the Physician Assistants Agreement did not violate the AKS.  SUTTER HEALTH knew it was in violation of the AKS and still knowingly continued to submit tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

119.    Based on the contractual and actual financial relationships between the SCSMG Physicians and SUTTER HEALTH, the AKS was violated because SUTTER HEALTH paid, and SCSMG and the SCSMG Physicians received, remuneration to induce the SCSMG Physicians to refer patients, including Medicare and Medicaid patients, to SUTTER HEALTH for the furnishing of inpatient and outpatient hospital services covered by Medicare and Medicaid and none of the statutory or regulatory safe harbors to the AKS apply.

120.    **Exhibit 13** is a redacted sample of actual patients referred by SCSMG Physicians to SUTTER HEALTH for inpatient hospital services, some of which resulted in false claims for reimbursement made by SUTTER HEALTH to Medicare on prohibited referrals from the SCSMG Physicians.

B. **Dr. David K. Roberts**

121.     In addition to the cardiovascular medical directorships paid to the three SCSMG Physicians, SUTTER HEALTH also pays hundreds of thousands of dollars per year to a fourth cardiovascular surgeon, Dr. David K. Roberts.  SUTTER HEALTH pays Defendant Sutter Medical Foundation for Dr. Roberts' services as Regional Medical Director at the hourly rate of $270.00 for up to 121 hours per month, or a total of $392,040.00 per year.  **Exhibit 14**.  The compensation is payable in monthly installments, subject to submission of monthly time reports.  **Exhibit 14**, ¶3(a).

122.     Dr. Roberts' Medical Director Agreement specifies that Dr. Roberts and Defendant Sutter Medical Group shall not bill or assert any claim for payment against any patient or payer for services performed during the 121 hours per month that Physician is performing his medical directorship duties.  **Exhibit 14**, ¶3(c).  Nonetheless, Dr. Roberts maintains a very active medical practice in his limited spare time, and billed Medicare over $200,000 during the year 2012.

123.     SUTTER HEALTH intended to reward Dr. Roberts for his high-volume referrals with the lucrative and duplicative Regional Medical Director Agreement.

124.     By stacking four cardiovascular Medical Director Agreements (three with SCSMG Physicians and another with Dr. Roberts) with aggregate annual compensation for the four medical directorships exceeding $700,000 (excluding patient care services performed by the SCSMG Physicians and Dr. Roberts), SUTTER HEALTH created a financial relationship with Dr. Roberts that was commercially unreasonable, grossly in excess of fair market value, and violative of the Stark Statute because no exception applied.

125.     Based on the contractual and actual financial relationships between Defendant Sutter Medical Foundation on behalf of Dr. Roberts and SUTTER HEALTH, the Stark Statute was violated

because Dr. Roberts had a compensation arrangement with SUTTER HEALTH and none of the statutory or regulatory exceptions to the Stark Statute apply.

126.    Given that SUTTER HEALTH paid Dr. Roberts excessive amounts for his medical directorship, one purpose of which was to induce future referrals to SUTTER HEALTH operating rooms, SUTTER HEALTH could not reasonably have concluded that the payments under Dr. Roberts' Medical Director Agreement did not violate the AKS.  SUTTER HEALTH knew it was in violation of the AKS and still knowingly submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

127.    Based on the contractual and actual financial relationships between Dr. Roberts and SUTTER HEALTH, the AKS was violated because SUTTER HEALTH paid, and Defendant Sutter Medical Foundation and Dr. Roberts Physicians received, remuneration to induce Dr. Roberts to refer patients, including Medicare and Medicaid patients, to SUTTER HEALTH for the furnishing of inpatient and outpatient hospital services covered by Medicare and Medicaid and none of the statutory or regulatory safe harbors to the AKS apply.

**C.    East Bay Perinatal Medical Associates ("EBPMA")**

128.    SUTTER HEALTH perpetrates similar fraud schemes using stacked compensation and financial agreements that pay or provide unlawful kickbacks, excessive compensation, free employees, preferential medical directorship and call coverage arrangements, and other illegal incentives to physicians in the East Bay region to selectively reward high-volume referrers to SUTTER HEALTH.

129.    Beginning with the effective date of the merger of Alta Bates Medical Center and Summit Medical Center on or about July 1, 2002 and continuing through August 31, 2014, SUTTER

HEALTH entered into a series of agreements with Defendant East Bay Perinatal Medical Associates, Inc. ("EBPMA") that restrict patient choice and competition, and reward high-volume referrers with preferential medical directorships and call coverage agreements for the Women and Infants Service Programs, one purpose of which was to induce referrals from the EBPMA physicians for inpatient and outpatient hospital services at SUTTER HEALTH. The current version of the agreement for perinatal and obstetrical coverage and administrative services agreement is attached as **Exhibit 15** (the "Perinatal Coverage Agreement").

130.    The current version of the Perinatal Coverage Agreement obligates SUTTER HEALTH to pay EBPMA for the administrative services of Dr. Stuart M. Lovett as Medical Director, and an unnamed Chief Obstetrical Generalist to be appointed by Dr. Lovett, for a combined maximum of 131 hours per month at the rate of $150 per hour, or a total of $235,800.00 per year. **Exhibit 15**, ¶1.3, ¶3.1(d). The compensation is payable in monthly installments of $19,650.00 each, subject to submission of monthly time reports. **Exhibit 15**, ¶3(d).

131.    In addition to the compensation for administrative services, the current version of the Perinatal Coverage Agreement obligates SUTTER HEALTH to pay EBPMA an aggregate annual amount of **$6,412,561.32** for exclusive call coverage services encompassing all 24-hour periods for 365 days a year for OB Generalists, Perinatologists and Certified Nurse Midwives. **Exhibit 15**, ¶1.1, ¶3.1(a). The compensation is payable in monthly installments of $534,380.11 each, without any accounting of time reports documenting the call coverage services actually rendered. **Exhibit 15**, ¶3(a). Moreover, SUTTER HEALTH agrees to pay EBPMA additional compensation for additional coverage services due to a strike or *force majeure* at the rate of $150 per hour for each OB Generalist and $72 per hour for each Certified Nurse Midwife. **Exhibit 15**, ¶1.2, ¶3.1(c).

