# EXHIBIT 6-3
# to Complaint

*U.S. ex rel. Hanvey v. Sutter Health System, et. al.*

## SUTTER HEALTH SACRAMENTO SIERRA REGION
## dba SUTTER MEDICAL CENTER SACRAMENTO

### CALL COVERAGE AGREEMENT
### Cardiothoracic Surgery

Sacramento Cardiovascular Surgeons Medical Group, Inc.

This Call Coverage Agreement ("Agreement") is entered into as of **November 17, 2012,** (the **"Effective Date"**) between **Sutter Health Sacramento Sierra Region,** a California nonprofit public benefit corporation **doing business as Sutter Medical Center Sacramento** ("Hospital"), and **Sacramento Cardiovascular Surgeons Medical Group, Inc.,** a California professional corporation ("Medical Group").

### RECITALS

A.  Hospital operates two acute care hospitals located in Sacramento, California, and offers the community a twenty-four (24) hour comprehensive emergency service.

B.  Hospital wishes to maintain adequate physician on-call coverage in its emergency departments in both hospitals (collectively referred to as the "Emergency Department") and to ensure physicians are available to consult for hospital inpatients in order to provide high quality emergency medical services to all patients, including patients who have no insurance or ability to pay, and to comply with the requirements of the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §1395dd.

C.  Medical Group is composed of physicians (each a "Physician," collectively "Physicians") who are duly qualified and licensed to practice medicine in the State of California and who specialize in Cardiothoracic Surgery including Cardiac Surgery Transplant and VAD Program ("Specialty"). Medical Group's Physicians are willing to participate on Hospital's Emergency Department on-call panel pursuant to the terms and conditions set forth herein.

NOW THEREFORE, the parties agree as follows:

1.  **MEDICAL GROUP'S RESPONSIBILITIES**

    a.  **On-Call Coverage**. Medical Group will ensure that Physicians serve as on-call physicians in the Specialty for twenty-four (24) hour coverage shifts with two Physicians concurrently on-call, one as primary and one as back-up, for each such coverage shift (each a "Coverage Shift") pursuant to a rotation on-call schedule ("Specialty Call Schedule") established and amended from time to time by Hospital in conjunction with Hospital's Emergency Department physicians. As a member of the Hospital's Emergency Department on-call panel, at all times during Physicians' Coverage Shifts (and as necessary for completion of services or follow-up care), Medical

Group agrees that Physicians will provide consultation or assistance within the scope of Physicians' Medical Staff privileges to Emergency Department physicians and other Medical Staff members who call for Specialty consults for their patients who are in the hospital.

      b.     **Response Time**. Medical Group will ensure that Physicians will be immediately available to Hospital on a scheduled and pre-assigned basis in accordance with the Specialty Call Schedule to provide Specialty services. For purposes of this Agreement, "immediately available" means unencumbered by conflicting duties or responsibilities; responding without delay when notified; and being physically present in the Emergency Department to provide services within thirty (30) minutes of a request for services.

      c.     **Consultations and Transfers**. During Coverage Shifts, Medical Group will ensure that Physicians take inpatient consultations in the Specialty and accept transfers of all appropriate patients requiring the Specialty services who are transferred from another hospital that does not have the capacity or capability to see that patient.

      d.     **Non-Discrimination**. Physicians will not discriminate against any person presenting to Hospital's Emergency Department by refusing to provide any service or privilege offered to or enjoyed by the general public because of race, religion, color, age, creed, national or ethnic origin, political opinion, sex, or disability. Physicians will treat all patients, including those patients who have no insurance and are deemed by the Hospital to be unable to pay for medical services provided.

      e.     **Qualifications**. During the term of this Agreement, Physicians must be duly qualified and licensed physicians and surgeons in the State of California, practicing in the Specialty. Physicians will also maintain an appointment to the Medical Staff in accordance with Hospital's Medical Staff bylaws, with privileges in the Specialty and must not be excluded from participation in the Medicare, Medi-Cal or Tri-Care programs or any other federal healthcare reimbursement program.

