LATHAM & WATKINS LLP
  Katherine A. Lauer (Bar No. 138010)
    *katherine.lauer@lw.com*
  Jason M. Ohta (Bar No. 211107)
    *jason.ohta@lw.com*
  Amy E. Hargreaves (Bar No. 266255)
    *amy.hargreaves@lw.com*
  12670 High Bluff Drive
  San Diego, CA 92130
  Telephone: (858) 523-5400
  Facsimile: (858) 523-5450

*Attorneys for Defendants Sutter Health, Sutter Valley Hospitals, Sutter Valley Medical Foundation, Sutter Bay Hospitals and Sutter Bay Medical Foundation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA *ex rel.* LAURIE M. HANVEY, <br><br> Plaintiff, <br><br> v. <br><br> SUTTER HEALTH; <br><br> SUTTER VALLEY HOSPITALS, f/k/a Sutter Health Sacramento Sierra Region, f/k/a Sutter Central Valley Hospitals, d/b/a Sutter Medical Center, Sacramento, a/k/a Sutter Roseville Medical Center, a/k/a Sutter Amador Hospital, a/k/a Sutter Auburn Faith Hospital, a/k/a Sutter Davis Hospital, a/k/a Sutter Solano Medical Center, d/b/a Memorial Hospital Center, a/k/a Memorial Hospital Los Banos, a/k/a Sutter Tracy Community Hospital; <br><br> SUTTER VALLEY MEDICAL FOUNDATION, f/k/a Sutter Medical Foundation, f/k/a Sutter Gould Medical Foundation; <br><br> SUTTER BAY HOSPITALS, f/k/a Sutter East Bay Hospitals, f/k/a Sutter Medical Center, Castro Valley, d/b/a Alta Bates Summit | Case No. 4:14-cv-04100-KAW <br><br> **DEFENDANTS SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION, SUTTER BAY HOSPITALS AND SUTTER BAY MEDICAL FOUNDATION'S NOTICE OF MOTION AND MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date: October 1, 2020 <br> Time: 1:30 p.m. <br> Ctrm: 4 <br> Judge: Hon. Kandis A. Westmore |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1   Medical Center, a/k/a Sutter Delta Medical
    Center, d/b/a Eden Medical Center;
2
    SUTTER BAY MEDICAL FOUNDATION,
3   f/k/a Sutter East Bay Medical Foundation;

4   SUTTER MEDICAL GROUP, A
    CALIFORNIA CORPORATION;
5
    SUTTER INDEPENDENT PHYSICIANS, A
6   MEDICAL CORPORATION;

7   SUTTER EAST BAY MEDICAL GROUP,
    INC., f/k/a East Bay Physicians Medical
8   Group, Inc.;

9   SACRAMENTO CARDIOVASCULAR
    SURGEONS MEDICAL GROUP, INC.;
10
    EAST BAY CARDIAC SURGERY CENTER
11  MEDICAL GROUP;

12  BASS MEDICAL GROUP, f/k/a Bay Area
    Surgical Specialists, Inc., A Medical
13  Corporation, f/k/a East Bay Vascular Group;

14  STEPHEN K. LIU, M.D., PROFESSIONAL
    CORPORATION; and
15
    CALIFORNIA EMERGENCY PHYSICIANS
16  MEDICAL GROUP, A PROFESSIONAL
    CORPORATION, f/k/a Sutter Emergency
17  Medical Associates,

18              Defendants.

19

20

21

22

23

24

25

26

27

28

1                **<u>NOTICE OF MOTION AND MOTION TO DISMISS</u>**

2  **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

3        PLEASE TAKE NOTICE that on October 1, 2020 at 1:30 p.m., or as soon thereafter as

4 the parties may be heard, before the Honorable Kandis A. Westmore, Magistrate Judge, United

5 States District Court for the Northern District of California, in the Oakland Courthouse,

6 Courtroom 4, 1301 Clay Street, Oakland, CA 94612, Defendants Sutter Health, Sutter Valley

7 Hospitals, Sutter Valley Medical Foundation, Sutter Bay Hospitals and Sutter Bay Medical

8 Foundation ("Sutter Defendants") will and hereby do move this Court for an order dismissing

9 Relator Laurie Hanvey's ("Relator") First Amended Complaint (Dkt. No. 46).  This motion is

10 brought on grounds that: Relator already has agreed to a release of claims related to Sacramento

11 Cardiovascular Surgeons Medical Group's ("Sac Cardio") alleged violations of the Anti-

12 Kickback Statute or the Stark Law from September 1, 2012 through September 30, 2014; Relator

13 fails to allege that Sutter Defendants knowingly submitted false claims related to Sac Cardio;

14 Relator fails to allege that Sutter Defendants identified any overpayments related to Sac Cardio;

15 Relator fails to plead with specificity that any claims Sutter Defendants submitted related to Dr.

16 David K. Roberts, East Bay Cardiac Surgery Center Medical Group, BASS Medical Group,

17 Stephen K. Liu, M.D., Professional Corporation, and California Emergency Physicians Medical

18 Group (collectively, "the Non-Sac Cardio Physicians") were false; Relator does not identify any

19 false claims submitted to the Government by Sutter Defendants related to the Non-Sac Cardio

20 Physicians; Relator fails to allege the scienter element of her FCA and CFCA claims against the

21 Non-Sac Cardio Physicians; and Relator fails to plead materiality of any allegedly false claims.

22        Sutter Defendants' Motion is based on this Notice of Motion and Motion to Dismiss, the

23 following Memorandum of Points and Authorities, all pleadings and papers in this action, and

24 any oral argument of counsel.

25        Sutter Defendants seek an order pursuant to Federal Rules of Civil Procedure 12(b)(6)

26 and 9(b) dismissing Relator's First Amended Complaint in its entirety for failure to state a claim

27 upon which relief can be granted.

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................................. 1

II.     BACKGROUND ................................................................................................................... 3

        A.      Relator's Complaint ................................................................................................. 3

        B.      Settlement of Claims Under the Stark Law and Anti-Kickback
                Statute ...................................................................................................................... 3

        C.      Relator's First Amended Complaint ......................................................................... 4

III.    LEGAL STANDARD ........................................................................................................... 5

IV.     ARGUMENT ........................................................................................................................ 6

        A.      Relator Fails to State a Claim for Relief as to Sutter Health's
                Arrangements with Sac Cardio ................................................................................ 6

                1.      Relator already agreed to a release of claims related to Sac
                        Cardio's alleged violations of the Anti-Kickback Statute
                        and the Stark Law from September 1, 2012 through
                        September 30, 2014 ...................................................................................... 7

                2.      Relator fails to allege that any non-released claims related
                        to Sac Cardio were "false" ........................................................................... 9

                3.      Relator fails to allege that Sutter Health knowingly
                        withheld any identified overpayments related to Sac Cardio ................. 16

        B.      Relator Fails to State a Claim for Relief as to Sutter Health's
                Arrangements with Other Named Physicians and Groups .................................. 18

                1.      Relator fails to allege that any claims related to the Non-
                        Sac Cardio Physicians were "false" ......................................................... 18

                2.      Relator fails to allege that Sutter Health submitted claims
                        resulting from prohibited referrals by the Non-Sac Cardio
                        Physicians in violation of the FCA .......................................................... 22

                3.      Relator fails to allege the scienter element of her FCA
                        claims against the Non-Sac Cardio Physicians ....................................... 23

        C.      Relator Fails to Plead that the Alleged Violations as to All Sutter
                Health Arrangements Were Material to the Government's Payment
                of Claims .............................................................................................................. 24

V.      CONCLUSION .................................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## CASES

4

*Ashcroft v. Iqbal,*
5
    556 U.S. 662 (2009)...................................................................................................6

6
*United States ex rel. Barajas v. United States,*
    258 F.3d 1004 (9th Cir. 2001) ...........................................................................1, 7, 8
7

8
*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................5, 6

9
*Bingham v. HCA, Inc.,*
10
    783 F. App'x 868 (11th Cir. 2019) ...............................................................10, 11, 19

11
*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
    342 F.3d 634 (6th Cir. 2003) ...........................................................................1, 6, 7, 8
12

13
*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.,*
    637 F.3d 1047 (9th Cir. 2011) ......................................................................6, 17, 18, 22

14
*United States ex rel. Campie v. Gilead Scis., Inc.,*
15
    862 F.3d 890 (9th Cir. 2017) ...............................................................................5, 24

16
*United States ex rel. Cook v. Providence Health & Servs.,*
    No. C13-1312RAJ, 2014 WL 4094116 (W.D. Wash. Aug. 18, 2014)....................................23
17

18
*Dysthe v. Basic Research, LLC,*
    No. CV 09-8013 AG (SSX), 2010 WL 11596676 (C.D. Cal. May 10, 2010).........................10

19
*United States ex rel. Folliard v. Comstor Corp.,*
20
    308 F. Supp. 3d 56 (D.D.C. 2018).........................................................................25

