BOIES SCHILLER FLEXNER LLP
George F. Carpinello (admitted *pro hac vic*e)
gcarpinello@bsfllp.com
30 S. Pearl St. 11th Floor
Albany, NY 12207
Telephone:       (518) 434-0600
Facsimile:       (518) 434-0665

Sean P. Rodriguez (SBN 262437)
srodriguez@bsfllp.com
Alexander J. Konik (SBN 299291)
akonik@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone:       (415) 293-6800
Facsimile:       (415) 293-6899

Marlan B. Wilbanks (admitted *pro hac vic*e)
mbw@wilbanksgouinlock.com
Susan S. Gouinlock
ssg@wilbanksgouinlock.com
WILBANKS & GOUINLOCK, LLP
3414 Peachtree Road, NE, Suite 725
Atlanta, GA 30326
Telephone:       (404) 842-1075
Facsimile:       (404) 842-0559

Additional counsel on signature page

*Attorneys for Qui Tam Plaintiff/Relator*
Laurie M. Hanvey

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA *ex rel.* LAURIE M. HANVEY, <br><br>              Relator, <br><br>       *v.* <br><br> SUTTER HEALTH *et al.*, <br>              Defendants. | Case No. 4:14-cv-04100-KAW <br><br> **RELATOR'S CONSOLIDATED OPPOSITION TO DEFENDANTS' SIX MOTIONS TO DISMISS** <br><br> (Responding to ECF Nos. 74, 75, 76, 77, 78, 79) <br><br> Hearing Date:    October 29, 2020 <br> Hearing Time:   1:30 p.m. <br> Courtroom:     Four, Third Floor <br> Judge:            Hon. Kandis A. Westmore <br><br><br> Action Filed:    September 10, 2014 <br> Trial Date:      None Set. |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ....................................................................................................1

II.     THE FRAUDULENT SCHEME AND PROCEDURAL BACKGROUND ..........3

III.    LEGAL STANDARD............................................................................................9

IV.     ARGUMENT .......................................................................................................10

        A.      The FAC Does Not Seek Recovery for Settled Conduct...........................10

                1.      The Partial Settlement agreement resolves only a limited, specific subset of the false claims alleged by Relator to have been submitted. ......................................................................................10

                2.      Relator does not seek double recovery............................................14

        B.      The Detailed FAC Contains More Than Enough Factual Allegations. ......14

                1.      The FAC pleads fraud with specificity............................................15

                2.      The FAC pleads *scienter* ................................................................19

                3.      The fraud and false statements were material .................................27

                4.      Relator adequately alleges liability based on an overpayment or "reverse false claims" theory.........................................................31

        C.      Defendants' Other Objections Are Meritless..............................................34

                1.      The FAC alleges FCA violations against each non-Sutter Defendant. ......................................................................................34

                2.      Sutter Medical Group willfully ignores numerous allegations. ......34

                3.      CEPMG cannot avoid accountability by quarreling about legal entity names or asserting purported facts about its business...........35

                4.      East Bay Cardiac ............................................................................38

                5.      BASS ...............................................................................................40

                6.      Liu MD PC .....................................................................................40

V.      CONCLUSION....................................................................................................40

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................... 9, 19, 21

*Bingham v. HCA, Inc.*,
   783 F. App'x 868 (11th Cir. 2019) ..................................................................... 27

*Burke v. Steinmann*,
   2003 WL 21507490 (S.D.N.Y. June 30, 2003) ................................................. 10

*Connecticut Nat. Bank v. Germain*,
   503 U.S. 249 (1992) ........................................................................................... 34

*Coto Settlement v. Eisenberg*,
   593 F.3d 1031 (9th Cir. 2010) ........................................................................... 35

*Dysthe v. Basic Research, LLC*,
   2010 WL 11596676 (C.D. Cal. May 10, 2010) ................................................. 22

*Ebeid ex rel. U.S. v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) ........................................................... 9, 15, 16, 39

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ........................................................................... 37

*F.T.C. v. Garvey*,
   383 F.3d 891 (9th Cir. 2004) ............................................................................. 11

*Glassey v. Amano Corp.*,
   2006 WL 889519 (N.D. Cal. Mar. 31, 2006) ..................................................... 12

*Hanlester Network v. Shalala*,
   51 F.3d 1390 (9th Cir. 1995) ............................................................................. 23

*In re W. States Wholesale Natural Gas Antitrust Litig.*,
   715 F.3d 716 (9th Cir. 2013) ............................................................................. 37

*Kane ex rel. U.S. v. Healthfirst, Inc.*,
   120 F. Supp. 3d 370 (S.D.N.Y. 2015) ............................................................... 31

*Klaczak v. Consol. Med. Transp.*,
   458 F. Supp. 2d 622 (N.D. Ill. 2006) ................................................................ 27

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ........................................................................... 30

*L.A. ex rel. Knudsen v. New Cingular Wireless Nat'l Accounts, LLC*,
   2019 WL 5566771 (E.D. Cal. Oct. 29, 2019) ................................................... 31

*Pearson v. Quickturn Design Sys.*,
   1998 WL 34607 (N.D. Cal. Jan. 23, 1998) ........................................................ 12

ii

*San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*,
224 Cal. App. 4th 627 (2014) .................................................................................... 15, 31

*U.S. ex rel. Atkins v. McInteer*,
470 F.3d 1350 (11th Cir. 2006) ......................................................................................... 30

*U.S. ex rel. Bahrani v. Conagra, Inc.*,
465 F.3d 1189 (10th Cir. 2006) ......................................................................................... 33

*U.S. ex rel. Bartlett v. Ashcroft*,
39 F. Supp. 3d 656 (W.D. Pa. 2014) .................................................................................. 25

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
342 F.3d 634 (6th Cir. 2003) ............................................................................................. 13

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
501 F.3d. 493 (6th Cir. 2007) ............................................................................................ 22

*U.S. ex rel. Bookwalter v. UPMC*,
946 F.3d 162 (3d Cir. 2019), *cert. denied* 206 L.Ed. 2d 855 (Apr. 27, 2020) .............. 17

*U.S. ex rel. Davern v. Hoovestol, Inc.*,
2015 WL 6872427 (W.D.N.Y. Nov. 9, 2015) .................................................................... 33

*U.S. ex rel. Devlin v. State of California*,
84 F.3d 358 (9th Cir. 1996) ............................................................................................... 38

*U.S. ex rel. Drakeford v. Tuomey*,
792 F.3d 364 (4th Cir. 2015) ............................................................................................. 26

*U.S. ex rel. Emanuele v. Medicor Assocs.*,
2017 WL 4867614 (W.D. Pa. Oct. 26, 2017) ................................................................... 26

*U.S. ex rel. Emanuele v. Medicor Assocs.*,
242 F. Supp. 3d 409 (W.D. Pa. 2017) ............................................................................... 29

*U.S. ex rel. Goodman v. Arriva Med., LLC*,
2020 WL 3840446 (M.D. Tenn. July 8, 2020) ................................................................. 28

*U.S. ex rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015) ..................................................................................... 21, 22

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) ........................................................................................... 14

*U.S. ex rel. Herbold v. Doctor's Choice Home Care, Inc.*,
2019 WL 5653459 (M.D. Fla. Oct. 31, 2019) .................................................................. 26

*U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*,
554 F.3d 88 (3d Cir. 2009) ................................................................................................ 26

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
51 F. Supp. 3d 9 (D.D.C. 2014) ........................................................................................ 33

iii

*U.S. ex rel. Longo v. Wheeling Hospital, Inc.*,
  2019 WL 4478843 (N.D. W. Va. Sept. 18, 2019) ....................................................28, 29

*U.S. ex rel. Martinez v. KPC Healthcare Inc.*,
  2017 WL 10439030 (C.D. Cal. June 8, 2017) .........................................................32, 33

*U.S. ex rel. May v. Purdue Pharma L.P*,
  737 F.3d  908 (4th Cir. 2013) ...........................................................................................11

*U.S. ex rel. Ormsby v. Sutter Health*,
  444 F. Supp. 3d 1010 (N.D. Cal. 2020) ................................................................22, 32

*U.S. ex rel. Perri v. Novartis Pharm. Corp.*,
  2019 WL 6880006 (D.N.J. Feb. 21, 2019) ....................................................................25

*U.S. ex rel. Schubert  v. All Children's Health Sys., Inc.*,
  2013 WL 6054803 (M.D. Fla. Nov. 15, 2013) ..............................................................39

*U.S. ex rel. Silingo v. WellPoint, Inc.*,
  904 F.3d 667 (9th Cir. 2018) ...........................................................................9, 19, 20, 21

*U.S. ex rel. Singh v. Bradford Reg'l Med. Ctr.*,
  752 F. Supp. 2d 602 (W.D. Pa. 2010) ............................................................................18

*U.S. ex rel. Stepe v. RS Compounding LLC*,
  325 F.R.D. 699 (M.D. Fla. 2017) ...................................................................................33

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamonte, P.A. v. Prudential Ins. Co.*,
  944 F.2d 1149 (3d Cir. 1991) ..........................................................................................39

*U.S. ex rel. Swoben v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) ...................................................................................*passim*

*U.S. ex rel. Wood v. Allergan, Inc.*,
  246 F. Supp. 3d 772 (S.D.N.Y. 2017) ............................................................................28

*U.S. v. Berkeley Heartlab, Inc.*,
  2017 WL 4803911 (D.S.C. Oct. 23, 2017) ................................................................... 29

*U.S. v. Berkeley Heartlab, Inc.*,
  2017 WL 6015574 (D.S.C. Dec. 4, 2017) ......................................................................28

*U.S. v. Campbell*,
  2011 WL 43013 (D.N.J. Jan. 4, 2011) ...........................................................................23

*U.S. v. Chang*,
  2017 WL 10544289 (C.D. Cal. July 25, 2017) ..............................................................38

*U.S. v. Crescendo Bioscience, Inc.*,
  2020 WL 2614959 (N.D. Cal. May 23, 2020) ....................................................16, 23, 24

*U.S. v. Greber*,
  760 F.2d 68 (3d Cir.1985) ...............................................................................................16

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

*U.S. v. Kats*,
   871 F.2d 105 (9th Cir. 1989) ..................................................................................16

*U.S. v. Kinetic Concepts, Inc.*,
   2017 WL 2713730 (C.D. Cal. Mar. 6, 2017)......................................................30, 33

*U.S. v. Maricopa Cty., Ariz.*,
   915 F. Supp. 2d 1073 (D. Ariz. 2012) ...................................................................14

*U.S. v. Medoc Health Servs. LLC*,
   2020 WL 3892453 (N.D. Tex. July 2, 2020) ..........................................................28

*U.S. v. Rogan*,
   2006 WL 8427270 (N.D. Ill. Oct. 2, 2006), *aff'd.* 517 F.3d 449 (7th Cir. 2008)........................23

*U.S. v. Vibrant America, LLC*,
   2020 WL 4818706 (N.D. Cal. Aug. 19, 2020) ..................................................passim

*Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.*,
   457 F.3d 1106 (9th Cir. 2006) ..............................................................................20

*U.S. ex rel. Besancon v. UChicago Argonne, LLC*,
   2014 WL 4783056 (N.D. Ill. Sept. 24, 2014) .........................................................33

*U.S. ex. rel Chandler v. Cook County, Ill.*,
   277 F.3d 969 (7th Cir. 2002) ...............................................................................30

*U.S. ex. rel. Jacobs v. CDS, P.A.*,
   2015 WL 5698395 (D. Idaho Sept. 28, 2015) ........................................................39

*U.S.. v. Ctr. for Diag. Imaging*,
   787 F. Supp. 2d 1213 (W.D. Wash. 2011), *amended on reconsideration*, 2011 WL 13353774
   (W.D. Wash. Apr. 25, 2011)................................................................................27

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016)..........................................................................27, 28, 29

*Vatan v. QTC Med. Servs., Inc.*,
   721 F. App'x 662 (9th Cir. 2018) .....................................................................21, 22

*Wallace v. Exactech, Inc.*,
   2020 WL 4500493 (N.D. Ala. Aug. 5, 2020) .........................................................33

*Walleri v. Fed. Home Loan Bank of Seattle*,
   83 F.3d 1575 (9th Cir. 1996) ...............................................................................30

*Winter ex rel. U.S. v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
   953 F.3d 1108 (9th Cir. 2020) ........................................................................15, 19

*Wojciechowski v. Kohlberg Ventures, LLC*,
   923 F.3d 685 (9th Cir. 2019) ...............................................................................11

**Statutes**

31 U.S.C. § 3729 ................................................................................11, 20, 32, 33, 34

31 U.S.C. § 3730 ................................................................................................11, 12

42 U.S.C. § 1320a-7 .................................................................................................27

42 U.S.C. § 1320a-7b ...............................................................................................28, 34

42 U.S.C. § 1320a–7k ..............................................................................................32

42 U.S.C. § 1395g ......................................................................................................8

42 U.S.C. § 1395 ..................................................................................................29, 34

Cal Bus. & Prof. Code § 650 ....................................................................................19

Cal Bus. & Prof. Code § 650.1 .................................................................................19

Cal. Gov't Code § 12650 ..........................................................................................20

Cal. Welf. & Inst. Code § 14107.2 ...........................................................................19

**Rules**

Civ. L.R. 3-15 ...........................................................................................................36

Fed. R. Civ. P. 15 ................................................................................................36, 37

Fed. R. Civ. P. 9(b) ..........................................................................................*passim*

**Regulations**

42 C.F.R. § 1001 ...................................................................................................8, 22

42 C.F.R. § 401.305 ..................................................................................................31

42 C.F.R. § 405.1801 ............................................................................................8, 22

42 C.F.R. § 405.1803 .................................................................................................8

42 C.F.R. § 411.354 ..................................................................................................18

42 C.F.R. § 413.20 .....................................................................................................8

42 C.F.R. § 413.60 .....................................................................................................8

42 C.F.R. § 413.64 .....................................................................................................8

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

**Other Authorities**

70 Fed. Reg. 4858 ..................................................................................................23, 24

70 Fed. Reg. 4867 ......................................................................................................26

5A Wright & Miller, Federal Practice and Procedure ..................................................9, 10

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

## I.    **INTRODUCTION**

In 2014, Ms. Hanvey (the Relator) blew the whistle on Defendants' long-standing fraudulent schemes to line their pockets with government funds to which they were not entitled.[1]  She filed this case, alleging that Sutter and the other Defendants had been submitting claims for payment to Medicare and Medicaid that they knew were not eligible for payment.  The claims were improper because Sutter was paying kickbacks and other illegal compensation to physicians to get them to refer patients to Sutter hospitals.  The federal government investigated the allegations and periodically requesting extensions of time to continue its investigation for about five years.

