DILLINGHAM & MURPHY, LLP
CARLA J. HARTLEY (SBN 117213)
BERNICE K. WU (SBN 329661)
601 Montgomery Street, Suite 1900
San Francisco, CA 94111
Telephone: (415) 397-2700
Facsimile: (415) 397-3300
cjh@dillinghammurphy.com
bkw@dillinghammurphy.com

Attorneys for Defendant
SUTTER MEDICAL GROUP, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA ex rel. LAURIE M. HANVEY,<br><br>Plaintiff,<br><br>v.<br><br>SUTTER HEALTH; *et al.*<br><br>Defendants. | Case No. 14-cv-04100-KAW<br><br>**DEFENDANT SUTTER MEDICAL GROUP'S REPLY IN SUPPORT OF MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT**<br><br>(Responding to ECF No. 104)<br><br>Judge: Hon. Kandis A. Westmore<br><br>Date: October 29, 2020<br>Time: 1:30 p.m.<br>Crtrm: 4, Third Floor |

## I.    INTRODUCTION

Relator's Consolidated Opposition, like her FAC, is an effort to leverage minimal facts embellished with speculation and inaccuracies to state claims against multiple unrelated entities. Nowhere in her 40 page Opposition has Relator established that she has met the heightened pleading standard required by Rule 9(b), or stated a claim upon which relief can be granted as required by Rule 12(b)(6), as to defendant Sutter Medical Group ("SMG"). When distilled, Relator's Opposition makes two arguments as to SMG:

First, Relator contends that "Sutter" entered into a sham agreement with SMG whereby SMG employee, Dr. David Roberts, would act as Medical Director. According to Relator, the Agreement was a "sham" because it specified that Dr. Roberts work 121 hours per month and Dr. Roberts "billed Medicare over $200,000 in a year covered by the agreement – an impossible figure if he also actually worked the 121 monthly hours paid by Sutter and abided by the terms of the medical director agreement." Opp. at 5, 34-35.

Second, Relator contends that the alleged "sham" arrangements between Sutter and the various physician entities "… did not exist in isolation. Their periods overlapped, and as a result, the defendant entities formed multifaceted arrangements that operated at the same time to accomplish their ultimate goal: pay for referrals." Opp. at 7.

As set forth below, both of Relator's arguments as to SMG fail. As a preliminary matter, Relator's Opposition misstates the allegations of her FAC. Furthermore, no amount of speculative, conclusory spin on the two facts Relator has alleged as to SMG – Dr. Roberts' Medical Director Agreement and his submitting $200,000 in billings to Medicare – can satisfy the pleading standards of Rules 9(b) and 12(b)(6). Similarly, there is no factual or legal support for Relator's contention that her allegations as to entities other than SMG satisfy her pleading obligations as to SMG.

## II. ARGUMENT

### A. Relator Has Failed to Allege Facts Against SMG With Sufficient Particularity to Support her FCA Claims.

As a preliminary matter, Relator's Opposition misstates the allegations in her FAC pertaining to SMG. For example, in support of her argument that she "alleges a fraudulent course of conduct and false certification" (Opp. at 15), she states:

> "Sutter paid SMG for four of its physicians to act as medical directors at aggregate expenditures of approximately $700,000, although the physicians did not in fact serve as medical directors." Opp. at 17.

In fact, Relator's FAC only alleges that one SMG employee, Dr. David Roberts, had a Medical Director Agreement. FAC ¶¶ 149-152. Furthermore, the Medical Director Agreements attached as Exhibits to the FAC clearly state that the other three physicians, Drs.

Longoria, Kinkade and Ingram, were employees of Sac Cardio, not SMG.  FAC, Exhs. 3-6.

Relator cannot remedy her deficient FAC by adding non-pleaded facts to her opposition or misconstruing her allegations to oppose Defendant's Motion to Dismiss.  *See Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 526 (1983) (holding that it is improper for a court to "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated [] laws in ways that have not been alleged").

