BOIES SCHILLER FLEXNER LLP
George F. Carpinello (Admitted *Pro Hac Vice*)
gcarpinello@bsfllp.com
Joseph D. Starsia (Admitted *Pro Hac Vice*)
jstarsia@bsfllp.com
30 S. Pearl St., 11th Floor
Albany, NY 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665

Sean P. Rodriguez (SBN 262437)
srodriguez@bsfllp.com
Alexander J. Konik (SBN 299291)
akonik@bsfllp.com
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6800
Facsimile: (415) 293-6899

WILBANKS & GOUINLOCK, LLP
Marlan B. Wilbanks (Admitted *Pro Hac Vice*)
mbw@wilbanksgouinlock.com
Susan S. Gouinlock (Admitted *Pro Hac Vice*)
ssg@wilbanksgouinlock.com
3490 Piedmont Road, NE, Suite 1010
Atlanta, Georgia 30305
Telephone: (404) 842-1075
Facsimile: (404) 842-0559

WITHROW, MCQUADE & OLSEN, LLP
Scott C. Withrow (Admitted *Pro Hac Vice*)
swithrow@wmolaw.com
3379 Peachtree Road, NE, Suite 970
Atlanta, Georgia 30326
Telephone: (404) 814-0200
Facsimile: (404) 814-0009

HIRST LAW GROUP, P.C.
Michael A. Hirst, Esq. (SBN 131034)
michael.hirst@hirstlawgroup.com
Marisela Bernal, Esq. (SBN 329589)
marisela.bernal@hirstlawgroup.com
200 B Street, Suite A
Davis, CA 95616
Telephone: (530) 756-7700
Facsimile: (530) 756-7707

*Attorneys for Qui Tam Plaintiff/Relator*
Laurie M. Hanvey

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA *ex. rel.* LAURIE M. HANVEY,<br><br>Relator,<br><br>v.<br><br>SUTTER HEALTH;<br><br>SUTTER VALLEY HOSPITALS, f/k/a Sutter Health Sacramento Sierra Region, f/k/a Sutter Central Valley Hospitals, f/k/a Memorial Hospitals Association, d/b/a Sutter Medical Center, Sacramento, a/k/a Sutter Roseville Medical Center, a/k/a Sutter Amador Hospital, a/k/a Sutter Auburn Faith Hospital, a/k/a Sutter Davis Hospital, a/k/a Sutter Solano Medical Center, d/b/a Memorial Medical Center, a/k/a Memorial Hospital Los Banos, a/k/a Sutter Tracy Community Hospital;<br><br>SUTTER VALLEY MEDICAL FOUNDATION, f/k/a Sutter Medical Foundation, f/k/a Sutter Gould Medical Foundation;<br><br>SUTTER BAY HOSPITALS, f/k/a Sutter East Bay Hospitals, f/k/a Sutter Medical Center, Castro Valley, d/b/a Alta Bates Summit Medical Center, a/k/a Sutter Delta Medical Center, d/b/a Eden Medical Center;<br><br>SUTTER MEDICAL GROUP, A CALIFORNIA CORPORATION;<br><br>EAST BAY CARDIAC SURGERY CENTER MEDICAL GROUP; and<br><br>STEPHEN K. LIU, M.D., PROFESSIONAL CORPORATION<br><br>Defendants. | Case No. 14-cv-04100-KAW<br><br>**THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729 ET SEQ.) AND CALIFORNIA FALSE CLAIMS ACT (CAL. GOV'T CODE §§ 12650 ET SEQ.)**<br><br><br>**DEMAND FOR JURY TRIAL** |

1

**THIRD AMENDED COMPLAINT**

2  LAURIE M. HANVEY ("Relator"), by and through her counsel of record, brings this action

3  on behalf of the United States of America and the State of California against SUTTER HEALTH;

4  SUTTER VALLEY HOSPITALS, f/k/a Sutter Health Sacramento Sierra Region, f/k/a Sutter Central

5  Valley Hospitals, f/k/a Memorial Hospitals Association, d/b/a Sutter Medical Center, Sacramento,

6  a/k/a Sutter Roseville Medical Center, a/k/a Sutter Amador Hospital, a/k/a Sutter Auburn Faith

7  Hospital, a/k/a Sutter Davis Hospital, a/k/a Sutter Solano Medical Center, d/b/a Memorial Medical

8  Center, a/k/a Memorial Hospital Los Banos, a/k/a Sutter Tracy Community Hospital; SUTTER

9  VALLEY MEDICAL FOUNDATION, f/k/a Sutter Medical Foundation, f/k/a Sutter Gould Medical

10 Foundation; and SUTTER BAY HOSPITALS, Sutter East Bay Hospitals, f/k/a Sutter Medical

11 Center, Castro Valley, d/b/a Alta Bates Summit Medical Center, a/k/a Sutter Delta Medical Center,

12 d/b/a Eden Medical Center (hereinafter collectively referred to as the "SUTTER HEALTH

13 ENTITIES" unless otherwise indicated); and against SUTTER MEDICAL GROUP, A

14 CALIFORNIA CORPORATION; EAST BAY CARDIAC SURGERY CENTER MEDICAL

15 GROUP; and STEPHEN K. LIU, M.D., PROFESSIONAL CORPORATION (hereinafter

16 collectively referred to as the "PHYSICIAN ENTITIES" unless otherwise indicated); pursuant to the

17 *Qui Tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729-33, *et. seq.*, and the California

18 False Claims Act ("CFCA"), Cal. Gov't Code §§ 12650, *et seq.*

19 As set forth below, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL

20 FOUNDATION, and SUTTER BAY HOSPITALS have routinely paid or provided, with the

21 knowledge of and at the direction of SUTTER HEALTH, unlawful kickbacks, excessive

22 compensation, free employees and other illegal incentives to physicians who refer patients to

23 SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS in violation of federal and

24 California law.  By knowingly submitting or causing to be submitted claims for reimbursement to

25 Government healthcare payers, including Medicare, TRICARE, CHAMPVA, FEHBP, and Medicaid

26 (hereinafter collectively referred to as "Government Payers" or "Government Health Care Programs")

27 based on referrals generated by physicians to whom SUTTER VALLEY HOSPITALS, SUTTER

28 VALLEY MEDICAL FOUNDATION, and SUTTER BAY HOSPITALS, with the knowledge of and

at the direction of SUTTER HEALTH, paid kickbacks, excessive compensation and other remuneration under illegal financial relationships, the SUTTER HEALTH ENTITIES violated the FCA and the CFCA because they knew  such claims were not eligible for reimbursement under 42 U.S.C. § 1395nn (commonly known as the "Stark Law" or "Stark Statute"); 42 U.S.C. § 1320a-7b(b) (commonly known as the federal Anti-Kickback Statute or "AKS"); California Business and Professions Code, section 650 (prohibiting inducements for referring patients); and California Welfare and Institutions, section 14107.2(b) (prohibiting payments for referrals for services to Medicaid patients).  In addition, as specifically described below, the PHYSICIAN ENTITIES conspired with each of SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION, SUTTER BAY HOSPITALS, and SUTTER HEALTH to cause the submission of false claims in violation of the FCA and the CFCA by accepting the unlawful kickbacks, compensation and other remuneration for referring beneficiaries of Government Health Care Programs for services provided at SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, services that the PHYSICIAN ENTITIES knew would be fraudulently billed by SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, at the direction of SUTTER HEALTH, to Government Payers. *See* 31 U.S.C. § 3729(a)(1)(C); Cal. Gov't Code § 12651(a)(3).

I. **NATURE OF ACTION AND SUMMARY OF FRAUD**

1.     Relator brings this action on behalf of the United States of America and the State of California (hereafter collectively "Government") to recover treble damages and civil monetary penalties under the FCA and CFCA arising from false and fraudulent statements, records and claims made and caused to be made by Defendants to the Government.

2.     Within the time frames detailed below, Defendants knowingly submitted thousands of false claims to the United States and the State of California which resulted in millions of dollars of government reimbursement that would not have been paid but for Defendants' misconduct.

3.     Since at least 2006, SUTTER HEALTH has designed and enacted a network-wide scheme to increase its profits by defrauding government healthcare programs.  SUTTER HEALTH has directed and worked with its subsidiaries and affiliates across its healthcare network to submit false claims for payment or to cause such claims to be submitted. Throughout this time, SUTTER

HEALTH has supported and directed the fraudulent conduct and directly intervened to shut down attempts by Relator and others to correct it.  This scheme has led to multiple settlements between SUTTER HEALTH, its subsidiaries and affiliates, and the United States government, including a settlement as a result of a part of Relator's original Complaint in this action.  The fraudulent scheme described hereinafter with greater specificity in this Complaint includes:

A.    From July 1, 2006 through at least November 30, 2014, SUTTER VALLEY HOSPITALS, f/k/a Sutter Health Sacramento Sierra Region, d/b/a Sutter Medical Center Sacramento, with the knowledge of and at the direction of SUTTER HEALTH, knowingly and repeatedly paid Sacramento Cardiovascular Surgeons Medical Group, Inc., ("SAC CARDIO") over $1.9 million annually to induce referrals. SAC CARDIO is a physician organization in which three cardiovascular surgeons in Sacramento held ownership interests as shareholders during all times relevant hereto. Those three cardiovascular surgeons are Drs. Ingram, Kincade and Longoria.  SUTTER VALLEY HOSPITALS, at the direction of SUTTER HEALTH, paid SAC CARDIO to induce referrals by stacking preferential arrangements with these surgeons that provided for exclusive cardiac call coverage and duplicative medical directorships. SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, also provided free employees to SAC CARDIO in the form of payments for four full-time Physician Assistants for whose time SAC CARDIO billed Government Payers for the financial benefit of SAC CARDIO's physician owners. *See* ¶¶ 109-162 below.  The United States and Relator entered into a partial settlement agreement with SAC CARDIO on December 23, 2019.  See Dkt. 45. Relator then dismissed SAC CARDIO from the remainder of this case on June 3, 2020. See Dkt. 72.

B.    From March 1, 2013 through at least November 30, 2014, SUTTER MEDICAL GROUP, with the knowledge of and at the direction of SUTTER VALLEY HOSPITALS, and SUTTER HEALTH, knowingly and repeatedly paid another cardiovascular surgeon, Dr. David K. Roberts, between $309,024 and $392,040 annually to induce referrals through a series of Medical Director Agreements ("MDAs"). The MDAs initially required an average of 87 hours per month paid at $296 per hour; and, beginning May 1, 2014, required an average of 121 hours of service per month, paid at $270 per hour.  Despite those purported time commitments for which SUTTER MEDICAL

GROUP improperly and knowingly paid Dr. Roberts, he simultaneously continued to maintain a full-time private medical practice during the periods of time covered by the MDAs.  *See* ¶¶ 163-172 below.

        C.     From February 4, 2009 through at least November 30, 2014, SUTTER BAY HOSPITALS, f/k/a Alta Bates Summit Medical Center, f/k/a Sutter East Bay Hospitals, at the direction of SUTTER HEALTH, knowingly and repeatedly paid East Bay Cardiac Surgery Center Medical Group, a physician organization in which two cardiothoracic surgeons in Oakland held ownership interests as partners during all time periods relevant hereto, up to $1,355,000 annually to induce referrals through a preferential arrangement providing for medical directorships, exclusive call coverage, and payments for phantom and/or unspecified data collection services.  See ¶¶ 173-187 below.

        D.     From September 1, 2008 through at least November 30, 2014, SUTTER VALLEY HOSPITALS, f/k/a Memorial Hospitals Association, f/k/a Sutter Central Valley Hospitals, d/b/a Memorial Medical Center, d/b/a Memorial Hospital Los Banos, with the knowledge of and at the direction of SUTTER HEALTH, knowingly and repeatedly paid Dr. Stephen K. Liu, Professional Corporation up to $438,000 per year for exclusive call coverage throughout a period of 24 hours per day for all 365 days of the year.  Dr. Stephen K. Liu, PC is the professional corporation of Dr. Stephen K. Lieu who is the sole owner.  Dr. Liu is an interventional radiologist in Modesto, CA. SUTTER VALLEY HOSPITALS, at the direction of SUTTER HEALTH, paid this exclusive call coverage to induce referrals by rewarding Dr. Liu for his high-volume of referrals.  He was the highest billing interventional radiologist in the entire State of California, having received Medicare payments of $4,604,464.10 in 2012.  *See* ¶¶ 188-201 below.

        E.     From February 1, 2008 through at least November 30, 2014, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly and repeatedly paid excessive compensation as detailed below to CEP America-California, a general partnership f/k/a California Emergency Physicians Medical Group, a general partnership in Emeryville ("CEPMG GP"), a physician organization in which hundreds of physicians held ownership interests as partners during all times relevant hereto, to induce referrals to hospitals owned and operated by SUTTER VALLEY HOSPITALS in Los Banos, Sacramento, Roseville, Auburn,

and Davis, California, and to a hospital owned and operated by SUTTER BAY HOSPITALS in Antioch, California.  SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, entered into compensation arrangements with CEPMG GP under which it knowingly and repeatedly paid CEPMG GP for all the direct costs associated with four mid-level practitioners ("Mid-Level Practitioners," is defined to include Physician Assistants and Nurse Practitioners) working for CEPMG GP and allowed CEPMG GP to bill for and receive payment for the services of those (free) Mid-Level Practitioners.  Moreover, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly and repeatedly paid CEPMG GP $300,000 per year purportedly to compensate CEPMG GP for providing professional services to patients who either lack a third-party payment source or whose third-party payor reimbursement was insufficient to cover CEPMG GP's costs of providing the services.  In reality, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, did this to induce referrals and reward CEPMG GP for referrals to SUTTER VALLEY HOSPITALS. *See* ¶¶ 202-223 below.

4.      The physician compensation scheme intentionally perpetrated by the named SUTTER HEALTH ENTITIES with the named PHYSICIAN ENTITIES violated the Stark Statute, 42 U.S.C. § 1395nn, the Anti-Kickback Statute, 42 U.S.C. § 1320-7b(b) (the "AKS"), the California Business and Professions Code, § 650, and California Welfare and Institutions, § 14107.2(b) and the FCA and CFCA.  The Stark Statute and AKS arose out of concern by Congress that certain types of financial incentives, or items of value, could improperly influence or even corrupt the medical decision-making of physicians and other health care providers, resulting in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.

5.      As set forth in detail below, SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly submitted or caused to be submitted false claims for reimbursement to Government Payers for services referred to SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS by the PHYSICIAN ENTITIES to whom SUTTER VALLEY HOSPITALS and SUTTER BAY

HOSPITALS, at the direction of SUTTER HEALTH, paid kickbacks and illegal excessive compensation to induce such referrals.  Relator has personal and direct insider knowledge of the illegal compensation arrangements among SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION, SUTTER BAY HOSPITALS and the named PHYSICIAN ENTITIES; the illegal referral practices of specific physicians at issue here at each PHYSICIAN ENTITY; the billing processes of SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS that resulted in its submission of false claims to Government Health Care Programs; and the control that SUTTER HEALTH exercised over SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION, and SUTTER BAY HOSPITALS.  The same fraudulent schemes resulted in false claims to all of the Government Payers.  In this Third Amended Complaint, Relator sets forth representative examples of actual false claims to Government Payers resulting from SUTTER HEALTH ENTITIES' fraudulent scheme, including representative examples of claims for services referred to SUTTER VALLEY HOSPITALS by SAC CARDIO that violate the Stark Law and/or AKS.

6.      As set forth in detail below, SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly submitted for reimbursement to Government Payers while falsely certifying to those Payers compliance with the Stark Statute and AKS.  By virtue of its own acts in control of the finances and physician compensation arrangements of its subsidiary hospitals, SUTTER HEALTH caused SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS to submit false claims to Government Healthcare Programs as described herein.

7.      The violations of the Stark Statute and AKS by the SUTTER HEALTH ENTITIES are material to the Government Payers' decisions to pay the claims submitted by SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH. Had the Government Payers known that the claims were false claims because they resulted from the Stark Statute or AKS violations, the Government Payers would not have paid those claims as a matter of law, because such Government payments are statutorily prohibited. *See*

1    42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396(s).  Claims for reimbursement for services resulting from

2    violations of AKS are false claims under the FCA and the CFCA.  42 U.S.C. § 1320a-7b(g).

3        8.      In addition to the SUTTER HEALTH ENTITIES violating the FCA and the CFCA by

4    knowingly submitting or causing to be submitted false claims and making or causing to be made false

5    statements material to false claims, SUTTER VALLEY HOSPITALS and SUTTER BAY

6    HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, violated the FCA

7    and the CFCA by knowingly and improperly retaining the payments received for such false claims.

8    SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS were required to pay back such

9    overpayments in full, but knowingly did not do so, at the direction of SUTTER HEALTH.

10   **II.    JURISDICTION AND VENUE**

11       9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

12   §§ 1331, 1345, 1367(a) and 3732, the last of which specifically confers jurisdiction on this Court for

13   actions brought under the FCA and related claims brought under the laws of any State. This Court

14   has jurisdiction over this *qui tam* action pursuant to 31 U.S.C. § 3730(b).  Relator is an "original

15   source" and is authorized to maintain this action in the name of the United States and the State of

16   California.

17       10.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C.

18   § 3732(a) and because one or more of the Defendants resides or transacts business in the Northern

19   District of California.

20       11.     Venue is proper in the Northern District of California under 31 U.S.C. § 3732(a) and

21   28 U.S.C. § 1391(b) and (c) because one or more of the Defendants can be found in, resides in, or

22   transacts business in this judicial district.

23       12.     Relator made voluntary disclosures to the United States and the State of California

24   prior to filing this lawsuit and complied with 31 U.S.C. § 3730(b)(2) and Cal. Gov't Code §

25   12652(c)(3).

26   **III.        INTRADISTRICT ASSIGNMENT**

27       13.     Assignment to a particular division within the Northern District of California under

28   Civil Local Rule 3.2(c) is based on the Courthouse serving the county in which the action arises.  This

1   action arises in Alameda County, California, because a substantial part of the events or omissions

2   which give rise to the claims in this Complaint occurred in Alameda County, California.  According

3   to Civil Local Rule 3-2(d), assignment is proper to the San Francisco Division or the Oakland

4   Division.

5   **IV.   THE PARTIES**

6         14.   Plaintiff-Relator Laurie M. Hanvey was employed by SUTTER VALLEY

7   HOSPITALS as the Compliance Officer of two of its hospitals at Sutter Medical Center ("SMC") in

8   Sacramento, California.  She worked for SUTTER VALLEY HOSPITALS from December 2012 to

9   December 2014, after previously working for over 25 years for other hospitals in the State of

10  California.  As the Compliance Officer for SMC, Relator reported directly to top executives of

11  SUTTER VALLEY HOSPITALS and directly to the Chief Compliance Officer of SUTTER

12  HEALTH.  Relator worked within a network of compliance personnel overseeing other hospitals

13  controlled by SUTTER HEALTH.  She gained personal knowledge of Defendants' false claims in

14  the regular course of her job duties.  Relator holds a Master's Degree in Business Administration and

15  was certified in Healthcare Compliance. She brings this *qui tam* action based on her direct personal

16  knowledge gained during her years of employment as a corporate insider at SUTTER VALLEY

17  HOSPITALS with reporting obligations directly to SUTTER HEALTH.

18        15.   Defendant SUTTER HEALTH is a California not-for-profit corporation

19  headquartered in Sacramento, California.  SUTTER HEALTH serves as the parent of a health care

20  delivery system that includes centralized support groups such as the General Counsel's Office and

21  Compliance departments and various health care-related businesses operating primarily in five

22  geographic regions, principally in Northern California.  The SUTTER HEALTH system includes 24

23  acute care hospitals, over 5,000 physicians and over 48,000 employees.  SUTTER HEALTH and its

24  subsidiaries and affiliates had consolidated gross revenues of $9.6 billion in 2013 and held $5.1 billion

25  in cash and marketable securities as of December 31, 2013.  As a large and sophisticated provider of

26  health care services to Government Health Care Programs' beneficiaries, SUTTER HEALTH is

27  charged with understanding and following the law and implementing policies and procedures that

28  comply with the explicit requirements of the Stark Law, AKS, FCA and CFCA.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16. Defendant SUTTER VALLEY HOSPITALS, is a California not-for-profit corporation with its principal place of business at 2700 Gateway Oaks Boulevard, Suite 2200, Sacramento, California 95833. SUTTER VALLEY HOSPITALS does business as Sutter Medical Center, Sacramento (two hospitals totaling 727 beds), Sutter Center for Psychiatry (69-bed hospital), Sutter Roseville Medical Center (328-bed hospital), Sutter Amador Hospital (52-bed hospital), Sutter Auburn Faith Hospital (69-bed hospital), Sutter Davis Hospital (48-bed hospital), Sutter Solano Medical Center (102-bed hospital), Memorial Medical Center (423-bed hospital), Memorial Hospital Los Banos (46-bed hospital) and Sutter Tracy Community Hospital (82-bed hospital). SUTTER VALLEY HOSPITALS is a subsidiary of and is controlled by SUTTER HEALTH.