132.     SUTTER HEALTH has paid EBPMA for both administrative fees and call coverage fees under the Perinatal Coverage Agreements since July 1, 2002.  The contractual amounts payable have varied over the years as follows:

**EBPMA Compensation – Perinatal Coverage Agreement (Excl. Patient Care Services)**

| **Perinatal Coverage Agreement** | **Medical Directorships** | **Call Coverage** | **Total Annual Compensation** |
|---|---|---|---|
| Effective July 1, 2002 | $  429,000.00 | $4,496,000.00 | **$4,925,000.00** |
| Effective August 28, 2007 | $  144,000.00 | $4,345,000.00 | **$4,489,000.00** |
| Effective December 4, 2009 | $  234,915.00 | $5,165,085.00 | **$5,400,000.00** |
| Effective June 1, 2014 | $  235,800.00 | $6,412,561.32 | **$6,648,361.32** |

**Exhibits 16-1, 16-2, 16-3 and 15**.

133.     Each version of the Perinatal Coverage Agreements allowed EBPMA to separately bill patients and their insurers for all professional fees rendered by on-call physicians and other covering providers.  For example, see **Exhibit 15**, ¶3.2(b).  EBPMA did in fact receive all professional fees rendered by on-call physicians and other covering providers, in addition to the millions paid annually by SUTTER HEALTH for administrative services and call coverage under the Perinatal Coverage Agreements.

134.     In August 2007, SUTTER HEALTH acquired the assets of East Bay Perinatal Center from EBPMA.  SUTTER HEALTH placed the acquired assets in a separate non-profit, tax-exempt corporation which was renamed East Bay Perinatal Center.  East Bay Perinatal Center operated a

community clinic specializing in maternal-fetal medicine in Oakland, California that served predominantly Medi-Cal patients (the "Clinic").

135.     Simultaneously with the acquisition of East Bay Perinatal Center effective August 28, 2007, SUTTER HEALTH caused East Bay Perinatal Center to enter into an exclusive Professional Services Agreement with EBPMA.  See **Exhibit 17-1**.  Under the Professional Services Agreement, SUTTER HEALTH pays EBPMA for the services of Dr. Stuart M. Lovett as Medical Director of the Clinic at the hourly rate of $150.00 for up to 20 hours per quarter, or a total of $36,000.00 per year. **Exhibit 17-1** (Exhibit 6.2, ¶3).  In addition, SUTTER HEALTH pays EBPMA for patient care services based on Medicare rates for Work Relative Value Units, a method that ensures EBPMA is paid for all patient care services regardless of the patient's ability to pay.  **Exhibit 17-1** (Exhibit 6.2, ¶2).  SUTTER HEALTH caused Sutter East Bay Hospitals to subsidize East Bay Perinatal Center so that EBPMA received full compensation for all services rendered in the Clinic.

136.     The Professional Services Agreement granted EBPMA the <u>exclusive</u> right to provide physician staffing to the Clinic:

IV     EXCLUSIVITY AND COMPETITION

4.1     **Exclusivity in Physician Staffing of the Clinic.**  So long as the Clinic's physician staffing needs are met in compliance with this Agreement, MEDICAL GROUP shall be the sole provider of physician services at the Clinic.  ABSPC may participate, and may require MEDICAL GROUP to participate (solely with respect to services delivered at the Clinic), in shared risk contracting arrangements with one or more Independent Practice Associations, as deemed necessary to effectively and efficiently participate in Sutter Health's system-wide or regional managed care contracting arrangements with third-party payors.

**Exhibit 17-1, ¶4.1**.

137.     SUTTER HEALTH intended to reward EBPMA for its high-volume referrals with the exclusive Professional Services Agreement.

41

138.    SUTTER HEALTH last renewed the Professional Services Agreement effective July 1, 2014. **Exhibit 17-2**.  The physician comprising EBPMA as of July 1, 2014 are Dr. Stuart Lovett, Dr. Jonathan Weiss, Dr. Ralph DePalma, Dr. David Marinoff, Dr. Janet Goldman and Dr. Leon Richmond (the "EBPMA Physicians").  **Exhibit 17-2**, (Exhibit 1.3(i)).

139.    In 2008, the first full calendar year of the Professional Services Agreement, SUTTER HEALTH (through East Bay Perinatal Clinic) paid EBPMA a total of $1,336,395, and SUTTER HEALTH (through Sutter East Bay Hospitals) paid EBPMA another $6,000,322.  In 2008, SUTTER HEALTH paid EBPMA a grand total of **$7,336,717**.

140.    Incredibly, EBPMA thought $7.3 million per year was not enough and in 2008 EBPMA requested even more funding from SUTTER HEALTH.   A SUTTER HEALTH memorandum dated August 19, 2008, reports that "EBPMA believes that the agreements do not adequately compensate them for their cost or the needs of the partners."  **Exhibit 18**.

141.    The same August 19, 2008 memorandum shows that SUTTER HEALTH intended to induce referrals when it later acquiesced to EBPMA's demands for increased compensation: "EBPMA has also been a valuable partner to [Alta Bates Summit Medical Center] in expanding its high risk consulting practice to areas outside the primary footprint of [Alta Bates Summit Medical Center], into the San Ramon, Martinez, Fremont and other geographical areas."  **Exhibit 18**.

142.    SUTTER HEALTH bowed to EBPMA's monetary demands and increased the total compensation payable to EBPMA under the Perinatal Coverage Agreement effective December 4, 2009 by $911,000.00 per year, from $4,489,000.00 under the August 28, 2007 version to $5,400,000.00 under the December 4, 2009 version.

143.     The Perinatal Coverage Agreements specified that EBPMA compensation would vary if monthly delivery volume substantially increases or decreases from a baseline average.  The baseline average in the August 28, 2007 version was 273 deliveries per month.  **Exhibit 16-2**, ¶2.2(d)(5).  The baseline average in the December 4, 2009 version was 300 deliveries per month.  **Exhibit 16-3**, ¶2.2.4(f).  Thus, the higher compensation paid by SUTTER HEALTH to EBPMA under the December 4, 2009 version of the Perinatal Coverage Agreement expressly and unequivocally varied with the volume of referrals for deliveries at SUTTER HEALTH's Alta Bates Summit Medical Center.

144.     SUTTER HEALTH intentionally rewarded EBPMA for its high-volume referrals by adding $911,000.00 in annual compensation under the December 4, 2009 version of the Perinatal Coverage Agreement (**Exhibit 16-3**), and by adding $1,248,361.32 under the June 1, 2014 version of the Perinatal Coverage Agreement (**Exhibit 15**).

145.     By stacking the preferential Perinatal Coverage Agreement with Sutter East Bay Hospitals, the exclusive Professional Services Agreement with East Bay Perinatal Center, and other contractual arrangements directly or indirectly benefiting EBPMA or the EBPMA physicians, with aggregate annual compensation exceeding $7 million per year, SUTTER HEALTH created a financial relationship with the EBPMA Physicians that was commercially unreasonable, grossly in excess of fair market value, and a financial relationship that violates the Stark law because no exception applied.