      f.     **Compliance**. Physicians will provide services in accordance with Hospital's standards of quality and efficiency and will comply with all applicable laws, statutes, ordinances, rules, regulations and standards of any governmental, semi-governmental or private authority having either mandatory or voluntary jurisdiction over Hospital, including but not limited to The Joint Commission, and with the bylaws, rules, regulations and policies of Hospital, Hospital's Medical Staff, and any duly authorized committee thereof. Notwithstanding anything contained herein to the contrary, the parties understand and agree that all decisions regarding a Physician's medical practice will be based solely upon Physician's professional medical judgment and will be made in the best interests of Physician's patients.

      g.     **Insurance**. Medical Group agrees to maintain, at its sole expense, a policy or policies of professional liability insurance that covers any acts of Physicians' professional negligence with limits of liability for Medical Group and each Physician of

no less than One Million Dollars ($1,000,000) per claim/Three Million Dollars ($3,000,000) annual aggregate. If coverage is provided on a claims-made policy, Medical Group further agrees to maintain continuous coverage, by either obtaining "tail" insurance from the preceding carrier, or "nose" coverage from the subsequent carrier, through the term of this Agreement, as well as any extensions or renewals, and for a period thereafter of not less than seven (7) years. Medical Group agrees to provide proof of current insurance and will, in the event of modification, termination, expiration or cancellation of any of the required policies of insurance give Hospital written notice within five (5) business days.

   h. **Billing and Collection**. Physicians will separately bill and collect charges at their own expense for any professional services rendered.

   i. **Reporting of Payments**. To ensure that payments under Section 3 (Compensation) of this Agreement are properly reported, Medical Group will complete, execute and deliver to Hospital an IRS Form W-9 (**Exhibit A**).

## 2. HOSPITAL'S RESPONSIBILITIES

   a. **Responsibility for Services**. To the extent required by the laws and regulations governing the operation of hospitals, Hospital retains professional and administrative responsibility for the services provided herein.

   b. **Tax Reporting**. To the extent required by law, Hospital will report all payments to Medical Group under this Agreement on IRS Form 1099 and its state law counterpart.

## 3. COMPENSATION

In exchange for the performance of responsibilities and services described in this Agreement, and to assure the availability of professional services in Specialty, upon presentation of a signed call invoice (**Exhibit B**), Hospital will pay to Medical Group the sum of **Two Thousand Five Hundred Dollars ($2500) for each twenty-four (24) hour Coverage Shift.**

## 4. TERM

This Agreement will have an effective term of **twenty-four (24) months** commencing on the Effective Date (the "Initial Term"), and will automatically renew for an additional ninety (90) days upon the expiration of the Initial Term unless (a) the parties enter into a new replacement agreement upon the expiration of the Initial Term, or (b) either party gives the other party advance written notice of its intent not to renew the Agreement at least thirty (30) days prior to the expiration of the Initial Term. Notwithstanding the foregoing, either party may terminate this Agreement at any time with or without cause by giving the other party at least ninety (90) days' advance written

notice. If so terminated, the parties will not enter into another agreement for the same or similar services until the expiration of one (1) year from the Effective Date.

## 5. INDEPENDENT CONTRACTOR

In performing the responsibilities and services described in this Agreement, Medical Group is acting as an independent contractor, and will not be considered a joint venturer or partner of Hospital for any purpose whatsoever. Hospital will not control or direct the methods by which Medical Group performs services provided pursuant to this Agreement. The sole interest and responsibility of the Hospital is to assure that services are performed in a competent, efficient and satisfactory manner. Physicians will have no claim under this Agreement or otherwise against Hospital for workers' compensation, severance pay, vacation pay, sick leave, retirement benefits, health plan benefits, Social Security benefits, disability insurance benefits, unemployment insurance benefits or any other benefits of any kind. Under no circumstances will Hospital: withhold FICA (Social Security) from payments to Medical Group; make state or federal unemployment insurance contributions on behalf of Physicians; withhold state and federal income tax from payments to Medical Group; make disability insurance contributions on behalf of Medical Group; or obtain workers' compensation insurance on behalf of Medical Group. Medical Group will be solely responsible for, and will indemnify, defend and hold Hospital harmless from and against any claim, liability or expense related to, any and all income tax withholding, estimated income tax, Social Security tax, self-employment tax, unemployment tax or any other tax obligations related to the compensation payable by Hospital to Medical Group under this Agreement.