21
*United States ex rel. Gough v. Eastwestproto, Inc.,*
    No. CV 14-465 (DMG (SHx), 2018 WL 6929332 (C.D. Cal. Oct. 24, 2018)................ *passim*
22

23
*Hanlester Network v. Shalala,*
    51 F.3d 1390 (9th Cir. 1995) ...............................................................9, 12, 13, 14

24
*United States ex rel. Harman v. Trinity Indus. Inc.,*
25
    872 F.3d 645 (5th Cir. 2017) ...............................................................................24

26
*United States ex rel. Hendow v. Univ. of Phoenix,*
    461 F.3d 1166 (9th Cir. 2006) ...............................................................................23

27

28

*United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*,
  No. CV 17-1694 PSG (SSX), 2019 WL 3282619 (C.D. Cal. July 16, 2019)........................23

*John Russo Indus. Sheetmetal, Inc. v. City of L.A. Dep't of Airports*,
  240 Cal. Rptr. 3d 217 (Cal. Ct. App. 2018) ....................................................5

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ...............................................................6

*United States ex rel. Kelly v. Serco, Inc.*,
  846 F.3d 325 (9th Cir. 2017) ...............................................................17

*United States ex rel. Lacy v. New Horizons, Inc.*,
  348 F. App'x 421 (10th Cir. 2009) .........................................................22

*United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*,
  591 Fed. Appx. 693 (11th Cir. 2014).......................................................15

*United States ex rel. Modglin v. DJO Glob. Inc.*,
  114 F. Supp. 3d 993 (C.D. Cal. 2015), *aff'd sub nom. United States v. DJO
  Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017) ...........................................23

*United States ex rel. Petratos v. Genentech Inc.*,
  855 F.3d 481 (3d Cir. 2017)................................................................25

*Rille v. Pricewaterhousecoopers LLP*,
  803 F.3d 368 (8th Cir. 2015) ..............................................................7

*United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*,
  752 F. Supp. 2d 602 (W.D. Pa. 2010).....................................................10, 16

*Smith v. Barrett, Daffin, Frappier, Treder & Weiss, LLP*,
  No. 18-CV-06098-RS, 2019 WL 2525185 (N.D. Cal. June 19, 2019)...............................8

*State of California v. Altus Finance*,
  116 P.3d 1175 (Cal. 2005) .................................................................5

*United States v. Chang*,
  No. CV-13-3772-DMG, 2017 WL 10544289 (C.D. Cal. July 25, 2017) ..........................9, 10

*United States v. Ctr. for Diagnostic Imaging, Inc.*,
  787 F. Supp. 2d 1213 (W.D. Wash. 2011), *amended in part on other grounds
  by* No. C05-0058RSL, 2011 WL 13353774 (W.D. Wash. 2011)........................12, 13, 14, 19

*United States v. Ctr. for Diagnostic Imaging, Inc.*,
  No. C05-0058, 2011 WL 13353773 (W.D. Wash. Aug. 12, 2011) ............................14, 15, 22

*Frazier ex rel. United States v. Iasis Healthcare Corp.*,
  392 F. App'x 535 (9th Cir. 2010) .........................................................9

SUTTER DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS RELATOR'S FAC
Case No. 4:14-cv-04100-KAW

*United States v. Kinetic Concepts, Inc.*,
   No. CV 08-01885-BRO, 2017 WL 2713730 (C.D. Cal. Mar. 6, 2017)............................17, 24

*Ebeid ex rel. United States v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) ...............................................................................6, 11, 14, 22

*United States v. San Bernardino Mountains Cmty. Hosp. Dist.*,
   No. EDCV 17-00002 JGB, 2018 WL 5266867 (C.D. Cal. Sept. 27, 2018) ............................25

*Universal Health Services., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016)............................................................................................................24

*United States ex rel. Vatan v. QTC Med. Servs., Inc.*,
   721 F. App'x 662 (9th Cir. 2018) .........................................................................................10

## STATUTES

31 U.S.C.
   § 3729(a) .................................................................................................................................23
   § 3729(a)(1)(G).......................................................................................................................17
   § 3729(b)(1) ............................................................................................................................23
   § 3729(b)(4) ............................................................................................................................24
   § 3730(c)(5) ..........................................................................................................................7, 8

42 U.S.C.
   § 1320a-7b(b) ...........................................................................................................................9
   § 1320a-7k(d)(2) ................................................................................................................5, 17
   § 1320a-7k(d)(3) ................................................................................................................5, 17
   § 1320a-8 ...................................................................................................................................9
   § 1385nn(a)(1)(A)...................................................................................................................21
   § 1395dd .................................................................................................................................13
   § 1395nn(a)(1)(A)...................................................................................................................15
   § 1395nn(a)(1)(B)...................................................................................................................14
   § 1395nn, *et seq.* ...................................................................................................................14

Cal. Code Regs., tit. 22, § 70435(b).............................................................................................13

## RULES

Fed. R. Civ. P. 9(b) ........................................................................................................................6

Fed. R. Civ. P. 12(b)(6)..................................................................................................................5

## REGULATIONS

42 C.F.R.
   § 411.354................................................................................................................................15
   § 411.354(c)(1)(i)...................................................................................................................15
   § 411.354(c)(2) .......................................................................................................................16

66 Fed. Reg. 855, 864 (Jan. 4, 2001) ...............................................................................15

**OTHER AUTHORITIES**

S. Rep. 99–345, 1986 U.S.C.C.A.N. ..................................................................................8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Congress designed the False Claims Act ("FCA") *qui tam* provisions to reward whistleblowers who bring successful actions in the name of the Government.   When the Government pursues an alternate remedy outside of the FCA based on the same conduct alleged in a *qui tam* complaint, the whistleblower may be entitled to recover a portion of the settlement proceeds.   But neither the Government nor the relator get two bites at the apple—once the Government has elected its remedy and the relator receives her share of the settlement proceeds, the relator cannot turn around and seek an additional recovery for the very same conduct that has been settled and released.

In September 2014, Relator Laurie Hanvey ("Relator") filed her initial Complaint.   *See* Compl., Dkt. No. 1.   After several years of investigation by the Government, Relator and the Government entered into a $30.5 million settlement with Defendant Sutter Health concerning conduct alleged to have occurred during Relator's tenure as a Compliance Officer at a single Sutter Health hospital ("Settlement Agreement").   *See* First Am. Compl. ("FAC") ¶ 144, Dkt. No. 46.   As a result of the settlement, the Government declined to intervene in this action, Relator received $5,795,000 from the settlement proceeds and Relator stipulated to a dismissal with prejudice as to some of her claims.   *See id.*; United States' and State of California's Notice Regarding Election to Intervene, Dkt. No. 43; Stipulation of Partial Dismissal, Dkt. No. 44.

Having recovered on those claims, Relator now returns to this litigation with a First Amended Complaint seeking additional compensation.   The case law with regard to the settled FCA claims is clear—the Government can enter into a settlement agreement as an "alternate remedy" to a *qui tam* action, and claims settled under such an agreement are not subject to double recovery.   *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 648 (6th Cir. 2003) (holding that the Government can pursue a settlement agreement as an "alternative to judicial enforcement", but "it will not have an opportunity for dual recovery on the same claim or claims"); *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1011, 1013–14 (9th Cir.

2001) (finding that settlement agreement was a remedy that "effectively [took] the place of the FCA remedy"). Relator did not, however, abandon her allegations as to conduct already covered by the Settlement Agreement. Instead, rather than honor the terms of the agreement, Relator attempts to double recover for the same conduct involving the same claims under the FCA's reverse false claims provision by speculating, without any factual support, that there are some unspecified "overpayments" that Sutter has identified and wrongfully withheld. *See* FAC ¶¶ 147–48. The Court must not allow Relator's claims based on such conduct to proceed, both because a dual recovery would be inconsistent with the FCA's "alternate remedy" provisions, and because Relator has stipulated in accordance with the Settlement Agreement to dismiss those claims with prejudice.

The remainder of Relator's action fails as speculative and lacking the particularity required under Federal Rule of Civil Procedure 9(b). Relator worked for only two years at a single Sutter Health hospital and she released, by the Settlement Agreement and dismissal with prejudice, her right to claims regarding the only conduct about which she has personal knowledge. The remainder of the FAC simply describes the terms of a series of valid contractual arrangements between Sutter entities and physician groups with whom Relator had no involvement, coupled with speculative and conclusory assertions that such agreements violated the Stark Law and federal Anti-kickback Statute ("AKS") and led to the submission of false claims, or retention of overpayments to the Government, in violation of the FCA.

Relator's allegations do not plausibly allege fraud, nor does the FAC plead facts necessary to satisfy Rule 9(b)'s stringent particularity requirements. Relator fails to allege specific facts demonstrating that any improper relationship actually existed between Sutter and any referring physician, a prerequisite for pleading a FCA case based on these underlying statutory violations. Relator pleads no facts suggesting that any identified Sutter employee ever submitted a claim for payment or a false compliance certification knowing that such claim or certification was false. Relator also fails to provide specific facts showing that Sutter had the requisite intent to violate the AKS. Finally, Relator fails to meet the rigorous and demanding materiality pleading requirements.