The federal government and Relator entered into a partial settlement in 2019 (the "Partial Settlement") with Sutter and a single physician group that referred patients to Sutter, Sacramento Cardiovascular Surgeons Medical Group, Inc. ("Sac Cardio") pursuant to which Sutter paid over $30 million and Sac Cardio paid over $500,000 to the federal government.  None of the other Defendants were involved in the Partial Settlement, and none of the California state law claims were resolved in that Partial Settlement.  The Partial Settlement only resolved allegations of false claims submitted by Sutter for patient services referred to it by Sac Cardio—and only between September 1, 2012 and September 30, 2014.  The United States and Relator filed stipulated dismissals expressly limited to the scope of the Partial Settlement's release—*i.e.*, claims for reimbursement submitted to the government by Sutter for Sac Cardio-referred services between September 1, 2012, and September 30, 2014 (the "Partial Settlement Period").  False claims submitted outside of that Partial Settlement Period, and false claims for services referred to Sutter by any of the other Defendants, were not released by any party.  The federal government could have intervened and stopped the rest of the federal claims.  Instead, it opted to allow Relator to take the laboring oar and pursue the rest of the case, at least for the time being.  This is a division of labor that the FCA contemplates, and it promotes efficient use of government resources.

---

[1] The active Defendants in this action are Sutter Health ("Sutter"); Sutter Valley Hospitals; Sutter Valley Medical Foundation; Sutter Bay Hospitals; Sutter Bay Medical Foundation; East Bay Cardiac Surgery Center Medical Group ("East Bay Cardiac"); Sutter Medical Group ("SMG"); BASS Medical Group ("BASS"); Stephen K. Liu, M.D., Professional Corporation ("Liu MD PC"); and California Emergency Physicians Medical Group, A Professional Corporation ("CEPMG").  Relator voluntarily dismissed Sac Cardio, Sutter Independent Physicians and Sutter East Bay Medical Group, Inc., f/k/a East Bay Physicians Medical Group, Inc.  ECF Nos. 72-73.

1    Relator then filed the operative First Amended Complaint (ECF No. 46; the "FAC"), which

2    explains the foregoing events and seeks relief for the violations that were not subject to the Partial

3    Settlement.

4    Now, six years in, Defendants move to dismiss the FAC as if it were still 2014.  Every one

5    of the six motions belittles Ms. Hanvey's knowledge and the sufficiency of her factual allegations

6    because she has not worked for Sutter for six years.  (That is true.  Relator left shortly after filing

7    the complaint, when her knowledge was fresh and up-to-date.)  Defendants also assert that they can

8    escape liability for their false claims after Ms. Hanvey left Sutter, not because they stopped

9    defrauding taxpayers at that time, but because that is when Ms. Hanvey's Sutter-insider knowledge

10   ends.  But it is indisputable that complaints cover illegal acts that continue after filing, a point

11   where the defendant is on full notice of its potential liability and continues the illegal conduct at its

12   own peril.  The six years of government investigation were not an opportunity for penalty-free

13   lawbreaking.  The government's investigation into Defendants' respective conduct arose out of this

14   *qui tam* action, which was validly instituted and covers Defendants' entire course of conduct,

15   including the fraudulent scheme that continued after its filing.

16   Defendants also wrongly argue that the FAC seeks double recovery.  Relator seeks recovery

17   on behalf of taxpayers only for conduct not included in the Partial Settlement:  (i) federal false

18   claims submitted <u>outside</u> the Partial Settlement Period against all Defendants (including Sutter); (ii)

19   federal false claims submitted <u>during</u> the Partial Settlement Period against Sutter resulting from

20   illegal financial relationships with all Defendants <u>other than</u> Sac Cardio; (iii) federal false claims

21   submitted <u>during</u> the Partial Settlement Period against all Defendants except for Sutter and Sac

22   Cardio (the latter of which has been voluntarily dismissed from this case); and (iv) state false claims

23   submitted for all periods against all Defendants (including Sutter), on behalf of the State of

24   California.[2]  None of these claims are subject to the Partial Settlement.

25   The rest of Defendants' arguments are exercises in denial—of fact, law, or both.  The

26   inquiry at the pleading stage is whether the plaintiff has pled a claim for relief that is plausible on its

27

28   _____
[2] The State of California was not party to the Partial Settlement Agreement, and no California state
claim was released for any period.  *See* RJN Exs. 1-2.

face, assuming all facts pled to be true.  In the FAC, Relator pleads a tried-and-true claim for relief under the False Claims Act ("FCA") based on violations of federal and state anti-kickback statutes ("AKS"), and the Stark Law.  The latter claims are based on Sutter paying commercially unreasonable compensation to physicians (unless Sutter took referrals into account), in excess of fair market value.  *See, e.g.*, FAC ¶¶ 112, 118, 152, 163, 177, 189, 201 (alleging payments to all defendants were commercially unreasonable and exceeded fair market value).

The FAC's allegations are more than plausible.  They are true.  If Relator and this Court are put to the burden of another amended complaint, Relator can allege even more details and will seek leave to obtain and use all relevant materials from the government's investigation.  But those steps are unnecessary.  The FAC surpasses the relevant pleading standards, and the Motions should be denied in full.

## II.  THE FRAUDULENT SCHEME AND PROCEDURAL BACKGROUND

Beginning as early as July 2006, Sutter and the other Defendants made covert, unlawful financial arrangements whereby Sutter paid physicians kickbacks and other unlawful compensation to refer patients for treatment at Sutter hospitals.  Sutter then billed Medicare or Medicaid in connection with those referrals, thereby violating the federal and state False Claims Acts.  In short, Sutter paid kickbacks to get more business, billed the government for that business, and lied to the government about it.

Relator Laurie M. Hanvey was employed by Sutter as the Compliance Officer of one of its hospitals, Sutter Medical Center ("SMC") in Sacramento, California.  FAC ¶ 14.  In that role, she was exposed to Sutter's practices, procedures and compliance issues on a regular basis.  *Id.* ¶¶ 14, 133.  She worked for Sutter from December 2012 to December 2014, after previously working for over 25 years for other hospitals in the State of California.  *Id.* ¶ 14.  She first discovered Defendants' fraudulent conduct in the regular course of her job duties and filed this action only after repeatedly raising that fraudulent conduct to her superiors within Sutter.  *E.g.*, *id.*  In response to her internal alarms, her superior shut down her efforts to enforce compliance and end the schemes; the persons whose compliance she was supposed to oversee continued paying kickbacks and circumvented her oversight efforts to stop the illegal compensation.

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

Ms. Hanvey filed this case in September 2014 and left Sutter in December 2014.  *See* ECF No. 1; FAC ¶ 14.  The federal government investigated for years, repeatedly requesting that this case remain under seal while it continued to unravel Defendants' fraud, Sutter's conspiracy, and the attempts to cover up their wrongdoing.  *See, e.g.*, ECF Nos. 9, 12, 16–24, 31, 38–42.  Partial justice was served in October 2019, when Sutter and Sac Cardio agreed to pay the United States over $30 million as partial settlement and restitution for a small portion of the damages caused by the fraudulent scheme pled by Relator.  *See* FAC ¶¶ 144–48.

This action seeks recovery on the aspects of Defendants' scheme that are still unresolved— the federal claims expressly preserved in the Partial Settlement, and all of the State claims.

Although the illegal compensation arrangements between Sutter and each of the physician group defendants took different forms, their substance was the same:  Sutter paid physicians for referrals so it could charge the government for more services.  To avoid detection of their violations of well-known prohibitions on kickbacks and Stark Law limitations on hospitals paying physician compensation that exceeds fair market value and is not commercially reasonable, Sutter and each physician group hid their prohibited financial relationships behind sham contracts.  *E.g.*, FAC ¶¶ 129–32, 151–55, 163–67, 177–81, 188–93, 201–05.  Defendants worked to make the compensation appear superficially lawful.

For example, Sutter paid a fixed amount per month for physician assistants ("PAs") who worked at Sac Cardio pursuant to a written contract requiring Sac Cardio to submit time reports to Sutter for the PAs' hours, and which provided that Sac Cardio was not permitted to bill third-party payers for the PA services for which Sutter was already paying.  *See* FAC ¶¶ 99–105 & Ex. 1 (describing Physician Assistants Agreements with Sac Cardio).  In reality, Sac Cardio was billing both Sutter and third-party payers for the PAs' time and pocketing the double-billing, and Sutter knew it.  *Id.* ¶ 104 & Ex. 2.  When Relator's compliance organization brought it to Sutter's attention that the PAs were not working the minimum number of hours required for Sac Cardio to receive the monthly payment from Sutter, Sutter's business arm went around the compliance organization and simply told Sac Cardio to submit different time records for the physician assistants.  *Id.* ¶¶ 119–20 & Ex. 12.  Relator, having been cut out of her own investigation, tracked down the revised

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

timesheets, identified numerous irregularities, and convinced the compliance organization to place a hold on future payment under the agreement pending investigation. *Id.* ¶ 121.  Sutter business personnel responded by procuring from Sac Cardio even more falsified timesheets, and pushed for Sac Cardio to be paid. *Id.* ¶ 122.  Relator next discovered that Sac Cardio was in fact billing Medicare for services provided by the physician assistants (in contravention of the agreement), and relator was successful in convincing the compliance organization to put yet another hold on payment. *Id.* ¶ 124.  Relator discovered similar billing discrepancies related to other Sac Cardio agreements. *E.g.*, *id.* ¶¶ 106 & 125 (Medical Director Agreements beginning in October 2006). Sutter's businesspeople again stepped in and issued retroactive payment to Sac Cardio in response to a threat from Sac Cardio physician Dr. Longoria to cut off the flow of referrals. *Id.* ¶¶ 126–28.[3]

Another way Sutter paid physicians kickbacks was through sham medical directorship agreements.  In those agreements, Sutter paid referring physicians hundreds of thousands of dollars per year purportedly to act in an administrative capacity on behalf of Sutter as "medical directors," responsible for medical supervision and regulation.  Just as with the physician assistant agreements, Sutter set up the agreement to systematically compensate for work that was never done. *E.g.*, FAC ¶¶ 149–50, Ex. 17 & ¶ 3(c).  For instance, Sutter papered a kickback involving SMG's Dr. Roberts as though he worked 121 hours per month as a medical director for Sutter, subject to his submission of monthly time reports. *See id.* ¶¶ 149–55.  The agreement specified that SMG may not bill or assert any claim for payment against any patient or payer for services performed during those 121 hours per month. *Id.* ¶ 50 & Ex. 17 ¶ 3(c).  Nonetheless, Dr. Roberts maintained such a busy medical practice that he billed Medicare over $200,000 in a year covered by the agreement—an impossible figure if he also actually worked the 121 monthly hours paid by Sutter and abided by the terms of the medical director agreement. *Id.*  As with the physician assistant agreements detailed in

---

[3] Sutter began paying Sac Cardio for referrals under such Physician Assistants Agreements as of July 1, 2006—well before the time period covered by the Partial Settlement—and the arrangement continued after the Partial Settlement Period. *See* FAC ¶¶ 99 ("Beginning July 1, 2006, SUTTER HEALTH knowingly entered into a series of agreements . . . that provided free physician assistants to and for the direct benefit of SCSMG, one purpose of which was to induce referrals"), 126–28 (payments were ongoing and continuing unimpeded under the normal terms of the agreement as of July 2014).  Accordingly, Sutter's wrongdoing in connection with the Physician Assistants Agreements was not discharged in the Partial Settlement.

the FAC, the Medical Director agreements between Sutter and referring physicians were simply shams to disguise payments to the physician for referrals to Sutter.  Along with Dr. Roberts, Sutter employed a similar scheme based on sham "Medical Director" agreements—beginning in October 2006—to funnel funds to Sac Cardio (for which payment was at one point withheld based on Relator's identification of billing irregularities).  FAC ¶¶ 106–10, 125 & Exs. 3–6.

Another part of Defendants' pay-for-referral scheme took the form of "Call Coverage Agreements," through which Sutter paid kickbacks to doctors for referrals with payments for services that all knew would never be performed.  *See* FAC ¶¶ 157–59 & Ex. 18 (East Bay Cardiac), 168–81 (BASS), 182–93 (Liu MD PC), 194–205 (CEPMG).  On their face, those Call Coverage Agreements appear to show Sutter paying physicians to make themselves available to provide emergency services on a 24-hour basis.  In reality, those agreements were a sham, another means of funneling illegal payments to physicians for referrals.  The sham Call Coverage Agreements incentivized even more referrals because they allowed the physicians to bill Sutter for their time and to bill the government and other insurers for their services while working for Sutter. Indeed, the same physicians were paid for call coverage in two places at the same time so they were paid twice by Sutter and then also for their services to patients.  That is because the Coverage Agreements also remunerated the referring physicians by allowing them to bill for any professional fees rendered during the coverage shifts.  *E.g.*, FAC ¶¶ 170, 175, Ex. 22 ¶ 1(j), Ex. 23 ¶ 1(l) (BASS); FAC ¶ 185 ("The Liu Call Coverage Agreement provides that Liu MD PC will separately bill and collect charges for any professional fees rendered during the coverage shifts.") & Ex. 27 ¶¶ 1(q) & 3(b) (Liu MD PC); FAC ¶ 195 ("The ED Coverage Agreement allowed CEPMG to bill and collect all charges for the professional component of medical services delivered to all patients by CEPMG, including services delivered by the Mid-Level Practitioners funded by SUTTER HEALTH.") & Ex. 29 ¶ 3.2(b) (CEPMG).