Relator also contends in her Opposition that Dr. Roberts "billed Medicare over $200,000 in a year covered by the [Medical Director] agreement …"  Opp. at 5.  However, the FAC alleges that Dr. Roberts billed "Medicare over $200,000 during the year 2012" and the Medical Director Agreement in question was not entered into until May 1, 2014 (emphasis added).  FAC ¶ 150 & Exh. 17.

Based on the facts alleged by Relator as to SMG, she has failed to sufficiently allege the elements of an FCA claim.  Other than misstating the allegations of the FAC, her Opposition does not even address the temporal discrepancy between the fact that the Medical Director Agreement was in effect from May 1, 2014 to May 1, 2016 and her allegation that Dr. Roberts billed Medicare over $200,000 during 2012.  FAC ¶ 150 & Exh. 17, p. 1 & 7.  The amount Dr. Roberts billed to Medicare in years other than when he was Medical Director are not in any way probative as to whether he submitted false billings.

Even if Dr. Roberts had billed Medicare over $200,000 in the same year he was obligated to work an average of 121 hours per month as a Medical Director, Relator has alleged no facts to support her contention that this is evidence that Dr. Roberts did not perform his Medical Director responsibilities or engaged in fraudulent billing.  The FAC includes the conclusory allegation:  "Nonetheless, Dr. Roberts maintained a busy medical practice, billing Medicare over $200,000 during the year 2012; he could not have done all of that work if he also actually worked 121 hours per month as a medical director, as shown in the sham agreement."  FAC ¶ 150.  However, Relator has alleged zero facts to support this.

Relator has acknowledged having, at a minimum, an obligation to plead the "details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that

claims were actually submitted." *Winter ex rel. U.S. v. Gardens Reg'l Hosp & Med. Ctr., Inc.*, 953 F.3d 1108, 1121 N. 9 (9th Cir 2020) (quoting *Ebeid ex. rel. U.S. v. Lungwitz*, 616 F.3d 993, 999 (9th Cir. 2010)). There is nothing inherently inconsistent with a physician working 121 hours per month as a Medical Director and additionally providing clinical care producing $200,000 in billings to Medicare in the same year. For example, Relator has not alleged that she observed time sheets submitted by Dr. Roberts containing false information, as she has alleged with respect to the Sac Cardio Physician Assistants. Nor has she alleged that that she has knowledge that Dr. Roberts worked fewer hours than specified in the Medical Director Agreement.

One of the issues here is that Relator is an outsider with respect to SMG. She has no personal knowledge of Dr. Roberts' practice or what he did as Medical Director other than the language of his Medical Director Agreement and what her attorneys were able to glean from the CMS website on his Medicare billings. The rest is pure speculation and insufficient to meet Relator's obligations under Rule 9(b). *See, e.g., U.S. ex rel. Clausen v. Laboratory Corporation of America Inc.,* 290 F.3d 1301, 1314 (11th Cir. 2002) (court does not give leniency to outsiders). Another example of this is her assertion that SMG and Sutter Medical Foundation agreed to appoint Dr. Roberts as "medical director" of operations as part of Sutter Health's fraudulent scheme. Opp. at 35. Relator's FAC does not contain this allegation, it is not supported by Dr. Roberts' Medical Director Agreement and she has alleged no factual support for the assertion. *See* FAC & Exh. 17.

Much of the discussion in Relator's Opposition as to SMG is devoted to arguing that SMG's Motion somehow misrepresented the allegations of the FAC.[1] Opp. at 34-35. SMG is

---

[1] In fact, Relator's Opposition again misrepresents Dr. Roberts' Medical Director Agreement. Relator contends: "The Foundation and SMG agreed to appoint Roberts as 'medical director' of operations that were part and parcel of Sutter's fraudulent scheme, taking millions of dollars from taxpayers." Opp. at 35. However, the Medical Director Agreement in question was entered into between Sutter Health Sacramento Sierra Region and Sutter Medical Foundation. FAC, Exh. 17, p. 1. SMG signed the Agreement in acknowledgement of its existence and to ensure, as Dr. Roberts' employer, that Dr. Roberts carried out his Medical Director responsibilities. FAC, Exh. 17, p. 2 & 21.

aware that it entered into a Professional Services Agreement with Sutter Medical Foundation to provide physicians and other health care professionals to treat the Foundation's patients and that its employee, Dr. Roberts, is one of the physicians who provides these services.  However, this has no bearing on the issue of whether Relator has properly pleaded a false claims scheme as to Dr. Roberts.