17. Defendant SUTTER VALLEY MEDICAL FOUNDATION, f/k/a Sutter Medical Foundation, is a California not-for-profit corporation with its principal place of business at 2700 Gateway Oaks Boulevard, Suite 2200, Sacramento, California 95833. SUTTER VALLEY MEDICAL FOUNDATION is aligned with physicians and mid-level providers of Defendant SUTTER MEDICAL GROUP to provide primary care and specialty care to patients. SUTTER VALLEY MEDICAL FOUNDATION is a subsidiary of and is controlled by SUTTER HEALTH.

18. Defendant SUTTER BAY HOSPITALS, f/k/a Sutter East Bay Hospitals, is a California not-for-profit corporation with its principal place of business at 2000 Powell Street, 10th Floor, Emeryville, California 94608. SUTTER BAY HOSPITALS does business as Alta Bates Summit Medical Center (two hospitals totaling 819 beds), Sutter Delta Medical Center (145-bed hospital) and Eden Medical Center (130-bed hospital). SUTTER BAY HOSPITALS is a subsidiary of and is controlled by SUTTER HEALTH.

19. Defendant SUTTER MEDICAL GROUP, A California Corporation, is a California for-profit professional corporation with its principal place of business at 2750 Gateway Oaks Drive, Suite 150, Sacramento, California 95833. SUTTER MEDICAL GROUP is a multi-specialty medical group including approximately 470 physicians and 120 allied health professionals.

20. Sacramento Cardiovascular Surgeons Medical Group, Inc., ("SAC CARDIO") is a California for-profit professional corporation with its principal place of business at 2800 L Street, Suite 260, Sacramento, California 95816. SAC CARDIO is a physician organization in which the

1    following three cardiovascular surgeons held ownership interests as shareholders during all times

2    relevant hereto:  Dr. Michael T. Ingram, Dr. Robert Kincade and Dr. James Longoria. SAC CARDIO

3    was a named defendant in Relator's First Amended Complaint (Dkt. No. 46), but Relator has since

4    dismissed this defendant (Dkt. 72).

5         21.    Defendant EAST BAY CARDIAC SURGERY CENTER MEDICAL GROUP is a

6    California general partnership with its principal place of business at 3300 Webster Street, Suite 500,

7    Oakland, California 94610.  EAST BAY CARDIAC SURGERY CENTER MEDICAL GROUP is a

8    physician organization in which the following two cardiovascular surgeons held ownership interests

9    as partners during all times relevant hereto:  Dr. Junaid H. Khan and Dr. Russell D. Stanten.

10        22.    Defendant STEPHEN K. LIU, M.D., PROFESSIONAL CORPORATION, is a

11   California for-profit professional corporation with its principal place of business at 1552 Coffee Road,

12   Suite 4, Modesto, California 95355.  STEPHEN K. LIU, M.D., PROFESSIONAL CORPORATION

13   is a physician organization in which Dr. Stephen K. Lui held an ownership interest as a shareholder

14   at all times relevant hereto.

15        23.    California Emergency Physicians Medical Group, A Professional Corporation

16   ("CEPMG PC"), is a California for-profit corporation. CEPMG PC is affiliated with CEP America-

17   California, a general partnership f/k/a California Emergency Physicians Medical Group, a general

18   partnership ("CEPMG GP"). CEPMG GP is a physician organization with its principal place of

19   business at 2100 Powell Street, Suite 400, Emeryville, CA 94608.  CEPMG GP is a physician

20   organization in which hundreds of physicians held ownership interests as partners. The physicians

21   who held ownership interests as shareholders in CEPMG GP during all times relevant hereto include

22   Dr. Mark J. Spiro, Dr. Theo Koury, Dr. Joseph C. Chiang, Dr. Henry W. Turkel, Dr. Byron F.

23   Carcelen and Dr. Philip Silverstein. CEPMG GP provides emergency room staffing services for

24   hospitals, including the SUTTER HEALTH hospitals located in Los Banos, Roseville, Antioch,

25   Sacramento, Auburn and Davis, California. CEPMG PC was named as a defendant in Relator's First

26   Amended Complaint (Dkt. No. 46), but Relator has since dismissed this defendant (Dkt. No. 136).

27   ///

28   ///

V.    **THE FALSE CLAIMS ACT AND THE CALIFORNIA FALSE CLAIMS ACT**

24.    The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).  Claims to Government Payers for reimbursement for health care services rendered to patients referred by physicians in violation of the Stark Law (as hereinafter described) are false claims actionable under the FCA.

25.    The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729.[1]  For purposes of the FCA:

the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

26.    The Social Security Act was amended by the Patient Protection and Affordable Care Act, P.L. 111-148 effective March 23, 2010 ("PPACA"), in an important respect relating to the FCA. PPACA established a deadline for reporting and returning overpayments received or retained under Medicare or Medicaid (generally 60 days after the date on which the overpayment was identified),

---

[1]    The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  Defendants' fraudulent schemes include false claims made prior to and after that date.  The four pre-amendment subsections relevant to this action are 31 U.S.C. §§ 3729(a)(1), (a)(2), (a)(3) and (a)(7). The t post-amendment sections relevant here are 3729(a)(1)(A), 3729(a)(1)(B), 3729(a)(1)(C) and 3729(a)(1)(G). Post-amendment section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the changes to that section applicable to all civil actions pending on or after June 7, 2008.

1   and PPACA provided that any overpayment retained by a person after the deadline for reporting and

2   returning the overpayments is an obligation as defined in 31 U.S.C. § 3729(b)(3) of the FCA.  PPACA

3   § 6402(d), adding § 1128J to the Social Security Act [42 U.S.C. § 1320a-7k].

4      27.    The CFCA has similar provisions to the FCA addressing the submission of false and

5   fraudulent claims to the State of California.   Cal. Gov't Code § 12651(a)(1), (2), (3) and (7).  The

6   CFCA was amended effective January 1, 2013 to reflect the amendments made to the FCA by FERA

7   and PPACA.  2012 Cal. Legis. Serv. Ch. 647 (A.B. 2492) (WEST).

8   **VI.    THE MEDICARE PROGRAM**

9      28.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

10   Medicare program, to pay for the costs of healthcare services for certain individuals.  The Department

11   of Health and Human Services ("HHS") is responsible for the administration and supervision of the

12   Medicare program, which it does through the Centers for Medicare and Medicaid Services ("CMS"),

13   an agency of HHS.

14      29.    Entitlement to Medicare is based on age, disability or affliction with end-stage renal

15   disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for

16   institutional care, including hospital, skilled nursing facility and home health care.  *See* 42 U.S.C. §§

17   1395c-1395i-4.  Part B of the Medicare program primarily covers physician and other ancillary

18   services.  *See* 42 U.S.C. § 1395k.

19      30.    To assist in the administration of Medicare Part A, CMS contracted with "fiscal

20   intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries (typically insurance companies) were

21   responsible for processing and paying claims and cost reports.

22      31.    To assist in the administration of Medicare Part B, CMS contracted with "carriers."

23   Carriers, typically insurance companies, were responsible for processing and paying Part B claims.

24      32.    Beginning in November 2006, Medicare Administrative Contractors ("MACs") began

25   replacing both the fiscal intermediaries and carriers.  *See* Fed. Reg. 67960, 68181 (Nov. 2006).  The

26   MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform

27   administrative functions on a regional level.  *See* 42 § C.F.R. 421.5(b) (2019).

28

33.    Noridian Healthcare Solutions, LLC, became the MAC for the California region in September 2013.  Palmetto GBA served as the MAC for the California region from September 2008 to August 2013.  Prior to September 2008, National Government Services served as the Part A fiscal intermediary and National Heritage Insurance Company served as the Part B carrier for the California region.

34.    As a large and sophisticated provider of health care services to Medicare, SUTTER HEALTH has "a duty to familiarize themselves with the legal requirements for payment." *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001).  "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law...." *Id., quoting Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

35.    Providers who wish to be eligible to participate in Medicare Part A must periodically sign an application to participate in the program.  The application, which must be signed by an authorized representative of the provider, contains an express certification that states, "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

36.    Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

37.    Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64 (2019).  At all relevant times, SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, at the direction of SUTTER HEALTH, submitted claims to Medicare Part A electronically using the standard machine readable format developed by the American National Standards Institute (ANSI) Accredited Standards Committee (ASC) X12N and known as the 837 Institutional format, and was

not allowed to submit claims to Medicare on paper forms UB-92 or UB-04 after the Administrative Simplification Compliance Act (Pub.L. 107-105, § 1, Dec. 27, 2001) became effective in 2003.

38. As detailed below, at all relevant times, Defendants SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, each were enrolled as a Government Health Care Programs provider and submitted or caused to be submitted electronic claims to Government Payers both for specific inpatient and outpatient services provided to individual beneficiaries as well as claims for general and administrative costs incurred in treating Government Health Care Programs' beneficiaries.

39. As a prerequisite to payment under Medicare Part A, CMS requires such hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

40. After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20 (2019); *see also* 42 C.F.R. § 405.1801(b)(1) (2019). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60, and 413.64(f)(1) (2019).

41. Defendants SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, were at all times relevant to this Complaint required to submit annually accurate hospital cost reports to the fiscal intermediary or MAC.

42. During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the providers for particular patient discharges (specifically listed in electronic claims filed in 837 Institutional format) during the course of the fiscal year. On the hospital cost report, this Medicare Part A liability to the hospital for services is then combined with any Medicare Part A liabilities owed to Medicare from the hospital to determine whether

Medicare or the hospital owes the other any funds related to treatment of Medicare Part A beneficiary patients during the course of a fiscal year.

43.     Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, carriers and MACs, had the right to audit the hospital cost reports and to investigate representations made by SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, at the direction of SUTTER HEALTH, in their claims for reimbursement and its cost reports to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made, such as payments for services rendered by physicians and hospitals which are not in compliance with the Stark Law or the AKS.  *See* 42 C.F.R. § 413.64(f) (2019).

44.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

45.     For all relevant years, SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, were required to expressly certify, and did certify, in relevant part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

46.     For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

47.     Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to

the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Statute (described below).

48.     For each of the years at issue, SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, at the direction of SUTTER HEALTH, submitted cost reports to their fiscal intermediary attesting, among other things, to the specific certifications quoted above.  Those certifications were false and SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS and SUTTER HEALTH each knew they were false.

49.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its fiscal intermediary or MAC.

50.     In addition to Part A claims, hospitals, doctors or other providers submit Medicare Part B claims to the carrier or MAC for payment.

51.     Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1).  For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality.  *See* 42 C.F.R. §§ 405.502–405.504 (2019).

52.     During the relevant time period, PHYSICIAN ENTITIES electronically submitted claims to Medicare Part B for professional services in ANSI ASC X12N 837 Professional format.  PHYSICIAN ENTITIES were required to certify, and did certify, by electronically signing each claim submitted to Medicare Part B in 837 Professional format:

> this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law).

53.     Medicare regulations require providers and suppliers to accurately certify that they meet, and will continue to meet, the requirements of the Medicare statute and applicable regulations. 42 C.F.R. § 424.516(a)(1) (2019).

54.     Because it is not feasible for the Medicare program, or its contractors, to review medical records corresponding to each of the millions of claims for payment it receives from

1  providers, the program relies on providers to comply with Medicare requirements and relies on

2  providers to submit truthful and accurate certifications and claims.

3  **VII.   THE MEDICAID PROGRAM**

4          55.     Medicaid is a joint federal-state program that provides health care benefits for certain

5  groups, primarily the poor and disabled. The federal government provides matching funds and ensures

6  that states comply with minimum standards in the administration of the program.

7          56.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid

8  programs to qualify for federal funding, which is called federal financial participation (FFP).  42

9  U.S.C. §§ 1396, *et seq.*

10          57.     In order to qualify for FFP, each state's Medicaid program must meet certain minimum

11  requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. §§

12  1396a(10)(A), 1396d(a)(1)-(2).

13          58.     In the State of California, provider hospitals participating in the Medicaid program

14  (known as "Medi-Cal") submit claims for hospital services rendered to beneficiaries to the California

15  Department of Health Care Services ("DHCS") for payment.

16          59.     In addition, DHCS requires hospitals participating in the Medi-Cal program to file a

17  copy of their Medicare cost report with DHCS.

18          60.     DHCS uses Medi-Cal patient data and the Medicare cost report to determine the

19  reimbursement to which the facility is entitled based in part on the number of Medi-Cal patients

20  treated at the facility.

21          61.     Medi-Cal, as a health insurance program, has been covering Californians who cannot

22  afford health care since 1966. DHCS programs serve more than 11 million Californians.  Nearly 1

23  out of 3 Californians in the state receive health care services financed or organized by DHCS, making

24  the department the largest health care purchaser in California.

25          62.     Under the Affordable Care Act, Medi-Cal coverage expanded in 2014. DHCS now

26  invests more than $91 billion in federal and state public funds to provide health care services for low-

27  income families, children, pregnant women, seniors, and persons with disabilities, while helping to

28  maintain the health care delivery safety net. The Medi-Cal expansion in 2014 opened the door for

millions of additional low-income Californians under age 65 to be eligible for coverage. To be eligible, annual income must be lower than 138 percent of the federal poverty level.[2]

## VIII.   TRICARE AND OTHER GOVERNMENT-FUNDED HEALTH CARE PROGRAMS

63.    In addition to Medicaid and Medicare, the federal government reimburses health care services under several other federal health care programs, including but not limited to TRICARE, CHAMPVA and the Federal Employees Health Benefit Program ("FEHBP").

64.    TRICARE, administered by the United States Department of Defense through the Defense Health Agency, is a health care program for individuals and dependents affiliated with the armed forces.  It offers military families a choice of three options: TRICARE Prime, TRICARE Extra, and TRICARE Standard (formerly known as CHAMPUS (Civilian Health & Medical Program for Uniformed Services), a health care plan for military dependents and retirees).

65.    CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service-connected disability.

66.    The FEHBP, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

67.    Like Medicare, TRICARE and other federal health care benefit programs cover only medically necessary inpatient and outpatient care.  TRICARE defines medically necessary care as services or supplies provided by a hospital, physician, and/or other provider for the prevention, diagnosis, and treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; provided in accordance with approved and generally accepted medical or surgical practice; not primarily for the convenience of the patient, the physician, or other providers; and not exceeding (duration or intensity) the level of care, which is needed to provide safe, adequate and appropriate diagnosis and treatments.  *See* 32 C.F.R. § 199.4(a)(1)(i) (2019) and applicable definitions at 32 C.F.R. § 199.2 (2019).

---

[2] https://www.dhcs.ca.gov/Pages/Medi-CalExpansionInformation.aspx#:~:text=Expanded%20Coverage%E2%80%8B&text=Under%20the%20Affordable%20Care%20Act,Cal%20coverage%20expanded%20in%202014.&text=Adults%20without%20children%2C%20ages%2019,procedures%20for%20Medi%2DCal%20eligibility (last viewed Apr. 7, 2021).

68.     As with Medicare, providers submit claims to TRICARE using the CMS 1500 or an electronic equivalent.  Providers therefore make the same certifications in submitting claims to TRICARE as they do when submitting claims to Medicare.

69.     Because it is not feasible for the TRICARE program, or its contractors, to review medical records corresponding to each of the claims for payment it receives from providers, the program relies on providers to comply with TRICARE requirements and relies on providers to submit truthful and accurate certifications and claims.

## IX.    THE STARK LAW

70.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (the  "Stark Statute") (the Stark Statute and its regulations are collectively defined as the "Stark Law") prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the Statute) with the hospital, and prohibits Medicare from paying any such claims.

71.     The Stark Statute establishes that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers. The Statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable or improper utilization of designated health services.

72.     Compliance with the Stark Law is a condition of payment by the Medicare program. The Stark Statute explicitly states that Medicare may not pay for any designated health service provided in violation of the Stark Statute.  *See* 42 U.S.C. § 1395nn(g)(1).  In addition, the regulations implementing the Stark Statute expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d) (2019).

73.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the

clinical lab provider unless a statutory or regulatory exception applies. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204, 103 Stat. 2106, 2236-43.

74.     In 1993, Congress passed Stark II, which extended the Stark Statute to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152, 108 Stat. 4398, 4436-37.

75.     The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception applies. "Designated health services" ("DHS") include inpatient and outpatient hospital services reimbursable under Medicare Part A or Part B. *See* 42 U.S.C. § 1395nn(h)(6).

76.     In pertinent part, the Stark Statute provides:

(a)     Prohibition of certain referrals

(1) In general. Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then –

(A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

77.     Moreover, the Stark Statute provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). *See* 42 U.S.C. § 1395nn(g)(1). Numerous physician compensation arrangements orchestrated by Defendant SUTTER HEALTH violate the Stark Law in multiple ways as set forth below.

78.     "Financial relationship" includes a "compensation arrangement," which includes any arrangement involving any remuneration paid directly or indirectly to a referring physician. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

79.     A direct compensation arrangement exists if remuneration passes between the referring physician (or a member of his or her immediate family) and the entity furnishing DHS without any intervening persons or entities. 42 C.F.R. § 411.354(c)(1)(i) (2019).

80.     A physician is deemed to "stand in the shoes" of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if—

>       (A) The only intervening entity between the physician and the entity furnishing DHS is his or her physician organization; and

>       (B) The physician has an ownership or investment interest in the physician organization.42 CF.R. § 411.354(c)(1)(ii) (2019).

## A.      Stark Law Exceptions

81.     The Stark Statute and companion regulations contain exceptions for certain compensation arrangements. The exceptions operate as affirmative defenses to alleged violations of the Stark Law. Once it has been shown that a party submitting Medicare claims has a financial relationship with a referring physician, the defendant bears the burden of demonstrating that the relationship meets all the requirements of an applicable statutory or regulatory exception to the Stark Law. *See, e.g., United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 405 (4th Cir. 2012). These exceptions include, among others, "personal services arrangements," "fair market value arrangements," and "indirect compensation relationships."

82.     In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, inter alia, both of the following statutory requirements: (A) the compensation does not exceed fair market value ("FMV"), *and* (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute). *See* 42 U.S.C. § 1395nn(e)(3)(A)(v).