146.     Given that SUTTER HEALTH paid EBPMA excessive amounts under the Perinatal Coverage Agreements that intentionally increased with the volume of referrals from EBPMA Physicians, SUTTER HEALTH could not reasonably have concluded that the payments under the

43

Perinatal Coverage Agreements did not violate the Stark Statute. SUTTER HEALTH knew it was in violation of the Stark Law and still knowingly made the payments to EBPMA and submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

147.   Based on the contractual and actual financial relationships between the EBPMA Physicians and SUTTER HEALTH, the Stark Statute was violated because EBPMA and the EBPMA Physicians had compensation arrangements with SUTTER HEALTH and none of the statutory or regulatory exceptions to the Stark Statute apply.

148.   Given that SUTTER HEALTH increased the compensation payable EBPMA under the Perinatal Coverage Agreement effective December 4, 2009 by $911,000.00 in response to EBPMA's demands, and one purpose of such increase was to reward and induce referrals of deliveries to SUTTER HEALTH's Alta Bates Summit Medical Center and the resulting Medicaid-covered inpatient hospital services, SUTTER HEALTH could not reasonably have concluded that the payments under the Perinatal Coverage Agreements did not violate the AKS.  SUTTER HEALTH knew it was in violation of the AKS and still knowingly submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

149.   Based on the contractual and actual financial relationships between the EBPMA Physicians and SUTTER HEALTH, the AKS was violated because SUTTER HEALTH paid, and EBPMA and the EBPMA Physicians received remuneration, to induce the EBPMA Physicians to refer patients, including Medicare and Medicaid patients, to SUTTER HEALTH hospitals for the furnishing of inpatient and outpatient hospital services covered by Medicare and Medicaid and none of the statutory or regulatory safe harbors to the AKS apply.

D.   **East Bay Cardiac Surgery Center Medical Group ("EBCSCMG")**

150.    SUTTER HEALTH similarly used preferential agreements with its cardiac surgeons in the East Bay region to pay or provide unlawful kickbacks, excessive compensation, preferential medical directorships and call coverage arrangements, and other illegal incentives to restrict patient choice and competition and to selectively reward high-volume referrers.

151.    From June 1, 2007 and continuing through August 31, 2014, SUTTER HEALTH entered into a series of Administrative and Coverage Agreements ("Coverage Agreements") with Defendant East Bay Cardiac Surgery Center Medical Group ("EBCSCMG").   The Coverage Agreement effective June 1, 2007 obligated SUTTER HEALTH to pay EBCSCMG an annual amount of $15,000.00 for a medical directorship and administrative services, plus a flat annual amount of $485,000.00 for 24-hour, 365 days a year call coverage and for an unspecified number of hours performing data collection services, for a grand total of $500,000.00 per year.   **Exhibit 19-1**, ¶¶3.1 and 3.2.  The Coverage Agreement effective February 4, 2009 obligated SUTTER HEALTH to pay EBCSCMG a flat annual amount of $1,000,000.00 for administrative services, call coverage and data collection services, without specifically identifying the time required to perform the purported data collection services.   **Exhibit 19-2**, ¶3.2.  The net effect was to literally double the payments to EBCSCMG from $500,000 to $1,000,000 per year.

152.    SUTTER HEALTH intended to reward EBCSCMG for its high-volume referrals by adding $500,000.00 in annual compensation under the February 4, 2009 version of the Coverage Agreement (**Exhibit 19-2**), SUTTER HEALTH knew that EBCSCMG was not performing additional services to justify the exorbitant increase.

153.    SUTTER HEALTH knew it was paying illegal compensation to EBCSCMG and tried to conceal the illegal scheme in later versions of the Coverage Agreement.  The current version of

45

the Coverage Agreement between Sutter East Bay Hospitals and EBCSCMG is attached as **Exhibit 19-3**. The current agreement stacks compensation for administrative services ($108,000.00), coverage and indigent care services ($862,000.00) and data collection services ($385,000.00 - $1,100 per case up to 350 cases per year), for a grand total of $1,355,000.00 per year. The physicians named to serve as Medical Director under the each version of the Coverage Agreement are Dr. Junaid H. Khan and Dr. Russell D. Stanten (the "EBCSCMG Physicians").

154.    In addition to the Coverage Agreements with Defendant Sutter East Bay Hospitals, SUTTER HEALTH pays the EBCSCMG Physicians for call coverage at Eden Medical Center in Castro Valley at the rate of $850 per shift through Defendant Sutter Medical Center, Castro Valley d/b/a Eden Medical Center.

155.    Even after attempting to conceal some of the additional compensation as "data collection services," SUTTER HEALTH and EBCSCMG admitted that EBCSCMG was not fully performing the data collection services for which SUTTER HEALTH allegedly paid EBCSCMG under the revised Coverage Agreement. Rather than immediately recovering the overpayments from EBCSCMG which should not have been paid under the revised Coverage Agreement, SUTTER HEALTH waived and abandoned its contractual right to collect the overpayment from EBCSCMG within thirty days. In fact, SUTTER HEALTH allowed EBCSCMG to be paid for over four months with the benefit of the additional compensation payable for purported data collection services under the current February 1, 2014 version of the Coverage Agreement. See **Exhibit 19.4**.

156.    SUTTER HEALTH intended to reward EBCSCMG for its high-volume referrals by adding more compensation under the February 1, 2014 version of the Coverage Agreement (**Exhibit**

**19-3**), and knew that EBCSCMG was not performing data collection services to justify the compensation for data collection services.

157.     By stacking compensation for administrative services, call coverage and data collection services in the Coverage Agreements with EBCSCMG, with aggregate annual compensation exceeding $1 million per year, SUTTER HEALTH created a financial relationship with the EBCSCMG Physicians that was commercially unreasonable, grossly in excess of fair market value, and a financial relationship that violates the Stark law because no exception applied.

158.     Given that SUTTER HEALTH knowingly paid EBCSCMG excessive amounts under the Coverage Agreements that included compensation for purported data collection services that were not performed, SUTTER HEALTH could not reasonably have concluded that the payments under the Coverage Agreements did not violate the Stark Statute. SUTTER HEALTH knew it was in violation of the Stark Law and still knowingly made the payments to EBCSCMG and submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

159.     Based on the contractual and actual financial relationships between the EBCSCMG Physicians and SUTTER HEALTH, the Stark Statute was violated because EBCSCMG and the EBCSCMG Physicians had compensation arrangements with SUTTER HEALTH and none of the statutory or regulatory exceptions to the Stark Statute apply.