## 6. ACCESS TO BOOKS AND RECORDS

Medical Group will maintain and make available all necessary written agreements, books, documents and records in order to assure that Hospital will be able to meet all requirements for participation and payment associated with public and private third party payment programs, including but not limited to matters covered by Section 1861(v)(1)(I) of the Social Security Act, as amended. Medical Group agrees as follows:

    a.    Until the expiration of four (4) years after the furnishing of services under this Agreement, Medical Group will, upon written request, make available to the Secretary of the Department of Health and Human Services (the "Secretary"), the Secretary's duly authorized representative, the Comptroller General, or the Comptroller General's duly authorized representative, this Agreement, and such books, documents and records as may be necessary to certify the nature and extent of such services; and

    b.    If any such services are performed by way of subcontract with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve month period, such subcontract will contain, and Medical Group will enforce, a clause to the same effect as subparagraph (a) immediately above.

The availability of Medical Group's Agreement, books, documents and records will be subject at all times to all applicable legal requirements, including without limitation such criteria and procedures for seeking and obtaining access that may be promulgated by the Secretary by regulation.

7. **CONFIDENTIALITY**

   a. **Hospital Information**. Medical Group recognizes and acknowledges that, by virtue of entering into this Agreement and providing services to Hospital, Medical Group may have access to certain information of Hospital that is confidential and constitutes valuable, special and unique property of Hospital. Medical Group agrees that it will not at any time, either during or subsequent to the term of this Agreement, disclose to others, use, copy or permit to be copied, without Hospital's written consent, except pursuant to duties pursuant to this Agreement, any confidential or proprietary information of Hospital, including but not limited to information that concerns Hospital's patients, costs, prices and treatment protocols at any time used, developed or made by Hospital, and that is not otherwise available to the public.

   b. **Terms of this Agreement**. Except for disclosure to Medical Group's legal counsel, accountant or financial advisors (none of whom will be associated in any way with Hospital or any of its affiliates), Medical Group will not disclose the terms of this Agreement to any person who is not a party to this Agreement, unless disclosure is required by law or otherwise authorized by this Agreement or consented to in writing by Hospital.

   c. **Patient Information**. Medical Group shall not disclose to any third party, except where permitted or required by law or where such disclosure is expressly approved by SSR in writing, any patient or medical record information regarding SSR patients ("Patient Information"), and Medical Group shall comply with all federal and state laws and regulations, and all rules, regulations, and policies of SSR and its Hospital's medical staffs, regarding the confidentiality of such information, including, but not limited to, the Federal Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA"), Subtitle D of the Federal HITECH Act ("HITECH Act," 42 U.S.C. § 17921 et seq.), and the regulations promulgated thereunder by the U.S. Department of Health and Human Services (the "HIPAA Regulations," 45 C.F.R. Part 160, et seq.), and the Confidentiality of Alcohol and Drug Abuse Patient Records regulations (42 C.F.R. Part 2), as amended from time to time.

8. **ARBITRATION**

   a. In the event that any dispute arises between Hospital and Medical Group arising out of or related to the validity, interpretation, enforcement or performance of this Agreement, or otherwise arising out of the relationship between the parties or the termination of that relationship, either party may by written notice call a meeting regarding such dispute to be attended by an executive officer of each party who has the

authority to negotiate and bind that party to a resolution. At the meeting, the parties will attempt in good faith to resolve the dispute.

      b.      If the dispute cannot be resolved within forty-five (45) days from the date of the initial notice, and if either party wishes to pursue the dispute, the dispute will be submitted to binding arbitration in accordance with the Commercial Rules of the American Arbitration Association or JAMS/Endispute, which service will be selected by Hospital at its sole discretion. The decision of the arbitrator will be final and binding and will be fully enforceable in any court having jurisdiction and venue over the parties. The arbitrator will have no power to alter, modify, ignore or otherwise deviate from the express terms of this Agreement, and the arbitrator will be bound by controlling law. The arbitrator's decision will be provided to the parties in writing and will succinctly set forth the arbitrator's findings of fact, conclusions of law, and remedy, if any. The cost of arbitration will be shared equally by Hospital and Medical Group, provided that each party will pay its own legal expenses.