1    For all of these reasons, Relator's FAC must be dismissed under Federal Rules of Civil

2    Procedure 12(b)(6) and 9(b).[1]

3    **II.    BACKGROUND**

4        **A.    Relator's Complaint**

5        On September 10, 2014, Relator filed a *qui tam* action in the United States District Court

6    for the Northern District of California against ten Sutter entities and nine physician groups alleging

7    eight causes of action: four under the federal False Claims Act ("FCA"), 31 U.S.C. §

8    3729(a)(1)(A)-(C), (G); and four under the California False Claims Act ("CFCA"), Cal. Gov't

9    Code § 12651(a)(1)-(3), (7).  *See* Dkt. No. 1.  Relator, who served as a local Compliance Officer

10   at a single Sutter hospital, Sutter Medical Center Sacramento ("SMCS") from December 2012 to

11   December 2014, alleged that Sutter entities had provided excessive compensation and other

12   incentives to physicians who referred patients to Sutter hospitals, and had conspired with physician

13   groups to do so.  Relator alleged that these arrangements violated the physician self-referral law,

14   42 U.S.C. § 1395nn (the "Stark Law"), the AKS, *id.* § 1320a-7b(b), and related state laws, giving

15   rise to liability under the FCA and CFCA.

16       **B.    Settlement of Claims Under the Stark Law and Anti-Kickback Statute**

17       In October 2019, following a nearly five-year investigation, the United States and Relator

18   entered into a Settlement Agreement with Sutter Health and SMCS that covered alleged Stark Law

19   violations arising from arrangements with only Sacramento Cardiovascular Surgeons Medical

20   Group ("Sac Cardio"), and only for the time period between September 1, 2012 and September

21   30, 2014.  *See* FAC ¶ 144.  Sutter Health and SMCS agreed to pay the United States $30,500,000

22   to settle these strict-liability Stark Law allegations (the "United States Covered Conduct").  *Id.*

23   For her part, Relator agreed to release any present or future claims against Sutter Health related to

24   Medicare claims "resulting from referrals by the physicians of [Sac Cardio], which claims violated

25   or resulted from violations **of the Stark Law or the AKS** during the period from September 1,

26

27   [1] Relator has failed to properly state her allegations, despite the opportunities afforded by a
     lengthy Government investigation and having had an opportunity to amend her original

28   Complaint.  Relator will not be able to do so if permitted to amend again, and therefore the FAC
     should be dismissed with prejudice.

1   2012 through September 30, 2014" ("Relator Covered Conduct"). *Id.* (emphasis added).  The

2   Relator's release was broader than the United States Covered Conduct, and Relator received a

3   share of the settlement.

4          On November 13, 2019, the United States filed a notice with the Court stating that it would

5   not intervene as to any claims against any Sutter entities.  *See* United States' and State of

6   California's Notice Regarding Election to Intervene, Dkt. No. 43.[2]   Shortly thereafter, in

7   accordance with the Settlement Agreement, the United States and Relator filed a Stipulation of

8   Partial Dismissal on November 21, 2019, in which Relator stipulated to a partial dismissal with

9   prejudice as to "claims in this action against Sutter Health and SMCS arising from SMCS's

10  submission of claims, and Sutter Health's causing SMCS to submit claims, to federal health

11  programs, including the Medicare and Medicaid programs, resulting from referrals by the

12  physicians of [Sac Cardio], which claims violated or resulted from violations **of the Stark Law**

13  **or the AKS** during the period from September 1, 2012, through September 30, 2014."  *See*

14  Stipulation for Partial Dismissal, Dkt. No. 44 (emphasis added).

15         **C.     Relator's First Amended Complaint**

16         On January 21, 2020, Relator filed a FAC containing allegations regarding five Sutter

17  entities (Defendants Sutter Health, Sutter Valley Hospitals, Sutter Valley Medical Foundation,

18  Sutter Bay Hospitals and Sutter Bay Medical Foundation) (collectively, "Sutter Defendants") and

19  eight physician groups ("Physician Group Defendants").[3]   Despite Relator's stipulation to a partial

20  dismissal with prejudice, Relator's factual allegations are largely unchanged from her initial

21  Complaint.  The FAC essentially restates the alleged Stark Law and AKS violations relating to

22  Sac Cardio, and covers the precise time period (September 1, 2012 through September 30, 2014)

23  of the Relator and United States Covered Conduct.  Relator alters her claims only insofar as she

24

25  [2] The United States stated that it would intervene against Sac Cardio for the purpose of
26  settlement, and only as to allegations related to the United States Covered Conduct.  The United
    States also noted that it had entered into a Settlement Agreement with SMCS to resolve "certain
27  claims not pending in this action."  *Id.*

    [3] Relator dropped her allegations against one of the physician group defendants in the original
28  Complaint, East Bay Perinatal Medical Associates.

SUTTER DEFENDANTS' NOTICE OF MOTION AND
MOTION TO DISMISS RELATOR'S FAC
Case No. 4:14-cv-04100-KAW

1   alleges that Sutter Defendants knowingly retained overpayments in violation of the FCA that

2   exceeded the settlement amount during the same period, and also knowingly retained

3   overpayments outside of that period due to the same conduct.  FAC ¶ 147.  Relator does not, and

4   cannot, plead any facts regarding Sac Cardio outside the time period covered by the Settlement

5   Agreement, which overlaps with her employment at SMCS.

6        The FAC also restates allegations relating to a series of financial arrangements between

7   other Sutter hospitals and other physician groups about which Relator has no personal knowledge.

8   Relator does not and cannot provide any particularized information regarding the seven physician

9   groups that practiced at hospitals where she did not work beyond the bare terms of their

10  agreements.  Relator simply restates the terms of each arrangement, and alleges without factual

11  support that each arrangement was intended to induce referrals and falls outside of an applicable

12  Stark Law exception or AKS safe harbor.

13  **III.   LEGAL STANDARD**

14       Under Federal Rules of Civil Procedure 12(b)(6), a court must dismiss a complaint that

15  fails to "state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6).  A claim under

16  the FCA based upon allegations of an underlying false certification of compliance requires a

17  showing of: "(1) a false statement of fraudulent course of conduct; (2) made with scienter; (3) that

18  was material, causing (4) the government to pay out money or forfeit moneys due." [4]  *United States*

19  *ex rel. Campie v. Gilead Scis., Inc.,* 862 F.3d 890, 899 (9th Cir. 2017) (citation omitted).  To the

20  extent a claim is based on the retention of an overpayment, there must also be a showing that the

21  defendant "identified" the overpayment and withheld it for more than 60 days or failed to disclose

22  it in an applicable cost report.  *See* 42 U.S.C. § 1320a-7k(d)(2)-(3) (the "Overpayment Rule").

23       To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to

24  relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see*

25  _____

26  [4] It is recognized that the CFCA is "patterned on similar federal legislation and it is appropriate
    to look to precedent construing the equivalent federal act."  *John Russo Indus. Sheetmetal, Inc. v.*
27  *City of L.A. Dep't of Airports*, 240 Cal. Rptr. 3d 217, 224 (Cal. Ct. App. 2018) (quoting *State of*
    *California v. Altus Finance*, 116 P.3d 1175, 1184 (Cal. 2005)).  Therefore, any failure to state a
28  claim under the FCA will similarly foreclose claims alleged under the CFCA.

1  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Claims are not plausible if there is an "obvious

2  alternative explanation." *Twombly*, 550 U.S. at 567.  While well-pleaded facts are accepted as true

3  for the purpose of deciding a motion to dismiss, "conclusory allegations" of illegal conduct are

4  insufficient.  *Id.*

5      A claim under the FCA must not be only plausible, it must also be pled with particularity.

6  Fed. R. Civ. P. 9(b); *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047,

7  1054-55 (9th Cir. 2011).  In a FCA case, the plaintiff therefore must allege "the who, what, when,

8  where, and how of the misconduct charged."  *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d

9  993, 998 (9th Cir. 2010).  It is insufficient for a relator to allege only "details of a scheme to submit

10  false claims"; she also must "identify representative examples of false claims" or, at the very least,

11  provide "reliable indicia that lead to a strong inference that claims were actually submitted."  *Id.*

12  at 998–99 (citation omitted).  Relator's FAC fails to meet these standards.

13  **IV.  ARGUMENT**

14      **A.  Relator Fails to State a Claim for Relief as to Sutter Health's Arrangements
            with Sac Cardio**

15

16      Relator's recycled allegations regarding Sutter Health's agreements with Sac Cardio must

17  be dismissed for several reasons.  First, Relator cannot seek dual recovery in connection with

18  claims that she and the United States have settled because the Settlement Agreement constitutes

19  an "alternate remedy" entered into by the United States under the FCA.  *See Bledsoe*, 342 F.3d at

20  649.  Second, Relator's allegations regarding the submission of false claims arising from Sutter

21  Defendants' arrangements with Sac Cardio outside of the Relator Covered Conduct are speculative

22  and imprecise, which fails to satisfy the level of specificity required under the rigorous pleading

23  standard of Rule 9(b).  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  This

24  is not surprising, given that Relator did not work for Sutter Health outside the time period covered

25  by the Settlement Agreement, and has no personal knowledge that would allow her to make

26  allegations with the particularity necessary to bring a claim.  Finally, Relator's overpayment claim

27  fails because the FAC contains no facts showing that Sutter Defendants identified an overpayment

28  and knowingly withheld that overpayment in violation of any obligation.