For example, Sutter entered into call coverage agreements where it agreed to pay BASS $650 to $850 per shift for surgery call coverage.  *See* FAC ¶¶ 168–69 & Exs. 22–23.  The agreement explicitly allowed BASS to separately bill for services rendered during the on-call period, for which it was already being paid by Sutter.  *Id.* ¶ 170.  Annually, the agreement called for

Sutter to pay a total of $474,500.  *Id.* ¶ 171.  However, as with the other agreements described above, in reality the payments did not actually depend on BASS providing any of the contracted-for services.  Sutter paid out on the sham agreements even though BASS put forward the same physician to be on call for emergency coverage at the exact same time, at entirely different hospitals—duties that are impossible to fulfill because a physician cannot be two places at once.  *Id.* ¶¶ 156–67, 175.  As with BASS, Sutter employed a similar scheme based on sham "Call Coverage" agreements to funnel funds to Sac Cardio (an arrangement beginning July 1, 2008—before the Partial Settlement Period—benefitting exclusively Sac Cardio) (*id.* ¶¶ 111–115).  The same scheme played out between Sutter and East Bay Cardiac (*id.* ¶¶ 156–60); between Sutter and Liu MD PC (*id.* ¶¶ 182–87 & Exs. 26–27); and between Sutter and CEPMG (with a similar "emergency department coverage" agreement that allowed double-billing for services provided at Sutter's emergency room and prohibited covered doctors from practicing at a competing hospital (*id.* ¶¶ 194–99 & Ex. 29)).

Sutter also had an agreement with East Bay Cardiac to perform unidentified "data processing services," which was paid as a flat fee regardless of hours spent on the task.  *See* FAC ¶¶ 157–62 & Exs. 20–21.  At some point the "data processing services" were changed to be paid per case (although the actual services remained unclear), and even then the parties to the agreement admitted that East Bay Cardiac was not fulfilling its obligations under the contract, but Sutter was paying anyway to induce referrals from East Bay Cardiac.  *Id.* ¶ 161.  Rather than seeking repayment from East Bay Cardiac for services never performed, Sutter simply ratified what was always the purpose of the agreement—paying East Bay Cardiac for referrals, not actual services— by letting the payments stand and waiving its right to collect based on the breach.  *Id.*

Critically, these sham arrangements did not exist in isolation.  Their periods overlapped, and as a result, the defendant entities formed multifaceted arrangements that operated at the same time to accomplish their ultimate goal:  pay for referrals.  While any one of the above-described arrangements would be sufficient to identify a particular fraudulent act, the overall fraudulent scheme identified and explained in the FAC requires consideration of the web of sham arrangements.  *See, e.g.*, FAC ¶¶ 3(A), 118, 152, 163, 177, 201 (alleging significance of Sutter

1  paying physicians for referrals through multiple overlapping, or "stacked," agreements).

2      Ultimately, each of the above-described schemes resulted in Sutter submitting false claims

3  to government payers. *E.g.*, FAC ¶ 133–37 & Ex. 16.  Relator personally reviewed many such false

4  claims.  *Id.*  To make these claims, Sutter had to make certifications to the government that were

5  clearly false given the arrangements described above.  As a prerequisite to payment under Medicare

6  Part A, Sutter was required to submit a form CMS-2552, more commonly known as the hospital

7  cost report, annually.  FAC ¶ 44.  Each year, Sutter filed a Medicare-mandated hospital "cost

8  report", which the federal and state governments rely upon to determine whether Sutter was entitled

9  to additional reimbursement from Medicare or whether Sutter had been overpaid and therefore was

10  obligated to reimburse Medicare.  FAC ¶ 45–46 (citing 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20;

11  42 C.F.R. § 405.1801(b)(1); 42 C.F.R. §§ 405.1803, 413.60, and 413.64(f)(1)).  When submitting

12  its annual cost reports, Sutter expressly certified,

13        "I am familiar with the laws and regulations regarding the provision of health care

14        services, and that the services identified in this cost report were provided in
      compliance with such laws and regulations. . . .  Furthermore, if services identified in

15        this report were provided or procured through the payment directly or indirectly of a
      kickback or where otherwise illegal, criminal, civil and administrative action, fines

16        and/or imprisonment may result."

17  FAC ¶¶ 49–52.  Accordingly, Sutter falsely certified that its services were billed in compliance with

18  applicable laws and regulations, including the AKS and the Stark Statute.  *Id.* ¶¶ 52–54.

19      Likewise, when the physician entities submitted claims to Medicare, the physician entity

20  defendants expressly and falsely certified that "this claim . . . complies with all applicable Medicare

21  and/or Medicaid laws, regulations, and program instructions for payment including but not limited

22  to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark

23  law)."  FAC ¶¶ 57, 142; *see also* FAC ¶ 70–71 (same certification on form CMS 1500).

24      In October 2019, Sutter entered into the Partial Settlement.  FAC ¶ 144.  Sutter agreed to

25  pay over $30 million as a partial settlement and restitution for its submission of claims to the

26  Medicare program resulting from tainted referrals by the Sac Cardio Physicians during the period

27  from September 1, 2012, through September 30, 2014.  *Id.*  Sac Cardio paid over $500,000 as

28  partial settlement for claims against them related to some of their conduct from May 1, 2011,

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

1  through September 30, 2014.  *Id.* ¶ 145.

2  The United States and Relator filed a joint "Stipulation of Partial Dismissal" that released

3  Sutter from claims resulting from referrals by Sac Cardio physicians during the period from

4  September 1, 2012, through September 30, 2014.  ECF No. 44.  Relator's FAC, seeking recovery

5  for the remainder of the fraudulent scheme described above, followed.  ECF No. 46.

6  ## III.   <u>LEGAL STANDARD</u>

7  A complaint must be a "short and plain" statement that alleges facts that, when taken as true,

8  present a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78

9  (2009).  This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation,"

10  but not "detailed factual allegations."  *Id.* at 678.  However, "[i]n alleging fraud or mistake, Rule

11  9(b) requires a party to state with particularity the circumstances constituting fraud or mistake,

12  including the who, what, when, where, and how of the misconduct charged.  In addition, the

13  plaintiff must set forth what is false or misleading about a statement, and why it is false."  *Ebeid ex*

14  *rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotations and citations omitted).

15  In determining whether allegations of fraud are sufficiently detailed to meet the requirements of

16  Rule 9(b), courts consider the primary purpose of the rule, namely, to "'give adequate notice to an

17  adverse party and enable that party to prepare a responsive pleading.'"  *U.S. ex rel. Swoben v.*

18  *United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (quoting 5A Wright & Miller,

19  *Federal Practice and Procedure* § 1298 (3d ed. 2016)).

20  Although the circumstances of fraud must be pleaded "with particularity . . . [m]alice, intent,

21  knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P.

22  9(b); *accord U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679–80 (9th Cir. 2018).

23  //

24  //

25  //

26  //

27  //

28  //

1  IV.   **ARGUMENT**

2       A.   **The FAC Does Not Seek Recovery for Settled Conduct.**

3            1.   **The Partial Settlement agreement resolves only a limited, specific subset of the false claims alleged by Relator to have been submitted.**

4

5       Defendants argue that the Partial Settlement with Sutter and Sac Cardio releases claims that

6  Relator still asserts.[4]  It does not.  Every federal claim (Counts 1–4) remains viable so long as it is

7  based on either (i) conduct outside the period September 1, 2012 through September 30, 2014, or

8  (ii) conduct during that period involving a transaction with a non-released Defendant.  And the

9  State claims (Counts 5–9) are unsettled for the entire period covered by the case.  Therefore, even if

10 Defendants were correct, their attempt to slice the liability period at this stage would neither narrow

11 the litigation nor sharpen the issues.  *Burke v. Steinmann*, 2003 WL 21507490, at *3 (S.D.N.Y. June

12 30, 2003) ("This aspect of the claim thus would necessarily survive, and would require essentially

13 the same discovery. . . .  It is thus more efficient to address the parties' differences about New York

14 contract law after the full development of the facts, as part of a motion for summary judgment or at

15 trial."); 5B Wright & Miller § 1349 n.17 (West 2020) ("The district court, in its discretion, may

16 defer the determination of any legal issue raised by [a motion to dismiss] until the trial . . . .")

17 (collecting authority).

18      Sutter's Motion (and those adopting Sutter's arguments[5]) goes further, arguing that it can

19 escape all federal liability by relying on what the Motion refers to as a "functional analysis" or an

20 "alternative remedy analysis."  ECF No. 78 ("Sutter MTD") at 7 & n.5.  Whatever the name, Sutter

21 has invented a theory of contract interpretation that disregards the express limits of the Partial

22 Settlement Agreement.

23      It is black-letter law that courts "are not at liberty to give [] greater preclusive effect" to

24 settlement agreements "than the parties intended."  *Wojciechowski v. Kohlberg Ventures, LLC*, 923

25

26 _____

[4] ECF No. 74 ("SMG MTD") at 4 n.1 (SMG); ECF No. 75 ("East Bay Cardiac MTD") at 2 (East Bay Cardiac); ECF No. 77 ("BASS MTD") at 2 (BASS); ECF No. 79 ("Liu MTD") at 3 (Liu MD PC).

27 [5] *See* SMG MTD (joining Sutter's motion); East Bay Cardiac MTD at i (same); ECF No. 76

28 ("CEPMG MTD") (same); Liu MTD at i (same); BASS MTD at 2 (incorporating arguments by reference).

F.3d 685, 691 (9th Cir. 2019); *see also F.T.C. v. Garvey*, 383 F.3d 891, 898 n.7 (9th Cir. 2004)

("The basically contractual nature of consent judgments has led to general agreement that

preclusive effects should be measured by the intent of the parties." (citation omitted)); *see also U.S.*

*ex rel. May v. Purdue Pharma L.P*, 737 F.3d  908, 913 (4th Cir. 2013) ("[G]iven the contractual

nature of consent decrees and settlement agreements, the preclusive effect of a judgment based on

such an agreement can be no greater than the preclusive effect of the agreement itself.").

The Partial Settlement is not ambiguous and has the following undisputed limits:

1.  The United States agreed to a limited release of Sutter for "submission of claims to the
    Medicare program, *resulting from referrals by the [Sac Cardio] Physicians*, which
    claims the United States contended violated the Stark Law *during only the period from
    September 1, 2012, through September 30, 2014* ("United States Covered
    Conduct")." FAC ¶ 144 (emphasis added); Sutter MTD at 7-9; RJN Ex. 1 at 2
    (releasing "claims against SMCS arising from SMCS's submission of claims to the
    Medicare program resulting from referrals by the physicians of Sacramento
    Cardiovascular Surgeons Medical Group, Inc. ("Sac Cardio") . . . which claims
    violated or resulted from violations of the Stark Law, during the period from
    September 1, 2012, through September 30, 2014.").

2.  The United States released Sutter only for "any civil monetary claim the United States
    has for the United States Covered Conduct under the common law theories of payment
    by mistake and unjust enrichment."  FAC ¶ 144; RJN Ex. 1 at 4 (releasing "from any
    civil monetary claim the United States has for the United States Covered Conduct
    under the common law theories of payment by mistake and unjust enrichment").  The
    United States did not release Sutter for "any other claims relating to the United States
    Covered Conduct, including claims under the FCA." FAC ¶ 144; RJN Ex. 1 at 6
    ("Notwithstanding the releases given . . . the following claims of the United States are
    specifically reserved and are not released: . . . Any liability arising under 31 U.S.C.
    §§ 3729-3733 (the False Claims Act)").

3.  Relator agreed to a limited release of Sutter for any claims relating to "submission of
    claims to federal healthcare programs, *resulting from referrals by the [Sac Cardio]
    Physicians*, which claims violated or resulted from violations of the Stark Law or AKS
    *during only the period from September 1, 2012 through September 30, 2014* ("Relator
    Covered Conduct")." FAC ¶ 144 (emphasis added); RJN Ex. 1 at 3 (releasing "certain
    civil claims against Sutter Health and SMCS arising from SMCS's submission of
    claims, and Sutter Health's causing SMCS to submit claims, to federal health
    programs . . . resulting from referrals by the physicians of Sac Cardio, which claims
    violated or resulted from violations of the Stark Law or the AKS during the period
    from September 1, 2012, through September 30, 2014").

4.  Relator did not release Sutter for "any claims other than the Relator Covered Conduct,
    and expressly reserved Relator's claims for expenses, attorney's fees and costs
    pursuant to 31 U.S.C. §3730(d) for all claims relating to the Relator Covered
    Conduct." FAC ¶ 144; RJN, Ex. 1 at 10 ("Relator releases her claims as described

herein, but does not release:  (i) Relator's claims not expressly released in this Agreement; and (ii) Relator's claims for expenses, attorney's fees, and costs pursuant to 31 U.S.C. § 3730(d) for all claims released in this Agreement.").

The stipulated dismissal is equally clear:

1. Consistent with the terms of the Settlement Agreement, the United States and Relator hereby dismiss the claims in this action against Sutter Health and SMCS arising from SMCS's submission of claims, and Sutter Health's causing SMCS to submit claims, to federal health programs, including the Medicare and Medicaid programs, resulting from *referrals by the physicians of Sacramento Cardiovascular Surgeons Medical Group, Inc.*, which claims violated or resulted from violations of the Stark Law or the AKS *during the period from September 1, 2012, through September 30, 2014*.