**B.     Relator's Inclusion of Allegations Related to Other Defendants Fails to Satisfy her Pleading Obligations as to SMG.**

Recognizing that her allegations specific to SMG are inadequate, Relator also argues that her allegations as to the other defendants have to be considered in determining whether she has stated claims as to SMG ("While any one of the above-described arrangements would be sufficient to identify a particular fraudulent act, the overall fraudulent scheme identified and explained in the FAC requires consideration of the web of sham arrangements.).." Opp. at 7. However, Relator is not permitted to aggregate allegations as to separate defendants to meet her pleading obligation as to each.  *See, e.g., Swartz v. KPMG LLP*, 476 F.3d 756, 764-765 (9th Cir. 2007)  ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiff to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.").

SMG's involvement in this action is limited to Dr. Roberts and his Medical Director Agreement.  The FAC alleges that Dr. Roberts' Medical Director Agreement was duplicative of those with the Sac Cardio physicians and "stacked."  FAC ¶¶ 151 & 152.  It is unclear what Relator means by the term "stacked."  Furthermore, there is no factual or legal support for Relator's conclusory allegations that the services provided by Dr. Roberts pursuant to his Medical Director Agreement were duplicative of those provided by the three Sac Cardio physicians.

Dr. Roberts' role was to act as Regional Medical Director of Sutter Health Sacramento Sierra Region's ("SSR") Cardiovascular Service Line.  FAC, Exh. 17, p. 2.  Specifically, "SSR operate[d] acute care general hospitals located in Sacramento, Davis, Vallejo, Auburn, Jackson

and Roseville" and needed "an experienced, qualified physician to serve as the regional medical director of the service …" Dr. Roberts, who was qualified in cardiovascular medicine and interventional cardiology, was such an expert. Exhibit 1.a. to the Medical Director Agreement set forth a lengthy list of Dr. Roberts' duties and responsibilities. FAC, Exh. 17, p. 22-25. As previously mentioned, Dr. Roberts Medical Director Agreement was effective from May 1, 2014 to May 1, 2016.

Dr. Michael T. Ingram's Agreement specified that he was to provide services to Sutter Medical Center of Sacramento ("SMCS"). FAC, Exhibit 3. His role was as Medical Director of an acute care hospital operated by SMCS as the Cardiac Intensive Care Unit and Assistant Medical Director of the Sutter Heart Institute. His specialty was cardiovascular surgery. His responsibilities included directing the hospital in obtaining and maintaining licensure and accreditation, setting policies and procedures for the operation of the service line, such as for high quality patient care and highly trained professional and technical personnel, developing a call schedule, advising on recruiting and retention, clinical supervision of technical personnel, training and education, and budgeting. FAC, Exh. 3, p. 18-19. Dr. Ingram was to devote a minimum of 18 hours per month to these responsibilities. FAC, Exh. 3, p. 3. The term of the Agreement was September 1, 2012 to September 1, 2014. FAC, Exh. 3, p. 1 & 8.

In 2013, Dr. Ingram's Agreement was amended to add responsibilities related to the development of a new Heart Surgery Valve Program to the service line and increase his hours to an average of 40 per month. FAC, Exh. 4.

Dr. Robert Kincade's Agreement specified that he was to provide services to Sutter Medical Center of Sacramento as the Surgical Director of its Advanced Heart Failure Transplant Ventricular Assist Device Program. FAC, Exh. 5. Specifically, SMCS needed the program to support critically ill cardiac surgery candidates for heart transplants. Dr. Kincade's Agreement set forth a detailed list of responsibilities related to this role. FAC, Exh. 5, p. 18-19. His Agreement was for a two-year term beginning September 1, 2012.