83.     A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

84. To qualify for the Stark Statute's exception for FMV compensation, the arrangement must satisfy each of the following conditions: there must be an agreement in writing; the written agreement must set forth all services to be furnished; all compensation must be set in advance and consistent with FMV; the agreement must not take into consideration the volume or value of referrals or other business generated by the referring physician; and the agreement must not violate federal or state law. *See* 42 C.F.R. § 411.357(l) (2019).

85. To qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source (*see* 42 C.F.R. § 411.354(c)(2) (2019)), there must be a written agreement, the compensation must be consistent with FMV, the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement cannot violate the Anti-Kickback Statute. *See* 42 C.F.R. § 411.357(p) (2019). In determining whether an indirect compensation arrangement exists, a physician is deemed to "stand in the shoes" of his or her physician organization if the physician has an ownership or investment interest in the physician organization. 42 C.F.R. § 411.354(c)(2)(iv)(A) (2019)

86. The Stark Statute applies to claims for payment under Government Health Care Programs. *See* 42 U.S.C. § 1396b(s).

87. The Stark Law is a strict liability statute, with no scienter component. Medicare providers who knowingly submit claims to the Medicare program in violation of the Stark Law may be found liable for violation of the FCA. A knowing violation of the Stark Law may also subject the billing entity to exclusion from participation in federal health care programs and civil monetary penalties. 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

88. Compliance with the Stark Law is material to the payment decisions of Government Payers because payment of Stark-tainted claims is statutorily prohibited: Congress decided that certain financial relationships between hospitals and referring physicians present a risk to federal healthcare programs and program beneficiaries due to questionable or improper utilization of

designated health services.   Government Payers would not and could not legally pay for any designated health service provided in violation of the Stark Law.   42 U.S.C. §§ 1395nn(g)(1), 1396b(s).

## X.   FEDERAL ANTI-KICKBACK STATUTE

89.    The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

>   (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or
>
>   (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.

42 U.S.C. § 1320a-7b(b)(1)–(2).   The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind.   42 U.S.C. § 1320a-7b(b)(1).

90.    The AKS "address[es] Congress' concern that health care decision-making can be unduly influenced by a profit motive."   Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998).

91.    Any claim for reimbursement submitted to a Government Health Care Program for items or services that resulted from a violation of the AKS constitutes a "false or fraudulent claim" under the FCA.   Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 119 (2010), adding 42 U.S.C. § 1320a-7b(g); *see also McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005).

92.    The AKS covers any arrangement where one purpose of the remuneration is to obtain money for the referral of services or to induce further referrals.   *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985), *cert. denied*, 474 U.S. 988 (1985);   *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000);   *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998).   The AKS is "violated, even if the payments were also intended to compensate for professional services."   *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011), quoting *Greber*, 760 F.2d at 72.

93.     The Patient Protection and Affordable Care Act of 2010 clarified the intent requirement of the AKS by adding a provision stating that actual knowledge of an AKS violation or the specific intent to commit a violation of the AKS is not necessary for conviction under the statute. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(2), 124 Stat. 119 (2010). The AKS now expressly provides: "With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."  42 U.S.C. § 1320a-7b(h).

94.     HHS has published safe harbor regulations that define practices not subject to the anti-kickback statute because such practices would be unlikely to result in fraud or abuse.  *See* 42 C.F.R. §1001.952 (2019).  The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor.  However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

95.     The interplay between the AKS and the Stark Statute has been summarized as follows:

> Both the anti-kickback statute and [Stark] address Congress' concern that health care decisionmaking can be unduly influenced by a profit motive. When physicians have a financial incentive to refer, this incentive can affect utilization, patient choice, and competition. Physicians can overutilize by ordering items and services for patients that, absent a profit motive, they would not have ordered. A patient's choice can be affected when physicians steer patients to less convenient, lower quality, or more expensive providers of health care, just because the physicians are sharing profits with, or receiving remuneration from, the providers. And lastly, where referrals are controlled by those sharing profits or receiving remuneration, the medical marketplace suffers since new competitors can no longer win business with superior quality, service, or price. Although the purposes behind the anti-kickback statute and [Stark] are similar, it is important to analyze them separately. In other words, to operate lawfully under Medicare and Medicaid, one must comply with both statutes.

*Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships*, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998).

96.     Compliance with AKS is material to Medicare's and Medicaid's payment decisions because kickbacks are statutorily prohibited in order to protect the integrity of federal healthcare programs and AKS-tainted claims are statutorily designated as false claims under FCA.  *See* 42 U.S.C. § 1320a-7b; Social Security Amendments of 1972, Pub. L. No. 92-603, § 242(b)-(c), 86 Stat. 1329, 1419-20; Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, 91 Stat. 1175

1   (1977); Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, 101

2   Stat 680; Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(1), 124 Stat.

3   119 (2010), adding 42 U.S.C. § 1320a-7b(g).

4   **XI.    SUTTER HEALTH'S CONTROL OF THE OTHER SUTTER ENTITIES**

5           97.     SUTTER HEALTH controls and directs the operations of its subsidiaries and affiliates

6   including  Defendants  SUTTER  VALLEY  HOSPITALS,  SUTTER  VALLEY  MEDICAL

7   FOUNDATION, and SUTTER BAY HOSPITALS.  Specifically, for example, Relator was employed

8   by SUTTER VALLEY HOSPITALS as the Compliance Officer of Sutter Medical Center but reported

9   directly to the chief compliance officer at SUTTER HEALTH, a position occupied Steve Ortquist and

10  then by Ginger Chappel, during Relator's tenure with SUTTER HEALTH.  The Chief Compliance

11  officer at SUTTER HEALTH reported to the general counsel for SUTTER HEALTH, a position

12  occupied by Flo DiBenedetto during Relator's tenure with SUTTER.  All physician contracts between

13  a SUTTER HEALTH subsidiary hospital and a PHYSICIAN ENTITY went through the SUTTER

14  HEALTH Legal Department and the SUTTER HEALTH Compliance Department, with support from

15  SUTTER  HEALTH-employed  attorneys  assigned  to  the  various  subsidiary  hospitals  and  the

16  compliance officers such as Relator at each such hospital.

17          98.     In addition to the reporting structures up through the SUTTER HEALTH Compliance

18  and Legal Departments from the subsidiary hospitals, SUTTER HEALTH also exerts control over

19  the  operations  of  SUTTER  VALLEY  HOSPITALS,  SUTTER  VALLEY  MEDICAL

20  FOUNDATION, and SUTTER BAY HOSPITALS, through overlapping corporate governance

21  boards and executive officers. For example, during the calendar years 2010-2014, SUTTER

22  HEALTH's Chief Executive Officer, Patrick Fry, was a member of the Board of Trustees of SUTTER

23  VALLEY HOSPITALS f/k/a Sutter Health Sacramento Sierra Region, a member of the Board of

24  Directors of SUTTER VALLEY HOSPITALS f/k/a Sutter Central Valley Hospitals, and a member

25  of the Board of Trustees of SUTTER BAY HOSPITALS f/k/a Sutter East Bay Hospitals. He was also

26  a member of the Board of Trustees of SUTTER VALLEY MEDICAL FOUNDATION, f/k/a Sutter

27  Gould Medical Foundation during the calendar years 2011-2014.

28

99.     SUTTER HEALTH and its subsidiaries and affiliates report consolidated financial statements.   Note 1 to SUTTER HEALTH's 2020 Consolidated Audited Financial Statements (**Exhibit 41**, p. 7) declares:

> Sutter Health is a California not-for-profit multi-provider integrated health care delivery system headquartered in Sacramento, California, which includes a centralized support group and various health care-related businesses operating primarily in Northern California. Sutter Health and its affiliates and subsidiaries provide health care, education, research and administrative services.

SUTTER HEALTH's website advertises SUTTER HEALTH, the hospitals  owned by SUTTER VALLEY  HOSPITALS and SUTTER BAY HOSPITALS, and the medical foundations including SUTTER VALLEY MEDICAL FOUNDATION f/k/a Sutter Gould Medical Foundation as being part of "Our Integrated Network."[3]   SUTTER HEALTH and its subsidiaries and affiliates have integrated and commingled business operations, including that SUTTER HEALTH's executives and directors control the financial and compliance operations of the subsidiaries and affiliates.

100.     In addition, Defendants SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION, and SUTTER BAY HOSPITALS co-mingled funds with the parent entity SUTTER HEALTH so that SUTTER HEALTH possesses the spoils of the fraudulent acts that it directed. SUTTER HEALTH's Shared Services department held short-term investments totaling $5,441,000,000 as of December 31, 2020, accumulated from SUTTER HEALTH's subsidiaries and affiliates, including Defendants SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION, and SUTTER BAY HOSPITALS. Exhibit 41, p. 53.

101.     With regard to compliance, in 1996, SUTTER HEALTH adopted a system-wide compliance policy purportedly "to maintain ethical business practices and to comply with all rules and regulations with regard to our business."   SUTTER HEALTH directed that all SUTTER HEALTH affiliates, including what are now SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER BAY HOSPITALS, comply with this purported

---

[3] https://www.sutterhealth.org/about/what-is-sutter-health (last viewed December 2, 2021).

1   compliance policy.  As part of this policy, SUTTER HEALTH purported to adopt a Compliance

2   Program to deter and detect noncompliance with rules and regulations that govern SUTTER

3   HEALTH'S business.  The board of directors of SUTTER HEALTH designated operational

4   responsibility for the Compliance Program to the SUTTER HEALTH President and CEO, with the

5   SUTTER HEALTH Board maintaining oversight of the Program through the Board's Governance

6   Committee.  Further, the SUTTER HEALTH President and CEO was directed to appoint a Chief Risk

7   Officer for SUTTER HEALTH who would oversee the Compliance Program and insure compliance

8   by all the affiliates.  Each affiliate hospital was directed to adopt by-laws to ensure compliance with

9   the SUTTER HEALTH Compliance Program and to name that affiliate's CEO as the Compliance

10  Officer for that affiliate.  Each affiliate CEO was to appoint a compliance liaison who would work

11  directly with, and under the supervision of, the SUTTER HEALTH Chief Risk Officer.  Each affiliate

12  Compliance Officer was directed to report all compliance matters to the SUTTER HEALTH Chief

13  Risk Officer on a monthly basis.

14      102.    Relator reported to the CEO of SUTTER VALLEY HOSPITALS and to the Chief

15  Compliance Officer of SUTTER HEALTH, Steven Ortquist, who oversaw regulatory compliance for

16  all Sutter hospitals.  Ortquist resigned in 2014 because of disagreements with SUTTER HEALTH

17  management over the failure of SUTTER HEALTH to insure that physician compensation complied

18  with the Stark Law and the AKS.  Ortquist was replaced by Ginger Chappell.  Before his departure,

19  Ortquist told Relator he had been instructed by SUTTER HEALTH that the Compliance Department

20  needed to be more "friendly" to the SUTTER ENTITIES' administrations, meaning being more

21  lenient in approving physician contracts regardless of their violations of the Stark and AKS laws.

22      103.    Each Sutter hospital had personnel from the SUTTER HEALTH General

23  Counsel's Office who were responsible for legal matters for that particular hospital.  One such person

24  during Relator's employment was Penny Westfall, who was regional legal counsel for Sutter Health

25  Sacramento Sierra Region (now SUTTER VALLEY HOSPITALS).  Relator was in regular contact

26  with Ms. Westfall concerning audit and compliance matters. Relator was also regularly in contact

27  with Brenna Arceo, who was general counsel for Sutter Medical Center, where Relator was employed.

28  Ms. Arceo reported to Ms. Westfall.  Through Relator's contacts with the General Counsel's Office,

she learned that that office sought FMV evaluations from third-party evaluators for various physicians providing services to the Sutter hospitals, but withheld from those evaluators all of the compensation being paid to those physicians.  Thus, even though cumulative compensation, in certain instances, exceeded fair market value, the evaluators did not consider all the compensation in doing FMV analyses so that SUTTER HEALTH could get a favorable analysis of the compensation.

104.   Relator worked on a daily basis with the SUTTER HEALTH Compliance Office, either with Ortquist or Chappell, or with Barbara Martinson, who was the Regional Compliance Officer at SUTTER HEALTH who oversaw Relator's facilities and who reported to Ortquist or Chappell.

105.   During the relevant period, all contracts and arrangements with physicians and physician groups, including the contracts at issue here, were approved by SUTTER HEALTH'S legal department, General Counsel's Office and Compliance Office.  No physician contract could be entered into by any of the hospitals without such prior approval.  Any audits of compliance with the terms of physician compensation contracts done at the hospital compliance level were reviewed and reacted to by the SUTTER HEALTH Compliance Office and the SUTTER HEALTH General Counsel's Office.

106.   In addition, all budgets for each of the Sutter hospitals were approved by the Chief Financial Officer of SUTTER HEALTH who reported directly to the CEO of SUTTER HEALTH who was, during Relator's employment, Patrick Fry.

107.   SUTTER HEALTH also maintained a Shared Services Department which handled all billing, coding, payroll and payment of vendor expenses for all the Sutter hospitals.  All claims for reimbursement to governmental and private payors were handled by SUTTER HEALTH's Shared Services Department.

108.   Each of the specific schemes described below was a part of SUTTER HEALTH's network-wide scheme to increase profits by inducing referrals from highly productive referring physicians.

## XII.   THE FRAUD SCHEME

### A.   Sacramento Cardiovascular Surgeons Medical Group, Inc. ("SAC CARDIO")

109.     Beginning July 1, 2006, SUTTER VALLEY HOSPITALS, at the direction of SUTTER HEALTH, knowingly entered into a series of agreements with Defendant SAC CARDIO that provided free physician assistants to and for the direct benefit of SAC CARDIO, one purpose of which was to induce referrals from the SAC CARDIO physicians for inpatient and outpatient hospital services at SUTTER VALLEY HOSPITALS.   The May 1, 2013 version of the agreement for physician assistants is attached as **Exhibit 1** (the "Physician Assistants Agreement"). The May 1, 2011 version of the agreement for physician assistants is attached as **Exhibit 2**.

110.     The Physician Assistants Agreement obligated SUTTER VALLEY HOSPITALS to pay SAC CARDIO for four physician assistants at the rate of $170,000 per full time equivalent, or a total of $680,000 per year.   **Exhibit 1**, ¶1(a).   The compensation was payable in monthly installments of $56,666.66 each, subject to submission of monthly time reports.   **Exhibit 1**, ¶3(a).

111.     Physician assistants that were paid for by SUTTER VALLEY HOSPITALS under the Physician Assistants Agreement include (without limitation):  Christopher J. Davis, Alan J. Fribourg, Mark B. Jones, and Teresa E. North (the "SAC CARDIO Physician Assistants").

112.     The three referring physicians illegally benefiting from the payments made by SUTTER VALLEY HOSPITALS, at the direction of SUTTER HEALTH, under the Physician Assistants Agreement for the free physician assistants are:  Dr. Michael T. Ingram, Dr. Robert Kincade and Dr. James Longoria (the "SAC CARDIO Physicians"). The SAC CARDIO Physicians each held an ownership interest in SAC CARDIO as a shareholder.

113.     The Physician Assistants Agreement expressly provides:

> c.     **No Billing to Patients or Other Payors.** The parties anticipate that the services to be provided by the Assistants are not chargeable to patients or third party payors.  In the event Group and Hospital determine that some or all of Assistants services are billable to third party payors, the parties shall meet and confer as to what compensation adjustments may be warranted to assure that patients and/or third party payors are not billed for services that are paid for by Hospital pursuant to this Agreement.

**Exhibit 1**, ¶3(c); **Exhibit 2**, ¶3(c).

1        114.    Despite the contractual provision to the contrary, SAC CARDIO did in fact

2   intentionally, illegally and systematically bill third party payers, including Medicare, for some of the

3   SAC CARDIO Physician Assistants' services, with the payments on such claims accruing to the

4   benefit of SAC CARDIO and thereby indirectly benefiting the SAC CARDIO Physicians.   See

5   **Exhibit 3** for 2012 Medicare payments for SAC CARDIO Physician Assistants' services paid to SAC

6   CARDIO.

7        115.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction

8   of SUTTER HEALTH, intended to induce referrals and reward SAC CARDIO for its high-volume

9   referrals with the preferential Physician Assistants Agreement. That conduct violated AKS.

10        116.    Additionally, beginning October 1, 2006, SUTTER VALLEY HOSPITALS,

11   at the direction of SUTTER HEALTH, knowingly entered into a series of three stacked Medical

12   Director Agreements with SAC CARDIO that paid SAC CARDIO up to a total of $318,264 annually

13   for services allegedly performed by each of the SAC CARDIO Physicians as the "Medical Director"

14   of various services lines.

15        117.    Dr. Michael T. Ingram is the Medical Director of the Cardiac Intensive Care

16   Unit and the Assistant Medical Director of the Sutter Heart Institute.  Under the September 1, 2012

17   version of the MDA, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction

18   of SUTTER HEALTH, repeatedly paid SAC CARDIO for Dr. Ingram's services as Medical Director

19   at the hourly rate of $330.55 for an average of 40 hours per month, or a total of $158,664 per year.

20   **Exhibits 4 and 5**.  The compensation was payable in monthly installments, subject to submission of

21   monthly time reports.  **Exhibit 5**, ¶3(a).  Under the September 1, 2010 version of the MDA, SUTTER

22   VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH,

23   repeatedly paid SAC CARDIO for Dr. Ingram's services as Medical Director at the hourly rate of

24   $350.00 for a minimum average of 17 hours per month, or a total of $71,400 per year.  **Exhibit 6**.

25   SAC CARDIO submitted monthly time reports to SUTTER VALLEY HOSPITALS claiming the

26   hours required under Dr. Ingram's Medical Director Agreements and SUTTER VALLEY

27   HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid SAC CARDIO

28   at the rates set forth in the agreements. **Exhibit 7**.

118.   Dr. Robert Kincade is the Medical Director of the Transplant Ventricular Assist Device Program.   Under the September 1, 2012 version of the MDA, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO for Dr. Kincade's services as Medical Director at the hourly rate of $332.50 for a minimum average of 20 hours per month, or a total of $79,800 per year.   **Exhibit 8**.  The compensation was payable in monthly installments, subject to submission of monthly time reports.   **Exhibit 8**, ¶3(a). Under the September 1, 2010 version of the MDA, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO for Dr. Kincade's services as Medical Director at the hourly rate of $350.00 for a minimum average of 19 hours per month, or a total of $79,800 per year. **Exhibit 9**. SAC CARDIO submitted monthly time reports to SUTTER VALLEY HOSPITALS claiming the hours required under Dr. Kincade's Medical Director Agreements and SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid SAC CARDIO at the rates set forth in the agreements. **Exhibit 10**.

119.   Dr. James Longoria is the Medical Director of the Surgical Ablation Program. Under the September 1, 2012 version of the MDA, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO for Dr. Longoria's services as Medical Director at the hourly rate of $332.50 for a maximum of 20 hours per month, or a total of $79,800 per year.   **Exhibit 11**.   The compensation was payable in monthly installments, subject to submission of monthly time reports.   **Exhibit 11**, ¶3(a).  Under the September 1, 2010 version of the MDA, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO for Dr. Longoria's services as Medical Director at the hourly rate of $350.00 for a maximum average of 19 hours per month, or a total of $79,800 per year. **Exhibit 12**. SAC CARDIO submitted monthly time reports to SUTTER VALLEY HOSPITALS claiming the hours required under Dr. Longoria's Medical Director Agreements and SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid SAC CARDIO at the rates set forth in the agreements. **Exhibit 13**.