160.     Given that SUTTER HEALTH increased the compensation payable EBCSCMG under the Coverage Agreement effective February 4, 2009 by $500,000.00 and knowingly paid EBCSCMG under the Coverage Agreements for services that were not performed, and one purpose of such payments was to reward and induce referrals of patients by EBCSCMG Physicians to SUTTER HEALTH's Alta Bates Summit Medical Center for inpatient and outpatient hospital

services covered by Medicare and Medicaid,  SUTTER HEALTH could not reasonably have concluded that the payments under the Coverage Agreements did not violate the AKS.  SUTTER HEALTH knew it was in violation of the AKS and still knowingly submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

161.    Based on the contractual and actual financial relationships between the EBCSCMG Physicians and SUTTER HEALTH, the AKS was violated because SUTTER HEALTH paid, and EBCSCMG and the EBCSCMG Physicians received remuneration, to induce the EBCSCMG Physicians to refer patients, including Medicare and Medicaid patients, to SUTTER HEALTH hospitals for the furnishing of inpatient and outpatient hospital services covered by Medicare and Medicaid and none of the statutory or regulatory safe harbors to the AKS apply.

**E.      Bay Area Surgical Specialists f/k/a East Bay Vascular Group ("BASS")**

162.    SUTTER HEALTH used preferential agreements with its vascular and thoracic surgeons in the East Bay region to pay or provide unlawful kickbacks, excessive compensation, preferential medical directorships and call coverage arrangements, and other illegal incentives to restrict patient choice and competition, and to selectively reward high-volume referrers.

163.    SUTTER HEALTH entered into multiple medical directorship and call coverage agreements with Defendant East Bay Surgical Specialists, Inc., A Medical Corporation f/k/a East Bay Vascular Group ("BASS"), including a Call Coverage Agreement for Vascular Surgery at Alta Bates Summit Medical Center (**Exhibit 20-1**) and a Call Coverage Agreement for Thoracic Surgery at Eden Medical Center (**Exhibit 20-2**) (the "BASS Call Coverage Agreements").  The BASS Call Coverage Agreements obligated SUTTER HEALTH to pay BASS call coverage at the rate of $650 per shift for vascular surgery coverage at each of the two Alta Bates Summit Medical Center

48

campuses, and at the rate of $850 per shift for thoracic surgery coverage for both of the campuses at Castro Valley and San Leandro.  **Exhibit 20-1**, ¶3(a); **Exhibit 20-2**, ¶3(a).

164.    Both of the BASS Call Coverage Agreements ensure the physicians serve as on-call physicians pursuant to a rotation on-call schedule established and amended from time to time by the hospital.  **Exhibit 20-1**, ¶1(a); **Exhibit 20-2**, ¶1(a).  Both of the BASS Call Coverage Agreements provide that BASS will separately bill and collect charges for any professional fees rendered during the coverage shifts.  **Exhibit 20-1**, ¶1(j); **Exhibit 20-2**, ¶1(l).

165.    In actual practice, Alta Bates Summit Medical Center rewards BASS for its high volume referrals with the preferential right to cover all shifts during the year for both hospital campuses.  For example, for the month of March 2014, SUTTER HEALTH paid BASS a total of $40,300.00, which included 31 shifts at the Alta Bates campus at $650 per shift, and 31 shifts at the Summit campus at $650 per shift.  **Exhibit 21-1**. Over a full year, SUTTER HEALTH pays BASS a total of $474,500.00 ($650 x 2 x 365 days) for vascular surgery call coverage.

166.    The BASS physicians appearing on the March 2014 call coverage report for Alta Bates Summit Medical Center are:  Dr. Rajiv Nagesetty, Dr. Fernando R. Otero, Dr. John D. Bry, Dr. Gonzalo P. Obnial and Dr. Keshav K. Pandurangi (the "BASS Vascular Surgeons").  Dr. Rajiv Nagesetty was far-and-away the highest-billing vascular surgeon in the entire State of California for 2012 with Medicare billings of **$4,176,471.06**.  Dr. Nagesetty and BASS referred hundreds of Medicare patients each year to SUTTER HEALTH hospitals for inpatient and outpatient hospital services relating to expensive cardiovascular procedures.

167.     SUTTER HEALTH intended to reward BASS and the BASS Vascular Physicians for their high-volume referrals with the preferred vascular surgery call coverage arrangement for the two campuses of Alta Bates Summit Medical Center.

168.     At Eden Medical Center in Castro Valley, the thoracic surgery call coverage is shared between two medical groups:  (1) BASS, the sole provider of vascular surgery call coverage at Alta Bates Summit Medical Center; and (2) EBCSCMG, the sole provider of cardiac surgery call coverage Alta Bates Summit Medical Center.  For example, for the month of June 2014, SUTTER HEALTH paid BASS a total of $11,900.00, which included 14 shifts at $850 per shift, and SUTTER HEALTH paid EBCSCMG a total of $13,600.00, which included 16 shifts at $850 per shift. **Exhibit 21-2**.

169.     The BASS physicians appearing on the June 2014 call coverage report for Eden Medical Center are Dr. Michaela Straznicka, Dr. Wilson Tsai and Dr. Saurin Shah (the "BASS Thoracic Surgeons").  The EBCSCMG physicians appearing on the June 2014 call coverage report for Eden Medical Center are Dr. Junaid H. Khan and Dr. Russell D. Stanten, the same two physicians that SUTTER HEALTH richly compensates for supposedly providing cardiac surgery call coverage at Alta Bates Summit Medical Center every single day of the year.  See Complaint ¶¶151-154 above.  SUTTER HEALTH was double paying the same EBCSCMG Physicians for call coverage.

170.     SUTTER HEALTH intended to reward BASS, the BASS Thoracic Physicians, EBCSCMG and the EBCSCMG Physicians for their high-volume referrals with the preferred thoracic surgery call coverage arrangement for Eden Medical Center.

50

171.    By stacking compensation for vascular and thoracic surgery call coverage at Eden Medical Center with the various preferential agreements and compensation schemes at Alta Bates Summit Medical Center, SUTTER HEALTH created a financial relationship with the BASS Vascular Physicians and the BASS Thoracic Physicians and that was commercially unreasonable, grossly in excess of fair market value, and a financial relationship that violates the Stark law because no exception applied.