9.     **INDEMNIFICATION**

Both parties to this Agreement will indemnify and hold the other harmless from and against any and all claims, losses, suits, actions, damages, costs or liabilities of any kind whatsoever incurred or resulting from the acts or omissions of the indemnifying party.

10.    **MISCELLANEOUS**

      a.      <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of California.

      b.      **Other Service Agreements**. Hospital represents that its TractManager databases include copies of all other agreements under which Medical Group, or any physician employed by Medical Group (or any immediate family member of any such physician), provides services to Hospital.

      c.      **Counterparts**. This Agreement may be executed in counterparts, and each counterpart will be deemed an original.

***Signature Page follows***

## SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the dates set forth below, to be effective as of the Effective Date.

**HOSPITAL:**

SUTTER HEALTH SACRAMENTO
SIERRA REGION dba Sutter Medical
Center Sacramento

By: _____
Name: Faraaz Yousuf
Title: Chief Operating Officer
Date: 11/12/12

**MEDICAL GROUP:**

SACRAMENTO
CARDIOVASCULAR SURGEONS
MEDICAL GROUP, INC.

By: _____
Name: Michael T. Ingram, M.D.
Title: President
Date: 11/12/12

**Address for notices:**

Sutter Medical Center Sacramento
5151 F Street
Sacramento, CA 95819
Attn: Margaret Mette, Assistant Administrator

**Address for notices:**

Sacramento Cardiovascular Surgeons
Medical Group, Inc.
5301 F Street, Suite 111
Sacramento, CA 95819
Attn: Michael T. Ingram, M.D., President

**With copy to:**

Sutter Health
Office of the General Counsel
2200 River Plaza Dr.
Sacramento, CA 95833
Attn: Penny G. Westfall, Esq.,
VP and Regional Counsel

| Form **W-9** (Rev. December 2011) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** | Give Form to the requester. Do not send to the IRS. |

**Name** (as shown on your income tax return)
Sacramento Cardiovascular Surgeons Medical Group, Inc

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
☐ Individual/sole proprietor ☑ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ ...........

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)
5301 F Street, Suite 111

City, state, and ZIP code
sacramento, CA 95819

Requester's name and address (optional)

List account number(s) here (optional)

### Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
☐☐☐ – ☐☐ – ☐☐☐☐

Employer identification number
[redacted]

### Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here**  Signature of U.S. person ▶ *[signature]*  Date ▶ 11/7/12

### General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X    Form **W-9** (Rev. 12-2011)

# EXHIBIT A

## IRS FORM W-9

[Attach Form]

# EXHIBIT B

## CALL INVOICE

[Attach Call Invoice]

## SUTTER MEDICAL CENTER SACRAMENTO

**Payable to:**  
Name:  
Address:  
City/State/Zip:

**Billable to:**  
Name:  
Address:  
City/State/Zip:

| Medical Group: | Month: |
|---|---|
| Service Specialty: | |
| Address: | TractManager: |
| Phone:    (     ) | |

*Mark the days of the month below that Medical Group provided a Coverage Shift pursuant to the Agreement by indicating which Physician provided the coverage each day:*

| 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th |
|---|---|---|---|---|---|---|---|---|---|
| 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th | 20th |
| 21st | 22nd | 23rd | 24th | 25th | 26th | 27th | 28th | 29th | 30th |
| 31st | | | | | | | | | |

**Medical Group Certification:** By my signature below, I certify that **Sacramento Cardiovascular Surgeons Medical Group, Inc.** provided the above-indicated coverage.

Date: _____    By: _____  
               Name: _____  
               Title: _____

| *FOR HOSPITAL USE ONLY:* |||
|---|---|---|
| Cost Center: | Account Number: | Tax Id #: |
| Days: Total Days Call Covered in Month: ____ | Rate: $ ____ / per day | Compensation: Total Due: $ ____ |

**Hospital Authorization:**  
Date: _____  _____  
                               Hospital Administrator