1.    **Relator already agreed to a release of claims related to Sac Cardio's alleged violations of the Anti-Kickback Statute and the Stark Law from September 1, 2012 through September 30, 2014**

Relator's allegations regarding conduct covered under the Settlement Agreement cannot be alleged anew in her FAC.  The United States opted to pursue the Settlement Agreement as an "alternate remedy," rather than intervene in Relator's *qui tam* action.  *See* 31 U.S.C. § 3730(c)(5) ("[T]he Government may elect to pursue its claim through any alternate remedy available to the Government[.]"); *see also Barajas*, 258 F.3d at 1014-15 (finding that a military settlement could constitute an "alternate remedy" under section 3730(c)(5)).

In order for a Government settlement to comprise an "alternate remedy" to a *qui tam* action, the conduct contemplated in the settlement must "overlap with the conduct alleged in Relator's complaint."  *Bledsoe*, 342 F.3d at 651; *see Rille v. Pricewaterhousecoopers LLP*, 803 F.3d 368, 373–74 (8th Cir. 2015).  There can be no reasonable dispute that overlap exists between the conduct alleged in Relator's FAC and the conduct contemplated in the Settlement Agreement: both contain allegations concerning the *same* arrangements with Sac Cardio that allegedly violated the Stark Law and AKS, allegedly resulting in the *same* submission of false claims to federal health programs during the *same* time period.  *See* FAC ¶ 144.  The United States and Relator filed a joint stipulation dismissing Relator's claims as to the conduct covered by the Settlement Agreement— claims which she repeats in her FAC nearly identically.  *See* Dkt. No. 44.  Relator cannot pursue these claims here, where the United States has "recovered funds lost ***from conduct asserted*** in Relator's *qui tam* action," as an "alternate remedy" to intervention in the action.  *Bledsoe*, 342 F.3d at 649 (emphasis added).[5]

---

[5] That the Settlement Agreement contained language indicating that the United States did not release Sutter Defendants from any claims under the FCA relating to the United States Covered Conduct, (*see* FAC ¶ 144), is not relevant to the "alternate remedy" analysis.  In *Bledsoe*, despite language in the settlement agreement that "specifically reserved and excluded" claims asserted in Relator's *qui tam* action, the Sixth Circuit applied a functional analysis in determining that the Government had "essentially settled Relator's claims."  *See* 342 F.3d at 649. Here, too, the facts are clear: the United States pursued settlement of the relevant claims as an "alternate remedy" to intervening in the *qui tam* action, regardless of any boilerplate language reserving its right of intervention.

1     When the Government resolves FCA claims by means of an "alternate remedy" or

2 settlement, it cannot proceed to pursue those same claims in a *qui tam* action.  *See id.* at 650

3 ("While the Government will have the opportunity to elect its remedy, it will not have an

4 opportunity for dual recovery on the same claim or claims.") (quoting S. Rep. 99–345, at 27, 1986

5 U.S.C.C.A.N. at 5292).  For the same reason, Relator cannot seek to recover based on allegations

6 that she and the United States already have resolved through an "alternate remedy."  *See Bledsoe*,

7 342 F.3d at 649.  Relator participated in the settlement, taking advantage of her right to recover

8 under the "alternate remedy" that the United States pursued.  *See* 31 U.S.C. § 3730(c)(5) ("If any

9 such alternate remedy is pursued in another proceeding, the person initiating the action shall have

10 the same rights in such proceeding as such person would have had if the action had continued

11 under this section."); *Barajas*, 258 F.3d at 1010 ("If the government chooses not to intervene in

12 the relator's action, but, instead, chooses to pursue 'any alternate remedy,' the relator has a right

13 to recover a share of the proceeds of the 'alternate remedy' to the same degree that he or she would

14 have been entitled to a share of the proceeds of an FCA action.").  Relator cannot then seek double

15 recovery based on this same conduct covered by the Settlement Agreement with Sutter Health and

16 SMCS.

17     Relator's FCA claims concerning arrangements between Sutter Defendants and Sac Cardio

18 are predicated upon conduct allegedly observed by Relator from September 1, 2012 through

19 September 30, 2014—the only time period during which she was employed by SMCS.  Relator is

20 bound by her Stipulation to Partial Dismissal of "claims in this action against Sutter Health and

21 SMCS arising from SMCS's submission of claims, and Sutter Health's causing SMCS to submit

22 claims, to federal health programs, including the Medicare and Medicaid programs, resulting from

23 referrals by the physicians of [Sac Cardio], which claims violated or resulted from violations of

24 the Stark Law or the AKS during the period from September 1, 2012, through September 30,

25 2014."  Dkt. No. 44.  A voluntary dismissal with prejudice has the effect of a final judgment on

26 the merits.  *See Smith v. Barrett, Daffin, Frappier, Treder & Weiss, LLP*, No. 18-CV-06098-RS,

27 2019 WL 2525185, at *8 (N.D. Cal. June 19, 2019) ("When the parties stipulate to a voluntary

28

dismissal with prejudice, it is considered a final judgment on the merits … Plaintiffs, therefore, may not assert claims based on such allegations.") (citation omitted).  Relator voluntarily entered into the stipulated partial dismissal of her claims, received $5,795,000 from the settlement proceeds and has not challenged the validity of that stipulation.  She cannot disregard this dismissal by raising claims she has already released by stipulation.

### 2. Relator fails to allege that any non-released claims related to Sac Cardio were "false"

Relator also attempts to pursue claims related to arrangements with Sac Cardio for claims submitted outside of the time period of the released conduct.  Relator contends that these claims were legally false, as they resulted from relationships that allegedly violated the Stark Law and AKS.  *See* FAC ¶ 143.  To satisfy Rule 12(b)(6), the FAC must allege facts sufficient to plead a violation of the FCA, the AKS and the Stark Law, and all must be alleged with the particularity required by Rule 9(b).  *See Frazier ex rel. United States v. Iasis Healthcare Corp.*, 392 F. App'x 535, 537 (9th Cir. 2010);  *United States v. Chang,* No. CV-13-3772-DMG (MRWx), 2017 WL 10544289, at *11 (C.D. Cal. July 25, 2017).  Relator's personal knowledge concerning Sutter Health's arrangements with Sac Cardio is solely limited to the conduct she allegedly observed during her SMCS employment, the entire time period of which is covered by the Settlement Agreement.  Relator has not, and cannot, allege with particularity violations of the AKS or Stark Law arising out of agreements with Sac Cardio resulting in false claims before September 1, 2012 or after September 30, 2014.

### a. Relator fails to plead that arrangements with Sac Cardio violated the AKS

The AKS imposes liability on any person who knowingly and willfully offers or pays remuneration to induce or reward referrals of items or services reimbursable by a federal health care program.  *See* 42 U.S.C. §§ 1320a-7b(b), 1320a-8.  To establish an AKS violation, a relator must allege with specificity that the defendant "knowingly and willfully offered or paid remuneration to induce referrals of program-related business." *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995); *see* 42 U.S.C. § 1320a-7b(b).  When the AKS is a predicate for

1   FCA claims, the elements of the alleged AKS violation must be alleged with particularity.  *See*

2   *Chang,* 2017 WL 10544289, at *10-*14.

3       The AKS is an intent-based statute with two separate heightened intent elements.  The

4   relator must allege that a defendant acted both "knowingly and willfully," (*i.e.*, with intent to

5   violate the law), and with intent to offer or pay remuneration in exchange for referrals.  *See United*

6   *States ex rel. Singh v. Bradford Reg'l Med. Ctr.*, 752 F. Supp. 2d 602, 640 (W.D. Pa. 2010).  In

7   order to adequately plead remuneration, Relator must specifically allege facts showing both (i) the

8   fair market value of Sac Cardio's arrangements with Sutter Health and (ii) that the physicians

9   received some benefit from Sutter Health in connection with these arrangements that was

10  something other than a fair market value exchange.  *See Bingham v. HCA, Inc.,* 783 F. App'x 868,

11  873–74 (11th Cir. 2019) (holding that relator must address "the issue of fair market value … in

12  order to show that [defendant] offered or paid remuneration to physician tenants"); *United States*

13  *ex rel. Gough v. Eastwestproto, Inc.*, No. CV 14-465 (DMG (SHx), 2018 WL 6929332, at *8 (C.D.

14  Cal. Oct. 24, 2018) ("In the context of the [AKS], courts use 'fair market value' as the gauge of

15  value when assessing the remuneration element of the offense.") (citation omitted).