2. This partial dismissal is with prejudice as to Relator and without prejudice as to the United States.

3. The United States and Relator *specifically do not release any claims not expressly released by the Settlement Agreement*, including Relator's claims for expenses, attorney's fees, and costs pursuant to 31 U.S.C. § 3730(d) for all claims released in the Settlement Agreement.

ECF No. 44 at 2 (emphases added).

The correct analysis is simple.  Releases in settlement agreements mean what they say.  *See Glassey v. Amano Corp.*, 2006 WL 889519, at *6 (N.D. Cal. Mar. 31, 2006) (barring claims expressly released in "plain language" of prior settlement agreement); *Pearson v. Quickturn Design Sys.*, 1998 WL 34607, at *5 (N.D. Cal. Jan. 23, 1998) (dismissing claims expressly released in prior settlement).  Were it otherwise, the careful carve-outs in the Partial Settlement and dismissal stipulation would have no meaning.  The government and Relator would have had no reason to reserve their rights, as they did.  And most important to Defendants, their argument here would mean that by paying to settle only a small portion of their wrongdoing, they would have eliminated far more liability than the government intended.

Sutter, and the remaining Defendants who join its motion, nevertheless insist that the partial Settlement Agreement's plain language is "not relevant" to a "functional" analysis of an "alternate remedy."  Sutter MTD at 7 at n.5 ("That the Settlement Agreement contained language indicating that the United States did not release Sutter Defendants [from certain claims] is not relevant to the 'alternate remedy' analysis").  Sutter's only support, a Sixth Circuit case called *Bledsoe*, in no way

supports its argument. *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634 (6th Cir. 2003). There, the government settled certain *qui tam* claims outside of court, without intervening in the action—*i.e.*, it pursued an "alternate remedy" rather than intervening. *Id.* at 647-49.  The government expressly carved the *Bledsoe* action out of the settlement, and then contended that it did not owe the *Bledsoe* relator a whistleblower's payment from the settlement fund because the settlement did not reach her claims. *Id.*  The relator argued that the settlement was due to the *qui tam* action, and under the law governing so-called "alternate remedies," she was entitled to a whistleblower payment from the government's settlement fund. *Id.* at 648-50.  The Sixth Circuit agreed. *Id.* at 650. ("We therefore hold that the government may not settle a relator's claims and seek to avoid paying a relator his or her statutory share to the settlement proceeds by excluding the relator's claims from the terms of the settlement agreement.").  *Bledsoe* also involved contract interpretation issues, but those arose from ambiguity in the contract and implicated extrinsic evidence. *Id.* at 650 n.9 & 651.  *Bledsoe* remanded for the district court to resolve the fact issue. *Id.* at 651 ("Although the government may be correct that the conduct contemplated in the settlement agreement does not overlap with the conduct alleged in Relator's complaint, we decline to decide this factual issue on appellate review.").  In short, Defendants' argument finds no support in the law or the Partial Settlement's plain text.  Nowhere in the opinion does *Bledsoe* even suggest that an FCA defendant who gets a specifically delineated release also gets released from all other non-released claims against it.

Moreover, Defendants' effort to excise evidence of wrongful conduct during the Partial Settlement Period should be rejected.  Sutter conspired with each defendant in an integrated course of conduct.  Defendants' actions remain relevant to establish the nature of their schemes, even though Sutter has been released for a portion of the allegedly false claims.  Under the FCA, it is a false claim that gives rise to liability and false claims that have not been released remain actionable. None of Sutter's or other defendants' false claims not explicitly described in the Partial Settlement Agreement have been released.  The entirety of Defendants' fraudulent conduct is relevant to the falsity of the claims that have not been released—including, for example, the California state claims, which have not been released for any time period.  Any bright lines drawn at this early stage

1   will no doubt be misused and taken out of context to argue that critical discovery is somehow

2   irrelevant or otherwise off the table.

3                    **2.       Relator does not seek double recovery.**

4        All of the Defendants argue that the federal government's partial settlement means Relator

5   seeks some form of "double recovery."  *See* Sutter MTD at 1–2, 8.[6]  Nonsense.  The FAC expressly

6   discusses the Partial Settlement agreement and the payments made under it and does not seek those

7   funds again.  *See* FAC ¶¶ 144-45.

8        Nonetheless, certain Defendants argue that the Partial Settlement should result in the

9   dismissal of two years of alleged false claims under the federal False Claims Act, or otherwise

10  affect the pleadings.[7]  Complaints assert facts and claims, not years or limits on damages.  *See U.S.*

11  *v. Maricopa Cty., Ariz.*, 915 F. Supp. 2d 1073, 1082 (D. Ariz. 2012) (a motion to dismiss challenges

12  "the legal sufficiency of the pleadings, not the appropriateness of the relief sought").  Sutter

13  engaged in a multiyear "conspiracy" and fraudulent "scheme" or course of conduct with each

14  Defendant, and it involved defrauding both the federal government and the State government

15  (which did not participated in the Partial Settlement's recovery).  *See, e.g.*, FAC ¶¶ 3(A)–(F).[8]

16  Even if liability were entirely off the table for certain years (it is not), the years comprise important

17  evidence of Defendants' respective fraudulent conduct and Sutter's conspiracy with each remaining

18  Defendant.

19                    **B.       The Detailed FAC Contains More Than Enough Factual Allegations.**

20       The elements of False Claims Act liability are:  "(1) a false statement or fraudulent course of

21  conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money

22  or forfeit moneys due."  *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir.

23  2006).  The California False Claims Act ("CFCA") provisions generally track the federal FCA, but

24  California law is clear that the CFCA resolves any interpretive issues in favor of the government

25

26  [6] *See also* SMG MTD (joining Sutter's motion); East Bay Cardiac MTD at i (same); ECF No. 76 ("CEPMG MTD") (same); Liu MTD at i (same); BASS MTD at 2 (incorporating arguments by reference).

27  [7] SMG MTD at 4 n.1 (SMG); East Bay Cardiac MTD at 2 (East Bay Cardiac); BASS MTD at 2 (BASS); Liu MTD at 3 (Liu MD PC).

28  [8] The federal Partial Settlement here did not discharge any State claims.  *See* RJN Exs. 1-2.

(and relators). *San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 224 Cal. App. 4th 627, 638 (2014) (the "CFCA must be construed broadly so as to give the widest possible coverage and effect to the prohibitions and remedies it provides." (citations and quotes omitted)).

### 1.    The FAC pleads fraud with specificity.

Defendants argue throughout their motions that Relator's pleading fails to satisfy Rule 9(b)'s requirements.  Those arguments are premised on two fundamental flaws that penetrate to the core of their motions.  *First*, Defendants misstate the requirements of Rule 9(b), in nearly every context.  *Second*, Defendants implicitly ask the court to strike large swaths of the pleading (without filing a motion to strike).  Defendants are wrong and their motions should be denied.

In the FCA context, a complaint need only allege "enough detail to give [defendants] notice of the particular misconduct which is alleged to constitute the fraud charged so that [they] can defend against the charge and not just deny that [they have] done anything wrong."  *Winter ex rel. U.S. v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1121 n.9 (9th Cir. 2020) (quoting *Ebeid*, 616 F.3d at 999) (internal quotation marks omitted).  Relator need not allege "all facts supporting each and every instance of billing submitted."  *Id.*  The Ninth Circuit has been consistently clear on this point:  it is the "details *of a scheme* to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted" that must be pled, rather than exemplars of the paperwork shuffled to execute each particular cog advancing the fraud.  *Swoben*, 848 F.3d at 1180 (emphasis added) (quoting *Ebeid*, 616 F.3d at 998–99).  Because the analysis looks to the scheme, a complaint "need not identify representative examples of false claims to support every allegation."  *Id.* (quoting *Ebeid*, 616 F.3d at 998).  Relator pleads how Sutter knowingly paid kickbacks to a variety of referring physicians through sham agreements, and then submitted false claims to the government for the referred services Sutter knew were not eligible for reimbursement.  The law does not demand impossible knowledge about each false claim submitted by Sutter.  Here, Relator alleges a fraudulent course of conduct that involves Sutter and its similarly-illegal financial relationships with the remaining Defendant physician groups.

Relator alleges a fraudulent course of conduct and false certifications, as explained thoroughly in the FAC and Sections I and II above.  Each of the identified agreements between

Sutter and the physician entities was designed to pay physicians for services they did not have to provide, to induce patient referrals to Sutter—a fraudulent course of conduct. *Cf. U.S. v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) (AKS "is violated if 'one purpose of the payment was to induce future referrals . . . even if the payments were also intended to compensate for professional services.'") (quoting *U.S. v. Greber*, 760 F.2d 68, 69 (3d Cir.1985)).  Defendants then submitted false claims for reimbursement to government healthcare payers which claims were based on referrals obtained through kickbacks and related illegal financial relationships, using false certifications in claim forms and in hospital cost reports.  FAC ¶¶ 44–54, 57, 70–71, 142.  Although the FAC does not attach specific invoices in the format in which they were submitted to Medicare and Medicaid, the Ninth Circuit does not require a Relator to do so.  *Swoben*, 848 F.3d at 1180 (Relator must allege only "details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted"); *accord Ebeid*, 616 F.3d at 998–99; *U.S. v. Vibrant America, LLC*, 2020 WL 4818706, at *14 (N.D. Cal. Aug. 19, 2020) ("detailed allegations about the nature of the processing fee scheme are sufficient to state a claim based on inducement even where the relator 'hasn't alleged any particular transaction or named a particular physician who sent samples' to the laboratory.'") (quoting *U.S. v. Crescendo Bioscience, Inc.*, 2020 WL 2614959, at *9 (N.D. Cal. May 23, 2020)); *cf.* FAC ¶¶ 135–37 & Ex. 16 (alleging claims submitted to Medicare).

Relator makes such allegations as to Sutter's arrangements with each Defendant.  For example:

- Sutter paid East Bay Cardiac for "data processing services" that Sutter knew East Bay Cardiac never provided. FAC ¶¶ 157–62 & Exs. 20–21. Sutter also paid East Bay Cardiac for on-call services that were never provided, and permitted East Bay Cardiac to double-bill in instances where it did actually provide on-call services. *E.g.*, *id.* ¶¶ 157–59 & Ex. 18.  In fact, Sutter paid East Bay cardiac for the *same physicians* to be on call at *different hospitals* at *the same time.  Id.* ¶¶ 175, 156–67.

- Sutter paid BASS for on-call services that were never provided, and permitted BASS to double-bill in instances where BASS did actually provide on-call services. *E.g.*, *id.* ¶¶ 168–81, Ex. 22 ¶ 1(j) & Ex. 23 ¶ 1(l).  Sutter paid BASS for on-call coverage for all 365 days of the year across four separate hospital campuses (*id.* ¶¶ 169, 171, 178), and one of the doctors purportedly providing that coverage was the highest-billing vascular surgeon in California that year, with Medicare payments of $4,176,471.06 (*id.* ¶ 172).

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

- Sutter paid CEPMG for emergency department coverage services provided by physician assistants, and it permitted CEPMG to double-bill for those services—pocketing the difference. *Id.* ¶¶ 194–95 & Ex. 29.  Sutter also paid CEPMG a flat $300,000 annual sum purportedly because CEPMG had a patient-pool less likely to have adequate insurance coverage, although the payment provided for no accounting of the actual number of patients who were unable to pay.  *Id.* ¶ 198 & Ex. 29.

- Sutter paid Stephen Liu MD PC—a practice with a single physician—up to $438,000 per year to be on call for 24 hours a day, 365 days a year.  *Id.* ¶¶ 3(E), 27.  (His compensation for this service was quadrupled in 2014.  *Id.* ¶ 184.)  While he was permanently on call, he was also the highest-billing interventional radiologist in California, with 2012 Medicare payments of $4,604,464.10, as Sutter permitted him to double-bill during his time on call.  *Id.* ¶¶ 3(E), 186–87 & Ex. 27.

- Sutter paid SMG for four of its physicians to act as medical directors, at an annual aggregate expenditure of approximately $700,000, although the physicians did not in fact serve as medical directors.  *E.g., id.* ¶¶ 149–55, Ex. 17 & ¶ 3(c).

- Sutter paid former defendant Sac Cardio's physician assistants' salaries, even when they were not working for Sutter and were instead double-billing.  *E.g., id.* ¶¶ 99–105, 119–28 & Exs. 1–2 & 12.  It also paid Sac Cardio physicians to act as medical directors, even when those services were never actually provided.  *Id.* ¶¶ 106–125 & Exs. 3–6.  In addition, Sutter paid Sac Cardio to make physicians available pursuant to Call Coverage Agreements, although those paid-for services were not actually provided.  *Id.* ¶¶ 111–15.

In the face of Relator's detailed allegations, Defendants simply ask the Court to ignore them.  Defendants argue that conduct for which they (wrongly) believe damages cannot be recovered due to the Partial Settlement "cannot be alleged" in the FAC at all.  Sutter MTD at 7.  On the contrary, the Partial Settlement strengthens the FAC's allegations.  *U.S. ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 174 (3d Cir. 2019), *cert. denied* 206 L.Ed. 2d 855 (Apr. 27, 2020) ("This settlement is not an admission of guilt. It proves no wrongdoing. But at the 12(b)(6) stage, we are looking only for plausible claims, not proof of wrongs. And the government's choice to intervene after years of investigation and its allegations in the settlement are cause for suspicion.").