Dr. James Longoria's Agreement specified that he was to provide services to SMCS as the Medical Director of the Surgical Ablation Program. FAC, Exh. 6. His duties included the

"overall surgical and medical supervision for clinical services pertaining to the surgical patients undergoing endoscopic procedures for aerial arrhythmias" including "assisting with the development of surgical pathway for this patient population including metrics for Length of Stay, Discharge Planning and other critical elements to support the surgical component for electrophysiology ('EP') Ablation." FAC, Exh. 6, p. 19-20. Dr. Longoria was a specialist in cardiothoracic and general surgery. FAC, Exh. 6, p. 3. His Agreement specified that he was to devote a maximum of 20 hours per month to the Director responsibilities. FAC, Exh. 6, p. 4. The term of his Agreement was two years beginning October 1, 2012. FAC, Exh. 6, p. 2 & 8.

These Medical Director Agreements demonstrate that Relator's allegations that the four physicians were providing duplicative services are inaccurate. *See Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1038 (9th Cir. 2010) (exhibit to complaint incorporated by reference). A written instrument that is an exhibit becomes part of the pleading for all purposes, including to determine the sufficiency of a claim for relief or a defense on a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6). 5 A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327 (4th ed. 2018); *U.S. v. Ritchie*, 342 F.3d 903, 907-908 (9th Cir. 2003) (the court is not required to convert defendant's motion to dismiss to a motion for summary judgment and may consider an exhibit to the complaint to determine a motion to dismiss).

Each directorship is for a different role and differing responsibilities. In particular, Dr. Roberts was Regional Medical Director for SSR's cardiovascular service line in all of SSR's acute care hospitals. The other physicians' directorships pertained to specific programs operated by SMCS, such as the Cardiac Intensive Care Unit, Heart Institute, Heart Surgery Valve Program, Advanced Heart Failure Transplant Ventricular Assist Device Program, and Surgical Ablation Program. For the most part, the Sac Cardio Agreements did not overlap in the time with Dr. Roberts' Agreement.

Relator has alleged no facts to support her contention that her allegations as to physicians employed by another entity adds anything to her allegations against SMG. While Relator apparently has a hostility towards medical directorships, she has pointed to no facts to

suggest there is anything inherently suspect about the position in general or these directorships specifically.

Nor has Relator pointed to any other authority to support her contention that medical directorships are inherently suspect. For example, she has not cited any OIG Special Fraud Alert or other guidance to support her allegations. *See, e.g., U.S. ex rel. STF, LLC v. Vibrant America, LLC*, 2020 WL 4818706 (N.D. Cal. Aug. 19, 2020) (relator's factual allegations consistent with OIG Fraud Alerts supports an inference of unlawful intent).

Relator has an obligation, at a minimum, to plead facts which put SMG on notice of its alleged wrongful acts. *Swartz,* supra at 764-765. "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiff to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud" *Ibid.*

### C. Because Relator Raised FMV as an issue in her FAC, She is Required to Allege Facts Supporting that the Medical Director Agreement was in Excess of FMV in Order to Plead an AKS Violation.

Relator contends that when pleading "remuneration" she is not required to make allegations about the fair market value ("FMV") for each payment. Opp. at 23. Relator has placed FMV directly at issue through the repeated, conclusory, allegations in her FAC that the agreements were improper because they exceeded the FMV. FAC ¶¶ 112, 118, 152, 163, 189, 201, 212, 214. Courts, including those cited by Relator, require those conclusory allegations be supported with evidence that payments exceeded FMV. *U.S. v. Crescendo Bioscience, Inc.* 2020 WL 2614959, at *7 (N.D. Cal. May 23, 2020) (Concluding that relator's factual allegations describing a scheme where defendants paid physicians five times more than the $3 Medicare pays suggested the arrangement implicated the FCA and whether the payments were at FMV); *Vibrant Am. LLC*, supra at *12 (Concluding that relator's allegations concerning the fee processing scheme at Vibrant aligns with a scheme described in a 2014 HHS OIG Special Fraud Alert in which the alert concludes such a scheme could indicate an unlawful intent to induce referrals).