120.    The compensation paid by SUTTER VALLEY HOSPITALS, at the direction of SUTTER HEALTH, to SAC CARDIO under the Medical Director Agreements for the services of Dr. Ingram, Dr. Kincade and Dr. Longoria, all of whom held ownership interests in SAC CARDIO as shareholders during all times relevant hereto, exceeded the fair market value of the services actually rendered by SAC CARDIO. The compensation arrangements were commercially unreasonable because the aggregate services contracted for exceeded those that were reasonable and necessary for the legitimate business purposes of the arrangements.

121.    SUTTER VALLEY HOSPITALS and SUTTER HEALTH knowingly intended to induce referrals and reward SAC CARDIO and its individual owner physicians for its high-volume referrals with the lucrative and duplicative Medical Director Agreements. That conduct violated AKS.

122.    Also, beginning July 1, 2008, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly entered into a series of Call Coverage Agreements with SAC CARDIO that repeatedly paid SAC CARDIO up to a total of $912,500 annually.  The purpose of the Call Coverage Agreements was ostensibly to assure the availability of cardiovascular surgeons to provide emergency services on a 24-hour basis.  See **Exhibits 14, 15 and 16**.

123.    The rate for call coverage paid by SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, to SAC CARDIO jumped **more than 200 percent** from $1,140 per 24-hour shift in the 2008 Call Coverage Agreement (**Exhibit 14**) to $2,500 per 24-hour shift in the 2010 Call Coverage Agreement (**Exhibit 15**), and remained at $2,500 per 24-hour shift in the 2012 Call Coverage Agreement (**Exhibit 16**).  The rate of $2,500 per 24-hour shift exceeds fair market value and exceeds the rates paid by SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS and other subsidiaries and affiliates of SUTTER HEALTH to other similar cardiovascular surgeons for call coverage during the same timeframes.

124.    Although not stated in the Call Coverage Agreements, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid call coverage for cardiovascular surgeons in the Sacramento area exclusively to SAC CARDIO, to the

exclusion of all other cardiovascular surgeons who are members of the medical staff at Sutter Memorial Center, Sacramento.  As an intended result, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO at the rate of $2,500 per shift for all 365 days of the calendar year.  See **Exhibit 17** for an example of July 2013 call coverage payment.

125.   SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, used improperly structured payments for on-call coverage to disguise unlawful remuneration. HHS-OIG has articulated and recognized that payments by hospitals for on-call coverage can be misused to entice physicians to join or remain on the hospital's staff or to generate additional business for the hospital. See OIG Advisory Opinion 12-15, p. 7 (issued October 23, 2012, corrected March 8, 2013).[4]  The exclusive arrangement used by SUTTER VALLEY HOSPITALS selectively, intentionally and excessively rewarded SAC CARDIO as a high referrer and denied all other specialists with hospital privileges the opportunity to take call coverage. *Id.*, p. 10.

126.   SUTTER VALLEY HOSPITALS and SUTTER HEALTH knowingly intended to induce referrals and rewarded SAC CARDIO for its high-volume referrals with the preferential, exclusive, and above-market Call Coverage Agreement. That conduct violated AKS.

127.   The Call Coverage Agreement specifies that SAC CARDIO Physicians may separately bill and collect charges for any professional services rendered, in addition to the $2,500 per shift.  **Exhibit 16**, ¶1(h).  Essentially, SAC CARDIO was paid twice for professional services rendered under the Call Coverage Agreements.

128.   In addition to the compensation paid to SAC CARDIO under the Physician Assistants Agreement, the Medical Director Agreements and the Call Coverage Agreement, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO for medical services provided by SAC CARDIO to patients pursuant to a Specialty Care Clinician Agreement for each of the SAC CARDIO Physicians.  See **Exhibit 18**

---

[4] https://oig.hhs.gov/fraud/docs/advisoryopinions/2012/advopn12-15-mod.pdf (last viewed Apr. 8, 2021).

for an example of the Specialty Care Agreement for Dr. Michael T. Ingram.  Defendant SUTTER VALLEY MEDICAL FOUNDATION was the entity that actually bills Medicare for the services provided by the SAC CARDIO Physicians.  SUTTER VALLEY MEDICAL FOUNDATION in turn contracted with various medical groups, including Sutter Independent Physicians, to obtain physician services.  SAC CARDIO was a member of Sutter Independent Physicians and received payments for patient care services from Government Payers through SUTTER VALLEY MEDICAL FOUNDATION and Sutter Independent Physicians.

129.    SUTTER VALLEY MEDICAL FOUNDATION, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO for patient care services under the Specialty Care Clinician Agreement.  In addition, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO the following annual compensation under the above-referenced agreements:

### SAC CARDIO Compensation – Excluding Patient Care Services

| Agreement | Total Annual Compensation |
|---|---|
| Physician Assistants Agreement | $680,000.00 |
| Medical Director Agreements | $318,264.00 |
| Call Coverage Agreement | $912,500.00 |
| TOTAL ANNUAL COMPENSATION | **$1,910,764.00** |

130.    By stacking the Physician Assistants Agreement, Medical Director Agreements and Call Coverage Agreements with aggregate annual compensation that exceeded $1.9 million (excluding patient care services performed by the SAC CARDIO Physicians), SUTTER VALLEY HOSPITALS knowingly created a financial relationship with the SAC CARDIO Physicians that was commercially unreasonable, grossly in excess of fair market value, and violative of the Stark Statute because no exception applied.

1

2

### 1.    SUTTER VALLEY HOSPITALS and SUTTER HEALTH Knew the SAC CARDIO Agreements Were Illegal.

3      131.    On November 7, 2013, Brooke Haynes, Contract Specialist in Accounts

4   Payable, copied Relator, as Compliance Officer of Sutter Medical Center, Sacramento, on an e-mail

5   sent to Vickie Sexton, Administrative Assistant to Rick Harrell ("Harrell"), the cardiovascular service

6   line administrator for SUTTER VALLEY HOSPITALS.  Ms. Haynes had critically questioned

7   payments to SAC CARDIO under the Physician Assistants Agreement because the SAC CARDIO

8   Physician Assistants had not documented the minimum number of hours required under the

9   agreement, and payment would need to be adjusted for the hours actually documented instead of the

10  full payment for each month in the quarter.  **Exhibit 19**.

11     132.    Harrell requested that the SAC CARDIO Physician Assistants review and

12  revise their timesheets for missing documentation of the services provided and resubmit the

13  timesheets.  On November 25, 2013, Harrell then sent the revised timesheets to the payment approvers

14  in Accounts Payable for payment, without involving Relator as the Compliance Officer even though

15  Relator had asked Harrell to provide her with the revised timesheets before submitting them for

16  payment.

17     133.    When Relator learned that the revised timesheets had been submitted to the

18  payment approvers in Accounts Payable without her review, Relator requested copies of the revised

19  timesheets for her review.  Therein, she discovered that the SAC CARDIO Physician Assistants had

20  billed more than 40 hours for 5 full weeks in each month.  She also discovered the timesheets had

21  falsely and fraudulently recorded non-work items, such as vacations, as being time spent at work.

22  After review, Relator concluded that the timesheets contained false information that was not

23  supported by accurate data.  As a result of Relator's review of the fraudulently altered timesheets and

24  after discussion with her superiors, SUTTER VALLEY HOSPITALS placed a hold on payments

25  under the Physician Assistants Agreement beginning with the payment for the month of January 2014

26  pending further investigation.

27     134.    On February 14, 2014, Relator met with Harrell to discuss her review of the

28  resubmitted timesheets.  As a result of the meeting, Harrell requested a third set of timesheets from

the SAC CARDIO Physician Assistants.  The third set of timesheets included estimates of additional duties and hours not historically recorded, such as patient rounding and pre/post procedure time. Relator questioned why payment for the claimed Physician Assistants' services was necessary as the services claimed by the SAC CARDIO Physician Assistants appeared to be compensable duties and part of the surgical global fee paid to the surgeons.  Harrell agreed with Relator that the Physician Assistants' services were compensable as part of the surgical global fee.  Nevertheless, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, resumed the $56,666.66 monthly payments to SAC CARDIO under the Physician Assistants Agreement in April 2014.  SUTTER VALLEY HOSPITALS removed the payment hold even though SUTTER VALLEY HOSPITALS and SUTTER HEALTH actually knew of the fraudulent timesheets.

135.    Relator continued to investigate the billing issues associated with the SAC CARDIO Physician Assistants and discovered that third party payers, including Medicare, were receiving claims for certain services provided by the physician assistants, even though at least in the written words of the Physician Assistants Agreement, SAC CARDIO had purportedly agreed not to bill for such services.  In March and April 2014, Relator worked with Malcolm Macleod, a an employee of SUTTER HEALTH's Shared Services Department to prepare the spreadsheet (**Exhibit 3**) showing that SAC CARDIO could in fact bill under Medicare rules for the work of physician assistants.  Relator presented the information about Medicare rules governing billing for physician assistants to her superiors at SUTTER VALLEY HOSPITALS and SUTTER HEALTH.

136.    On or about July 24, 2014, Harrell queried the CMS Physician Payment Data for 2012 and confirmed that SAC CARDIO had billed Medicare for services performed by the SAC CARDIO Physician Assistants which SUTTER VALLEY HOSPITALS funded, in breach of the Physician Assistant Agreement.  Harrell reported this information to his superiors at SUTTER VALLEY HOSPITALS and SUTTER HEALTH.  SUTTER VALLEY HOSPITALS decided to issue another hold on further payments under the Physician Assistants Agreement pending further investigation.  Relator issued the payment hold on the Physician Assistants Agreement by e-mail on Monday, July 28, 2014 at 9:59 a.m.  **Exhibit 20**.  SAC CARDIO was being provided free employees and SAC CARDIO was billing Medicare for the (free) Physician Assistants' services and retaining

the payments.  This illegal financial benefit to SAC CARDIO allowed them to improperly profit from these services which were not connected to personally performed physician services.

137.    Relator also reviewed the timesheets supporting the payments to SAC CARDIO under the Medical Director Agreements.  Relator found duplicative supervision of Dr. Daren Danielson, a Travis Air Force Base physician who is fully credentialed, and duplicative supervision of other ICU staff.  Relator also found other indications that the timesheets supporting the payments to SAC CARDIO had been fraudulently prepared, indicating that work had been performed during times when procedures, in fact, did not take place.  On June 19, 2014, after discussion with Relator's superiors at SUTTER VALLEY HOSPITALS, Relator issued a hold on further payments under the Medical Director Agreements pending further investigation.  **Exhibit 21**.

## 2.    **SUTTER HEALTH'S CEO Directly Intervened to Resume SUTTER VALLEY HOSPITALS' Knowing Payment of Kickbacks to Induce Referrals.**

138.    On Thursday, July 31, 2014, Dr. James Longoria of SAC CARDIO called Carol Spangler, Assistant to Patrick Fry, the President and Chief Executive Officer of SUTTER HEALTH. Dr. Longoria left a message with Ms. Spangler because Mr. Fry was not in the office.  Dr. Longoria threatened to shut down the Operating Rooms if the payment stop was not lifted.

139.    Fry intervened on behalf of the physicians because of financial considerations regarding the high dollar value of referrals by the SAC CARDIO Physicians.  On July 31, 2014 Fry called Flo Di Benedetto, who was General Counsel of SUTTER HEALTH, at 3:00 a.m. in Europe and ordered her to immediately release the funds to pay SAC CARDIO.  Di Benedetto then called Ginger Chappell, who was then Chief Compliance Officer of SUTTER HEALTH, and ordered her to release the funds.  Chappell then directed SUTTER VALLEY HOSPITALS to reverse the hold and reissue the $56,666.66 payment for June 2014.  The payment from SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, was to subsidize the SAC CARDIO Physician Assistants who were billing third party payers, including Medicare, for the benefit of the

referring SAC CARDIO Physicians in breach of the Physician Assistants Agreement.  One purpose of reissuing the $56,666.66 payment to SAC CARDIO for June 2014 was to continue to induce future referrals to SUTTER VALLEY HOSPITALS' operating rooms and to maintain the status quo of referrals from SAC CARDIO.  The direct threat by Dr. Longoria to shut down the operating rooms achieved its intended effect:  Fry ordered SUTTER VALLEY HOSPITALS to reinstitute full payment to SAC CARDIO despite knowing of the illegal billing activities described above.

140.    Eric Dalton, VP Finance of SUTTER HEALTH's Sutter Shared Services, ordered Brooke Haynes in Accounts Payable to reissue the check due on the Physician Assistants Agreement and send it to SAC CARDIO via Federal Express immediately.  SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, sent the $56,666.66 check to SAC CARDIO on July 31, 2014 under Federal Express Tracking Number 770738076893.  **Exhibit 22**.

141.    Rick Harrell, the Cardiovascular Service Line Administrator for SUTTER VALLEY HOSPITALS threatened that whoever ordered the stop payment on the compensation to the SAC CARDIO physicians "was going to pay."

142.    Relator later learned that attorneys Brenna Arceo and Hillary Isaacson, both employees of SUTTER HEALTH's General Counsel's Office were aware before her investigation of the fact that SUTTER HEALTH had paid SAC CARDIO to subsidize the SAC CARDIO physician assistants even though SAC CARDIO was billing for their services.  Neither Arceo nor Isaacson took any steps to end these payments.

143.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SAC CARDIO to subsidize the SAC CARDIO Physician Assistants and allowed SAC CARDIO to bill for their services, compensation that was unrelated to the personally performed services of the SAC CARDIO physicians. As such, SUTTER VALLEY HOSPITALS and SUTTER HEALTH could not reasonably have concluded that the payments under the Physician Assistants Agreement did not violate the Stark Law.  SUTTER VALLEY HOSPITALS and SUTTER HEALTH knew the scheme violated the Stark Law and still knowingly made or caused

1  to be made the payments to SAC CARDIO and submitted or caused to be submitted tainted illegal

2  claims for reimbursement to Government Payers in violation of the FCA and CFCA.

3          144.    Based on the contractual and actual financial relationships between the SAC

4  CARDIO Physicians and SUTTER VALLEY HOSPITALS, the Stark Statute was violated because

5  SAC CARDIO and the SAC CARDIO Physicians had direct compensation arrangements with

6  SUTTER VALLEY HOSPITALS and none of the statutory or regulatory exceptions to the Stark

7  Statute apply to those arrangements. Each of the compensation arrangements under the Physician

8  Assistants Agreement, the Medical Director Agreements and the Call Coverage Agreement was a

9  direct compensation arrangement under the Stark Law because Dr. Ingram, Dr. Kincade and Dr.

10  Longoria (the referring physicians) each stand in the shoes of SAC CARDIO (their physician

11  organization) due to their ownership interests as shareholders, and SUTTER VALLEY HOSPITALS

12  (the entity furnishing DHS), with the knowledge of and at the direction of SUTTER HEALTH,

13  repeatedly paid them directly without an intervening person or entity. 42 C.F.R. § 411.354(c)(1)(i)

14  and (ii) (2019).

15          145.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction

16  of SUTTER HEALTH, repeatedly paid SAC CARDIO to subsidize the SAC CARDIO Physician

17  Assistants and allowed SAC CARDIO to bill for their services, and that one purpose of that

18  arrangement was to induce future referrals to SUTTER VALLEY HOSPITALS. As such, SUTTER

19  VALLEY HOSPITALS and SUTTER HEALTH could not reasonably have concluded that the

20  payments under the Physician Assistants Agreement did not violate the AKS.  SUTTER VALLEY

21  HOSPITALS and SUTTER HEALTH each knew it was in violation of the AKS and still SUTTER

22  VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH,

23  knowingly continued to submit tainted ineligible claims for reimbursement to Government Payers in

24  violation of the FCA and CFCA.

25          146.    Based on the contractual and actual financial relationships between the SAC

26  CARDIO Physicians and SUTTER VALLEY HOSPITALS, SUTTER VALLEY HOSPITALS, with

27  the knowledge of and at the direction of SUTTER HEALTH violated the AKS by paying SAC

28  CARDIO remuneration to induce the SAC CARDIO Physicians to refer Government Health Care

1   Programs' beneficiaries to SUTTER VALLEY HOSPITALS for the furnishing of inpatient and
2   outpatient hospital services covered by Government Payers and none of the statutory or regulatory
3   safe harbors to the AKS apply.

4           3.      **Relator's Knowledge of SUTTER VALLEY HOSPITALS' Billing**
5                   **Processes and Submission of False Claims to Medicare.**

6           147.    As the Compliance Officer of Sutter Medical Center, Sacramento, Relator
7   became deeply familiar with the processes by which SUTTER VALLEY HOSPITALS submits
8   claims to Government Payers.  Throughout her tenure, Relator reviewed actual bills from SUTTER
9   VALLEY HOSPITALS to Government Payers on a regular basis as part of her compliance reviews
10  of SUTTER VALLEY HOSPITALS' hospital billing and coding practices and its financial
11  arrangements with physicians.  She reviewed and discussed actual claims submitted to Government
12  Payers by SUTTER VALLEY HOSPITALS for hospital services (designated health services)
13  referred to SUTTER VALLEY HOSPITALS by the SAC CARDIO Physicians.  Relator worked
14  directly with Malcolm Macleod, the Reimbursement Manager at SUTTER VALLEY MEDICAL
15  FOUNDATION, on investigations of SUTTER VALLEY HOSPITALS' billings to Government
16  Payers for services involving the SAC CARDIO Physician Assistants.  Through that investigation,
17  Relator had direct access to SUTTER VALLEY HOSPITALS' billing systems and actual claims
18  submitted to Government Payers. She also worked and communicated regularly with compliance
19  officers of other hospitals of SUTTER HEALTH's subsidiaries and affiliates, including SUTTER
20  BAY HOSPITALS, where similar billing processes were utilized.

21          148.    As part of her investigation into the SAC CARDIO Physician Assistants
22  compliance problem described in ¶ 135 above, Relator obtained from Mr. Macleod and his staff a
23  spreadsheet summarizing actual patients referred by SAC CARDIO Physicians to SUTTER
24  VALLEY HOSPITALS for inpatient hospital services.  **Exhibit 23 (patient information redacted)**.
25  The spreadsheet, which includes Medicare patients, summarizes electronic data in the automated
26  hospital databases that SUTTER VALLEY HOSPITALS used to electronically bill Government
27  Payers.  The spreadsheet includes details and information specific to hospital inpatient services
28  provided to actual patients, including Medicare patients, who were referred to SUTTER VALLEY

1  HOSPITALS by the SAC CARDIO Physicians in violation of the Stark Law and AKS, and whose

2  services SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER

3  HEALTH, knowingly billed to Medicare.  Those bills are false claims to Medicare and provide

4  representative examples of SUTTER VALLEY HOSPITALS' submission of false claims to

5  Government Payers.  SUTTER VALLEY HOSPITALS used the same billing process to submit

6  claims to all Government Payers, not just to Medicare. SUTTER BAY HOSPITALS used the same

7  billing process as SUTTER VALLEY HOSPITALS to submit claims to all Government Payers.

8  **4.      SUTTER VALLEY HOSPITALS' Representative False Claims.**

9  149.    **Representative False Claim #1** - As reflected on Line 2 of **Exhibit 23**, on

10  December 20, 2013, Dr. Robert Kincade (Surgeon), Dr. Daren Danielson (Assist Surgeon) and Alan

11  Fribourg (Physician Assistant) performed a coronary artery bypass in the operating room at Sutter

12  Medical Center, Sacramento for Redacted Patient Name #1, a Medicare patient.  The procedures that

13  Dr. Kincade performed on Redacted Patient Number #1 in connection with the inpatient hospital

14  services that SUTTER VALLEY HOSPITALS billed to Medicare are described by Current

15  Procedural Terminology ("CPT") code 33510 (Coronary artery bypass, vein only, single coronary

16  venous graft).  Relator has direct knowledge that SUTTER VALLEY HOSPITALS submitted an

17  electronic claim for the hospital inpatient services to Medicare for Redacted Patient #1, and that claim

18  was a false claim under the FCA.