172.    Given that SUTTER HEALTH knowingly paid BASS excessive amounts under the preferential BASS Coverage Agreements that included vascular surgery call coverage for all 365 days of the year, SUTTER HEALTH could not reasonably have concluded that the payments under the BASS Coverage Agreements did not violate the Stark Statute. SUTTER HEALTH knew it was in violation of the Stark Law and still knowingly made the payments to BASS and submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

173.    Based on the contractual and actual financial relationships between the BASS Vascular Physicians, the BASS Thoracic Physicians and SUTTER HEALTH, the Stark Statute was violated because BASS, the BASS Vascular Physicians and the BASS Thoracic Physicians had compensation arrangements with SUTTER HEALTH and none of the statutory or regulatory exceptions to the Stark Statute apply.

174.    Given that SUTTER HEALTH knowingly assigned vascular and thoracic call coverage to BASS and EBCSCMG on a preferential basis and paid BASS and EBCSCMG based on such assignments, and one purpose of such preferential assignments and payments was to reward and induce referrals of patients by BASS Vascular Physicians, BASS Thoracic Physicians and EBCSCMG Physicians to SUTTER HEALTH's Alta Bates Summit Medical Center and Eden

51

Medical Center for inpatient and outpatient hospital services covered by Medicare and Medicaid, SUTTER HEALTH could not reasonably have concluded that the payments under the BASS Coverage Agreements did not violate the AKS.  SUTTER HEALTH knew it was in violation of the AKS and still knowingly submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

175.    Based on the contractual and actual financial relationships between the BASS Vascular Physicians, the BASS Thoracic Physicians and SUTTER HEALTH, the AKS was violated because SUTTER HEALTH paid, and BASS, the BASS Vascular Physicians and the BASS Thoracic Physicians received remuneration, to induce the BASS Vascular Physicians and the BASS Thoracic Physicians to refer patients, including Medicare and Medicaid patients, to SUTTER HEALTH hospitals for the furnishing of inpatient and outpatient hospital services covered by Medicare and Medicaid and none of the statutory or regulatory safe harbors to the AKS apply.

**F.      Dr. Stephen K. Liu**

176.    SUTTER HEALTH used preferential agreements with its physicians in the Central Valley region to pay or provide unlawful kickbacks, excessive compensation, preferential medical directorships and call coverage arrangements, and other illegal incentives to restrict patient choice and competition, and selectively reward high-volume referrers.

177.    Beginning September 1, 2008, SUTTER HEALTH entered into a series of <u>exclusive</u> call coverage agreements for with Defendant Stephen K. Liu, M.D., Professional Corporation ("Liu MD PC") for Interventional Radiology at Memorial Medical Center in Modesto, California.  **Exhibit 22-1** (the "Liu Call Coverage Agreement").  The initial Liu Call Coverage Agreement expressly provided that Liu MD PC "shall be the exclusive provider of the specific interventional radiology

52

Services set forth at Exhibit A, attached hereto," and Liu MD PC shall provide coverage services "on a twenty-four (24) hour basis every day of the calendar year." **Exhibit 22-1**, ¶1(a) and (b). Initially, the call coverage rate was $500 per shift. **Exhibit 22-1**, ¶3(a).

178.    SUTTER HEALTH has since **quadrupled** the call coverage compensation from $500 to $2,000 per shift in the current version of the Liu Call Coverage Agreement effective April 4, 2014. **Exhibit 22-2**, ¶3(a).

179.    The Liu Call Coverage Agreement provides that Liu MD PC will separately bill and collect charges for any professional fees rendered during the coverage shifts. **Exhibit 22-1**, ¶3(b); **Exhibit 22-2**, ¶1(q).

180.    Under the Liu Call Coverage Agreement, Memorial Medical Center rewards Liu MD PC and Dr. Stephen Liu individually for his high volume referrals with the exclusive right to cover all shifts for every day of the calendar year.  For example, for the month of March 2014, SUTTER HEALTH paid Liu MD PC a total of $37,200.00, which included all 31 shifts of the month at the Memorial Medical Center at $1,200 per shift. **Exhibit 23**.  Over a full year at the rate of $1,200 per shift, SUTTER HEALTH paid Liu MD PC a total of $438,000.00 ($1,200 x 365 days) for interventional radiology call coverage.

181.    Dr. Stephen Liu was far-and-away the highest-billing diagnostic radiologist in the entire State of California for 2012 with Medicare billings of **$4,604,464.10**.  Dr. Liu and Liu MD PC referred hundreds of Medicare patients each year to SUTTER HEALTH hospitals for inpatient and outpatient hospital services relating to expensive cardiovascular procedures.

182.    SUTTER HEALTH intended to reward Liu MD PC and Dr. Liu individually for their high-volume referrals with the exclusive interventional radiology call coverage arrangement for Memorial Medical Center.

183.    By providing Liu MD PC with preferential call coverage assignments and payments for all 365 days of the year, SUTTER HEALTH created a financial relationship with Liu MD PC and Dr. Stephen Liu individually that was commercially unreasonable, grossly in excess of fair market value, and a financial relationship that violates the Stark law because no exception applied.

184.    Given that SUTTER HEALTH knowingly paid Liu MD PC excessive amounts under the preferential Liu Coverage Agreement that included interventional radiology call coverage for all 365 days of the year, SUTTER HEALTH could not reasonably have concluded that the payments under the Liu Coverage Agreement did not violate the Stark Statute. SUTTER HEALTH knew it was in violation of the Stark Law and still knowingly made the payments to Liu MD PC and submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

185.    Based on the contractual and actual financial relationships between Dr. Stephen Liu and SUTTER HEALTH, the Stark Statute was violated because Liu MD PC and Dr. Stephen Liu individually had compensation arrangements with SUTTER HEALTH and none of the statutory or regulatory exceptions to the Stark Statute apply.

186.    Given that SUTTER HEALTH knowingly assigned interventional radiology call coverage to Liu MD PC on a preferential basis and paid Liu MD PC based on such assignments, and one purpose of such preferential assignments and payments was to reward and induce referrals of patients by Dr. Stephen Liu to SUTTER HEALTH's Memorial Medical Center for inpatient and

outpatient hospital services covered by Medicare and Medicaid,  SUTTER HEALTH could not reasonably have concluded that the payments under the Liu Coverage Agreements did not violate the AKS.  SUTTER HEALTH knew it was in violation of the AKS and still knowingly submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

187.    Based on the contractual and actual financial relationships between Dr. Stephen Liu and SUTTER HEALTH, the AKS was violated because SUTTER HEALTH paid, and Liu MD PC and Dr. Stephen Liu individually received remuneration, to induce Dr. Liu to refer patients, including Medicare and Medicaid patients, to SUTTER HEALTH hospitals for the furnishing of inpatient and outpatient hospital services covered by Medicare and Medicaid and none of the statutory or regulatory safe harbors to the AKS apply.