16      Moreover, to satisfy Rule 9(b), a relator must also specifically allege that an individual, not

17  just a corporation generally, committed the relevant act.  *See United States ex rel. Vatan v. QTC*

18  *Med. Servs., Inc.*, 721 F. App'x 662, 664 (9th Cir. 2018) (finding that relator adequately pled the

19  "who" under Rule 9(b) by "proffer[ing] the names of individuals allegedly involved in

20  perpetuating the purported fraud"); *Dysthe v. Basic Research, LLC*, No. CV 09-8013 AG (SSX),

21  2010 WL 11596676, at *3 (C.D. Cal. May 10, 2010) (holding that to satisfy Rule 9(b), a plaintiff

22  "must allege 'who' at Defendants made the allegedly false statements, or at least provide a specific

23  explanation of why such an allegation is impossible to make").

24      As detailed below, Relator fails to adequately allege that any individual paid any illegal

25  remuneration or possessed the requisite intent to violate the AKS.  The FAC is devoid of

26  allegations that an individual at Sutter Heath or SMCS "knowingly and willfully offered or paid

27  remuneration to induce referrals of program-related business," or that the physician arrangements

28

---

at issue were outside of the range of fair market value or were otherwise commercially unreasonable. Furthermore, for each of the three types of arrangements with Sac Cardio, Relator fails to allege "the who, what, when, where, and how of the misconduct charged." *Ebeid*, 616 F.3d at 998.

### (1)    Physician Assistants Agreement

Relator fails to allege an AKS claim with respect to Sac Cardio's Physician Assistants Agreement because she alleges neither the fair market value of the Agreement, nor that Sac Cardio received some benefit from Sutter Health in connection with these arrangements that was something other than a fair market value exchange. *See Bingham,* 783 F. App'x at 873–74. First, Relator fails to allege the Physician Assistants Agreement is not consistent with fair market value for the services provided under the Agreement. She begins with a bare assertion that Sutter Health "provided free physician assistants to and for the direct benefit of Sac Cardio." FAC ¶ 99. However, the next paragraph reveals the true nature of the arrangement—a Physician Assistants Agreement by which Sutter Health paid Sac Cardio $170,000 for full-time use of each Sac Cardio Physician Assistant per year, or $56,666.66 per month, subject to submission of monthly time reports. *Id.* ¶ 100. Relator provides no further support for her allegations that the physician assistants provided "free" support to Sac Cardio, or that the payments made pursuant to the Physician Assistants Agreement were above fair market value or otherwise commercially unreasonable.

Second, Relator's general claims regarding allegedly improper remuneration all fall within the time period covered by the Settlement Agreement (September 1, 2012 to September 30, 2014) and therefore are not actionable here. *Id.* ¶ 119–128. Again, Relator cannot seek to recover for claims for which she has already recovered, and which she has released pursuant to the terms of the Settlement Agreement. *See supra* at 7–9. Moreover, those allegations indicate that any alleged payment beyond the scope of the Agreement was not contemplated or intended by Sutter Health. For example, Relator describes an investigation of inaccurately documented hours that led Sutter Health to place a hold on payments under the Physician Assistants Agreement pending further

1   investigation. *Id*. ¶ 121.  She then indicates that the hold was released only after the physician

2   assistants provided a third, revised set of timesheets—and she does not allege any issues with the

3   revised timesheets other than a suggestion that the services were compensable as part of surgical

4   global fees, for which she provides no further support or clarification. *Id*. ¶ 121.  Relator's

5   allegations concerning Sac Cardio's alleged billing of Medicare for services provided by the Sac

6   Cardio physician assistants similarly appear to indicate at most that Sutter Health responded to

7   claims that Sac Cardio was non-compliant with the Physician Assistants Agreement—she does not

8   allege with any particularity that non-compliance actually occurred, including "when" such alleged

9   noncompliance occurred, nor does she demonstrate that Sutter Health acted "knowingly and

10  willfully," (*i.e.*, with intent to violate the law), and with intent to offer or pay remuneration in

11  exchange for referrals. *Id*. ¶ 124.

12                    *(2)    Medical Director Agreements*

13          Relator alleges that Sutter Health "intended to reward Sac Cardio and its individual

14  physicians for its high-volume referrals with the lucrative and duplicative Medical Director

15  Agreements." *Id*. ¶ 110.  Once again, Relator supports this conclusory allegation primarily by

16  describing the compensation terms of each Medical Director Agreement. *Id*. ¶¶ 106–09.  She

17  alleges no specific facts identifying anyone at Sutter who acted with the intent to induce referrals,

18  or showing that any payments under the agreements were above fair market value or that the

19  Medical Director Agreements were duplicative.  *See Hanlester*, 51 F.3d at 1398; *Eastwestproto*,

20  2018 WL 6929332, at *8; *United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213,

21  1223 (W.D. Wash. 2011), *amended in part on other grounds by* No. C05-0058RSL, 2011 WL

22  13353774, (W.D. Wash. 2011).  In fact, the FAC reveals that the Agreements were not duplicative,

23  but rather covered separate and distinct service lines: the Cardiac Intensive Care Unit, the Sutter

24  Heart Institute, the Transplant Ventricular Assist Device Program, and the Surgical Ablation

25  Program.  FAC ¶¶ 107–09, Exs. 3–6.  Beyond simply describing the Medical Director Agreements,

26  Relator's lone factual allegation concerns one set of Sac Cardio Medical Director timesheets from

27  2014, the time period covered under the Settlement Agreement.  FAC ¶ 125.  Relator alleges

28

1   simply that the time sheets indicated that duplicative supervision occurred, and that she issued a

2   hold on further payments under the Medical Director Agreements pending further investigation—

3   in short, nothing sufficient to plausibly allege the existence of a kickback scheme with particularity

4   (even if this allegation were not precluded by the Settlement Agreement).  *See id.*

5                              *(3)    Call Coverage Agreements*

6           Relator alleges that Sutter Health "knowingly rewarded Sac Cardio for its high-volume

7   referrals with a preferential, exclusive, and above-market Call Coverage Agreement."  *Id.* ¶ 114.

8   However, nowhere in her FAC does Relator identify any Sutter Defendants "who" knowingly

9   rewarded Sac Cardio with these Agreements for its referrals, nor does the FAC contain any factual

10  allegations explaining how these Call Coverage Agreements were "preferential" or "above-

11  market."  Relator also fails to acknowledge that these call coverage agreements are used to ensure

12  the availability of cardiovascular surgeons to provide emergency services on a 24-hour basis, as

13  required by law.  *See* 42 U.S.C. § 1395dd; Cal. Code Regs., tit. 22, § 70435(b).[6]  Again, she merely

14  provides the terms of the Call Coverage Agreements and generally alleges that the rate Sutter

15  Health paid Sac Cardio for call coverage "exceeds fair market value and exceeds the rates paid by

16  Sutter Health to other similar cardiovascular surgeons during the same timeframes."  FAC ¶ 112.

17  Relator does not include any facts to support these conclusory allegations—namely, she does not

18  allege what fair market value payments for call coverage would be, or the rates that Sutter Health

19  paid similar cardiovascular surgeons during the same timeframes, and therefore fails to provide

20  the requisite specificity for her kickback allegations.  *See Hanlester*, 51 F.3d at 1398;

21  *Eastwestproto*, 2018 WL 6929332, at *8; *Diagnostic Imaging*, 787 F. Supp. 2d at 1223.

22                              *(4)    Alleged "Stacking"*

23          Finally, Relator alleges that through the "stacking" of the above arrangements, Sutter

24  Health "knowingly created a financial relationship with the Sac Cardio Physicians that was

---

[6] Relator also inaccurately characterizes the practice of paying Sac Cardio for providing 24-hour call coverage while permitting Sac Cardio to bill for professional services rendered as "being paid twice for professional services rendered under the Call Coverage Agreements."  FAC ¶ 115. The $2,500 per 24-shift paid to Sac Cardio under the agreement is compensation for the surgeons making themselves readily available to provide emergency services at SMCS on a 24-hour basis, not compensation for the professional services themselves.  *See Id.* Exs. 7–9.

1  commercially unreasonable, grossly in excess of fair market value."  FAC ¶ 118.  In support of

2  this conclusory allegation, Relator includes only the compensation terms of each arrangement.  *Id.*

3  ¶ 117.  Once again, Relator fails to demonstrate how the arrangements considered together were

4  commercially unreasonable or in excess of fair market value, and therefore fails to plausibly allege

5  with particularity the existence of a "stacking" kickback scheme.  *See Hanlester*, 51 F.3d at 1398;

6  *Eastwestproto*, 2018 WL 6929332, at *8; *Diagnostic Imaging*, 787 F. Supp. 2d at 1223.

### b.  Relator fails to plead that arrangements with Sac Cardio violated the Stark Law

9  The Stark Law prohibits physicians from referring patients for most hospital services

10  payable by Medicare or Medicaid from entities with which a physician or an immediate family

11  member has a financial relationship, unless an exception applies.  42 U.S.C. § 1395nn, *et seq.*  The

12  Stark Law also prohibits hospitals from submitting claims for designated health services if the

13  services were provided pursuant to a prohibited referral.  *See id.* § 1395nn(a)(1)(B).  As with her

14  allegations that Sutter Health's arrangements with Sac Cardio violated the AKS, Relator's

15  allegations that such arrangements violated the Stark Law are also insufficient to establish a claim

16  under the FCA.