After (wrongly) assuming their success on that argument, Defendants argue that Relator's allegations "outside of the time period of the released conduct" are inadequate.  Sutter MTD at 9.  But as explained above with respect to Defendants' misguided "double recovery" argument, pleading and understanding defendants' long-running scheme requires explanation of the conduct that occurred during its middle period—regardless of what quantum of damages those particular

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

1    acts support.

2                    **(a)    "Direct compensation" arrangements are adequately pled.**

3          Defendants contend they can avoid liability for false claims resulting from Stark Law

4    violations because the FAC's allegations amount to "indirect" financial arrangements in situations

5    where a "direct" arrangement is necessary to violate the Stark Law.  *Id.* at 23.  Sutter

6    misapprehends the regulations, which establish that the FAC clearly alleges "direct" financial

7    arrangements.

8          Prior to 2007, the Stark Law regulations only covered remuneration transactions with an

9    individual doctor.  Parties were able to avoid liability by structuring remuneration transactions to

10   take place between business or physician organizations, rather than natural persons.  *U.S. ex rel.*

11   *Singh v. Bradford Reg'l Med. Ctr.*, 752 F. Supp. 2d 602, 618–19 (W.D. Pa. 2010) ("prior to the

12   December 4, 2007 change in the Stark regulations, a physician could avoid creating a 'direct

13   compensation arrangement' simply by making sure that any remuneration was paid to a

14   professional practice rather than to the doctor individually.") (discussing 42 C.F.R.

15   § 411.354(c)(2)(iii) (2006)).  Sutter exploited that loophole.  For example, Sutter made sure that

16   certain remuneration flowed to the Sac Cardio legal entity rather than individual Sac Cardio

17   physicians.  Sutter MTD at 23-24.

18         In response to abuse like Sutter's, Congress added the defined term "direct financial

19   arrangement" to the Stark Act regulations in December 2007.  *Singh*, 752 F. Supp. 2d at 618-19; 42

20   C.F.R. § 411.354(c)(1)(ii) & (c)(3)(i).  Thereafter, the regulations established that individual

21   physicians "stand in the shoes" of their "physician organizations," thereby creating a "direct

22   financial relationship" between the remunerating party and the remunerated organization.  *Singh*,

23   752 F. Supp. 2d at 618-19; 42 C.F.R. § 411.354(c)(1)(ii) & (c)(3)(i).  Contrary to Sutter's

24   arguments, the FAC alleges and explains why Sac Cardio is a "physician organization" within the

25   regulations' meaning.  *Compare* FAC ¶¶ 24, 81, 99, 102, 106, 111, 116 *with* Sutter MTD at 15

26   ("Relator has not alleged a *direct* compensation arrangement between Sutter Health and the Sac

27   Cardio physicians" (emphasis in original)).  Thus, payments made by Sutter were "direct" payments

28   to the physicians as a matter of law.

1    The FAC, therefore, pleads the "direct financial arrangement" required under the Stark Act

2    regulations.

3    Defendants make no argument with respect to Claims 5–9, which allege violations of the

4    CFCA based on, inter alia, violations of Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. &

5    Inst. Code § 14107.2.  Defendants' arguments here—based solely on federal regulations—

6    accordingly have no application to Relator's claims based on California law, and the Motions

7    should also be denied as to those CA state law claims.

8                    2.      **The FAC pleads *scienter***

9    The FAC pleads that Defendants engaged in their fraudulent course of conduct with the

10   requisite *scienter*.  Defendants wrongly demand that Relator plead scienter with the specificity

11   Rule 9(b) reserves for pleadings related to conduct.  Rule 9(b) requires no such thing.  Fed. R. Civ.

12   P. 9(b) ("a party must state with particularity the circumstances constituting fraud or mistake.

13   Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

14   "[U]nder Rule 9(b), scienter need not be pleaded with particularity, but may be alleged generally.

15   A complaint needs only to allege facts supporting a plausible inference of scienter."  *Winter*, 953

16   F.3d at 1122 (citing Fed. R. Civ. P. 9(b)).

17   Relator "set[s] out sufficient factual matter from which a Defendant's knowledge of a fraud

18   might reasonably be inferred", which is all that is required.  *Silingo*, 904 F.3d at 679–80 (citing

19   *Iqbal*, 556 U.S. at 678).  The FAC explains that each agreement was entered into with the

20   affirmative knowledge and intent that it was a sham intended to illegally benefit the physicians

21   financially and Sutter with referrals of more government-paid work.  For example, Sutter not only

22   knew but intended that Sac Cardio would double-bill for physician assistant time paid for by Sutter,

23   and pocket the difference.  Relator's compliance organization brought that very issue to Sutter's

24   attention, and Sutter's response evinced knowledge of guilt—businesspeople circumvented

25   compliance and had Sac Cardio invent additional fraudulent invoices to cover up their wrongdoing.

26   *E.g.*, FAC ¶¶ 119–120 & Ex. 12 (Sutter directing Sac Cardio to re-construct and re-submit bills),

27   126–28 (Sutter issuing payments regardless of non-performance).  That was not an isolated

28   incident.  Sutter made a practice of paying physicians for sham services, which naturally gives rise

to the inference that it intended to do so.  *See, e.g.*, FAC ¶¶ 149–55 (payments to SMG's Dr.

Roberts regardless of non-compliance with agreement); FAC ¶¶ 156–67 & 175 (payment to East

Bay Cardiac physicians for overlapping, unnecessary call services); FAC ¶¶ 161 (paying East Bay

Cardiac under data processing contract where all parties agreed there was no performance).

Moreover, for FCA liability to attach to Sutter's conduct, the Relator is not required to allege or

prove such intent, because the FCA "require[s] no proof of specific intent to defraud." 31 U.S.C. §

3729(b)(1)(B).

Defendants argue that Relator fails to allege scienter for three reasons:  First, they argue that

the Court should assess scienter allegations using Rule 9(b)'s heightened pleading requirements;

second, they argue that Relator must allege the specific, individual human actors who acted with the

requisite scienter, and cannot rely on a corporate entity's knowing or willful conduct at the pleading

stage; and third, Defendants argue that in order to allege scienter under the AKS based on illegally

compensating a physician for referrals, a relator must allege facts supporting benchmark rates for

each service a physician provides to show that the physician was overpaid.  Each of these

arguments fails.

### (a) Knowledge and intent are not subject to Rule 9(b)

Various Defendants' motions argue that the FAC does not plead knowledge and intent with

sufficient specificity to satisfy Rule 9(b).[9]  Defendants flatly ignored Rule 9(b)'s text, which

provides that "intent, knowledge, and other conditions of a person's mind" are not subject to its

requirements and may instead "be alleged generally."  Fed. R. Civ. P. 9(b).  Nothing in the FCA or

state laws alter the Rule.[10]  *E.g.*, *Silingo*, 904 F.3d at 679-80 ("Although the circumstances of a

fraud must be pleaded with particularity, knowledge may be pleaded generally."; FCA case);

*Swoben*, 848 F.3d at 1180, 1184 ("Knowledge, however, may be pled generally. . . .  [and] need not

be pled with particularity"; FCA case).

---

[9] East Bay Cardiac MTD at 5-6; CEPMG MTD at 15–16; BASS MTD at 4; Sutter MTD (*passim*);
Liu MTD 5.

[10] The CFCA similarly requires only "reckless[ness]" regarding the truth or falsity of the
information in the claim, and does also not require "[p]roof of specific intent to defraud."  Cal.
Gov't Code § 12650(b)(3).  *See Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106,
1111-12 (9th Cir. 2006).

Nevertheless, Defendants argue that Relator:

- "fails to provide specific facts showing that Sutter had the requisite intent to violate the AKS" (Sutter MTD. at 2);
- "fails to adequately allege that any individual . . . possessed the requisite intent to violate the AKS" (*id.*at 10);
- does not "demonstrate that Sutter Health acted 'knowingly and willfully,' (*i.e.*, with intent to violate the law), and with intent to offer or pay remuneration in exchange for referrals" (*id.* at 12);
- "alleges no specific facts identifying anyone at Sutter who acted with the intent to induce referrals" (*id.* at 12); and
- propounds "no allegation showing she knows any facts about the purpose or intent of the contract" (East Bay Cardiac MTD at 4).

In truth, Relator need only "set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred." *Silingo*, 904 F.3d at 679–80 (citing *Iqbal*, 556 U.S. at 678). The FAC is replete with allegations that Defendants acted not only knowingly, but willfully, as explained throughout the discussion of the factual background and in this section above, which explains an intentional scheme—not mere accidental or even passive activity. *E.g.*, FAC ¶¶ 119–120, 149–55, 156–67, 175 & Ex. 12.

### (b) Defendants cannot rely on distinctions between corporate and individual intent.

Sutter argues that a relator must specifically allege which "individual" committed each relevant act and had the requisite intent. Sutter MTD at 10. Sutter misapprehends the standard. Corporations act through individuals, and are themselves legal persons. There is no special rule that requires allegations to name the individual persons behind each corporate act.

For the point, Sutter cites *U.S. ex rel. Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 664 (9th Cir. 2018) (unpublished)—a case that actually supports Relator's position. Sutter MTD at 10. *Vatan* explains that Rule 9(b)'s purpose is to require allegations "specific enough to give defendants notice of the particular [alleged] misconduct ... so that they can defend against the charge." *Vatan*, 721 F. App'x at 664 (quoting *Swoben*, 848 F.3d at 1180). Given that purpose, the court **rejected** the defendant's argument that the relator "failed to adequately plead 'who' was responsible for the misconduct" because the relator had "alleged 'with specificity how ***the company itself*** institutionalized and enforced its fraudulent scheme.'" *Id.* (emphasis added) (quoting *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015)). Such company-specific "allegations

sufficiently identify 'who' was involved, such that the defendant has the requisite notice to 'defend against the charge.'" *Id.*[11]

The same is true with respect to pleading knowledge. *E.g.*, *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1084 n.499 (N.D. Cal. 2020) (explaining that the FCA does not require a plaintiff "to plead or prove that the individuals who—on behalf of the defendant organization—submitted claims or certifications had scienter themselves. . . . It is sufficient to plead that the defendant organization had scienter (whether imputed knowledge from any employee who had scienter or otherwise), regardless of whether the individuals who submitted the claims or certifications were wholly innocent and had no scienter themselves.") (collecting cases).

The published opinions on which *Vatan* relies agree. In *Heath*, the court rejected the defendant's objections that "the complaint fails to identify the specific actors who made the false statements or misrepresentations" because the relator did "identify a specific actor—AT&T itself." Heath, 791 F.3d at 125. *Heath* explained that "alleging with specificity how the company itself institutionalized and enforced its fraudulent scheme . . . sufficiently identifies who committed the fraud for the purposes of Rule 9(b)." *Id.*; *see also Swoben*, 848 F.3d at 1180 ("[I]t is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'"); *Bledsoe*, 501 F.3d at 509 (6th Cir. 2007) ("where the corporation is the defendant in a [False Claims Act] action, we hold that a relator need not always allege the specific identity of the natural persons within the defendant corporation.").

        **(c)**    **The AKS requires "remuneration" allegations—not formalisms about "fair market value" or "benchmarks."**

Violations of AKS Section 1320a-7b(b)(1) require the solicitation or receipt of "any

---

[11] Defendants' sole remaining authority comes from a Central District order dismissing a complaint alleging CLRA, unjust enrichment, UCL, and breach of warranty claims in a consumer class action related to product advertising—not false claims statutes. *Dysthe v. Basic Research, LLC*, 2010 WL 11596676, at *1 (C.D. Cal. May 10, 2010). Moreover, the plaintiffs in *Dysthe* argued that Rule 9(b) did not apply to their complaint, resting instead on conclusory allegations that defendants made "wild (and completely false) claims," which the plaintiffs "heard." *Id.* at *2-3. The *Dysthe* court explained that Rule 9(b) demanded more—the plaintiffs could allege who made the statement or explain why they could not name the speaker. *Id.* at *3. The FAC, by contrast, does not merely assert that false claims were made. It explains how they were made, and explains the role of the relevant actors—the entities that doctored the paperwork and presented the false claims.

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

remuneration." *See* 42 U.S.C. § 1320a-7b(b)(1). Remuneration is a "broad term" that was intended "to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates." *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (discussing Pub. L. No. 95-142, 91 Stat. 1175, 1182 (1977)); *see also* Medicare & State Health Care Programs: Fraud & Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July 29, 1991) (codified at 42 C.F.R. § 1001) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.").

Defendants contend that pleading "remuneration" requires allegations about fair-market-value ("FMV") for each payment.[12] Defendants are wrong. There is no such thing as the FMV of a bribe. *See Vibrant America*, 2020 WL 4818706, at *12 ("Relator has alleged that Vibrant pays a fee . . . where the recipients performed *no* services whatsoever. Drawing all reasonable inferences in favor of Relator, these allegations are sufficient to support an inference that the fee paid by Vibrant exceeds the fair market value of the services provided."); *Crescendo Bioscience*, 2020 WL 2614959, at *7. And the FAC does include FMV allegations where such allegations are helpful and reasonably available before the expert stage. *E.g.*, FAC ¶¶ 112, 118, 150, 163, 195, 201. Nothing in the law demands more.

*First*, "FMV" allegations would be incoherent or meaningless where payments were made for services never rendered or pursuant to sham contracts. "If there was no requirement to actually perform the duties of [the agreement] then the compensation could not be the fair market value for those services, and thus would serve some other purpose, such as compensation for patient referrals." *U.S. v. Campbell*, 2011 WL 43013, at *8 (D.N.J. Jan. 4, 2011) (citing *U.S. v. Rogan*, 2006 WL 8427270, at *17 (N.D. Ill. Oct. 2, 2006), *aff'd.* 517 F.3d 449 (7th Cir. 2008)). The FCA analyzes FMV issues in the same common-sense way as the Federal Rules. It treats FMV as a fact that, as with all other relevant facts, may be more or less useful under the circumstances. *See* 70 Fed. Reg. 4858, at 4867 (explaining that FMV is a "general rule of thumb"; listing "factors,"

---

[12] BASS MTD at 4; CEPMG MTD at 27; Liu MTD at 5, 9 ("Relator must allege facts establishing the fair market value of SKLMD's services"); Sutter MTD at 10 (demanding "facts showing both (i) the fair market value of Sac Cardio's arrangements with Sutter and (ii) that the physicians received some benefit from Sutter in connection with these arrangements that was something other than a fair market value exchange.").