Here, Relator has not sufficiently alleged "sham" agreements or provided any other

indicia beyond the basic terms of the agreement to support her conclusory statement that the payments contemplated in the agreements exceed FMV and thus are intended to induce referrals.  Because she pleaded FMV was at issue, Relator must sufficiently allege a lack of FMV to meet the pleading standard for an AKS violation.  Relator has failed to do this.

### D. Relator has Failed to State Claims Against SMG for Violations of the California False Claims Act.

Relator contends SMG makes no argument with respect to her CFCA claims.  Opp. at 19.  The CFCA imposes penalties to individuals who "[k]nowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval."  Cal Gov. Code § 12651, subd. (a)(1).   Relator's FAC fails to include any allegations concerning claims for reimbursement by a California state health program, which is required to allege a CFCA violation.  Additionally, it has been recognized that the CFCA is patterned on similar federal legislation.  *John Russo Indus. Sheetmetal, Inc. v. City of Los Angeles Dep't of Airports*, 29 Cal.App.5th 378, 388 (2018).  Therefore, a failure to state claims under the FCA will foreclose similar claims alleged under the CFCA.  This was discussed in SMG's Motion to Dismiss.  SMG MTD at 8.

### E. Relator Should not be Permitted to Amend her Complaint Again as to SMG.

Relators are most commonly insiders who have sufficient personal knowledge about the alleged FCA violations.  An outsider Relator is not entitled to special leniency simply because the Relator does not have access to information.  *U.S. ex rel. McFarland v. Florida Pharm. Solutions*, 358 F.Supp.3d 1316, 1321 (M.D. Fla. 2017) (finding a relator did not plead facts with particularity concerning the other 69 defendants because he was an outsider who did not have access to their records and no leniency is given to outsiders); *Clausen*, supra at 1314. Moreover, a Rule 9(b) requires Relator to allege facts with particularity in order to reach discovery.  *Vibrant Am., LLC*, supra at *9; *see also*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  "When a plaintiff does not specifically plead the minimum elements of their allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendants' good will and reputation by bringing a suit…This is especially

1 so in cases involving the False Claims Act….." *Clausen*, supra at 1313 n.24

2 Just like the *McFarland* relator, Ms. Hanvey only worked for one of the Defendants she sued, Sutter Health. *McFarland*, supra at 1321. Relator has pleaded no facts to indicate she had any personal knowledge concerning Dr. Roberts' Medical Director Agreement. As an SMG outsider, she should not be able to jump around Rule 9(b) to conduct discovery on her FAC by proclaiming she will seek leave to obtain and use materials from the government's investigation. Opp. at 3.

Relator has had six years, since she filed her original Complaint, to acquire sufficient information pertaining to SMG to state a claim. Her FAC demonstrates that she has no such information. Nothing in her Opposition suggests she has additional facts on SMG if given the chance to amend. Instead, she wrongly asserts that SMG has had ample time to investigate.[2] This is not relevant to the sufficiency of her plead claims. Without adequate claims against SMG, Relator is not entitled to conduct discovery to find fraud, if any exist.

### III.  CONCLUSION

For the foregoing reasons, Defendant Sutter Medical Group respectfully requests that the Court grant its motion and dismissing the FAC as to SMG in its entirety without leave to amend.

DATE:  September 30, 2020

DILLINGHAM & MURPHY, LLP

\_\_\_/s/Carla J. Hartley_____
CARLA J. HARTLEY
BERNICE K. WU
Attorneys for Defendant
SUTTER MEDICAL GROUP, INC.

---

[2] Relator also asserts that SMG has known of her allegations "and has had at least six years to investigate them." Opp. at 35. In fact, SMG had no idea Relator had accused it of violating the law until Relator's counsel sent SMG the FAC service packet on January 31, 2020.