19  150.    **Representative False Claim #2** - As reflected on Line 33 of **Exhibit 23**, on

20  August 20, 2013, Dr. James Longoria (Surgeon), Dr. Robert Kincade (Assist Surgeon) and Chris

21  Davis (Physician Assistant) performed a coronary artery bypass in the operating room at Sutter

22  Medical Center, Sacramento for Redacted Patient Name #2, a Medicare patient.  The procedures that

23  Dr. Longoria performed on Redacted Patient Number #2 in connection with the inpatient hospital

24  services that SUTTER VALLEY HOSPITALS billed to Medicare are described by CPT code 33535

25  (Coronary artery bypass, using arterial grafts; 3 coronary arterial grafts).  Relator has direct

26  knowledge that SUTTER VALLEY HOSPITALS submitted an electronic claim for the hospital

27  inpatient services to Medicare for Redacted Patient #2, and that claim was a false claim under the

28  FCA.

1    151.   **Representative False Claim #3** - As reflected on Line 49 of **Exhibit 23**, on

2    June 20, 2013, Dr. James Longoria (Surgeon), Dr. Daren Danielson (Assist Surgeon) and Therese

3    North (Physician Assistant) performed a coronary artery bypass in the operating room at Sutter

4    Medical Center, Sacramento for Redacted Patient Name #3, a Medicare patient.  The procedures that

5    Dr. Longoria performed on Redacted Patient Number #3 in connection with the inpatient hospital

6    services that SUTTER VALLEY HOSPITALS billed to Medicare are described by CPT code 33511

7    (Coronary artery bypass, vein only; 2 coronary venous grafts).  Relator has direct knowledge that

8    SUTTER VALLEY HOSPITALS submitted an electronic claim for the hospital inpatient services to

9    Medicare for Redacted Patient #3, and that claim was a false claim under the FCA.

10                    5.   **Relator's Knowledge of Physician Referrals**.

11    152.   "Referral," for purposes of the Stark Law, is defined as "the request or

12    establishment of a plan of care by a physician which includes the provision of designated health

13    services." 42 U.S.C. § 1395nn(h)(5)(B).  The term "designated health services" is defined to include

14    inpatient and outpatient hospital services.  42 U.S.C. § 1395nn(h)(6).  The regulations interpreting

15    the statute also broadly define "referral" as, among other things, "a request by a physician that

16    includes the provision of any designated health service for which payment may be made under

17    Medicare, the establishment of a plan of care by a physician that includes the provision of such a

18    designated health service, or the certifying or recertifying of the need for such a designated health

19    service." 42 C.F.R § 411.351.  A referring physician is defined in the same regulation as "a physician

20    who makes a referral as defined in this section or who directs another person or entity to make a

21    referral or who controls referrals made to another person or entity."  *Id.*

22                    153.   Relator has personal and direct knowledge that on each of Representative False

23    Claims Nos. 1-3, one of the SAC CARDIO Physicians was the referring physician for designated

24    health services provided at SUTTER VALLEY HOSPITALS, as reflected in the electronic claims

25    submitted to Medicare.  The physicians identified on Medicare claims are referring physicians as a

26    matter of law.  *See U.S. ex rel. Kunz v. Halifax Hosp. Med. Ctr., No. 6:09-CV-1002-ORL-31,* 2013

27    WL 6017329, at *5 (M.D. Fla. Nov. 13, 2013); *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys.,*

28    *Inc.,* 675 F.3d 394, 406-07 (4th Cir. 2012); *U.S. v. Rogan*, 459 F. Supp. 2d 692, 713-714 & n. 11, 722

(N.D. Ill. 2006), *aff'd* 517 F.3d 449 (7th Cir. 2008); *U.S. ex rel. Singh v. Bradford Reg. Med. Center*, 752 F. Supp. 2d 602, 639-40 (W.D. Pa. 2010). *See also* 42 U.S.C. § 1395l(q) ("Each request for payment, or bill submitted, for an item or service furnished by an entity for which payment may be made under this part and for which the entity knows or has reason to believe there has been a referral by a referring physician (within the meaning of section 1395nn of this title) shall include the name and unique physician identification number for the referring physician.").

154.     In addition, **Exhibit 23** relating to Representative False Claims Nos. 1–3 shows one of the SAC CARDIO Physicians as the "Surgeon" personally performing professional services relating to the facility fees that SUTTER VALLEY HOSPITALS billed to Medicare.  When a physician personally performs a service, the resulting hospital facility fee is a referral as a matter of law for Stark Law purposes. *Tuomey Healthcare Sys., Inc.*, 675 F.3d at 407.  This evidence of referrals is determinative as a matter of law.

6.     **SAC CARDIO's Representative False Claims.**

155.     **Exhibit 23** shows an SAC CARDIO Physician was the surgeon personally performing professional services described by CPT codes 33510, 33535 and 33511, respectively. SAC CARDIO submitted claims to Medicare for its physicians' services using those CPT codes. These physician services provided to Medicare patients are separate and apart from SUTTER VALLEY HOSPITALS' claims for its hospital services (facility fees) rendered to these patients.

156.     With each claim for physician services that SAC CARDIO electronically submitted to Medicare relating to Representative False Claims Nos. 1-3, SAC CARDIO electronically signed the claim and thereby certified as follows:

> this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law).

157.     SAC CARDIO knew that these certifications were false because it knew its financial arrangements with SUTTER VALLEY HOSPITALS violated the Stark Law and AKS. SAC CARDIO's false certifications are material to Medicare's decision to pay SAC CARDIO's claims for professional fees (as well as SUTTER VALLEY HOSPITALS' claims for facility fees)

1  because Medicare is statutorily prohibited from paying claims for services referred in violation of the

2  Stark Law and AKS-tainted claims are false claims under FCA.  42 U.S.C. §§ 1395nn(a)(1)(B),

3  1320a-7b(g).  Thus, Medicare would not have paid SAC CARDIO's claims for professional fees (or

4  SUTTER VALLEY HOSPITALS' claims for facility fees) if Medicare had known the SAC CARDIO

5  certifications were false.

6          7.    **Partial Recoveries from SUTTER HEALTH, SUTTER VALLEY**

7                **HOSPITALS and SAC CARDIO.**

8          158.   In October 2019, SUTTER HEALTH and SUTTER VALLEY HOSPITALS,

9  agreed to pay the United States $30,500,000 as a partial settlement and restitution for SUTTER

10  VALLEY HOSPITALS' submission of claims to the Medicare program resulting from referrals by

11  the SAC CARDIO Physicians, which claims the United States contended violated the Stark Law,

12  during the period from September 1, 2012, through September 30, 2014 (the "United States Covered

13  Conduct").  Dkt. 103-1. This Settlement Agreement (Dkt. 103-2) was signed by Florence L. Di

14  Benedetto, on behalf of SUTTER HEALTH as Senior Vice President and General Counsel, and on

15  behalf of SUTTER VALLEY HOSPITALS as Authorized Agent. The United States agreed on a

16  limited release of SUTTER HEALTH and SUTTER VALLEY HOSPITALS from any civil monetary

17  claim the United States has for the United States Covered Conduct under the common law theories

18  of payment by mistake and unjust enrichment.  The United States did not release SUTTER HEALTH

19  or SUTTER VALLEY HOSPITALS for any other claims relating to the United States Covered

20  Conduct, including claims under the FCA.  Relator agreed to a limited release of SUTTER HEALTH

21  and SUTTER VALLEY HOSPITALS from any claims relating to SUTTER VALLEY HOSPITALS'

22  submission of claims to federal healthcare programs, resulting from referrals by the SAC CARDIO

23  Physicians, which claims violated or resulted from violations of the Stark Law or AKS during only

24  the period from September 1, 2012, through September 30, 2014 ("Relator Covered Conduct").

25  Relator did not release SUTTER HEALTH or SUTTER VALLEY HOSPITALS for any claims other

26  than the Relator Covered Conduct, and expressly reserved Relator's claims for expenses, attorney's

27  fees and costs pursuant to 31 U.S.C. §3730(d) for all claims relating to the Relator Covered Conduct.

28  The United States and Relator filed a Joint Stipulation of Partial Dismissal (Dkt. 44) with respect to

1    the Relator Covered Conduct consistent with the terms of the partial settlement with SUTTER

2    HEALTH and SUTTER VALLEY HOSPITALS.

3            159.    In October 2019, SAC CARDIO agreed to pay the United States $506,000, of

4    which $340,000 was identified as restitution, as a partial settlement for SAC CARDIO's billing of

5    Medicare, from May 1, 2011, through September 30, 2014, for services provided at SUTTER

6    VALLEY HOSPITALS by physician assistants whose services SAC CARDIO was leasing to

7    SUTTER VALLEY HOSPITALS ("SAC CARDIO Covered Conduct").  Dkt. 103-2. The United

8    States agreed to a limited release of SAC CARDIO from any civil or administrative monetary claim

9    the United States has for the SAC CARDIO Covered Conduct under the FCA; the Civil Monetary

10   Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-

11   3812; or the common law theories of payment by mistake, unjust enrichment, and fraud related to the

12   SAC CARDIO Covered Conduct.  The United States did not release SAC CARDIO for any claims

13   outside of the period from May 1, 2011, through September 30, 2014.  Relator agreed to a limited

14   release of SAC CARDIO from any claims relating to the SAC CARDIO Covered Conduct for the

15   limited time period.  Relator did not release SAC CARDIO for any claims other than the SAC

16   CARDIO Covered Conduct, and expressly reserved Relator's claims for expenses, attorney's fees

17   and costs pursuant to 31 U.S.C. §3730(d) for all claims relating to the SAC CARDIO Covered

18   Conduct.  The United States and Relator filed a Joint Stipulation of Further Partial Dismissal (Dkt.

19   45) with respect to the SAC CARDIO Covered Conduct consistent with the terms of the partial

20   settlement with SAC CARDIO.

21           160.    On October 31, 2019, the United States and the State of California notified the

22   Court that the United States elected to partially intervene and settle only a part of the case, and the

23   United States and California elected to allow the Relator to go forward with the rest of the case on

24   behalf of the taxpayers of the United States and the State of California (Dkt. 43).  The Relator is

25   proceeding in the name of the United States and the State of California on all claims not released in

26   the partial settlements.

27   ///

28   ///

1

2

8.      **SUTTER HEALTH and SUTTER VALLEY HOSPITALS Knowingly Retained Overpayments.**

3       161.      SUTTER HEALTH and SUTTER VALLEY HOSPITALS each knows that it

4 had a legal obligation to refund more than $30.5 million in partial settlement payments covering

5 (only) the period from September 1, 2012, through September 30, 2014.  In addition, SUTTER

6 HEALTH and SUTTER VALLEY HOSPITALS each knowingly avoided its obligation to refund to

7 the United States and the State of California overpayments received from false claims on Stark-

8 prohibited and AKS-tainted referrals by the SAC CARDIO Physicians for periods before September

9 1, 2012 and after September 30, 2014.

10       162.      In addition, SUTTER VALLEY HOSPITALS co-mingled funds with

11 the parent entity SUTTER HEALTH so that SUTTER HEALTH possesses the spoils of the fraudulent

12 acts relating to SAC CARDIO that it directed. SUTTER HEALTH's Shared Services department held

13 Short-term investments totaling $5,441,000,000 as of December 31, 2020, accumulated from

14 SUTTER HEALTH's subsidiaries and affiliates, including SUTTER VALLEY HOSPITALS.

15 **Exhibit 41**, p. 53. SUTTER HEALTH must be held financially accountable for its own fraudulent

16 acts and for directing the fraudulent acts of SUTTER VALLEY HOSPITALS relating to SAC

17 CARDIO.

18      **B.     Dr. David K. Roberts**

19       163.      SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction

20 of SUTTER HEALTH, repeatedly paid hundreds of thousands of dollars per year to cardiovascular

21 surgeon, Dr. David K. Roberts.  Under the May 1, 2014 version of the MDA, with the knowledge of

22 and at the direction of SUTTER HEALTH, SUTTER VALLEY HOSPITALS repeatedly paid

23 Defendant SUTTER VALLEY MEDICAL FOUNDATION, which contracted with Defendant

24 SUTTER MEDICAL GROUP for Dr. Roberts' services as Regional Medical Director at the hourly

25 rate of $270.00 for an average of 121 hours per month, or a total of $392,040.00 per year.  **Exhibit**

26 **24**. The compensation was payable in monthly installments, subject to submission of monthly time

27 reports.  **Exhibit 24**, ¶3(a). Under the March 1, 2013 version of the MDA, with the knowledge of and

28 at the direction of SUTTER HEALTH, SUTTER VALLEY HOSPITALS repeatedly paid Defendant

1    SUTTER VALLEY MEDICAL FOUNDATION, which contracted with Defendant SUTTER

2    MEDICAL GROUP for Dr. Roberts' services as Regional Medical Director at the hourly rate of

3    $296.00 for a minimum average of 87 hours per month, or a total of $309,024 per year.  **Exhibit 25**.

4    Dr. Roberts submitted monthly time reports to SUTTER VALLEY HOSPITALS claiming the hours

5    required under Dr. Roberts' Medical Director Agreements and SUTTER VALLEY HOSPITALS,

6    with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SUTTER

7    VALLEY MEDICAL FOUNDATION at the rates set forth in the agreements. **Exhibit 26**.

8         164.    Relator reviewed the time reports that Dr. Roberts submitted to SUTTER

9    VALLEY HOSPITALS under the Medical Director Agreements. Dr. Roberts claimed over 130 hours

10   of medical director services in each month during the period from December 2013 through June 2014.

11        165.    Dr. Roberts' Medical Director Agreement specifies that Dr. Roberts,

12   Defendant SUTTER VALLEY MEDICAL FOUNDATION and Defendant SUTTER MEDICAL

13   GROUP shall not bill or assert any claim for payment against any patient or payer for services

14   performed by Dr. Roberts under the Medical Director Agreements.  **Exhibit 24**, ¶3(c); **Exhibit 25**,

15   ¶3(d).  Nonetheless, Dr. Roberts maintained a busy medical practice, billing Medicare hundreds of

16   thousands of dollars during the period from 2013-2015. He could not have done all of that work if he

17   also actually worked all the hours that he claimed to be performing medical director services under

18   the sham agreements.

19        166.    The compensation paid by SUTTER VALLEY HOSPITALS, with the

20   knowledge of and at the direction of SUTTER HEALTH, to SUTTER VALLEY MEDICAL

21   FOUNDATION under the Medical Director Agreements for the services of Dr. Roberts exceeded the

22   fair market value of the services actually rendered by SUTTER VALLEY MEDICAL

23   FOUNDATION and the compensation arrangements were commercially unreasonable because the

24   aggregate services contracted for exceeded those that were reasonable and necessary for the legitimate

25   business purposes of the arrangements.

26        167.    SUTTER VALLEY HOSPITALS, SUTTER HEALTH and SUTTER

27   VALLEY MEDICAL FOUNDATION intended to induce referrals to SUTTER VALLEY

28

HOSPITALS and rewarded Dr. Roberts for his referrals by paying excessive and commercially unreasonable compensation for Dr. Roberts' medical director services. That conduct violates AKS.

168.     SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid SUTTER VALLEY MEDICAL FOUNDATION excessive amounts for Dr. Roberts' medical directorship, one purpose of which was to induce referrals to SUTTER VALLEY HOSPITALS by Dr. Roberts. As such, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER HEALTH could not reasonably have concluded that the payments under Dr. Roberts' Medical Director Agreements did not violate the AKS.  SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER HEALTH each knew it was in violation of the AKS and still SUTTER VALLEY HOSPITALS, at the direction of SUTTER HEALTH, knowingly submitted tainted illegal claims for reimbursement to Government Payers in violation of the FCA and CFCA.

169.     Based on the contractual and actual financial relationships between SUTTER VALLEY MEDICAL FOUNDATION and SUTTER VALLEY HOSPITALS, the AKS was violated because SUTTER VALLEY HOSPITALS, at the direction of SUTTER HEALTH paid, and SUTTER VALLEY MEDICAL FOUNDATION, SUTTER MEDICAL GROUP, and Dr. Roberts received, remuneration to induce Dr. Roberts to refer, including Government Health Care Programs' beneficiaries, to SUTTER VALLEY HOSPITALS for the furnishing of inpatient and outpatient hospital services covered by Government Payers and none of the statutory or regulatory safe harbors to the AKS apply.

170.     On or about August 30, 2021, Defendants SUTTER HEALTH and SUTTER VALLEY MEDICAL FOUNDATION entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General (OIG) of the U.S. Department of Health and Human Services. The CIA was signed by Florence L. Di Benedetto, on behalf of SUTTER HEALTH as Senior Vice President and General Counsel, and on behalf of SUTTER VALLEY MEDICAL FOUNDATION as Authorized Representative. The CIA is intended to promote compliance with federal healthcare program requirements over a period of five years and includes specific elements that must be in place and monitored. The CIA specifically obligates SUTTER HEALTH and SUTTER VALLEY

MEDICAL FOUNDATION to develop and implement written policies and procedures to "ensure that all Arrangements do not violate the Anti-Kickback Statute and the Stark Law."

171.     SUTTER HEALTH and SUTTER VALLEY HOSPITALS each knowingly avoided its obligation to refund to the United States and the State of California overpayments received from false claims on AKS-tainted referrals by Dr. Roberts.

172.     In addition, SUTTER VALLEY HOSPITALS and SUTTER VALLEY MEDICAL FOUNDATION co-mingled funds with the parent entity SUTTER HEALTH so that SUTTER HEALTH possesses the spoils of the fraudulent acts relating to Dr. Roberts that it directed. SUTTER HEALTH's Shared Services department held Short-term investments totaling $5,441,000,000 as of December 31, 2020, accumulated from SUTTER HEALTH's subsidiaries and affiliates, including SUTTER VALLEY HOSPITALS and SUTTER VALLEY MEDICAL FOUNDATION. **Exhibit 41**, p. 53. SUTTER HEALTH must be held financially accountable for its own fraudulent acts and for directing the fraudulent acts of SUTTER VALLEY HOSPITALS and SUTTER VALLEY MEDICAL FOUNDATION relating to Dr. Roberts.

## C.     East Bay Cardiac Surgery Center Medical Group ("EAST BAY CARDIAC")

173.     SUTTER HEALTH similarly directed its subsidiary, SUTTER BAY HOSPITALS, f/k/a Alta Bates Summit Medical Center, f/k/a Sutter East Bay Hospitals, to use special agreements with cardiac surgeons in the East Bay region to pay unlawful kickbacks, excessive compensation and other unlawful remuneration to restrict patient choice and competition and to selectively reward high-volume referrers.

174.     From June 1, 2007 and continuing through August 31, 2014, SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly entered into a series of Administrative and Coverage Agreements ("Coverage Agreements") with Defendant EAST BAY CARDIAC. The EAST BAY CARDIAC physicians named to serve as a medical director under the various versions of the Coverage Agreements are Dr. Junaid H. Khan and Dr. Russell D. Stanten (the "East Bay Cardiac Physicians"). Each of the East Bay Cardiac Physicians held an ownership interest in EAST BAY CARDIAC as a partner at all times relevant hereto. The Coverage Agreement effective June 1, 2007, obligated SUTTER BAY HOSPITALS to pay EAST BAY

CARDIAC an annual amount of $15,000 for a medical directorship and administrative services, plus a flat annual amount of $485,000 for 24-hour, 365 days a year call coverage and for an unspecified number of hours performing data collection services, for a grand total of $500,000 per year. **Exhibit 27**, ¶¶3.1 and 3.2. The Coverage Agreement, effective February 4, 2009, obligated SUTTER BAY HOSPITALS to pay EAST BAY CARDIAC a flat annual amount of $1,000,000 for administrative services, call coverage and data collection services, without specifically identifying the time required to perform the purported data collection services. **Exhibit 28**, ¶3.2. The net effect was to literally double the payments to EAST BAY CARDIAC from $500,000 to $1,000,000 per year.