### G.    California Emergency Physicians Medical Group, A Professional Corporation f/k/a/ Sutter Emergency Medical Associates ("CEPMG")

188.    Beginning February 1, 2008, SUTTER HEALTH entered into a series of agreements with Defendant California Emergency Physicians Medical Group f/k/a Sutter Emergency Medical Associates ("CEPMG") for emergency department coverage services at Memorial Hospital Los Banos that provided compensation for CEPMG's mid-level practitioners to and for the direct benefit of CEPMG, one purpose of which was to induce referrals from the CEPMG physicians for inpatient and outpatient hospital services at SUTTER HEALTH.  The current version of the agreement for emergency department coverage services is attached as **Exhibit 24** (the "ED Coverage Agreement").

189.    The ED Coverage Agreement obligates SUTTER HEALTH to pay for CEPMG for its Mid-Level Practitioners (defined to include Physician Assistants and Nurse Practitioners) working in the Emergency Department at Memorial Hospital Los Banos at the rate of $60.33 per hour.  **Exhibit**

**24**, ¶3.1(c).  The ED Coverage Agreement allowed CEPMG to bill and collect all charges for the professional component of medical services delivered to all patients by CEPMG, including services delivered by the Mid-Level Practitioners funded by SUTTER HEALTH.  **Exhibit 24**, ¶3.2(b).  The payment for Mid-Level Practitioners varied with the volume and value of inpatient hospital services referred by the CEPMG Physicians to the CEPMG Mid-Level Practitioners.  The revenues and profits made by CEPMG rise directly in correlation to the referrals made by CEPMG physicians to the Mid-Level Practitioners.

190.    Mid-Level Practitioners that were paid for by SUTTER HEALTH under the ED Coverage Agreement include (without limitation):  Lani Antonio, Alysee Michalosky, David Belshaw, Philip Sampson and Elmer Santos (the "CEPMG Mid-Level Practitioners").

191.    Physicians that provided services under the ED Coverage Agreement and that illegally benefited from the payments made by SUTTER HEALTH for Mid-Level Practitioners under the ED Coverage include (without limitation): Dr. Joseph Chiang, Dr. Henry W. Turkel, Dr. Byron F. Carcelen and Dr. Philip Silverstein (the "CEPMG Physicians").

192.    In addition to the payments for Mid-Level Practitioners, the ED Coverage Agreement expressly obligated SUTTER HEALTH to pay CEPMG $12,000.00 per year for Medical Director administrative duties and a "Disproportionate Share Subsidy" of $300,000.00 per year.  **Exhibit 24**, ¶3.1(a) and (b).  The purpose of the Disproportionate Share Subsidy was supposedly "to compensate Group fairly for its treatment of a disproportionate number of Hospital patients who either lack a third-party payment source or whose third-party payor reimbursement is insufficient to cover Group's costs of providing services hereunder."  **Exhibit 24**, ¶3.1(b).  It is important to note that the

56

ED Coverage Agreement provided for no accounting of the actual number of indigent patients seen by the CEPMG Physicians.

193.    The ED Coverage Agreement restricted competition and patient choice: "no Physician assigned to provide services to Hospital shall also be assigned at any time throughout this Agreement to provide services to Doctors Medical Center in Modesto, California." **Exhibit 24**, ¶1.1. Doctors Medical Center is a 394-bed hospital in Modesto which competes with SUTTER HEALTH's Memorial Medical Center, also located in Modesto.  Thus, one purpose of the various compensation arrangements under the ED Coverage Agreement was to restrict competition and induce CEPMG Physicians to refer patients exclusively to SUTTER HEALTH.

194.    SUTTER HEALTH also has similar emergency room coverage agreements with CEPMG for its hospitals located in Roseville, Antioch, Sacramento, Auburn and Davis, California.

195.    By stacking compensation for Mid-Level Practitioners, Medical Director administrative services and the $300,000.00 annual Disproportionate Share Subsidy (excluding patient care services performed by the CEPMG) for Memorial Hospital Los Banos, and entering similar agreements for emergency room coverage for its hospitals in Roseville, Antioch, Sacramento, Auburn and Davis, California, SUTTER HEALTH created a financial relationship with the CEPMG that was commercially unreasonable, in excess of fair market value, varied with volume and value of referrals, and a financial relationship that violates the Stark law because no exception applied.

196.    Given that SUTTER HEALTH knowingly paid CEPMG excessive amounts under the preferential ED Coverage Agreement that included payment for Mid-Level Practitioners that varied with volume and value of referrals, SUTTER HEALTH could not reasonably have concluded that the payments under the ED Coverage Agreement did not violate the Stark Statute. SUTTER

HEALTH knew it was in violation of the Stark Law and still knowingly made the payments to CEPMG and submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

197.    Based on the contractual and actual financial relationships between CEPMG and SUTTER HEALTH, the Stark Statute was violated because CEPMG had compensation arrangements with SUTTER HEALTH and none of the statutory or regulatory exceptions to the Stark Statute apply.

198.    Given that SUTTER HEALTH knowingly paid for Mid-Level Practitioners and provided other compensation under the ED Coverage Agreement, and one purpose of such compensation was to restrict competition and induce referrals of patients by CEPMG Physicians to Memorial Hospital Los Banos, instead of Doctors Memorial Hospital in Modesto, for inpatient and outpatient hospital services covered by Medicare and Medicaid,  SUTTER HEALTH could not reasonably have concluded that the payments under the ED Coverage Agreements did not violate the AKS.  SUTTER HEALTH knew it was in violation of the AKS and still knowingly submitted tainted illegal claims for reimbursement to the Government in violation of the FCA and CFCA.

199.    Based on the contractual and actual financial relationships between CEPMG and SUTTER HEALTH, the AKS was violated because SUTTER HEALTH paid, and CEPMG received remuneration, to induce CEPMG Physicians to refer patients, including Medicare and Medicaid patients, to SUTTER HEALTH hospitals for the furnishing of inpatient and outpatient hospital services covered by Medicare and Medicaid and none of the statutory or regulatory safe harbors to the AKS apply.

## XI.    FALSE CLAIMS AND FRAUDULENT CLAIMS AND STATEMENTS

200.     The physicians with whom SUTTER HEALTH entered into financial relationships specified in paragraphs 85-199, above, referred patients, including Medicare and Medicaid patients, to SUTTER HEALTH in violation of the Stark Statute.

201.     SUTTER HEALTH, in turn, presented, or caused to be presented through the fiscal intermediary and MAC, claims for payment to the Medicare program for designated health services provided to patients of the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 85-199.