17  Relator's Stark Law claims must fail because she fails to allege an essential element of

18  such claims: that the Sac Cardio physicians referred patients for applicable hospital services

19  payable by Medicare or Medicaid to Sutter Health.  The FAC only describes referrals from Sac

20  Cardio that were made in 2013—a time period for which she has released her rights to claims

21  resulting from alleged violations of the Stark Law or AKS under the Settlement Agreement.  *See*

22  FAC ¶¶ 139–40.  Her remaining, general allegations that Sutter Health violated the Stark Law,

23  which lack specificity regarding the alleged referrals, are insufficient under Rule 9(b).  *See Ebeid*,

24  616 F.3d at 1000; *see also United States v. Ctr. for Diagnostic Imaging, Inc.*, No. C05-0058, 2011

25  WL 13353773, at *4 (W.D. Wash. Aug. 12, 2011) (dismissing plaintiff's Stark Law allegations

26  where the relator did not allege when the referrals occurred, how many were made, the patients

27  involved, or what services the referrals involved).  Because Relator does not allege that Sac Cardio

28  actually made any referrals to Sutter Health for designated health services prior to or after 2013,

1   Relator fails to allege that Sutter Health violated the Stark Law pursuant to its arrangements with
2   Sac Cardio.

3          In addition, to proceed past the pleading stage, a relator must plead specific facts showing
4   that a "financial relationship," as defined by the Stark Law, exists between a physician and a
5   hospital.  *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed. Appx. 693, 698
6   (11th Cir. 2014) (citing 42 U.S.C. § 1395nn(a)(1)(A)); *see also Ctr. for Diagnostic Imaging*, 2011
7   WL 13353773, at *3 (finding plaintiffs' allegations sufficient to establish financial relationship
8   only as to certain physicians).   Financial relationships include both direct and indirect
9   compensation arrangements.   *See* 42 C.F.R. § 411.354.[7]   Relator has not alleged a *direct*
10  compensation arrangement between Sutter Health and the Sac Cardio physicians, Dr. Michael
11  Ingram, Dr. Robert Kincade and Dr. James Longoria ("Sac Cardio Physicians"), but instead
12  contends that Sutter Health/SMCS had *indirect* compensation relationships with them through Sac
13  Cardio's various contracts.  FAC ¶¶ 99, 106, 111, 116.  If Relator cannot plead facts demonstrating
14  that these arrangements satisfy the very specific regulatory definition of an "indirect compensation
15  arrangement," then she has not alleged a financial relationship and her Stark Law claims must fail.
16  *See* Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which
17  They Have Fin. Relationships, 66 Fed. Reg. 855, 864 (Jan. 4, 2001) (explaining "[t]he existence
18  of a financial relationship … is the factual predicate for triggering the application" of the Stark
19  Law).

20         Under the Stark Law, an indirect compensation arrangement exists only when all three of
21  the following elements are present: (1) the hospital and the physician are connected by an unbroken
22  chain of entities with financial relationships between them; (2) the aggregate compensation
23  ***received by the physician*** "varies with, or takes into account, the volume or value of referrals or
24  other business generated by the referring physician" for the hospital; and (3) the hospital actually

---

25
26  [7] A direct compensation arrangement exists if remuneration passes between the referring
    physician and the entity furnishing DHS (the hospital) without any intervening persons or
    entities, for example, an employment agreement between a hospital and a doctor, or a doctor
27  leasing office space directly from a hospital. *See* Ctrs. for Medicare and Medicaid Servs., Dep't
    of Health and Hum. Servs., Fin. Relationships Between Physicians and Entities Furnishing
28  Designated Health Servs., 42 C.F.R. § 411.354(c)(1)(i) (2010).

knows, recklessly disregards, or is deliberately ignorant, of the fact that ***the physician's compensation*** varies with or takes into account the volume or value of referrals. *See* 42 C.F.R. § 411.354(c)(2) (emphasis added). Relator has alleged the first prong of this definition by pleading a chain of financial relationships between Sutter hospitals and physicians by virtue of their contractual arrangements. She fails, however, to plead facts sufficient to establish the second and third prongs.

For an arrangement to satisfy the second prong, the compensation paid to the physician must vary with, or take into account, the volume or value of the patients referred by the physician to the hospital. *Id.*; *see also Singh*, 752 F. Supp. 2d at 618. In making the "volume or value of referrals" inquiry, the Stark Law requires an analysis of the compensation arrangement closest to the referring physicians—Relator must demonstrate that the ***compensation paid to the physicians by Sac Cardio*** varied with or took into account patient referrals to SMCS. *Singh*, 752 F. Supp. 2d at 621. Relator fails to satisfy this prong because she does not allege any facts about the physicians' compensation from Sac Cardio—much less that this compensation varied with or took into account the volume or value of referrals made to SMCS.

Relator also cannot satisfy the third prong because she has not alleged that Sutter Defendants knew, recklessly disregarded, or were deliberately ignorant of the fact that the physicians' compensation varied with or took into account the volume or value of referrals. Because Relator has not pled facts demonstrating that Sac Cardio's arrangements with Sutter Health satisfy the regulatory definition of an "indirect compensation arrangement," her FCA claims predicated on a Stark Law violation must fail.

### 3. Relator fails to allege that Sutter Health knowingly withheld any identified overpayments related to Sac Cardio

Relator alleges that Sutter Health "knows that it had an obligation to refund more than $30.5 million in partial settlement payments covering (only) the period from September 1, 2012, through September 30, 2014," *see* FAC ¶ 147, and that Sutter "knowingly avoided its obligation to refund to the United States and the State of California overpayments received from false claims on Stark and AKS-prohibited referrals by the Sac Cardio Physicians for periods before September

1, 2012 and after September 30, 2014." *Id.* The "reverse false claims" provision of the FCA "creates liability for one who … 'knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.'" *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 335–36 (9th Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(G)). Where a plaintiff claims that this obligation arises from the retention of an overpayment, she must plausibly allege that the defendant "identified" an overpayment and withheld it for more than 60 days or failed to disclose it in an applicable cost report. *See* 42 U.S.C. § 1320a-7k(d)(2)-(3). "In cases where a plaintiff alleges a reverse false claim by claiming that the defendant fraudulently overcharged the government and then failed to repay the government, courts have consistently dismissed the claim as redundant of false statement and presentment claims." *United States v. Kinetic Concepts, Inc.*, No. CV 08-01885-BRO (AGRx), 2017 WL 2713730, at *13 (C.D. Cal. Mar. 6, 2017) (citation omitted).

Here, the factual basis for Relator's claims that Sutter Defendants knowingly retained an overpayment by the Government is unclear, as she appears to rely solely upon the existence of the Settlement Agreement to support these allegations. But the Settlement Agreement by its terms did not comprise an admission of liability as to any alleged violation, even as to the specific claims covered by the Settlement Agreement, let alone those falling outside of the scope of that agreement. Therefore, the execution of that agreement cannot show that Sutter Defendants "identified" any overpayment giving rise to an obligation to repay the government. *See* 42 U.S.C. § 1320a-7k(d)(3). And, as discussed above, Relator has failed to plausibly allege that any violations occurred with respect to Sac Cardio-related conduct and claims outside of the released time period, and she has released any claims concerning alleged violations during that period. If there is no underlying violation, there is no overpayment that could have been wrongfully withheld. *See Serco,* 846 F.3d at 336 ("The 'reverse false claims' provision does not eliminate or supplant the FCA's false claim requirement.") (quoting *Cafasso*, 637 F.3d at 1056). Moreover, having failed to allege any violation of the Overpayment Rule, Relator's reverse false claim is "redundant" of her presentment claims. *See Kinetic Concepts*, 2017 WL 2713730, at *13–14.

1    Accordingly, Relator fails to allege a "reverse false claim," and her allegations regarding retention

2    of an overpayment must be dismissed.