1  including FMV factors, that may be relevant to identifying fraud under some circumstances).

2  Earlier this year, Judge Hixson also considered the issue of whether allegations that

3  payments did not accord with a service's fair market value are necessary to plead an FCA claim

4  brought based on the AKS.  In *Crescendo*, "[d]efendants contend[ed] that a relator cannot allege

5  inducement if the relator fails to allege at least some facts that could give rise to an inference that a

6  fee paid is above fair market value."  2020 WL 2614959, at *7.  *Crescendo* held that "the AKS can

7  be implicated *whenever* a clinical laboratory pays a physician for services, even if payment doesn't

8  exceed fair market value for the service."  *Id.* (quoting OIG, Special Fraud Alert (2014) (emphasis

9  in original)); *accord* OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg.

10  4858, 4864 ("[U]nder the anti-kickback statute, neither a legitimate business purpose for the

11  arrangement, nor a fair market value payment, will legitimize a payment if there is also an illegal

12  purpose (*i.e.*, inducing Federal health care program business).").  *Crescendo* explains that the

13  relevant question was whether the relator's allegations "create a reasonable inference that the

14  payments were being made to induce referrals, whether or not the payments exceeded fair market

15  value."  *Id.*  Where they do, a relator "has plausibly alleged improper inducements under the AKS."

16  *Id.*  The *Crescendo* Court denied the motion to dismiss, reasoning that the alleged "arrangement

17  might implicate the FCA for multiple reasons, whether or not its payments were at fair market

18  value."  *Id.*

19  Similarly, *Vibrant America* explains that payments exceeding FMV is but "one scenario" in

20  "a non-exclusive list of the types of features of such arrangements that could indicate an unlawful

21  intent to induce referrals."  2020 WL 4818706, at *12 (quoting OIG, Special Fraud Alert (2014)).

22  Of course, "while the 'probability that a payment is for an illegitimate purpose is increased . . . if a

23  payment exceeds fair market value[,]' a processing fee paid by the laboratory may violate the Anti-

24  Kickback Statute 'regardless of whether the payment is fair market value for services rendered.'"

25  *Id.* (quoting OIG, Special Fraud Alert (2014)).  That is because, in part, "'under the anti-kickback

26  statute, neither a legitimate business purpose for the arrangement, ***nor a fair market value payment***,

27  will legitimize a payment if there is also an illegal purpose (*i.e.*, inducing Federal health care

28  program business).'  Rather, the relevant question is whether '*one* purpose of the remuneration [is]

24

to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program[.]'" *Id.* at \*16 (first emphasis added) (quoting *U.S. ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 678 (W.D. Pa. 2014) (not necessary to plead that payments are made "*exclusively* to induce referrals" or that payments "are not sometimes justified")).

Last year's *Perri* case likewise rejected the defendant's argument that "a relator alleging an FCA claim predicated on a violation of the AKS must plead that the remuneration offered was 'commercially unreasonable' or inconsistent with fair market value," reasoning that "[t]he language and structure of the statute supports an expansive interpretation of renumeration." *U.S. ex rel. Perri v. Novartis Pharm. Corp.*, 2019 WL 6880006, at \*10–12 (D.N.J. Feb. 21, 2019) ("The language 'directly or indirectly, overtly or covertly, in cash or in kind' suggests that the form or manner of the payment is meant to encompass an extensive range of transactions."). The court noted that the term "fair market value" was not part of the original statute (42 U.S.C. § 1320a-7b(b)(1)), but appears in later-enacted sections that "specify relationships and conduct, even if technically within the purview of the statute, will not be prosecuted as criminal offenses under the AKS." *Id.* But *Perri*, like the present action, was not criminal. Thus, those "fair market value" provisions therefore did not apply. *Id.* at \*14.

The FAC's representative examples and detailed allegations of Sutter's conspiracy are more than sufficient to plausibly allege that the remuneration was above FMV, as explained above. Sections II, IV.B.1. Defendants' request for more would essentially require attaching an expert report to the FAC. Relator is fully prepared to amend to do that, but such a demand would be unprecedented in the FCA context and would put the expert cart before the discovery horse, undermining Rule 26 and giving Defendants early disclosure they need not reciprocate.

***Third***, the FAC alleges FMV and benchmarks where they are useful and reasonably available prior to expert discovery.

For instance, Sutter quarrels about the appropriate inferences from "call coverage reports" from Sac Cardio. Sutter MTD at 21. The FAC explains Sutter increased Sac Cardio's call coverage rate "more than 200 percent from $1,140 per 24-hour shift in the 2008 Call Coverage Agreement . . . to $2,500" in 2010, where it remained for at least several years. FAC ¶ 112. It goes

on to explain that the $2,500 rate "exceeds *fair market value* and exceeds the rates paid by SUTTER HEALTH to other similar cardiovascular surgeons for call coverage during the same timeframes." *Id.* (emphasis added).  Nothing more is necessary to make the FMV inference; a greater than 200% rate increase between 2008 and 2010 speaks for itself.  Similarly, in other areas where alleging FMV does not require expert analysis, Relator alleges specific values.  *E.g.*, ¶¶ 112, 118, 150, 163, 195, 201.

**Fourth**, Defendants' affirmative defenses—not Relator's claims—require proof of FMV. The Department of Health and Human Services has promulgated regulatory "safe harbors" or "exceptions" for certain transactions.  70 Fed. Reg. at 4867 (collecting safe harbor regulations that require FMV); *see also* FAC ¶¶ 83-86 (explaining that defendants may qualify for certain safe harbors by proving FMV).  Almost all exceptions require that a <u>defendant</u> prove a transaction took place at FMV in order for the Defendant to claim the safe harbor.  70 Fed. Reg. at 4867 (collecting regulations; noting that hospitals "should" get fair-market value opinions to defend against certain FCA claims).  Thus, it is Defendants' burden to prove that the compensation was not in excess of fair market value.  *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95, 97-98 (3d Cir. 2009) (considering FMV only after "the burden shifts to the defendant to establish that the conduct was protected by an exception."); *see also U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 374 (4th Cir. 2015) (following *Kosenske*'s burden-shifting approach).  Relator need not plead what she need not prove.  *See U.S. ex rel. Herbold v. Doctor's Choice Home Care, Inc.*, 2019 WL 5653459, at *13 (M.D. Fla. Oct. 31, 2019) (because exceptions to the Stark Act "most closely resemble affirmative defenses, it is the Defendants' obligation to plead that they apply rather than the Government's obligation to plead that they do not apply." (citation omitted)); *U.S. ex rel. Emanuele v. Medicor Assocs.*, 2017 WL 4867614, at *3 (W.D. Pa. Oct. 26, 2017).

Defendants' authorities do not undermine these rules.  Defendants' *Diagnostic Imaging* case goes astray two ways.  *First*, it appears to confuse affirmative defenses involving proof of FMV with the requirements for pleading a *prima facie* claim.  The defendant in *Diagnostic Imaging* claimed a safe harbor that requires demonstrating FMV.  *U.S. v. Ctr. for Diag. Imaging*, 787 F. Supp. 2d 1213, 1222 (W.D. Wash. 2011), *amended on reconsideration*, 2011 WL 13353774 (W.D.

Wash. Apr. 25, 2011).  *Diagnostic Imaging* acknowledges that the safe-harbor defense was before it, but goes on to treat the FMV issue as the plaintiff's burden.  *Id.* at 1222-23.  *Second*, the one case *Diagnostic Imaging* cites on point (*Klaczak*) does not support any special FMV pleading burden. *Id.* at 1223.  *Klaczak is a* <u>summary judgment</u> opinion explaining that the relator had adduced no <u>proof</u> of <u>remuneration</u> (not "FMV"), save for a "fundamentally defective" theory and an excluded expert.  *Klaczak v. Consol. Med. Transp.,* 458 F. Supp. 2d 622, 678-79 (N.D. Ill. 2006).  By contrast, Relator has pled remuneration (and FMV), and now is not the time for an expert report or proof of those allegations.[13]

Defendants also cite the un-published, non-precedential, out-of-circuit opinion *Bingham v. HCA, Inc.*, 783 F. App'x 868, 873–74 (11th Cir. 2019).  Sutter MTD at 10.  The relevant portion of *Bingham* reviewed a grant of summary judgment, not a motion to dismiss.  783 F. App'x at 875 ("For these reasons, we conclude that Relator has not shown that HCA conveyed any remuneration to physician tenants of the Centerpoint MOB, and therefore that Relator's AKS claim fails on summary judgment.").  *Bingham* concluded that FMV proof was necessary to "quantif[y]" Defendants' benefits.  *Id.* at 873.  *Bingham*'s only statutory support for an FMV requirement came from a definition of "remuneration" that is expressly limited to a different "particular section" concerning monetary penalties under the AKS.  *Id.* at 873 ("Although that definition is limited to that particular section of Title 42 . . . ." (citing 42 U.S.C. § 1320a-7a(i)(6))).  The civil penalty provision defines "remuneration" "<u>to include</u>" non-FMV transactions.  *Id.* (emphasis added).  It does not state that FMV is required or establish any pleading requirement.

### 3.    The fraud and false statements were material

#### (a)    Sutter's materiality arguments rest on unreasonable inferences and demands

Defendants' violations of the Stark Law and the AKS were material to the government's payment decisions.  In *Escobar*, the Supreme Court espoused the reasonable-person standard for materiality, explaining that "a 'matter is material'  . . . :  (1) "[if] a reasonable man would attach

---

[13] *Diagnostic Imaging* is also distinguishable because, in that case, "plaintiffs have simply alleged, 'upon information and belief' that many of the referring physicians were" situated such that "their compensation would fluctuate based on the number of referrals."  2011 WL 13353773 at *4.

importance to [it] in determining his choice of action in the transaction." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002–03 (2016) (quoting Restatement (Second) of Torts § 538, at 80). "No reasonable person could believe that AKS compliance is unimportant to the Government's reimbursement decisions. . . ." *U.S. v. Berkeley Heartlab, Inc.*, 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017). Thus, "where it is adequately alleged that claims for Medicare and Medicaid reimbursement cover services that were provided as a result of a violation of the Anti-Kickback Statute, the materiality requirement is adequately alleged. *Vibrant America*, 2020 WL 4818706, at *18 ("Because the Court finds that Relator has adequately alleged violations of the Anti-Kickback Statute, the Court rejects Vibrant's argument that Relator's claims fail because they do not allege facts establishing materiality"). Congress has made the same judgment—that claims based on AKS violations constitute a <u>complete</u> FCA violation. In 2010 it passed a statute establishing that a "claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g); *see also Vibrant America*, 2020 WL 4818706, at *18 (discussing legislative history); *U.S. ex rel. Goodman v. Arriva Med., LLC*, 2020 WL 3840446, at *8 (M.D. Tenn. July 8, 2020) (explaining that "Congress has chosen . . . to mandate a categorical rule" that AKS violations constitute a complete fraud claim, including any implied materiality element). This feature, among others, regularly leads courts to conclude that AKS violations are "*per se*," or very nearly "*per se*," material. *Berkeley Heartlab*, 2017 WL 6015574, at *2; *U.S. ex rel. Longo v. Wheeling Hospital, Inc.*, 2019 WL 4478843*, at *9-10 (N.D. W. Va. Sept. 18, 2019); *U.S. v. Medoc Health Servs. LLC*, 2020 WL 3892453, at *8 (N.D. Tex. July 2, 2020); *see also U.S. ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 812 (S.D.N.Y. 2017), *rev'd* on other grounds and remanded, 899 F.3d 163 (2d Cir. 2018) (explaining that the 2010 amendments "ma[d]e plain" that AKS violations establish false claims).

Similarly, the alleged Stark Act violations are material to the government's decision to pay claims for reimbursement to doctors and hospitals. The Stark Act, itself, expressly prohibits Medicare from paying claims that do not satisfy each of its requirements, including every element of any applicable exception. *Longo*, 2019 WL 4478843, at *2, 9 (discussing 42 U.S.C. § 1395nn(a)(1), (g)(1)). Thus, courts readily conclude that claims in violation of the Stark Act are

material, at least so long as the Stark Act violations are more than mere technicalities. *U.S. ex rel. Emanuele v. Medicor Assocs.*, 242 F. Supp. 3d 409, 431 (W.D. Pa. 2017) (explaining why *Escobar* is satisfied by a substantial Stark Act violation); *Longo*, 2019 WL 4478843, at *9 ("courts have repeatedly held that alleged violations of the Stark Law and AKS were material, including after *Escobar*" (collecting cases)).

Notwithstanding the statutory language and case law, Sutter asks the court to go beyond the pleadings and speculate that the government may have concluded that the violations alleged in the FAC were immaterial. *See* Sutter MTD at 24. According to Sutter, the government has "continuously" paid new Sutter invoices since this case was instituted in 2014. *Id.* (citing FAC ¶ 147, a paragraph concerning Sutter's obligation to "refund to the United States and the State of California overpayments . . . for periods before September 1, 2012 and after September 30, 2014"). Sutter contends that its extra-record assertions about events six years after filing are "strong evidence" that the government believes Sutter's misconduct was immaterial, $30 million settlement notwithstanding. *Id.* But we know what happened: The federal government investigated, reached a partial settlement, and chose to permit Relator to continue moving the federal portion of this case forward as to the unsettled time period, rather than dismissing it in full.