175. SUTTER BAY HOSPITALS and SUTTER HEALTH intended to induce referrals and reward EAST BAY CARDIAC for its high-volume referrals from the East Bay Cardiac Physicians by adding $500,000 in annual compensation under the February 4, 2009 version of the Coverage Agreement (**Exhibit 28**), despite the fact that SUTTER BAY HOSPITALS and SUTTER HEALTH knew that EAST BAY CARDIAC was not performing additional services to justify the exorbitant increase.

176. SUTTER BAY HOSPITALS knew it was paying illegal compensation to East Bay Cardiac and tried to conceal the illegal scheme in later versions of the Coverage Agreement with the knowledge of and at the direction of SUTTER HEALTH. The February 1, 2014 version of the Coverage Agreement between SUTTER BAY HOSPITALS and EAST BAY CARDIAC is attached as **Exhibit 29**. This agreement stacks compensation for administrative services ($108,000), coverage and indigent care services ($862,000) and data collection services ($385,000 - $1,100 per case for up to 350 cases per year), for a grand total of $1,355,000 per year.

177. In addition to the Coverage Agreements SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid EAST BAY CARDIAC for providing the East Bay Cardiac Physicians for call coverage at Eden Medical Center in Castro Valley at the rate of $850 per shift.

178. After attempting to conceal some of the additional compensation which was disguised and described as "data collection services," SUTTER BAY HOSPITALS and EAST BAY CARDIAC eventually admitted that EAST BAY CARDIAC was in fact not performing the data

collection services for which SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid East Bay Cardiac under the revised Coverage Agreement. Rather than immediately recovering the overpayments from EAST BAY CARDIAC which should not have been paid under the revised Coverage Agreement, SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, waived and abandoned its contractual right to collect the overpayment from EAST BAY CARDIAC within thirty days. In fact, SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, allowed EAST BAY CARDIAC to be paid for over four months with the benefit of the additional compensation payable for purported data collection services under the February 1, 2014 version of the Coverage Agreement. See **Exhibit 30**.  This conduct demonstrates that the payments for data collections were made to induce and reward referrals to SUTTER BAY HOSPITALS from EAST BAY CARDIAC.

179.   SUTTER BAY HOSPITALS and SUTTER HEALTH intended to induce referrals and rewarded EAST BAY CARDIAC for its high-volume referrals by adding more compensation under the February 1, 2014 version of the Coverage Agreement (**Exhibit 29**). SUTTER BAY HOSPITALS and SUTTER HEALTH knew that EAST BAY CARDIAC was not performing data collection services to justify the compensation for data collection services. That conduct violates AKS.

180.   By stacking compensation for administrative services, call coverage and data collection services in the Coverage Agreements with EAST BAY CARDIAC, with aggregate annual compensation exceeding $1 million per year, SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly created a financial relationship with the East Bay Cardiac Physicians that was commercially unreasonable, grossly in excess of fair market value, and violative of the Stark Statute because no exception applied.

181.   SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly and repeatedly paid EAST BAY CARDIAC excessive amounts under the Coverage Agreements that included compensation for purported data collection services that were not performed. As such, SUTTER BAY HOSPITALS and SUTTER HEALTH could not reasonably have concluded that the payments under the Coverage Agreements on or after February

4, 2009 did not violate the Stark Statute.  SUTTER BAY HOSPITALS and SUTTER HEALTH each knew it was in violation of the Stark Law and still knowingly made or caused to be made the payments to EAST BAY CARDIAC and submitted or caused to be submitted tainted illegal claims for reimbursement to Government Payers in violation of the FCA and CFCA.

182.   Based on the contractual and actual financial relationships between the East Bay Cardiac Physicians and SUTTER BAY HOSPITALS, the Stark Statute was violated because EAST BAY CARDIAC and the East Bay Cardiac Physicians had direct compensation arrangements with SUTTER BAY HOSPITALS and none of the statutory or regulatory exceptions to the Stark Statute apply. Each of the compensation arrangements under the Coverage Agreements was a direct compensation arrangement under the Stark Law because Dr. Khan and Dr. Stanten (the referring physicians) each stand in the shoes of EAST BAY CARDIAC (their physician organization) due to their ownership interests as partners, and SUTTER BAY HOSPITALS (the entity furnishing DHS), with the knowledge of and at the direction of SUTTER HEALTH, paid them directly without an intervening person or entity. 42 C.F.R. § 411.354(c)(1)(i) and (ii) (2019).

183.   SUTTER HEALTH increased the compensation payable to EAST BAY CARDIAC under the Coverage Agreement, effective February 4, 2009, by $500,000 and knowingly paid EAST BAY CARDIAC under the Coverage Agreements for services that were not performed, and one purpose of such payments was to reward and induce referrals of patients by East Bay Cardiac Physicians to SUTTER BAY HOSPITALS for inpatient and outpatient hospital services covered by Government Payers. As such, SUTTER HEALTH could not reasonably have concluded that the payments under the Coverage Agreements on or after February 4, 2009 did not violate the AKS. SUTTER HEALTH knew it was in violation of the AKS and still knowingly submitted tainted illegal claims for reimbursement to Government Payers in violation of the FCA and CFCA.

184.   Based on the contractual and actual financial relationships between the East Bay Cardiac Physicians and SUTTER BAY HOSPITALS, the AKS was violated because SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid, and EAST BAY CARDIAC and the East Bay Cardiac Physicians received remuneration, to induce the East Bay Cardiac Physicians to refer, including Government Health Care Programs' beneficiaries, to

1   SUTTER BAY HOSPITALS for the furnishing of inpatient and outpatient hospital services covered

2   by Government Payers and none of the statutory or regulatory safe harbors to the AKS apply.

3          185.    In October 2019, SUTTER HEALTH and certain subsidiaries and affiliates of

4   SUTTER HEALTH, including SUTTER BAY HOSPITALS and SUTTER VALLEY HOSPITALS,

5   agreed to pay the United States $15,117,516.36 as a settlement and restitution for submission of

6   claims to the Medicare program by certain SUTTER HEALTH subsidiaries and affiliates resulting

7   from referrals by certain physicians, which claims the United States contended violated the Stark

8   Law, during the period from January 1, 2009 through March 2, 2012. The Settlement Agreement was

9   signed by Florence L. Di Benedetto, on behalf of SUTTER HEALTH as Senior Vice President and

10  General Counsel, on behalf of SUTTER BAY HOSPITALS as Authorized Agent. and on behalf of

11  SUTTER VALLEY HOSPITALS as Authorized Agent. SUTTER HEALTH had made voluntary

12  disclosures on behalf of its subsidiaries and affiliates to the United States Department of Health and

13  Human Services, Office of Inspector General, relating to the conduct addressed in the settlement.

14  However, SUTTER HEALTH, SUTTER BAY HOSPITALS and SUTTER VALLEY HOSPITALS

15  each knowingly failed to disclose to the United States and concealed the violations of Stark Law

16  described in this Third Amended Complaint.

17         186.    SUTTER HEALTH and SUTTER BAY HOSPITALS each knowingly hid and

18  avoided its obligation to refund to the United States and the State of California overpayments received

19  from false claims submitted on or after February 4, 2009 on Stark-prohibited and AKS-tainted

20  referrals by the East Bay Cardiac Physicians.

21         187.    In addition, SUTTER BAY HOSPITALS co-mingled funds with the parent

22  entity SUTTER HEALTH so that SUTTER HEALTH possesses the spoils of the fraudulent acts

23  relating to East Bay Cardiac that it directed. SUTTER HEALTH's Shared Services department held

24  Short-term investments totaling $5,441,000,000 as of December 31, 2020, accumulated from

25  SUTTER HEALTH's subsidiaries and affiliates, including SUTTER BAY HOSPITALS. **Exhibit 41**,

26  p. 53. SUTTER HEALTH must be held financially accountable for its own fraudulent acts and for

27  directing the fraudulent acts of SUTTER BAY HOSPITALS relating to East Bay Cardiac.

28  ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      Dr. Stephen K. Liu**

188.     SUTTER HEALTH directed its subsidiary, SUTTER VALLEY HOSPITALS to use preferential agreements with its physicians in the Central Valley region to pay or provide unlawful kickbacks, excessive compensation, preferential medical directorships and call coverage arrangements, and other illegal incentives to restrict patient choice and competition, and selectively reward high-volume referrers.

189.     Beginning September 1, 2008, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly entered into a series of <u>exclusive</u> call coverage agreements with Defendant STEPHEN K. LIU, M.D., PROFESSIONAL CORPORATION ("Liu MD PC") for Interventional Radiology at Memorial Medical Center in Modesto, California. **Exhibit 31** (the "Liu Call Coverage Agreement"). The initial Liu Call Coverage Agreement expressly provided that Liu MD PC "shall be the exclusive provider of the specific interventional radiology Services set forth at Exhibit A, attached hereto," and Liu MD PC shall provide coverage services "on a twenty-four (24) hour basis every day of the calendar year." **Exhibit 31**, ¶1(a) and (b). Initially, the call coverage rate was $500 per shift. **Exhibit 31**, ¶3(a).

190.     SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, **quadrupled** the call coverage compensation from $500 to $2,000 per shift in the version of the Liu Call Coverage Agreement effective April 4, 2014. **Exhibit 32**, ¶3(a).

191.     The Liu Call Coverage Agreement provides that Liu MD PC will separately bill and collect charges for any professional fees rendered during the coverage shifts. **Exhibit 32**, ¶3(b); **Exhibit 32**, ¶1(q).

192.     Under the Liu Call Coverage Agreement, SUTTER VALLEY HOSPITALS and SUTTER HEALTH intended to induce referrals and rewarded Liu MD PC and its owner, Dr. Stephen Liu, for his high-volume referrals with the exclusive right to cover all shifts for every day of the calendar year. For example, for the month of March 2014, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid Liu MD PC a total of $37,200, which included all 31 shifts of the month at Memorial Medical Center at $1,200 per shift. **Exhibit**

1   **33**.  Over a full year at the rate of $1,200 per shift, SUTTER HEALTH paid Liu MD PC a total of

2   $438,000 ($1,200 x 365 days) for interventional radiology call coverage.

3              193.    Dr. Stephen Liu held an ownership interest in Liu MD PC as a shareholder at

4   all times relevant hereto. Dr. Stephen Liu was far-and-away the highest-billing diagnostic radiologist

5   in the entire State of California for the period from 2012 to 2015, receiving Medicare payments

6   ranging from $4,861,815 in 2012 to $5,247,239 in 2015. **Exhibit 34**.  Dr. Liu referred hundreds of

7   Government Health Care Programs' beneficiaries each year to SUTTER VALLEY HOSPITALS for

8   inpatient and outpatient hospital services relating to expensive/lucrative cardiovascular procedures.

9              194.    SUTTER  VALLEY  HOSPITALS  and  SUTTER  HEALTH  knowingly

10  intended to induce referrals and rewarded Liu MD PC for Dr. Liu's high-volume referrals with the

11  exclusive interventional radiology call coverage arrangement for Memorial Medical Center. That

12  conduct violated AKS.

13             195.    By providing Liu MD PC with preferential call coverage assignments and

14  payments for all 365 days of the year, SUTTER VALLEY HOSPITALS, with the knowledge of and

15  at the direction of SUTTER HEALTH, knowingly created a financial relationship with Liu MD

16  PC/Dr. Stephen Liu that was commercially unreasonable, grossly in excess of fair market value, and

17  violative of the Stark Statute because no exception applied.

18             196.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction

19  of SUTTER HEALTH, knowingly paid Liu MD PC excessive amounts under the preferential Liu

20  Coverage Agreement that included interventional radiology call coverage for all 365 days of the year.

21  As such, SUTTER VALLEY HOSPITALS and SUTTER HEALTH could not reasonably have

22  concluded that the payments under the Liu Coverage Agreement did not violate the Stark Statute.

23  SUTTER VALLEY HOSPITALS and SUTTER HEALTH each knew it was in violation of the Stark

24  Law and still knowingly made or caused to be made the payments to Liu MD PC and submitted or

25  caused to be submitted tainted illegal claims for reimbursement to Government Payers in violation of

26  the FCA and CFCA.

27             197.    Based on the contractual and actual financial relationships between Dr.

28  Stephen Liu and SUTTER VALLEY HOSPITALS, the Stark Statute was violated because Dr.

Stephen Liu had a direct compensation arrangement with SUTTER VALLEY HOSPITALS and none of the statutory or regulatory exceptions to the Stark Statute apply. Each of the compensation arrangements under the Liu Call Coverage Agreements was a direct compensation arrangement under the Stark Law because Dr. Liu (the referring physician) stands in the shoes of Liu MD PC (his physician organization) due to his ownership interest as a shareholder in Liu MD PC, and SUTTER VALLEY HOSPITALS (the entity furnishing DHS), with the knowledge of and at the direction of SUTTER HEALTH, paid him directly without an intervening person or entity. 42 C.F.R. § 411.354(c)(1)(i) and (ii) (2019).

198.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly assigned interventional radiology call coverage to Liu MD PC on a preferential basis and paid Liu MD PC based on such assignments, and one purpose of such preferential assignments and payments was to reward and induce referrals of patients by Dr. Stephen Liu to SUTTER VALLEY HOSPITALS for inpatient and outpatient hospital services covered by Government Payers. As such, SUTTER VALLEY HOSPITALS and SUTTER HEALTH could not reasonably have concluded that the payments under the Liu Coverage Agreements did not violate the AKS.  SUTTER VALLEY HOSPITALS and SUTTER HEALTH each knew it was in violation of the AKS and still knowingly submitted or caused to be submitted tainted illegal claims for reimbursement to Government Payers in violation of the FCA and CFCA.

199.    Based on the contractual and actual financial relationships between Dr. Stephen Liu and SUTTER VALLEY HOSPITALS, the AKS was violated because SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid, and Dr. Stephen Liu received, remuneration to induce Dr. Liu to refer patients, including Government Health Care Programs' beneficiaries, to SUTTER VALLEY HOSPITALS for the furnishing of inpatient and outpatient hospital services covered by Government Payers and none of the statutory or regulatory safe harbors to the AKS apply.

200.    SUTTER HEALTH and SUTTER VALLEY HOSPITALS each knowingly hid and avoided its obligation to refund to the United States and the State of California overpayments received from false claims submitted on Stark-prohibited and AKS-tainted referrals by Dr. Liu

201.    In addition, SUTTER VALLEY HOSPITALS co-mingled funds with the parent entity SUTTER HEALTH so that SUTTER HEALTH possesses the spoils of the fraudulent acts relating to Liu MD PC that it directed. SUTTER HEALTH's Shared Services department held Short-term investments totaling $5,441,000,000 as of December 31, 2020, accumulated from SUTTER HEALTH's subsidiaries and affiliates, including SUTTER VALLEY HOSPITALS. **Exhibit 41**, p. 53. SUTTER HEALTH must be held financially accountable for its own fraudulent acts and for directing the fraudulent acts of SUTTER VALLEY HOSPITALS relating to Liu MD PC.

**F.    CEP America-California, a general partnership f/k/a California Emergency Physicians Medical Group, a general partnership ("CEPMG GP")**

202.    Beginning April 1, 2011, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly entered into a series of agreements with CEP America-California, a general partnership, f/k/a California Emergency Physicians Medical Group, a general partnership ("CEPMG GP") for emergency department coverage services at Memorial Hospital Los Banos that paid all direct costs for CEPMG GP's Mid-Level Practitioners. SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid compensation to and for the direct benefit of CEPMG GP, one purpose of which was to induce referrals from the CEPMG GP's physicians for inpatient and outpatient hospital services at SUTTER VALLEY HOSPITALS. The April 1, 2011 version of the agreement for emergency department coverage services is attached as **Exhibit 35** (the "ED Coverage Agreement").

203.    SUTTER VALLEY HOSPITALS executed the First Extension to the ED Coverage Agreement as of March 31, 2014 (the "First Extension"). **Exhibit 36**. The First Extension named Defendant California Emergency Physicians Medical Group, a California professional corporation ("CEPMG PC") as the contracting party. The First Extension was signed by Theo Koury, MD on behalf of CEPMG PC.

204.    Theo Koury, MD has since declared that he is the President of CEPMG GP, and is also a shareholder, director, President and Chief Financial Officer of CEPMG PC. Dkt. 108-1, ¶1. Theo Koury further declared that the mention of CEPMG PC in the First Extension was a

1    "scriveners error," and that CEPMG GP, not CEPMG PC, was party to the ED Coverage Agreement.

2    *Id.,* ¶ 14.

3         205.    Relator's original Complaint (Dkt. 1) and First Amended Complaint (Dkt. 46)

4    named CEPMG PC as a defendant by mistake caused by the scriveners error in the First Extension

5    and confusion resulting from the fact that both CEPMG GP and CEPMG PC conducted business

6    under the identical name "California Emergency Physicians Medical Group." On March 17, 2021,

7    this Court issued an order granting CEPMG PC's motion to dismiss. Dkt. 131 at 31. The same order

8    permitted an amended complaint against all Defendants and a motion under Rule 15(c)(1)(C)(ii) to

9    substitute or add CEPMG GP for CEPMG PC. *Id.*, at 30.  Relator included CEPMG PC as a defendant

10   in the Second Amended Complaint (Dkt. 133), but Relator has since dismissed this defendant (Dkt.

11   No. 136) and never filed a motion to add CEPMG GP as a defendant.

12        206.    The ED Coverage Agreement obligates SUTTER VALLEY HOSPITALS to

13   pay CEPMG GP for its Mid-Level Practitioners working in the Emergency Department at Memorial

14   Hospital Los Banos at the rate of $60.33 per hour.  **Exhibit 35**, ¶3.1(c).  The ED Coverage Agreement

15   allowed CEPMG GP to bill and collect all charges for the professional component of medical services

16   delivered to all patients by CEPMG GP, including services delivered by the Mid-Level Practitioners

17   funded by SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER

18   HEALTH.  **Exhibit 35**, ¶3.2(b).  The payment for Mid-Level Practitioners varied with the volume

19   and value of inpatient hospital services referred by the CEPMG GP's physicians to CEPMG GP's

20   Mid-Level Practitioners.  The revenues and profits made by CEPMG GP rise directly in correlation

21   to the referrals made by CEPMG GP's physicians to the Mid-Level Practitioners.

22        207.    Mid-Level Practitioners that were paid for by SUTTER VALLEY

23   HOSPITALS under the ED Coverage Agreement include (without limitation):  Lani Antonio, Alysee

24   Michalosky, David Belshaw, Philip Sampson and Elmer Santos (the "CEPMG Mid-Level

25   Practitioners").

26        208.    Physicians that provided services under the ED Coverage Agreement and that

27   illegally benefited from the payments made by SUTTER VALLEY HOSPITALS for Mid-Level

28   Practitioners under the ED Coverage include (without limitation):  Dr. Joseph Chiang, Dr. Henry W.

Turkel, Dr. Byron F. Carcelen and Dr. Philip Silverstein (the "CEPMG Physicians"). Each of the CEPMG Physicians held an ownership interest as a partner in CEPMG GP during all times relevant hereto.