202.     SUTTER HEALTH also presented, or caused to be presented through the State of California's DHCS, claims for payment to the Medicaid program for designated health services provided to patients of the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 85-199.  SUTTER HEALTH thereby obtained payments from the United States and the State of California in violation of the Stark Statute.

203.     Under the FCA (31 U.S.C. § 3729(a)(1), now 31 U.S.C. § 3729 (a)(1)(A)) and the CFCA (Cal. Gov't Code § 12651(a)(1)), the claims submitted by SUTTER HEALTH in paragraphs 85-199 above were false and/or fraudulent because SUTTER HEALTH was prohibited by the Stark Statute from obtaining payment from the United States and the State of California upon claims for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships.

204.     Under the AKS (42 U.S.C. § 1320a-7b(g)), the FCA (31 U.S.C. § 3729(a)(1), now 31 U.S.C. § 3729 (a)(1)(A)), and the CFCA (Cal. Gov't Code § 12651(a)(1)), the claims submitted by SUTTER HEALTH in paragraphs 85-199 above were false and/or fraudulent because SUTTER HEALTH knowingly and willfully paid remuneration to physicians and their professional

corporations set forth in paragraphs 85-199 to induce referrals to SUTTER HEALTH in violation of the AKS, Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

205.    SUTTER HEALTH also violated the FCA (31 U.S.C. § 3729(a)(2), now 3729(a)(1)(B)), and the CFCA (Cal. Gov't Code § 12651(a)(2)), by making false statements, or causing false statements to be made by the fiscal intermediary and MAC, to get claims paid by Medicare for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 85-199. SUTTER HEALTH's certifications on its cost reports that its statements were "true" and/or "correct" and that it was entitled to payment of its claims for such services were false or fraudulent because the Stark Statute prohibited SUTTER HEALTH from receiving payments from the United States and the State of California for those claims.

206.    SUTTER HEALTH and PHYSICIAN ENTITIES conspired with one another to get false and fraudulent claims allowed and paid by Medicare and Medicare, and to retain such overpayments, in violation of the FCA and CFCA.   SUTTER HEALTH and PHYSICIAN ENTITIES also conspired to pay physicians excessive compensation and remuneration in violation of the Stark Statute and AKS laws.   SUTTER HEALTH and PHYSICIAN ENTITIES acted in a concerted fashion to defraud Medicare and Medicaid, and acted with others in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the United States and the State of California.   Accordingly, the SUTTER HEALTH and PHYSICIAN ENTITIES violated the FCA (31 U.S.C. § 3729(a)(3), now § 3729(a)(1)(C)) and the CFCA (Cal. Gov't Code § 12651(a)(3)).

60

207.     SUTTER HEALTH knowingly made, used, and caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States and the State of California (*i.e.*, to avoid refunding payments made in violation of the Stark Statute) by certifying on their annual cost reports that the services were provided in compliance with federal law, all in violation of the FCA (31 U.S.C. § 3729(a)(7), now § 3729(a)(1)(G)) and the CFCA (Cal. Gov't Code § 12651(a)(7)). The false certifications, made with each annual cost report submitted to the government, were part of SUTTER HEALTH's unlawful and orchestrated scheme to defraud Medicare and Medicaid.

208.     All claims submitted to Medicare or Medicaid by SUTTER HEALTH for designated health services referred by any of the physicians identified in paragraphs 85-199 above were false claims that were <u>knowingly</u> submitted to the United States. SUTTER HEALTH submitted and caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to inpatient and outpatient designated health services rendered to patients who were referred to the hospital by the physicians affiliated with SUTTER HEALTH who had improper contracts which violated the Stark Statute and the AKS.

209.     SUTTER HEALTH presented, or caused to be presented, all of said false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.  The illegal scheme implemented by SUTTER HEALTH involved thousands of prohibited referrals made by the physicians identified in paragraphs 85-199 above.

## COUNT ONE

(False Claims Act: Presentation of False Claims)

(31 U.S.C. § 3729(a)(1) now (a)(1)(A))

210.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

211.    SUTTER HEALTH knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement (identified in paragraphs 85-199 above) for designated health services rendered to patients who were referred by physicians with whom SUTTER HEALTH had entered into prohibited financial relationships in violation of the Stark Statute.

212.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### COUNT TWO

(False Claims Act: Using False Statements to Get False Claims Paid)

(31 U.S.C. § 3729(a)(2), now 3729(a)(1)(B))

213.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

214.    SUTTER HEALTH made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and caused to be made by SUTTER HEALTH when initially submitting the false claims for payments and the false certifications made by SUTTER HEALTH in submitting the cost reports — to get false or fraudulent claims paid and approved by the United States.

215.    SUTTER HEALTH's false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of SUTTER HEALTH's statements and actions.

216.    The false certifications and representations made and caused to be made by SUTTER HEALTH were material to the United States' payment of the false claims.

217.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT THREE

(False Claims Act: False Record Material to Obligation to Pay)

(31 U.S.C. § 3729(a)(7), now (a)(1)(G))

218.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

219.    SUTTER HEALTH made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

220.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT FOUR

(False Claims Act: Conspiracy to Violate False Claims Act)

(31 U.S.C. § 3729(a)(3), now 3729(a)(1)(C))

221.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

222.    SUTTER HEALTH and PHYSICIAN ENTITIES conspired with one another to get false and fraudulent claims allowed and paid by the United States in violation of 31 U.S.C. § 3729(a)(1)(A) and/or (B) and to retain overpayments in violation of 31 U.S.C. § 3729(a)(1)(G).

SUTTER HEALTH and PHYSICIAN ENTITIES also conspired to pay physicians excessive compensation and remuneration in violation of the *Stark* and AKS laws.

223.　SUTTER HEALTH and PHYSICIAN ENTITIES acted in a concerted fashion to defraud the United States, and acted with others in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the United States.  Accordingly, the SUTTER HEALTH and PHYSICIAN ENTITIES violated 31 U.S.C. § 3729(a)(1)(C).

224.　As a result of the actions of SUTTER HEALTH and PHYSICIAN ENTITIES, the United States have been severely damaged.

**COUNT FIVE**

(California False Claims Act: Presentation of False Claims)

(Cal. Gov't Code § 12651(a)(1))

225.　Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

226.　Cal. Gov't Code § 12651(a)(1) provides liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

227.　In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & lnst. Code § 14107.2.

228.　SUTTER HEALTH violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 from at least July 1, 2002 to the present by engaging in the fraudulent and illegal practices described herein.