3    **B.  Relator Fails to State a Claim for Relief as to Sutter Health's Arrangements
         with Other Named Physicians and Groups**

4

5    Relator similarly fails to allege valid FCA claims with respect to other Sutter Health

6    facilities' financial arrangements with other physicians.  The FAC simply recites the terms of each

7    arrangement and then states in identical conclusory language that each arrangement violates the

8    Stark Law and AKS.  Relator's summary and unfounded allegations do not come close to satisfying

9    the particularity requirements of Rule 9(b).  *See Cafasso*, 637 F.3d at 1055.  Therefore, Relator's

10   claims regarding Dr. Roberts, East Bay Cardiac, BASS, Stephen K. Liu, M.D., PC and CEPMG

11   (the "Non-Sac Cardio Physicians") should be dismissed.[8]

12   **1.  Relator fails to allege that any claims related to the Non-Sac Cardio
         Physicians were "false"**

13   Relator includes a series of conclusory, repetitive and unsupported allegations related to

14   Sutter Health's arrangements with the Non-Sac Cardio Physicians.  As was the case with her

15   legally deficient claims against Sac Cardio, Relator contends that Sutter Health's claims for

16   payment were legally false, resulting from relationships that violated the AKS and Stark Law.  For

17   each of these arrangements, Relator merely describes the terms of the arrangement and then

18   generally alleges that Sutter Health intended the agreement to reward the physicians for their

19   referrals and that the agreements were in excess of fair market value.  *See* FAC ¶¶ 149, 151–52,

20   157, 159–60, 162–63, 167, 169–74, 176, 183–85, 188, 194-200.  There is a complete failure on

21   Relator's part to allege the details of the alleged underlying violations, as required by Rule 9(b).

22   **a.  Relator fails to plead that arrangements with the Non-Sac Cardio
         Physicians violated the AKS**

23

24   Relator concludes—without factual support—that Sutter Health intended each of its

25   agreements with Dr. Roberts, East Bay Cardiac, BASS, Stephen K. Liu, M.D., PC and CEPMG to

26   

27   [8] Moreover, any claims against Sutter Medical Group must be dismissed, as the FAC includes no substantive allegations or theories of liability regarding this entity.  Recently, Relator voluntarily dismissed Sutter East Bay Physicians Medical Group, Inc., and Sutter Independent Physicians from her FAC, which received similarly cursory treatment in the FAC.  *See* Dkt. No. 73.

28

1   reward the physicians for their referrals and that the agreements were in excess of fair market value

2   in violation of the AKS. *See id.* These allegations are insufficient to demonstrate an AKS violation

3   in connection with these arrangements.

4          Most fundamentally, Relator fails to allege the payment of illegal remuneration, as she

5   does not allege how compensation was above fair market value or what fair market value was for

6   the services provided under each agreement. *See Bingham,* 783 F. App'x at 873–74. Instead,

7   Relator's allegations follow an identical pattern: Relator parrots the payment terms of the relevant

8   agreements of which she appears to have obtained a copy during her employment with Sutter

9   Health and then alleges in a conclusory manner that the financial relationship was "commercially

10  unreasonable" and "grossly in excess of fair market value[.]" FAC ¶¶ 152, 163, 177, 189, 201.

11  But Relator cannot allege the payment of remuneration under the AKS unless she alleges facts

12  indicating what fair market value was for the services provided and that some above-fair market

13  value amount was paid, which she has not done. *See Bingham,* 783 F. App'x at 873–74;

14  *Eastwestproto*, 2018 WL 6929332, at *8; *see also Diagnostic Imaging*, 787 F. Supp. 2d at 1223.

15         Relator also fails to specifically allege that any individual paid any illegal remuneration or

16  possessed the requisite intent to violate the AKS. The FAC is devoid of any facts that would

17  support a finding that any particular individual at Sutter Health entered into the Non-Sac Cardio

18  Physicians' arrangements to induce or reward referrals, that any individual at Sutter Health knew

19  that compensation was above fair market value and not commercially reasonable, or knew that the

20  transactions at issue violated the law. The FAC contains only conclusory allegations, unsupported

21  by factual detail necessary to satisfy Rule 9(b).

22                         *(1)     Dr. Roberts Medical Director Agreement*

23         In addition to the boilerplate allegations against each of the Non-Sac Cardio Physicians,

24  Relator pleads other general allegations regarding Dr. Roberts, which also fail to satisfy Rule 9(b).

25  Regarding Sutter Health's Medical Director Agreement with Sutter Medical Foundation, which

26  names Dr. Roberts as Medical Director of SMCS's cardiovascular service line, Relator alleges that

27  the Agreement was a "sham" as Dr. Roberts could not have performed his clinical work in addition

28

1   to his work as Medical Director.  FAC ¶ 150.  Dr. Roberts's Medical Director Agreement provides

2   that Sutter Medical Foundation will be paid for *up to* 121 hours per month of administrative

3   services performed by Dr. Roberts.  *Id*. ¶ 149, Ex. 17.  However, nowhere does Relator allege how

4   many hours Dr. Roberts actually performed and was paid for under the Agreement each month.

5   Nor does Relator allege that she has any special insight or knowledge into Dr. Roberts's medical

6   practice or the administrative services he provided pursuant to the Agreement.  Relator improperly

7   assumes that Dr. Roberts could not have performed his clinical work in addition to his Medical

8   Director duties based solely on the terms of the Agreement and the fact that he billed Medicare

9   "over $200,000 during the year 2012."  *Id*. ¶ 150.  Such conjecture without supporting factual

10  allegations is not sufficient to allege an AKS violation under Rule 9(b).

11                      *(2)    Call Coverage Agreements with East Bay Cardiac and*
12                              *CEPMG*

13         Relator also generally alleges additional "facts" regarding East Bay Cardiac and CEPMG

14  that similarly fail to meet Rule 9(b)'s stringent pleading requirements.  With respect to Sutter East

15  Bay Hospital's 2014 Call Coverage Agreement with East Bay Cardiac, which includes data

16  collection services, Relator alleges that Sutter East Bay Hospital and East Bay Cardiac admitted

17  that the group was not fully performing the data collection services, that Sutter East Bay Hospital

18  waived its contractual right to collect an overpayment from the group within 30 days, and that

19  Sutter East Bay Hospital allowed the group to be paid for over four months "with the benefit of

20  the additional compensation payable for purported data collection services under the February 1,

21  2014 version of the Coverage Agreement."  *Id.* ¶ 161.  However, Relator fails to allege any facts

22  regarding the identity of individuals at Sutter East Bay Hospital or East Bay Cardiac who allegedly

23  admitted that the group was not providing the data collection services, or who waived the hospital's

24  right to collect the overpayment from East Bay Cardiac.  Additionally, Relator does not allege how

25  this decision was intended to reward East Bay Cardiac for its referrals.  Furthermore, from her

26  position at SMCS, Relator had no personal knowledge of the data collection services provided by

27  East Bay Cardiac at Sutter East Bay Hospital, and accordingly does not plead any facts regarding

28  the services actually provided.

1    Relator also alleges that because two East Bay Cardiac physicians appeared on the June

2    2014 call coverage reports for Eden Medical Center, in addition to providing cardiac surgery call

3    coverage at Alta Bates Summit Medical Center, Sutter Health was double paying these East Bay

4    Cardiac physicians for call coverage.  *Id*. ¶ 175.  However, Relator does not allege that these

5    physicians failed to provide the coverage required by each agreement, nor does she explain how

6    two physicians being compensated for providing call coverage at two different facilities constitutes

7    "double paying" for call coverage.

8    Finally, Relator alleges that one purpose of the Emergency Department ("ED") Coverage

9    Agreement with CEPMG at Memorial Hospital Los Banos was to "restrict competition and induce

10    CEPMG Physicians to refer patients exclusively to Sutter Health."  *Id*. ¶ 199.  The only explanation

11    Relator provides for this conclusory allegation is the fact that the ED Coverage Agreement

12    included a provision that "no Physician assigned to provide services to Hospital shall also be

13    assigned at any time throughout this Agreement to provide services to Doctors Medical Center in

14    Modesto, California."  *Id*.  However, this provision alone fails to demonstrate an AKS violation,

15    and Relator fails to allege which individuals at Sutter Health allegedly intended this agreement to

16    induce CEPMG physicians to refer patients exclusively to Sutter Health, or that compensation paid

17    under this arrangement was above fair market value.

18
19
           **b.**    **Relator fails to plead that arrangements with the Non-Sac Cardio Physicians triggered the Stark Law's referral prohibition**

20    With respect to Sutter Health's arrangements with the Non-Sac Cardio Physicians, Relator

21    fails to allege a key element of a Stark Law claim: that the physicians made "a referral to the entity

22    of certain designated health services [("DHS")]" covered by the Medicare program.  42 U.S.C. §

23    1385nn(a)(1)(A).  Even if Relator had adequately alleged a financial arrangement[9] sufficient to

24

25

26
27
28

---

[9] For the same reasons discussed above in Section IV.A.2.b, Relator has failed to establish an indirect financial relationship between Sutter Health and Dr. Roberts, East Bay Cardiac, BASS or CEPMG.  Even assuming Relator sufficiently alleges a financial relationship between Stephen K. Liu, M.D., PC and Memorial Medical Association or Sutter Central Valley Hospitals (*see* FAC ¶¶ 27, 183, Exs. 26, 27), Relator's Stark Law claims still fail because she failed to allege that Dr. Liu made any prohibited referrals.

trigger the Stark Law's referral prohibition, general allegations that Sutter Health violated the Stark Law, lacking any details or facts setting out the details of the alleged referrals, are insufficient under Rule 9(b).  *See Ebeid*, 616 F.3d at 993; *Ctr. for Diagnostic Imaging*, 2011 WL 13353773, at *3.