Moreover, Sutter is asking the Court to make an inference in favor of Sutter and not Relator, a practice not permitted at the pleading stage. Sutter contends that it is entitled to an inference that its fraud was not material because Relator does not allege whether "the Government discontinued payment" after filing this case. *Id.* at 25. The fact that the Government allowed a large hospital system to continue to treat Medicare and Medicaid patients who urgently need services is no indication that the Government does not take the kickbacks seriously. *See U.S. v. Berkeley HeartLab*, *Inc.*, 2017 WL 4803911, at *6 (D.S.C. Oct. 23, 2017) ("The Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing"); *Longo*, 2019 WL 4478843, at *7 ("This Court doubts that the hospital industry would warmly welcome a rule that required the Government to cut off hospital funding whenever a *qui tam* action is filed  . . . .").

The Ninth Circuit in *Godecke* addressed a defendant that, like Sutter, speculated about what

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

the government might have done after a claim was submitted.  *U.S. ex rel. Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1213–14 (9th Cir. 2019) ("KCI simply suggests that because the government 'may'" take action inconsistent with materiality, the Court should infer a lack of materiality).  The panel declined to infer affirmative government action (that the government paid claims knowing they were false) from silence.  *Id.* at 1214.  Instead, the <u>defendant</u> needed <u>evidence</u> to support its speculation.  *Id.* at 1214 ("But KCI [defendant] has not shown that Medicare has paid a particular claim in full despite its actual knowledge . . . .  Nowhere in the record is there evidence that the government actually *has* reimbursed a particular claim in full despite knowing" of the alleged falsehood) (emphasis in original).  This follows because the Relator, not Sutter, receives the benefit of inferences at the pleading stage.  *Walleri v. Fed. Home Loan Bank of Seattle*, 83 F.3d 1575, 1580 (9th Cir. 1996) ("The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from well-pleaded facts."); *see also Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005) ("we accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party").

Sutter also asserts that the government's "declination to intervene" supports an inference in Sutter's favor on this score.  *Id.* at 25.  The Government allowing Relator to pursue the rest of the case with her experienced counsel does not suggest anything about the merits of the case.  *See, e.g.*, *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006)  ("We do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient or the qui tam relator's allegations for fraud to be without merit.  In any given case, the government may have a host of reasons for not pursuing a claim."); *U.S. ex. rel Chandler v. Cook County, Ill.,* 277 F.3d 969, 974 n.5 (7th Cir. 2002) ("There is no reason to presume that a decision by the Department of Justice not to assume control of the suit is a commentary on its merits. The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney.").

//

//

1

**(b)** **California law flatly rejects Sutter's materiality arguments**

2      California courts and its Attorney General emphatically reject Sutter's what-might-have-

3   happened-later style of argument. Under the CFCA, materiality is assessed from the time the claim

4   was made. Facts or speculation about what the government might or did do afterwards are

5   insufficient as a matter of law.

6      The "CFCA must be construed broadly so as to give the widest possible coverage and effect

7   to the prohibitions and remedies it provides." *L.A. ex rel. Knudsen v. New Cingular Wireless Nat'l*

8   *Accounts, LLC*, 2019 WL 5566771, at *7 (E.D. Cal. Oct. 29, 2019) (quoting *Contreras v. First*

9   *Student, Inc.*, 224 Cal. App. 4th at 638). Just like the FCA, the CFCA's materiality element is

10  satisfied where the falsehood or omission "had a natural tendency to influence or was capable of

11  influencing government action." *Contreras*, 224 Cal. App. 4th at 642. California law is emphatic

12  that the correct analysis "focus[es] on materiality at the time a false claim was presented" rather

13  than *post hoc* facts, which means that arguments about subsequent government (in)action are an

14  insufficient defense. *Id.* at 642-43 (also explaining that the State Attorney General took this

15  position as an *amicus* in the appeal).

16      In *Contreras*, the CFCA defendant argued at summary judgment that "alleged false implied

17  certifications were not material because [the relevant State agency] declined to intervene in the

18  present action, declined to bring an action of its own for breach of contract, always paid defendant's

19  monthly invoices in full, and extended the Contract in 2010." *Id*. at 641 (emphasis in

20  original). *Contreras* elaborated that "decisions not to intervene or bring suit for breach of contract

21  could simply reflect a judgment that plaintiffs' claims should be resolved in the present action at

22  minimal cost to the District," and thus inferences from government inaction or continued payment

23  were insufficient as a matter of law. *Id.* at 644.

24

**4.**   **Relator adequately alleges liability based on an overpayment or "reverse false claims" theory.**

25

26      The FCA "unequivocally provides that to retain—to not return—an overpayment constitutes

27  a violation of the FCA." *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y.

28  2015). Such overpayment claims are also known as "reverse false claims" and they arise when a

31

Defendant "fraudulently avoids an obligation for it to pay money to the government." *Ormsby*, 444

F. Supp. 3d at 1054-55; 31 U.S.C. § 3729(b)(3) (providing that an "obligation" to pay may arise

from "an established duty, whether or not fixed, arising from . . . the retention of any

overpayment"). Defendants are expressly obligated to repay the overpayments alleged in the FAC.

*E.g.*, 42 C.F.R. § 401.305(a) & 42 U.S.C. § 1320a–7k(d)(1) (Medicare and Medicaid

overpayments); 42 C.F.R. § 411.353(d) (duty to return Stark payments); FAC ¶¶ 31, 48, 147-48,

161, 212, 229, 252 (alleging such overpayment obligations).[14]

Sutter argues, "Relator's reverse false claim [sic] is 'redundant' of her presentment claims."

Sutter MTD at 27. To the extent Sutter means the claims are legally redundant, it is wrong as a

matter of law. *U.S. ex rel. Martinez v. KPC Healthcare Inc.,* 2017 WL 10439030, at \*6 (C.D. Cal.

June 8, 2017). The statutes and regulation that require Defendants to repay their fraudulently-

procured overpayments impose an "independent legal duty" that is separate and apart from the

duties Defendants breached when they initially presented the false claims and when they falsely

certified compliance in cost reports. *Id.*

Sutter is also wrong if it means to say that the reverse claims are redundant as a factual

matter. Presentment claims, or "direct false claims," are not coextensive with reverse false claims.

For instance, they have the added element of presentment, which requires that a claim be submitted

to the government. *Ormsby*, 444 F. Supp. 3d at 1055-58 (discussing and distinguishing the

elements of direct and reverse false claims; denying Sutter's motion to dismiss presentment and

reverse-false claims). In some complex cases the presentment element has mattered, such as where

defendants knowingly receive an overpayment but did not "present" the claims in the required

manner, or where statute of limitations disputes arise. *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465

---

[14] Sutter defines two subdivisions of the relevant Medicare and Medicaid statute, 42 U.S.C. § 1320a-7k(d)(2)-(3), as "the Overpayment Rule" and states that Relator does not allege a violation of that Rule. Sutter MTD at 5, 17 ("Moreover, having failed to allege any violation of the Overpayment Rule, Relator's reverse false claim is 'redundant' of her presentment claims."). But the FAC does allege violations of the Rule. Though it did not need to, the FAC expressly cites the entirety of Section 1320a-7k and correctly explains that the statute created one (not all) of the overpayment obligations Sutter and the other Defendants breached. FAC ¶ 31. Specifically, Subdivision (d)(1) defines one of the obligations that Sutter breached (the obligation "to report and return [an] overpayment"). The Subdivisions Sutter calls the "Overpayment Rule" are about the deadline for it to "report and return" overpayments and certain remedies the government elects to pursue. 42 U.S.C. § 1320a-7k(d)(2)-(3).

F.3d 1189, 1207 (10th Cir. 2006) (reversing summary judgment for defendant that argued "presentment" element was not satisfied because the reverse false claim provision "does not require presentment"); *U.S. ex rel. Landis v. Tailwind Sports Corp.,* 51 F. Supp. 3d 9, 60 n.38  (D.D.C. 2014) (noting a statute of limitations dispute that turned on the element of "presentation"), *as amended by* 160 F. Supp. 3d 53 (D.D.C. 2016), *and as clarified on denial of reconsideration*, 2016 WL 3197550 (D.D.C. June 8, 2016).

In any event, it is premature to dismiss reverse false claims at this stage of the case. *Wallace v. Exactech, Inc.,* 2020 WL 4500493, at *21 (N.D. Ala. Aug. 5, 2020) ("While it appears that Relators' claim under 31 U.S.C. § 3729(a)(1)(G) may be redundant of the affirmative false claims, this Court concludes that the claim would best be assessed after factual development.").  If in fact Relator's direct and reverse false claims are coextensive, then Relator will elect which to pursue at the fact stage.  Meanwhile, Sutter cannot complain because merely "redundant" claims could pose no additional potential liability.  And to the extent Sutter contends that direct and reverse false claims are inconsistent, it is a basic rule of pleading that claims can be pled in the alternative. *E.g.*, *U.S. ex rel. Stepe v. RS Compounding LLC*, 325 F.R.D. 699, 709–10 (M.D. Fla. 2017) ("[T]he Court agrees with the United States that [reverse false claim theory] is not duplicative . . . and is properly pled in the alternative.").

The lone case Sutter cites, *Kinetic Concepts*, grapples with none of the foregoing issues. Sutter MTD at 17 (citing *U.S. v. Kinetic Concepts, Inc.*, 2017 WL 2713730, at *13 (C.D. Cal. Mar. 6, 2017), *vacated sub nom. Godecke*, 937 F.3d 1201 (9th Cir. 2019)).  *Kinetic* relies on a line of cases holding that reverse false claims theories should be dismissed because it could not have been "the intent of the statute" to create potentially redundant claims.  *U.S. ex rel. Besancon v. UChicago Argonne, LLC*, 2014 WL 4783056, at *4 (N.D. Ill. Sept. 24, 2014) (cited at *Kinetic*, 2017 WL 2713730 at *13); *U.S. ex rel. Davern v. Hoovestol, Inc.*, 2015 WL 6872427, at *9 (W.D.N.Y. Nov. 9, 2015) (same).  But assumptions about legislative "intent" cannot override the "plain meaning" of the statute, which demonstrates that Congress intended to create a new and additional obligation to repay Medicare funds that were obtained by false claims.  *Martinez*, 2017 WL 10439030, at *6 (rejecting *Davern*).  Moreover, the concern about "redundancies" is fundamentally misguided:

"Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws . . . a court must give effect to both." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) (citation omitted).

Sutter's remaining reverse false claim arguments rely on Sutter's mistaken position regarding the Partial Settlement agreement's scope with respect to the federal claims (Sutter MTD at 17), or demand unreasonable and unsupportable pleading requirements. *Compare* Sutter MTD at 17 (complaining that each particular overpayment was not "identified"), *with* Section I, *supra*.

## C.  Defendants' Other Objections Are Meritless

### 1.  The FAC alleges FCA violations against each non-Sutter Defendant.

The Stark Law makes it illegal for Sutter to bill Medicare for DHS referrals from a Stark-tainted physician, and illegal for the physician to make the referral. 42 U.S.C. § 1395nn(a)(1). The AKS makes it illegal for Sutter to offer or pay kickbacks, and illegal for the physician to solicit or receive kickbacks. 42 U.S.C. § 1320a-7b(b)(1)–(2).  The FCA makes it illegal for the physician and his professional corporation to knowingly present or cause to be presented a false claim, make a false statement or retain an overpayment.  31 U.S.C. § 3729.

The FAC alleges distinct Stark Law violations against each non-Sutter Defendant. FAC ¶¶ 152-153 (SMG), 163-165 (East Bay Cardiac) 177-179 (BASS), 189-191 (Dr. Liu) & 201-203 (CEPMG).  The FAC alleges distinct AKS violations against each non-Sutter Defendant. FAC ¶¶ 154-155 (SMG), 166-167 (East Bay Cardiac), 180-181 (BASS), 192-193 (Dr. Liu) & 204-205 (CEPMG). The FAC alleges FCA violations against each non-Sutter Defendant resulting from distinct financial relationships that violated the Stark Law and/or the AKS.  FAC ¶¶ 206, 208-216.

### 2.  Sutter Medical Group willfully ignores numerous allegations.

Sutter Medical Group (SMG), a 470-physician medical group with a Medical Director Agreement with Sutter (*see* FAC ¶¶ 21, 150), asserts "Relator fails to allege any facts specific to SMG." ECF No. 74 ("SMG MTD") at 4-5.  Both propositions require ignoring numerous allegations—including an allegation that SMG itself cites.  FAC ¶ 18.

If SMG's argument appears coherent at first blush, that is only because it plays a shell game with corporate entity names, gambling that the Court will not read the allegations explaining why

paragraphs referring to other Sutter parties equally implicate SMG:  "Defendant Sutter Valley Medical Foundation, f/k/a Sutter Medical Foundation" works with "physicians and mid-level providers of Defendant Sutter Medical Group [SMG] to provide primary care and specialty care to patients."  FAC ¶ 18.  Paragraphs 148-49 discuss and refer to Exhibit 17, which is attached to the FAC and therefore incorporated by reference into it.  *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (incorporation by reference where "the contents of the document are alleged in a complaint").  Together, these sources explain:

> Sutter Medical Foundation has entered into a Professional Services Agreement with Sutter Medical Group [SMG], A California Corporation ("Group"), whereby Foundation retains the services of physicians employed by Group [SMG].

Ex. 17 at 1.  One SMG physician, "David K. Roberts, III, M,D., ('Physician')," is engaged "to serve as medical director."  *Id.*  The Foundation and SMG agreed to appoint Roberts as "medical director" of operations that were part and parcel of Sutter's fraudulent scheme, taking millions of dollars from taxpayers.  *Id.*; FAC ¶¶ 149-55.  The FAC then alleges specific representative payments of hundreds of thousands of dollars, and explains that the hours that SMG and the Foundation billed to the government could not reasonably have been worked in light of the volume of work that Roberts conducted in his own practice consistent with the hours requirements of his contract.  FAC ¶ 150.