209.   SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, provided a tangible financial benefit to CEPMG GP by paying CEPMG GP the costs of the Mid-Level Practitioners, who performed patient care services that are normally the responsibility of the physician or the physician's staff. CEPMG GP billed Medicare and Medicaid for services rendered by the Mid-Level Practitioners, without having to bear the direct costs of the Mid-Level Practitioners. SUTTER VALLEY HOSPITALS and SUTTER HEALTH each knowingly provided this tangible benefit to induce referrals from CEPMG GP. That conduct violates AKS. See HHS-OIG Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (Issued October 1994);[5] HHS-OIG Advisory Opinion 98-16 (Issued Nov. 3, 1998).[6]

210.   CEPMG GP realized the tangible benefit that SUTTER VALLEY HOSPITALS was providing by paying for to Mid-Level Practitioners and CEPMG GP then substantially increased the monetary value of the benefit by hiring two more Mid-Level Practitioners, that it charged to SUTTER VALLEY HOSPITALS. For example, CEPMG GP invoiced SUTTER VALLEY HOSPITALS for reimbursement for Physician Assistants totaling 306.5 hours in September 2011 at $60.33 per hour for an invoice amount of $18,973.79.  **Exhibit 37**. By June 2013, CEPMG GP had increased the number of Mid-Level Practitioners from 2 persons to 4 persons. CEPMG GP invoiced SUTTER VALLEY HOSPITALS for reimbursement for Physician Assistants totaling 556.75 hours in June 2013 at $60.33 per hour for an invoice amount of $33,588.73. **Exhibit 38**.

211.   In addition to the payments for Mid-Level Practitioners, the ED Coverage Agreement expressly obligated SUTTER VALLEY HOSPITALS to pay CEPMG GP $12,000 per year for Medical Director administrative duties that were documented in completed and signed time

---

[5] https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html (last viewed Apr. 9, 2021).

[6] https://oig.hhs.gov/fraud/docs/advisoryopinions/1998/ao98_16.htm (last viewed Apr. 9, 2021).

reports.  **Exhibit 35**, ¶3.1(a).  Dr. Joseph F. Chiang was the Medical Director in 2013 and submitted time reports to SUTTER VALLEY HOSPITALS to document his administrative duties.  **Exhibit 39**.

212.   In addition to the payments for Mid-Level Practitioners and payments for administrative duties, SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid CEPMG GP a "Disproportionate Share Subsidy" of $300,000, payable in monthly installments of $25,000. **Exhibit 35**, ¶3.1(b). The stated purpose of the Disproportionate Share Subsidy was "to compensate Group fairly for its treatment of a disproportionate number of Hospital patients who either lack a third-party payment source or whose third-party payor reimbursement is insufficient to cover Group's costs of providing services hereunder." But SUTTER VALLEY HOSPITALS' and SUTTER HEALTH's real purpose was to induce referrals from CEPMG GP in violation of AKS. *Id.*

213.   Federal law requires that state Medicaid programs make Disproportionate Share Hospital (DSH) payments to qualifying hospitals that serve a large number of Medicaid and uninsured individuals. The law establishes an annual DSH allotment for each state that limits Federal Financial Participation (FFP) for total statewide DSH payments made to hospitals. Federal law also limits FFP for DSH payments through the hospital-specific DSH limit. Under the hospital-specific DSH limit, FFP is not available for state DSH payments that are more than the hospital's eligible uncompensated care cost, which is the cost of providing inpatient hospital and outpatient hospital services to Medicaid patients and the uninsured, minus payments received by the hospital on or on behalf of those patients. For states to receive FFP for DSH payments, federal law requires states to submit an independent certified audit and an annual report to the Secretary describing DSH payments made to each DSH hospital. The report must identify each disproportionate share hospital that got a DSH payment adjustment, and provide any other information the Secretary needs to ensure the appropriateness of the payment amount. The annual certified independent audit includes specific verifications to make sure all DSH payments are appropriate.[7]

---

[7] See 42 U.S.C. § 1396a; 42 U.S.C. § 1396r-4; https://www.medicaid.gov/medicaid/financial-management/medicaid-disproportionate-share-hospital-dsh-payments/index.html (last viewed Apr. 9, 2021).

214.    While federal law requires state Medicaid programs to make DSH payments to qualifying hospitals, AKS prohibits SUTTER VALLEY HOSPITALS from paying remuneration to CEPMG GP to induce the referral of business paid for by Medicare or Medicaid. *See* HHS-OIG Special Fraud Alert: Hospital Incentives to Physicians (Issued May 1992).[8] Hospital incentives to physicians may result in reductions in the physician's professional expenses or an increase in his or her revenues. *Id.* In exchange, the physician is aware that he or she is expected to refer all of his or her patients to the hospital providing the incentive. *Id.* Suspect hospital incentive arrangements include guarantees which provide that, if the physician's income fails to reach a predetermined level, the hospital will supplement the remainder up to a certain amount. *Id.*

215.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, repeatedly paid CEPMG GP the Disproportionate Share Subsidy of $300,000 per year without any substantiation that CEPMG GP actually provided professional services to a "disproportionate number of Hospital patients who either lack a third-party payment source or whose third-party payor reimbursement is insufficient to cover Group's costs of providing services hereunder." **Exhibit 40**. The ED Coverage Agreement was commercially unreasonable because it provided a $300,000 annual subsidy with no substantiation required, while states and hospitals are subject to audit and reporting requirements in order to receive the DSH payments.

216.    SUTTER VALLEY HOSPITALS also had similar unlawful emergency room coverage agreements with CEPMG GP for its hospitals located in Roseville, Sacramento, Auburn, and Davis, California, and SUTTER BAY HOSPITALS had a similar unlawful emergency room coverage agreement with CEPMG GP for its hospital located in Antioch, California.

217.    By stacking compensation for Mid-Level Practitioners (and allowing CEPMG GP to separately bill for all patient care services performed by the CEPMG GP Mid-Level Practitioners), Medical Director administrative services and the $300,000 annual Disproportionate Share Subsidy  for Memorial Hospital Los Banos, and entering into similar agreements for emergency room coverage for its hospitals in Roseville, Antioch, Sacramento, Auburn, and Davis, California,

---

[8] https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html (last viewed Apr. 9, 2021).

SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly created a financial relationship with CEPMG GP that was commercially unreasonable, in excess of fair market value, varied with the volume and value of referrals, and violative of the Stark Statute because no exception applied.

218.   SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly paid CEPMG GP excessive amounts under the preferential ED Coverage Agreement that included payment for Mid-Level Practitioners that varied with volume and value of referrals. As such, SUTTER VALLEY HOSPITALS and SUTTER HEALTH could not reasonably have concluded that the payments under the ED Coverage Agreement did not violate the Stark Statute.  SUTTER VALLEY HOSPITALS and SUTTER HEALTH each knew it was in violation of the Stark Law and still knowingly made or caused to be made the payments to CEPMG GP and submitted or caused to me submitted tainted illegal claims for reimbursement to Government Payers in violation of the FCA and CFCA.

219.   Based on the contractual and actual financial relationships between CEPMG GP and SUTTER HEALTH, the Stark Statute was violated because CEPMG GP had direct compensation arrangements with SUTTER VALLEY HOSPITALS and none of the statutory or regulatory exceptions to the Stark Statute apply. Each of the compensation arrangements under the ED Coverage Agreements was a direct compensation arrangement under the Stark Law because the CEPMG Physicians (the referring physicians) each stand in the shoes of CEPMG GP (their physician organization) due to their ownership interests as partners, and SUTTER VALLEY HOSPITALS (the entity furnishing DHS), with the knowledge of and at the direction of SUTTER HEALTH, paid them directly without an intervening person or entity. 42 C.F.R. § 411.354(c)(1)(i) and (ii) (2019).

220.   SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, knowingly paid for Mid-Level Practitioners and provided other compensation under the ED Coverage Agreement, and one purpose of such compensation was to induce referrals of patients by CEPMG Physicians to Memorial Hospital Los Banos for inpatient and outpatient hospital services covered by Government Payers. As such, SUTTER VALLEY HOSPITALS and SUTTER HEALTH could not reasonably have concluded that the payments under the ED Coverage

Agreements did not violate the AKS.  SUTTER VALLEY HOSPITALS and SUTTER HEALTH each knew it was in violation of the AKS and still knowingly submitted or caused to be submitted tainted illegal claims for reimbursement to Government Payers in violation of the FCA and CFCA.

221.    Based on the contractual and actual financial relationships between CEPMG GP and SUTTER VALLEY HOSPITALS, the AKS was violated because SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, paid, and CEPMG GP received remuneration, to induce CEPMG Physicians to refer, including Government Health Care Programs' beneficiaries, to SUTTER VALLEY HOSPITALS for the furnishing of inpatient and outpatient hospital services covered by Government Payers and none of the statutory or regulatory safe harbors to the AKS apply.

222.    SUTTER HEALTH and SUTTER VALLEY HOSPITALS each knowingly avoided its obligation to refund to the United States and the State of California overpayments received from false claims submitted on Stark-prohibited and AKS-tainted referrals by the CEPMG Physicians.

223.    In addition, SUTTER VALLEY HOSPITALS co-mingled funds with the parent entity SUTTER HEALTH so that SUTTER HEALTH possesses the spoils of the fraudulent acts relating to CEPMG that it directed. SUTTER HEALTH's Shared Services department held Short-term investments totaling $5,441,000,000 as of December 31, 2020, accumulated from SUTTER HEALTH's subsidiaries and affiliates, including SUTTER VALLEY HOSPITALS. **Exhibit 41**, p. 53. SUTTER HEALTH must be held financially accountable for its own fraudulent acts and for directing the fraudulent acts of SUTTER VALLEY HOSPITALS relating to CEPMG GP.

## XII.    FALSE CLAIMS AND FRAUDULENT CLAIMS AND STATEMENTS

224.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, entered into financial relationships specified above with the following PHYSICIAN ENTITIES: SAC CARDIO, Liu MD PC, and CEPMG GP, and with the SAC CARDIO Physicians, Dr. Stephen Lin and the CEPMG Physicians who stand in the shoes of their respective physician organizations for purposes of the Stark Statute. The SAC CARDIO Physicians, Dr. Stephen

Lin and the CEPMG Physicians referred patients, including Government Health Care Programs' beneficiaries, to SUTTER VALLEY HOSPITALS in violation of the Stark Law.

225.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, in turn, presented, or caused to be presented through the fiscal intermediary and MAC, and through California's DHCS, claims for payment to Government Payers for designated health services provided to patients of the physicians with whom they had entered into prohibited financial relationships as set forth above.

226.    SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, thereby obtained payments from the United States and the State of California in violation of the Stark Statute.

227.    Under the FCA (31 U.S.C. § 3729(a)(1), now 31 U.S.C. § 3729 (a)(1)(A)) and the CFCA (Cal. Gov't Code § 12651(a)(1)), the claims submitted by SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, as set forth above were false and/or fraudulent because SUTTER VALLEY HOSPITALS was prohibited from obtaining payment from the United States and the State of California for designated health services provided to referrals from the physicians with whom SUTTER VALLEY HOSPITALS had Stark-violative financial relationships.

228.    SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, entered into financial relationships specified above with EAST BAY CARDIAC and the East Bay Cardiac Physicians who stand in the shoes of their physician organization under the Stark Statute. The East Bay Cardiac Physicians referred patients, including Government Health Care Programs' beneficiaries, to SUTTER BAY HOSPITALS in violation of the Stark Statute.

229.    SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER HEALTH, in turn, presented, or caused to be presented through the fiscal intermediary and MAC, and through California's DHCS, claims for payment to Government Payers for designated health services provided to patients of the physicians with whom they had entered into prohibited financial relationships as set forth above.

1   230.   SUTTER BAY HOSPITALS, with the knowledge of and at the direction of

2   SUTTER HEALTH, thereby obtained payments from the United States and the State of California in

3   violation of the Stark Statute.

4   231.   Under the FCA (31 U.S.C. § 3729(a)(1), now 31 U.S.C. § 3729 (a)(1)(A)) and

5   the CFCA (Cal. Gov't Code § 12651(a)(1)), the claims submitted by SUTTER BAY HOSPITALS,

6   with the knowledge of and at the direction of SUTTER HEALTH, as set forth above were false and/or

7   fraudulent because SUTTER BAY HOSPITALS was prohibited from obtaining payment from the

8   United States and the State of California for designated health services provided to referrals from the

9   physicians with whom SUTTER BAY HOSPITALS had Stark-violative financial relationships.

10   232.   Under the AKS (42 U.S.C. § 1320a-7b(g)), the FCA (31 U.S.C. § 3729(a)(1),

11   now 31 U.S.C. § 3729 (a)(1)(A)), and the CFCA (Cal. Gov't Code § 12651(a)(1)), the claims

12   submitted by SUTTER VALLEY HOSPITALS, with the knowledge of and at the direction of

13   SUTTER HEALTH, and by SAC CARDIO, SUTTER MEDICAL GROUP relating to Dr. Roberts,

14   Liu MD PC, and CEPMG GP relating to the CEPMG Physicians as set forth above were false and/or

15   fraudulent because SUTTER VALLEY HOSPITALS and SUTTER VALLEY MEDICAL

16   FOUNDATION, each with the knowledge of and at the direction of SUTTER HEALTH, knowingly

17   and willfully paid (and SAC CARDIO, SUTTER MEDICAL GROUP, Liu MD PC and CEPMG GP

18   knowingly received) remuneration to induce referrals to SUTTER VALLEY HOSPITALS in

19   violation of the AKS, Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

20   233.   Under the AKS (42 U.S.C. § 1320a-7b(g)), the FCA (31 U.S.C. § 3729(a)(1),

21   now 31 U.S.C. § 3729 (a)(1)(A)), and the CFCA (Cal. Gov't Code § 12651(a)(1)), the claims

22   submitted by SUTTER BAY HOSPITALS, with the knowledge of and at the direction of SUTTER

23   HEALTH, and by EAST BAY CARDIAC as set forth above were false and/or fraudulent because

24   SUTTER BAY HOSPITALS, at the direction of SUTTER HEALTH, knowingly and willfully paid

25   (and EAST BAY CARDIAC knowingly received) remuneration to induce referrals to SUTTER BAY

26   HOSPITALS in violation of the AKS, Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst.

27   Code § 14107.2.

28

234.   SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, each with the knowledge of and at the direction of SUTTER HEALTH also violated the FCA (31 U.S.C. § 3729(a)(2), now 3729(a)(1)(B)), and the CFCA (Cal. Gov't Code § 12651(a)(2)), by making false statements on their cost reports, or causing false statements to be made by the fiscal intermediary and MAC, and by DHCS, to get claims paid by Government Payers for designated health services based on prohibited financial relationships as set forth above.

235.   SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP each also violated the FCA (31 U.S.C. § 3729(a)(2), now 3729(a)(1)(B)), and the CFCA (Cal. Gov't Code § 12651(a)(2)), by making false statements, or causing false statements on its form 837 claims that its statements were "true" and/or "correct" and/or "complie[d] with all applicable Medicare and/or Medicaid laws, regulations, and program instructions" (for example) such that they were entitled to payment of their claims for such services were false or fraudulent because the Stark Statute prohibited it from receiving payments from the United States and the State of California for those claims as set forth above.

236.   SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO conspired with one another to get false and fraudulent claims allowed and paid by Government Payers and to retain the resulting overpayments, in violation of the FCA and CFCA as set forth above. SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO also conspired to pay (and receive) unlawful, excessive compensation and remuneration in violation of the Stark Statute and the AKS as set forth above.  SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO acted in a concerted fashion to defraud Government Payers, and acted with one another to keep the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the United States and the State of California as set forth above.  Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO violated the FCA (31 U.S.C. § 3729(a)(3), now § 3729(a)(1)(C)) and the CFCA (Cal. Gov't Code § 12651(a)(3)).

237.   SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER MEDICAL GROUP conspired with one another to get false and fraudulent claims allowed and paid by Government Payers and to retain the resulting

overpayments, in violation of the FCA and CFCA as set forth above. SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER MEDICAL GROUP also conspired to pay (and receive) unlawful, excessive compensation and remuneration in violation of the AKS as set forth above. SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER MEDICAL GROUP acted in a concerted fashion to defraud Government Payers, and acted with one another to keep the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the United States and the State of California as set forth above. Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER MEDICAL GROUP violated the FCA (31 U.S.C. § 3729(a)(3), now § 3729(a)(1)(C)) and the CFCA (Cal. Gov't Code § 12651(a)(3)).

238.    SUTTER HEALTH, SUTTER BAY HOSPITALS and EAST BAY CARDIAC conspired with one another to get false and fraudulent claims allowed and paid by Government Payers and to retain the resulting overpayments, in violation of the FCA and CFCA as set forth above. SUTTER HEALTH, SUTTER BAY HOSPITALS and EAST BAY CARDIAC also conspired to pay (and receive) unlawful, excessive compensation and remuneration in violation of the Stark Statute and the AKS as set forth above. SUTTER HEALTH, SUTTER VALLEY HOSPITALS and EAST BAY CARDIAC acted in a concerted fashion to defraud Government Payers, and acted with one another to keep the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the United States and the State of California as set forth above. Accordingly, SUTTER HEALTH, SUTTER BAY HOSPITALS and EAST BAY CARDIAC violated the FCA (31 U.S.C. § 3729(a)(3), now § 3729(a)(1)(C)) and the CFCA (Cal. Gov't Code § 12651(a)(3)).

239.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC conspired with one another to get false and fraudulent claims allowed and paid by Government Payers and to retain the resulting overpayments, in violation of the FCA and CFCA as set forth above. SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC also conspired to pay (and receive) unlawful, excessive compensation and remuneration in violation of the Stark Statute and the AKS as set forth above. SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC

acted in a concerted fashion to defraud Government Payers, and acted with one another to keep the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the United States and the State of California as set forth above.  Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC violated the FCA (31 U.S.C. § 3729(a)(3), now § 3729(a)(1)(C)) and the CFCA (Cal. Gov't Code § 12651(a)(3)).

240.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP conspired with one another to get false and fraudulent claims allowed and paid by Government Payers and to retain the resulting overpayments, in violation of the FCA and CFCA as set forth above. SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP also conspired to pay (and receive) unlawful, excessive compensation and remuneration in violation of the Stark Statute and the AKS as set forth above.  SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP acted in a concerted fashion to defraud Government Payers, and acted with one another to keep the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the United States and the State of California as set forth above.  Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP violated the FCA (31 U.S.C. § 3729(a)(3), now § 3729(a)(1)(C)) and the CFCA (Cal. Gov't Code § 12651(a)(3)).

241.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS, SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP knowingly made, used, and caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States and the State of California (*i.e.*, to avoid refunding payments made in violation of the Stark Statute) by certifying on their annual cost reports and Form 837 claims that the services were provided in compliance with federal law, all in violation of the FCA (31 U.S.C. § 3729(a)(7), now § 3729(a)(1)(G)) and the CFCA (Cal. Gov't Code § 12651(a)(7)).  The false certifications, made with each annual cost report and Form 837 claim submitted to the government, were part of their unlawful and orchestrated scheme to defraud Government Payers.

242.    Even if SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION, SUTTER BAY HOSPITALS, SAC CARDIO, SUTTER

MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP, or any one of them could be considered not to have initially known that the scheme in which they conspired was fraudulent, and as such were each beneficiaries of inadvertent submissions of false claims, they each subsequently discovered the falsity of the claims and failed to disclose the false claims to the State of California within a reasonable time after discovery in violation of the CFCA (Cal. Gov't Code § 12651(a)(8)). The conduct was part of their orchestrated scheme to defraud Government Payers.