229.     SUTTER HEALTH furthermore violated Cal. Gov't Code § 12651(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least July 1, 2002 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Stark Act and the AKS, as described herein.

230.     The State of California, by and through the Medi-Cal program, and unaware of SUTTER HEALTH's fraudulent and illegal practices, paid the claims submitted by health care providers.

231.     Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and also was an express condition of payment of claims submitted to the State of California.

232.     Had the State of California known that SUTTER HEALTH was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with SUTTER HEALTH's fraudulent and illegal practices.

233.     SUTTER HEALTH and PHYSICIAN ENTITIES conspired with one another to get false and fraudulent claims allowed and paid by the State of California in violation of Cal. Gov't Code § 12651(a)(1).   SUTTER HEALTH and PHYSICIAN ENTITIES also conspired to pay kickbacks in violation of Cal. Bus. & Prof. Code §§ 650 and 650.1, and Cal. Welf. & lnst. Code § 14107.2.

234.     SUTTER HEALTH and PHYSICIAN ENTITIES acted in a concerted fashion to defraud the State of California, and acted with others in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the State of California.   Accordingly, the

SUTTER HEALTH and PHYSICIAN ENTITIES violated Cal. Gov't Code § 12651(a).

235.    As a result of SUTTER HEALTH and PHYSICIAN ENTITIES violations of Cal. Gov't Code § 12651(a)(1), the State of California has been severely damaged.

## COUNT SIX

(California False Claims Act: Using False Statements to Get False Claims Paid)

(Cal. Gov't Code § 12651(a)(2))

236.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

237.    SUTTER HEALTH made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and caused to be made by SUTTER HEALTH when initially submitting the false claims for payments and the false certifications made by SUTTER HEALTH in submitting the cost reports — to get false or fraudulent claims paid and approved by the State of California.

238.    SUTTER HEALTH's false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of SUTTER HEALTH's statements and actions.

239.    The false certifications and representations made and caused to be made by SUTTER HEALTH were material to the State of California's payment of the false claims.

240.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT SEVEN

(California False Claims Act: False Record Material to Obligation to Pay)

(Cal. Gov't Code § 12651(a)(7))

241.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

242.    SUTTER HEALTH made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the State of California, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the State of California.

243.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT EIGHT

(California False Claims Act: Conspiracy to Violate False Claims Act)

(Cal. Gov't Code § 12651(a)(3))

244.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

245.    SUTTER HEALTH and PHYSICIAN ENTITIES conspired with one another to get false and fraudulent claims allowed and paid by the State of California in violation of (Cal. Gov't Code § 12651(a)(1) or (2) and to retain overpayments in violation of Cal. Gov't Code § 12651(a)(7). SUTTER HEALTH and PHYSICIAN ENTITIES also conspired to pay physicians excessive compensation and remuneration in violation of the Stark Law, AKS laws, Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

246.    SUTTER HEALTH and PHYSICIAN ENTITIES acted in a concerted fashion to defraud the State of California, and acted with others in keeping the facts necessary to investigate the

67

fraud and the damages caused by the fraud away from the State of California. Accordingly, the SUTTER HEALTH and PHYSICIAN ENTITIES violated Cal. Gov't Code § 12651(a)(3).

247.    As a result of the actions of SUTTER HEALTH and PHYSICIAN ENTITIES, the State of California have been severely damaged.

**WHEREFOR**E, Relator prays for judgment against SUTTER HEALTH as follows:

1.    On Count One under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00), and no more than Eleven Thousand Dollars ($11,000.00) per claim as are authorized by law, together with all such further relief as may be just and proper; and

2.    On Count Two under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00), and no more than Eleven Thousand Dollars ($11,000.00) per claim as are authorized by law, together with all such further relief as may be just and proper; and

3.    On Count Three under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00), and no more than Eleven Thousand Dollars ($11,000.00) Dollars per claim as are authorized by law, together with all such further relief as may be just and proper; and

4..    On Count Four under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00), and no more than Eleven Thousand Dollars ($11,000.00) per claim as are authorized by law, together with all such further relief as may be just and proper; and

5.    On Count Five under the California False Claims Act, for the amount of the State of

68

California's  damages, trebled as required by law, and such civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00), and no more than Eleven Thousand Dollars ($11,000.00) per claim as are authorized by law, together with all such further relief as may be just and proper; and

6.      On Count Six under the California False Claims Act, for the amount of the State of California's  damages, trebled as required by law, and such civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00), and no more than Eleven Thousand Dollars ($11,000.00) per claim as are authorized by law, together with all such further relief as may be just and proper; and

7.      On Count Seven under the California False Claims Act, for the amount of the State of California's  damages, trebled as required by law, and such civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00), and no more than Eleven Thousand Dollars ($11,000.00) per claim as are authorized by law, together with all such further relief as may be just and proper; and

8.      On Count Eight under the California False Claims Act, for the amount of the State of California's  damages, trebled as required by law, and such civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00), and no more than Eleven Thousand Dollars ($11,000.00) per claim as are authorized by law, together with all such further relief as may be just and proper; and

9.      That Relator be awarded the maximum Relator share amount permissible according to 31 U.S.C. § 3730(c) and Cal. Gov't Code § 12652; and

10.      That judgment be granted for the United States of America, State of California and

COMPLAINT AND
DEMAND FOR JURY TRIAL

Relator and against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this case, including, but not limited to, all attorney fees and costs available pursuant to 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652; and

11.     That the United States, State of California and Relator be granted such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator demands a jury trial in this case.

Respectfully submitted this 10th day of September, 2014.

/s/ Michael A. Hirst
Michael A. Hirst, Esq. CA Bar #131034
michael.hirst@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, CA 95616
(530) 756-7700 (tel)
(530) 756-7707 (fax)

/s/ Marlan B. Wilbanks
Marlan B. Wilbanks
Georgia Bar No. 758223
Susan S. Gouinlock
Georgia Bar No. 303217
WILBANKS & BRIDGES, LLP
3414 Peachtree Road, NE
Suite 1075
Atlanta, Georgia  30326
(404) 842-1075 (tel)
(404) 842-0559 (fax)
mbw@wilbanks-bridgeslaw.com
ssg@wilbanks-bridgeslaw.com
*(subject to pro hac vice admission)*

70

/s/ Scott C. Withrow
Scott C. Withrow
Georgia Bar No. 772330
WITHROW, MCQUADE & OLSEN, LLP
3379 Peachtree Road, NE
Suite 970
Atlanta, Georgia  30326
(404) 814-0200 (tel)
(404) 814-0009 (fax)
swithrow@wmolaw.com
*(subject to pro hac vice admission)*

71