Here, Relator does not identify which physicians made referrals of Medicare patients for DHS, when referrals occurred, how many were made, the patients involved, or what alleged services the referrals involved.  And it is not surprising that Relator cannot allege these facts because she worked only at SMCS, and only for a limited time, whereas these physicians practiced primarily at other facilities.  Accordingly, Relator fails to sufficiently allege that Sutter Health received prohibited referrals in violation of the Stark Law as a result of its arrangements with the Non-Sac Cardio Physicians.

> **2.    Relator fails to allege that Sutter Health submitted claims resulting from prohibited referrals by the Non-Sac Cardio Physicians in violation of the FCA**

Relator's claims against the Sutter Defendants regarding agreements with the Non-Sac Cardio Physicians also fail because she does not identify any allegedly false claims submitted to the Government by the Sutter Defendants resulting from referrals from these groups and physicians.  A relator must allege "specific details concerning any particular false claim for payment submitted … to the government."  *United States ex rel. Lacy v. New Horizons, Inc.*, 348 F. App'x 421, 425 (10th Cir. 2009); *see Cafasso*, 637 F.3d at 1057 (an allegation that "identifies a general sort of fraudulent conduct but specifies no particular circumstances of any discrete fraudulent statement, is precisely what Rule 9(b) aims to preclude").  Otherwise, the complaint does not "supply reasonable indicia that false claims were actually submitted."  *Ebeid*, 616 F.3d at 999.

Relator has not and cannot provide any information relating to the submission of any specific claim for payment to a federal or state healthcare program related to the Non-Sac Cardio Physicians.  In connection with these physicians, Relator pleads no facts regarding: (1) the date on which false or fraudulent claims were submitted; (2) the identities of any Sutter Health employees

1   or department responsible for submitting false or fraudulent claims; (3) patient names for whom

2   false or fraudulent claims were submitted by Sutter Health; and (4) any federal or state healthcare

3   program to whom Sutter Health submitted false or fraudulent claims.  Further, Relator does not

4   allege that the Non-Sac Cardio Physicians have ever practiced at SMCS, so Relator cannot

5   establish any "insider" knowledge of claims submitted for these physicians.  Thus, because Relator

6   fails to plead with specificity and identifies no particular claims, Relator's claims regarding the

7   Non-Sac Cardio Physicians must be dismissed.

8                    **3.      Relator fails to allege the scienter element of her FCA claims against
                              the Non-Sac Cardio Physicians**

9

10          A claim under the False Claims Act requires a showing that a false statement or fraudulent

11   course of conduct was made "knowingly."  31 U.S.C. § 3729(a).  For FCA purposes, "knowing"

12   means that a defendant "(i) has actual knowledge of the information; (ii) acts in deliberate

13   ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or

14   falsity of the information."  *Id.* § 3729(b)(1).  "Mere negligence, however, is insufficient to state a

15   claim under the FCA."  *United States ex rel. Integra Med Analytics LLC v. Providence Health &*

16   *Servs.*, No. CV 17-1694 PSG (SSX), 2019 WL 3282619,  at *21 (C.D. Cal. July 16, 2019); *see*

17   *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1175 (9th Cir. 2006) ("[I]nnocent

18   or unintentional violations do not lead to False Claims Act liability.").

19          The FAC includes only boilerplate allegations that Sutter Defendants had knowledge of

20   the alleged violations of the AKS and Stark Law, which are not sufficient to establish this element

21   of a FCA claim.  *See United States ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1012,

22   1024 (C.D. Cal. 2015), *aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th

23   Cir. 2017) (finding, "[i]n the absence of any factual allegations supporting relators' assertion that

24   defendants acted with the requisite scienter," that relator's conclusory allegations of knowledge

25   were insufficient to plead a plausible claim for relief).  Moreover, having failed to establish any

26   violation of the AKS or Stark Law, as described above, Relator's allegations do not support an

27   inference of the requisite scienter.  *See United States ex rel. Cook v. Providence Health & Servs.*,

28   No. C13-1312RAJ, 2014 WL 4094116, at *7 (W.D. Wash. Aug. 18, 2014) (finding "no allegations

ATTORNEYS AT LAW

                                                  23                    SUTTER DEFENDANTS' NOTICE OF MOTION AND
                                                                        MOTION TO DISMISS RELATOR'S FAC
                                                                        Case No. 4:14-cv-04100-KAW

1  giving rise to a plausible inference that [defendant] was deliberately ignoring or recklessly

2  disregarding" information concerning unlawful activity").  Relator therefore has failed to allege

3  the scienter element of her claims based on Sutter Health's arrangements with the Non-Sac Cardio

4  Physicians.

5  **C.  Relator Fails to Plead that the Alleged Violations as to All Sutter Health Arrangements Were Material to the Government's Payment of Claims**

6

7  "Under the False Claims Act, a falsehood is material if it has 'a natural tendency to

8  influence, or be capable of influencing, the payment or receipt of money or property.'" *Gilead*

9  *Scis.*, 862 F.3d at 904–05 (quoting 31 U.S.C. § 3729(b)(4)).  *Universal Health Services., Inc. v.*

10  *United States ex rel. Escobar* instructs that the FCA's materiality requirement is "rigorous" and

11  "demanding," and that it must be strictly enforced because the FCA is not "an all-purpose antifraud

12  statute" nor "a vehicle for punishing garden-variety breaches of contract or regulatory violations."

13  136 S. Ct. 1989, 2002–03 (2016) (citation omitted).  The standard is not "too fact intensive for

14  courts to dismiss [FCA] cases on a motion to dismiss." *Kinetic Concepts*, 2017 WL 2713730, at

15  *10 (quoting *id.* at 2004 n.6).

16  As Relator acknowledges, CMS has continuously made payments to Sutter Health for

17  services provided by Sac Cardio after September 2014.  *See* FAC ¶ 147.  Moreover, the FAC,

18  though filed over five years after the case's initiation, contains no suggestion of any remedial

19  actions taken by either CMS or DOJ other than with respect to the Sac Cardio claims that were

20  released in connection with the Settlement Agreement.  In other words, the Government has not

21  acted as if the alleged violations in the FAC are material to the Government's payment decision.

22  Relator pleads no facts to overcome this strong evidence of lack of materiality. *Gilead Scis.*, 862

23  F.3d at 907 ("[I]f the Government pays a particular claim in full despite its actual knowledge that

24  certain requirements were violated, that is very strong evidence that those requirements are not

25  material.  Or, if the Government regularly pays a particular type of claim in full despite actual

26  knowledge that certain requirements were violated, and has signaled no change in position, that is

27  strong evidence that the requirements are not material."); *United States ex rel. Harman v. Trinity*

28  *Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017) ("[T]hough not dispositive, continued payment by

1  the federal government after it learns of the alleged fraud substantially increases the burden on the

2  relator in establishing materiality.").

3          The failure to allege that the Government discontinued payment, particularly when coupled

4  with its declination to intervene, is regularly deemed sufficient to dismiss a FCA complaint on

5  materiality grounds.  *See, e.g.*, *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490

6  (3d Cir. 2017) (affirming dismissal of a FCA claim in part because the government failed to stop

7  payment and declined to intervene in the case); *United States ex rel. Folliard v. Comstor Corp.*,

8  308 F. Supp. 3d 56, 86–87 (D.D.C. 2018) (dismissing FCA action where DOJ declined to intervene

9  and the amended pleading, "filed after the government was fully informed for years about the

10  relator's allegations regarding the defendant's purported role in the fraudulent scheme, [wa]s silent

11  as to whether the government took any action whatsoever against the defendants"); *United States*

12  *v. San Bernardino Mountains Cmty. Hosp. Dist.*, No. EDCV 17-00002 JGB (KKX), 2018 WL

13  5266867, at *8 (C.D. Cal. Sept. 27, 2018) (granting motion to dismiss based on materiality

14  argument where government declined to intervene and Relator failed to show hospital

15  reimbursement requests had been rejected despite actual knowledge of wide-scale noncompliance

16  with the location requirement being "strong evidence that the requirements are not material").

17  Relator therefore fails to allege materiality as to her claims against all Defendants and the Court

18  should dismiss such claims on that basis.

19  **V.    CONCLUSION**

20          For the foregoing reasons, the Sutter Defendants respectfully request that the Court dismiss

21  Relator's First Amended Complaint in its entirety with prejudice.

22  Dated:  June 25, 2020                    Respectfully submitted,

23                                          LATHAM & WATKINS LLP

24

25                                          By: */s/  Jason M. Ohta*
                                                 Jason M. Ohta

26                                          *Attorneys for Defendants Sutter Health, Sutter*
27                                          *Valley Hospitals, Sutter Valley Medical*
                                            *Foundation, Sutter Bay Hospitals and Sutter*
28                                          *Bay Medical Foundation*

1

## **CERTIFICATE OF SERVICE**

2          I HEREBY CERTIFY that on June 25, 2020, the foregoing document was served on all

3   counsel of record by ECF or electronic mail.

4

5   Dated: June 25, 2020                              */s/  Jason M. Ohta*
                                                       Jason M. Ohta
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS┗┗┛
    ATTORNEYS AT LAW