SMG knows all that.  It did not misread the FAC.  In fact, SMG cites one of the paragraphs that states Dr. Roberts's conduct is attributable to SMG.  FAC ¶ 150 ("Dr. Roberts, Defendant Sutter Medical Foundation and Defendant Sutter Medical Group" engaged in fraud together), *cited at* SMG MTD at 5.

SMG broke the law for years.  It has known about the allegations and has had at least six years to investigate them.  Now it tries to mislead the Court by talking about an "appearance[]" it well knows to be false, drawing attention away from the contractual and financial arrangement laid bare in the FAC and playing games with the various "Sutter"-related corporate entity names.

### 3.    CEPMG cannot avoid accountability by quarreling about legal entity names or asserting purported facts about its business.

CEPMG makes two unique arguments:  *First*, that a scrivener's error involving two letters

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

("PC" rather than "GP") means that CEPMG is excused from all liability, even though CEPMG (or its predecessor legal entity) has been party to this case for six years and can identify no prejudice from the mistake. *Second*, CEPMG contends that Relator's allegations are based upon a misreading of a contract. CEPMG's arguments, however, are a matter of extrinsic evidence: assertions about how "rural" hospitals work, and a citation-free assertion that it "would not" have included specific certification language when submitting forms to the government.

(a) <strong>The difference between "CEPMG PC" and "CEPMG GP" does not warrant dismissal without leave to amend.</strong>

The FAC alleges a series of agreements with CEPMG, which was formerly known as "Sutter Emergency Medical Associates." FAC ¶ 194. The FAC attached the April 1, 2011 version of the "ED Coverage Agreement" as Exhibit 29. CEPMG's Motion points to the first page of the ED Coverage Agreement attached as Exhibit 29 naming "California Emergency Physicians Medical Group, a <u>General Partnership</u>," as the contracting party, rather than "California Emergency Physicians Medical Group, a Professional Corporation," the named Defendant. According to CEPMG, this mistake—the difference between what its motion calls "CEPMG GP" and "CEPMG PC"—means that final judgment should be entered in its favor. CEPMG MTD at 9-10. Not so.

The confusion is of CEPMG's own making. CEPMG's motion does not mention that a different page of Exhibit 29 calls the relevant entity "California Emergency Medical Group, <u>a Professional Corporation</u>." ECF No. 46-29 at 26. Note that this name differs in two respects from the name CEPMG's Motion prefers. CEPMG MTD at 9-10. It omits "Physicians" and it refers to a PC—or, using the acronym style CEPMG's Motion uses, "CEGM PC." CEPMG also extended the ED Coverage Agreement as of March 31, 2014 in a document naming "California Emergency Physicians Medical Group, a California *professional corporation*," as the contracting party. RJN Ex. 3 at 1 (emphasis added). Despite this, CEPMG did not name the general partnership in its certificate of interested entities, in violation of a clear Local Rule. *See* ECF No. 50; Civ. L.R. 3-15(a). CEPMG itself is confused about "GP" vs. "PC."

Moreover, regardless of any slight naming discrepancy, Relator's allegations are sufficient to put CEPMG on notice of the nature of the fraudulent scheme alleged. Further, CEPMG's own

documents—viewed in light of Relator's allegations of the fraudulent scheme—contain information sufficient to put it on notice.  *See, e.g.*, *Vibrant America,* 2020 WL 4818706, at *14.

On this record, Relator therefore is entitled to discovery on CEPMG, its corporate history, and its corporate structure.  CEPMG and its attorneys are either profoundly confused about their own corporate identity or are playing a shell game.

In addition, Relator respectfully requests leave to amend to add CEPMG GP as a party to the complaint while it takes this discovery.  Leave to amend should be "freely given when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotation marks and citations omitted).  "Five factors are commonly used to determine the propriety of a motion for leave to amend:  (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Fed. Sols. Grp., Inc. v. H2L1-CSC, JV*, No. 4:17-cv-05433-KAW (N.D. Cal. May 1, 2019) (quoting *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 738 (9th Cir. 2013).  "Absent prejudice, or a strong show of bad faith, undue delay, or futility of amendment," there exists a presumption . . . in favor of granting leave to amend." *Aspeon*, 316 F.3d at 1051 (citation omitted). Here, Relator acted in good faith; there has been and will be no undue delay that could prejudice CEPMG (it appeared less than six months before it raised the issue); and the prior amendment was made for good reason—after almost six years of government-requested continuances, Relator amended to update the complaint so that it addresses the Partial Settlement that every Defendant (incorrectly) argues is central to the issues before the Court at this stage.

Relator also requests an order granting leave to amend and expressly holding that the amendment will relate back to the original filing.  Rule 15 provides that amendments relate back in these circumstances for two independent reasons.[15]  *First*, an amendment relates back when it asserts the same conduct and transactions "set out--or attempted to be set out--in the original

---

[15] CEPMG appears to misread Rule 15(c)(1)(C)(ii) as the only provision that can apply when a name is changed.  *See* CEPMG MTD at 9-10.  Nothing in the Rule implies that the (c)(1) options are mutually exclusive.  Consistent with the Rule's permissive approach, subsection (c)(1) offers multiple alternatives by providing relation back "when . . . or . . . ."

37

pleading." Fed. R. Civ. P. 15(c)(1)(B). *Second*, an amendment relates back if it changes a party name, the party received actual notice, cannot show it was prejudiced, and "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *Id.* 15(c)(1)(C)(i)(ii). CEPMG received actual notice, as evidenced by its appearance in this action. It does not assert any prejudice. It could not, since the proceedings against CEPMG are moving on the same timeline as every other Defendant. And CEPMG "knew or should have known" the FAC asserts claims against "GP," not "PC," as demonstrated by the same facts.

Finally, Relator requests that the order expressly permit relation back because CEPMG states its intent to raise a statute of limitations argument if the amendment does not relate back. CEPMG's goal is to take advantage of the years of government-requested continuances in this case to escape liability. CEPMG is wrong about the limitations period, but an express relation-back holding will prevent CEPMG from wasting more time on this issue.

### (b)   CEPMG asserts purported facts well outside the record

CEPMG also attempts to argue facts outside the pleadings. It says that, as a "rural" hospital, its contract should be read differently. CEPMG MTD at 1, 22. CEPMG asserts that a fact outside the pleadings (that it has "historically included a higher-than-usual no-payor patient population") is reason to dismiss or discount Relator's allegations—but it does not explain why. *Id.* at 22-23. Even if it were proper for the court to consider that extraneous fact (it is not), CEPMG does not offer any authority to suggest that "rural" operations get special treatment at the pleading stage.

### 4.   East Bay Cardiac

East Bay Cardiac (and others) argue that Relator's claims fail because she lacks personal knowledge of documentation evidencing every single cog in Defendants' wide-ranging fraudulent scheme. But that argument simply demands more than the law requires. *E.g.*, *U.S. v. Chang*, 2017 WL 10544289, at *11 (C.D. Cal. July 25, 2017) (a relator need not "be first-hand witnesses to the alleged" conduct); *see also U.S. ex rel. Devlin v. State of California*, 84 F.3d 358, 360–63 (9th Cir. 1996) ("[N]othing ... would bar suit by someone who learned of the fraud from an insider, if the information had not yet been publicly disclosed." (quoting *U.S. ex rel. Stinson, Lyons, Gerlin &*

1  *Bustamonte, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1161 (3d Cir. 1991))).

2      East Bay Cardiac also argues that Relator fails to plead an FCA claim based on the Stark

3  Act because she fails to plead that East Bay Cardiac referred any patients to Sutter.  As an initial

4  matter, Relator has specifically alleged that that Sutter paid East Bay Cardiac to refer patients.  FAC

5  ¶¶ 3(a), 156, 166 ("one purpose of such payments was to reward and induce referrals of patients by

6  East Bay Cardiac Physicians to SUTTER HEALTH's Alta Bates Summit Medical Center for

7  inpatient and outpatient hospital services covered by Government Payers"); *see generally* FAC ¶¶

8  156–67 (detailing referral-for-compensation scheme between Sutter and East Bay Cardiac).

9      But a relator "does not need to point to a specific 'referral' or claim for 'designated health

10 services' to meet his burden at the pleading stage. . . As stated by the Ninth Circuit, 'it is sufficient

11 to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead

12 to a strong inference that claims were actually submitted.'"  *U.S. ex. rel. Jacobs v. CDS, P.A.*, 2015

13 WL 5698395, at *11 (D. Idaho Sept. 28, 2015) (quoting *Ebeid*, 616 F.3d at 998–99).

14     East Bay Cardiac cites *U.S. ex rel. Schubert  v. All Children's Health Sys., Inc.*, 2013 WL

15 6054803, at *14 (M.D. Fla. Nov. 15, 2013) for the proposition that Relator must allege specific

16 referrals, but that order ***denied*** defendants' motion to dismiss based on the following pleading:

17 "Relator alleges these overcompensated physicians made referrals to the Hospital that resulted in

18 the submission of false claims to the State of Florida and the United States."  *Id.* at *2.  Relator has

19 plainly exceeded the standard East Bay Cardiac holds up.  *See, e.g.*, FAC ¶¶ 166, 206–07.

20     Finally, East Bay Cardiac recognizes that Relator pled that it entered into an agreement with

21 Sutter meant to induce referrals, and that Sutter "waived and abandoned its contractual right to

22 collect" an overpayment Sutter made to the physician entity.  East Bay Cardiac MTD at 4.  East

23 Bay Cardiac responds with factual disputes, which cannot support a motion to dismiss the

24 pleadings:  that in fact Sutter did not abandon recovery of the overpayment, that the repayment

25 actually occurred pursuant to terms negotiated and documented in an unalleged instrument, and that

26 the agreements and overpayments were not intended to induce referrals.  *Id.*  The factual disputes

27 presented in East Bay Cardiac's motion to dismiss can be resolved at a later stage of litigation—not

28 on a motion to dismiss.

RELATOR'S CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS
Case No. 4:14-cv-04100-KAW

### 5.   BASS

BASS's arguments are duplicative of those addressed above.  It argues that Relator failed to plead how its agreements with Sutter provided for compensation in excess of FMV, and that Relator has no personal knowledge of BASS's billing department such that she could not specifically plead that it submitted any claims to Medicaid or Medicare.  Like East Bay Cardiac, BASS also argues that relator needed to identify specific patients.  These arguments fail for the reasons stated above.

### 6.   Liu MD PC

Liu MD PC first argues that, although Relator alleges that his practice had an on-call agreement with Sutter, the False Claims Act pleading fails because the contracts attached to the FAC relating to Liu MD PC are not with Sutter Health, and they were not explicitly conditioned on Liu MD PC providing referrals.  Instead, the on-call contracts were between Liu MD PC and "Memorial Hospitals Association" and "Sutter Central Valley Hospitals dba Memorial Medical Center."  This argument is pure sophistry, because "Sutter Central Valley Hospitals" is a named defendant and is expressly included in the term "Sutter Health."  FAC at p. 1 (caption), 3:1–10.

Liu MD PC otherwise advances arguments that have been addressed above:  that Relator has not identified any examples of specific claims that were submitted or patients referred; that Liu MD PC did not act with scienter; and that Relator has not pled facts identifying the fair market value of its on-call agreements.  But as explained above, the FAC alleged all of these points, to the extent they are necessary, and more.  *See, e.g.*, FAC ¶¶ 3(E), 27 ("Defendant Stephen K. Liu, M.D., Professional Corporation is comprised of one physician, Dr. Stephen K. Liu."), ¶ 183 (Sutter contract pays Liu for coverage services "on a twenty-four (24) hour basis every day of the calendar year"), ¶ 185 (Liu permitted to separately bill and collect charges for services rendered during the coverage shifts), ¶ 187 (referrals and services billed to Medicare), ¶¶ 186 & 188–93 (Liu's arrangement commercially unreasonable, grossly in excess of fair market value, and shows unlawful intent).

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny each pending motion to dismiss.

//

Dated: August 31, 2020

Respectfully Submitted,

By:  */s/ George F. Carpinello*

BOIES SCHILLER FLEXNER LLP
George F. Carpinello (admitted *pro hac vice*)
gcarpinello@bsfllp.com
30 S. Pearl St. 11th Floor
Albany, NY 12207
Telephone:     (518) 434-0600
Facsimile:     (518) 434-0665

Sean P. Rodriguez (SBN 262437)
srodriguez@bsfllp.com
Alexander J. Konik (SBN 299291)
akonik@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone:     (415) 293-6800
Facsimile:     (415) 293-6899

Marlan B. Wilbanks (admitted *pro hac vice*)
mbw@wilbanksgouinlock.com
Susan S. Gouinlock (admitted *pro hac vice*)
ssg@wilbanksgouinlock.com
WILBANKS & GOUINLOCK, LLP
3414 Peachtree Road, NE, Suite 725
Atlanta, GA 30326
Telephone:     (404) 842-1075
Facsimile:     (404) 842-0559

Scott C. Withrow (admitted *pro hac vice*)
swithrow@wmolaw.com
WITHROW, MCQUADE & OLSEN, LLP
3379 Peachtree Road, NE, Suite 970
Atlanta, GA 30326
Telephone:     (404) 814-0200
Facsimile:     (404) 814-0009

Michael A. Hirst, Esq. (SBN 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal, Esq. (SBN 329589)
marisela.bernal@hirstlawgroup.com
HIRST LAW GROUP, P.C.
200 B Street, Suite A
Davis, CA 95616
Telephone:     (530) 756-7700
Facsimile:     (530) 756-7707

*Attorneys for Qui Tam Plaintiff/Relator*
Laurie M. Hanvey