243.    All claims submitted to Government Payers by SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, each with the knowledge of and at the direction of SUTTER HEALTH, for designated health services, as set forth above, were false claims that were <u>knowingly</u> submitted to the United States or the State of California.   SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, each with the knowledge of and at the direction of SUTTER HEALTH submitted or caused others to submit false and fraudulent claims for payment to Government Payers, which included claims relating to inpatient and outpatient designated health services that resulted from violations of the Stark Statute and the AKS.

244.    SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS, each at the direction of SUTTER HEALTH, and SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP presented, or caused to be presented, all of said false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.  The illegal scheme implemented by the Defendants involved thousands of false claims based on prohibited conduct, as discussed above.

## COUNT ONE

(False Claims Act: Presentation of False Claims)

(31 U.S.C. § 3729(a)(1) now (a)(1)(A))

245.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

246.    SUTTER VALLEY HOSPITALS and SUTTER HEALTH, knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement identified above for designated health services

rendered to patients covered by Government Health Care Programs who were referred by physicians with whom SUTTER VALLEY HOSPITALS had entered into prohibited financial relationships in violation of the Stark Statute.

247.    SUTTER BAY HOSPITALS and SUTTER HEALTH, knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement identified above for designated health services rendered to patients covered by Government Health Care Programs who were referred by physicians with whom SUTTER BAY HOSPITALS had entered into prohibited financial relationships in violation of the Stark Statute.

248.    The false claims presented or caused to be presented by SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS and SUTTER HEALTH were material to the United States' payment decisions on the claims and said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

**COUNT TWO**

(False Claims Act: Using False Statements to Get False Claims Paid)

(31 U.S.C. § 3729(a)(2), now 3729(a)(1)(B))

249.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

250.    SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS, SUTTER HEALTH, SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP made, used, and caused to be made or used, false records or statements to get false or fraudulent claims paid and approved by the United States.

251.    Those false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of their statements and actions.

252.    Those false certifications and representations made and caused to be made were material to the United States' payment of the false claims.

253.     Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

**COUNT THREE**

(False Claims Act: False Record Material to Obligation to Pay)

(31 U.S.C. § 3729(a)(7), now (a)(1)(G))

254.     Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

255.     SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS, SUTTER HEALTH, SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

256.     Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

**COUNT FOUR**

(False Claims Act: Conspiracy to Violate False Claims Act)

(31 U.S.C. § 3729(a)(3), now 3729(a)(1)(C))

257.     Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

258.     SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO conspired with one another to get false and fraudulent claims allowed and paid by the United States in violation of 31 U.S.C. § 3729(a)(1)(A) and/or (B) and to retain overpayments in violation of 31 U.S.C. § 3729(a)(1)(G).

259.     SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO acted in a concerted fashion to defraud the United States, and acted with others in keeping the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the United States.   Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO violated 31 U.S.C. § 3729(a)(1)(C).

1    260.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY

2    MEDICAL FOUNDATION and SUTTER MEDICAL GROUP conspired with one another to get

3    false and fraudulent claims allowed and paid by the United States in violation of 31 U.S.C. §

4    3729(a)(1)(A) and/or (B) to retain overpayments in violation of 31 U.S.C. § 3729(a)(1)(G).

5    261.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY

6    MEDICAL FOUNDATION and SUTTER MEDICAL GROUP acted in a concerted fashion to

7    defraud the United States, and acted with others in keeping the facts necessary to investigate the fraud,

8    and the damages caused by the fraud, concealed from the United States.  Accordingly, SUTTER

9    HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and

10   SUTTER MEDICAL GROUP violated 31 U.S.C. § 3729(a)(1)(C).

11   262.    SUTTER HEALTH, SUTTER BAY HOSPITALS and EAST BAY

12   CARDIAC conspired with one another to get false and fraudulent claims allowed and paid by the

13   United States in violation of 31 U.S.C. § 3729(a)(1)(A) and/or (B) and to retain overpayments in

14   violation of 31 U.S.C. § 3729(a)(1)(G).

15   263.    SUTTER HEALTH, SUTTER BAY HOSPITALS and EAST BAY

16   CARDIAC acted in a concerted fashion to defraud the United States, and acted with others in keeping

17   the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the

18   United States.  Accordingly, SUTTER HEALTH, SUTTER BAY HOSPITALS and EAST BAY

19   CARDIAC violated 31 U.S.C. § 3729(a)(1)(C).

20   264.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC

21   conspired with one another to get false and fraudulent claims allowed and paid by the United States

22   in violation of 31 U.S.C. § 3729(a)(1)(A) and/or (B) and to retain overpayments in violation of 31

23   U.S.C. § 3729(a)(1)(G).

24   265.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC acted

25   in a concerted fashion to defraud the United States, and acted with others in keeping the facts

26   necessary to investigate the fraud, and the damages caused by the fraud, concealed from the United

27   States.  Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC

28   violated 31 U.S.C. § 3729(a)(1)(C).

266.   SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP conspired with one another to get false and fraudulent claims allowed and paid by the United States in violation of 31 U.S.C. § 3729(a)(1)(A) and/or (B) and to retain overpayments in violation of 31 U.S.C. § 3729(a)(1)(G).

267.   SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP acted in a concerted fashion to defraud the United States, and acted with others in keeping the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the United States.   Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP violated 31 U.S.C. § 3729(a)(1)(C).

268.   As a result of the actions of Defendants, the United States has been severely damaged.

## COUNT FIVE

(California False Claims Act: Presentation of False Claims)

(Cal. Gov't Code § 12651(a)(1))

269.   Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

270.   Cal. Gov't Code § 12651(a)(1) provides liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

271.   In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & lnst. Code § 14107.2.

272.   SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS, SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 from at least July 1, 2006 to the present by engaging in the fraudulent and illegal practices described herein.

273.   SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SUTTER BAY HOSPITALS furthermore violated Cal. Gov't Code § 12651(a)(1) and knowingly presented or caused

to be presented false claims to the State of California from at least July 1, 2006 to the present by violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Stark Act and the AKS, as described herein.

274.    Those false claims were material to the State of California's payment decision and the State of California, by and through the Medi-Cal program, and unaware of those fraudulent and illegal practices, paid the claims submitted by health care providers.

275.    Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and also was an express condition of payment of claims submitted to the State of California.

276.    Had the State of California known that those Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

**COUNT SIX**

(California False Claims Act: Using False Statements to Get False Claims Paid)

(Cal. Gov't Code § 12651(a)(2))

277.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

278.    SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS, SUTTER HEALTH, SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP made, used, and caused to be made or used, false records or statements to get false or fraudulent claims paid and approved by the State of California.

279.    Those false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of those statements and actions.

280.    The false certifications and representations made and caused to be made by those Defendants were material to the State of California's payment of the false claims.

281.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

**COUNT SEVEN**

(California False Claims Act: False Record Material to Obligation to Pay)

(Cal. Gov't Code § 12651(a)(7))

282.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

283.    SUTTER VALLEY HOSPITALS, SUTTER BAY HOSPITALS, SUTTER HEALTH, SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the State of California, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the State of California.

284.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

**COUNT EIGHT**

(California False Claims Act: Discovery of Inadvertent Submission of False Claims)

(Cal. Gov't Code § 12651(a)(8))

285.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

286.    Even if SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION, SUTTER BAY HOSPITALS, SAC CARDIO, SUTTER MEDICAL GROUP, EAST BAY CARDIAC, Liu MD PC and CEPMG GP, or any one of them could be considered initially unaware of their fraud, they were the beneficiaries of inadvertent submissions of false claims, and having subsequently discovered the falsity of such claims, failed to disclose the false claims within a reasonable time to the State of California.

287.    Had those Defendants disclosed the false claims to the State of California, and had the State of California thus known that Defendants were violating the federal and state laws cited herein, the State of California would have recovered from Defendants the payments they received and were not entitled to, and would have taken steps to prevent further fraudulent conduct by these Defendants.

**COUNT NINE**

(California False Claims Act: Conspiracy to Violate False Claims Act)

(Cal. Gov't Code § 12651(a)(3))

288.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

289.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO conspired with one another to get false and fraudulent claims allowed and paid by the State of California in violation of Cal. Gov't Code § 12651(a)(1) and (2), to retain overpayments in violation of Cal. Gov't Code § 12651(a)(7), and to fail to disclose any inadvertent submission of false claims in violation of Cal. Gov't Code  § 12651(a)(8).   SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO also conspired to violate the Stark Law, AKS laws, Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

290.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO acted in a concerted fashion to defraud the State of California, and acted with others in keeping the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed from the State of California.  Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and SAC CARDIO violated Cal. Gov't Code § 12651(a)(3).

291.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER MEDICAL GROUP conspired with one another to get false and fraudulent claims allowed and paid by the State of California in violation of Cal. Gov't Code § 12651(a)(1) and (2), to retain overpayments in violation of Cal. Gov't Code § 12651(a)(7), and to fail to disclose any inadvertent submission of false claims in violation of Cal. Gov't Code  § 12651(a)(8).    SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER MEDICAL GROUP also conspired to violate the AKS laws, Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

292.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS, SUTTER VALLEY MEDICAL FOUNDATION and SUTTER MEDICAL GROUP acted in a concerted fashion to defraud the State of California, and acted with others in keeping the facts necessary to investigate the

1   fraud, and the damages caused by the fraud, concealed from the State of California.  Accordingly,

2   SUTTER  HEALTH,  SUTTER  VALLEY  HOSPITALS,  SUTTER  VALLEY  MEDICAL

3   FOUNDATION and SUTTER MEDICAL GROUP violated Cal. Gov't Code § 12651(a)(3).

4   293.   SUTTER  HEALTH,  SUTTER  BAY  HOSPITALS  and  EAST  BAY

5   CARDIAC conspired with one another to get false and fraudulent claims allowed and paid by the

6   State of California in violation of Cal. Gov't Code § 12651(a)(1) and (2), to retain overpayments in

7   violation of Cal. Gov't Code § 12651(a)(7), and to fail to disclose any inadvertent submission of false

8   claims  in  violation  of  Cal.  Gov't  Code   §  12651(a)(8).   SUTTER  HEALTH,  SUTTER  BAY

9   HOSPITALS and EAST BAY CARDIAC also conspired to violate the Stark Law, AKS laws, Cal

10  Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

11  294.   SUTTER  HEALTH,  SUTTER  BAY  HOSPITALS  and  EAST  BAY

12  CARDIAC acted in a concerted fashion to defraud the State of California, and acted with others in

13  keeping the facts necessary to investigate the fraud, and the damages caused by the fraud, concealed

14  from the State of California.  Accordingly, SUTTER HEALTH, SUTTER BAY HOSPITALS and

15  EAST BAY CARDIAC violated Cal. Gov't Code § 12651(a)(3).

16  295.   SUTTER  HEALTH,  SUTTER  VALLEY  HOSPITALS  and  Liu MD  PC

17  conspired with one another to get false and fraudulent claims allowed and paid by the State of

18  California in violation of Cal. Gov't Code § 12651(a)(1) and (2), to retain overpayments in violation

19  of Cal. Gov't Code § 12651(a)(7), and to fail to disclose any inadvertent submission of false claims

20  in  violation  of  Cal.  Gov't  Code   §  12651(a)(8).   SUTTER  HEALTH,  SUTTER  VALLEY

21  HOSPITALS and Liu MD PC also conspired to violate the Stark Law, AKS laws, Cal Bus. & Prof.

22  Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

23  296.   SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC acted

24  in a concerted fashion to defraud the State of California, and acted with others in keeping the facts

25  necessary to investigate the fraud, and the damages caused by the fraud, concealed from the State of

26  California.  Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and Liu MD PC

27  violated Cal. Gov't Code § 12651(a)(3).

28

1         297.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP

2  conspired with one another to get false and fraudulent claims allowed and paid by the State of

3  California in violation of Cal. Gov't Code § 12651(a)(1) and (2), to retain overpayments in violation

4  of Cal. Gov't Code § 12651(a)(7), and to fail to disclose any inadvertent submission of false claims

5  in violation of Cal. Gov't Code   § 12651(a)(8).   SUTTER HEALTH, SUTTER VALLEY

6  HOSPITALS and CEPMG GP also conspired to violate the Stark Law, AKS laws, Cal Bus. & Prof.

7  Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

8         298.    SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP acted

9  in a concerted fashion to defraud the State of California, and acted with others in keeping the facts

10  necessary to investigate the fraud, and the damages caused by the fraud, concealed from the State of

11  California.  Accordingly, SUTTER HEALTH, SUTTER VALLEY HOSPITALS and CEPMG GP

12  violated Cal. Gov't Code § 12651(a)(3).

13         299.    As a result of the actions of Defendants, the State of California has been

14  severely damaged.

15      **WHEREFORE**, Relator prays for judgment against Defendants as follows:

16      1.    On Count One under the False Claims Act, for the amount of the United States'

17  damages, trebled as required by law, and such civil penalties as are authorized by law, together with

18  all such further relief as may be just and proper;

19      2.    On Count Two under the False Claims Act, for the amount of the United States'

20  damages, trebled as required by law, and such civil penalties as are authorized by law, together with

21  all such further relief as may be just and proper;

22      3.    On Count Three under the False Claims Act, for the amount of the United States'

23  damages, trebled as required by law, and such civil penalties as are authorized by law, together with

24  all such further relief as may be just and proper;

25      4.    On Count Four under the False Claims Act, for the amount of the United States'

26  damages, trebled as required by law, and such civil penalties as are authorized by law, together with

27  all such further relief as may be just and proper;

28      5.    On Count Five under the California False Claims Act, for the amount of the State of

California's damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

6.      On Count Six under the California False Claims Act, for the amount of the State of California's damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

7.      On Count Seven under the California False Claims Act, for the amount of the State of California's damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

8.      On Count Eight under the California False Claims Act, for the amount of the State of California's damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

9.      On Count Nine under the California False Claims Act, for the amount of the State of California's damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper;

10.     That Relator be awarded the maximum Relator share amount pursuant to 31 U.S.C. § 3730(c) and Cal. Gov't Code § 12652;

11.     That judgment be granted for the United States of America, State of California and Relator and against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this case, including, but not limited to, all attorney fees and costs available pursuant to 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652; and

12.     That the United States, State of California, and Relator be granted such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator demands a jury trial in this case.

///

///

1    Respectfully submitted this 8th day of December, 2021.

2                                    /s/ Sean P. Rodriguez

3
                                     BOIES SCHILLER FLEXNER LLP
4                                    George F. Carpinello (Admitted *Pro Hac Vice*)
                                     gcarpinello@bsfllp.com
5                                    Joseph D. Starsia (Admitted *Pro Hac Vice*)
                                     jstarsia@bsfllp.com
6                                    30 S. Pearl St., 11th Floor
                                     Albany, NY 12207
7                                    Telephone: (518) 434-0600
                                     Facsimile: (518) 434-0665
8
                                     Sean P. Rodriguez (SBN 262437)
9                                    srodriguez@bsfllp.com
                                     Alexander J. Konik (SBN 299291)
10                                   akonik@bsfllp.com
                                     44 Montgomery Street, 41st Floor
11                                   San Francisco, CA 94104
                                     Telephone: (415) 293-6800
12                                   Facsimile: (415) 293-6899

13                                   WILBANKS & GOUINLOCK, LLP
                                     Marlan B. Wilbanks (Admitted *Pro Hac Vice*)
14                                   mbw@wilbanksgouinlock.com
                                     Susan S. Gouinlock (Admitted *Pro Hac Vice*)
15                                   ssg@wilbanksgouinlock.com
                                     3490 Piedmont Road, NE, Suite 1010
16                                   Atlanta, Georgia 30305
                                     Telephone: (404) 842-1075
17                                   Facsimile: (404) 842-0559

18                                   WITHROW, MCQUADE & OLSEN, LLP
                                     Scott C. Withrow (Admitted *Pro Hac Vice*)
19                                   swithrow@wmolaw.com
                                     3379 Peachtree Road, NE, Suite 970
20                                   Atlanta, Georgia 30326
                                     Telephone: (404) 814-0200
21                                   Facsimile: (404) 814-0009

22                                   HIRST LAW GROUP, P.C.
                                     Michael A. Hirst, Esq. (SBN 131034)
23                                   michael.hirst@hirstlawgroup.com
                                     Marisela Bernal, Esq. (SBN 329589)
24                                   marisela.bernal@hirstlawgroup.com
                                     200 B Street, Suite A
25                                   Davis, CA 95616
                                     Telephone: (530) 756-7700
26                                   Facsimile: (530) 756-7707

27                                   Attorneys for Relator

28

**Second Amended Complaint – Exhibit Index**

Exhibit 1: SAC CARDIO Physician Assistants Agreement May 1, 2013

Exhibit 2: SAC CARDIO Physician Assistants Agreement May 1, 2011

Exhibit 3: PA Copy of Medicare Files 2012

Exhibit 4: Cardiac ICU MDA – Ingram September 1, 2012

Exhibit 5: Cardiac ICU MDA Amendment – Ingram December 1, 2013

Exhibit 6: Cardiac ICU MDA – Ingram September 1, 2010

Exhibit 7: Ingram MDA Time Sheets January-August 2012

Exhibit 8: HTVAD MDA – Kincade September 1, 2012

Exhibit 9: HTVAD MDA – Kincade September 1, 2010

Exhibit 10: Kincade MDA Time Sheets January-August 2012

Exhibit 11: Surgical Ablation MDA – Longoria September 1, 2012

Exhibit 12: Surgical Ablation MDA – Longoria September 1, 2010

Exhibit 13: Longoria MDA Time Sheets January-August 2012

Exhibit 14: SAC CARDIO Call Coverage Agreement 2008

Exhibit 15: SAC CARDIO Call Coverage Agreement 2010

Exhibit 16: SAC CARDIO Call Coverage Agreement 2012 Redacted

Exhibit 17: SAC CARDIO Call Coverage July 2013

Exhibit 18: Specialty Care Clinician Agreement – Ingram

Exhibit 19: Email from Brooke Haynes – 2013.11.07

Exhibit 20: Email from Laurie Hanvey – 2014.07.28

Exhibit 21: Email from Laurie Hanvey – 2014.06.19

Exhibit 22: Emails Regarding Urgent! Sacramento Cardio Check Reissued

Exhibit 23: Examples of False Claims on Prohibited Referrals - Redacted

Exhibit 24: Roberts SSR Service Line May 1, 2014

Exhibit 25: Roberts SSR Service Line March 1, 2013

Exhibit 26: Roberts Check Requests and Time Sheets April-May 2014

Exhibit 27: East Bay Cardiac Admin Agreement 2007

Exhibit 28: East Bay Cardiac Admin Agreement 2009

Exhibit 29: East Bay Cardiac Admin Agreement 2014

Exhibit 30: East Bay Cardiac Promissory Note 2014

Exhibit 31: Dr. Liu Physician Services Agreement 2008

Exhibit 32: Dr. Liu Call Coverage Agreement 2014

Exhibit 33: Dr. Liu Check Request March 2014

Exhibit 34: Liu Medicare Billings 2012-2015

Exhibit 35: California Emergency Physicians April 2011

Exhibit 36: California Emergency Physicians First Extension March 31 2014

Exhibit 37: CEPMG GP Invoices and Hours September-October 2011

Exhibit 38: CEPMG GP Invoices and Hours June-July 2013

Exhibit 39: Chiang Time Reports July-November 2013

Exhibit 40: Check Requests for Disproportionate Share Subsidy January-July 2013

Exhibit 41: Sutter Health's 2020 Consolidated Audited Financial Statements