**BOIES SCHILLER FLEXNER LLP**

George F. Carpinello (Admitted *Pro Hac Vice*)
Joseph Starsia (Admitted *Pro Hac Vice*)
30 S. Pearl St. 11th Floor
Albany, NY 12207
Tel: (518) 434-0600
Fax: (518) 434-0665
gcarpinello@bsfllp.com
jstarsia@bsfllp.com

Sean P. Rodriguez (SBN 262437)
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel: (415) 293-6800
Fax: (415) 293-6899
srodriguez@bsfllp.com

**WILBANKS & GOUINLOCK, LLP**

Marlan B. Wilbanks (Georgia Bar No. 758223)
 (Admitted *Pro Hac Vice*)
Susan S. Gouinlock (Georgia Bar No. 303217)
 (Admitted *Pro Hac Vice*)
3490 Piedmont Road, NE, Suite 1010
Atlanta, Georgia 30305
Tel: (404) 842-1075
Fax: (404) 842-0559
mbw@wilbanksgouinlock.com
ssg@wilbanksgouinlock.com

**WITHROW, MCQUADE & OLSEN, LLP**

Scott C. Withrow (Georgia Bar No. 772330)
 (Admitted *Pro Hac Vice*)
3379 Peachtree Road, NE, Suite 970
Atlanta, Georgia  30326
Tel:  (404) 814-0200
Fax:  (404) 814-0009
swithrow@wmolaw.com

**HIRST LAW GROUP, P.C.**

Michael A. Hirst (California Bar No. 131034)
Marisela Bernal (California Bar No. 329589)
200 B Street, Suite A
Davis, CA 95616
Tel:  (530) 756-7700
Fax:  (530) 756-7707
michael.hirst@hirstlawgroup.com
marisela.bernal@hirstlawgroup.com

*Attorneys for Relator*

Case No. 14-cv-04100 KAW
RELATOR'S OPPOSITION TO SUTTER HEALTH'S MOTION TO DISMISS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA *ex. rel.* LAURIE M. HANVEY, | |
| Relator, | |
| v. | Case No. 14-cv-04100-KAW |
| SUTTER HEALTH; | |
| SUTTER VALLEY HOSPITALS, f/k/a Sutter Health Sacramento Sierra Region, f/k/a Sutter Central Valley Hospitals, f/k/a Memorial Hospitals Association, d/b/a Sutter Medical Center, Sacramento, a/k/a Sutter Roseville Medical Center, a/k/a Sutter Amador Hospital, a/k/a Sutter Auburn Faith Hospital, a/k/a Sutter Davis Hospital, a/k/a Sutter Solano Medical Center, d/b/a Memorial Medical Center, a/k/a Memorial Hospital Los Banos, a/k/a Sutter Tracy Community Hospital; | RELATOR'S MEMORANDUM IN OPPOSITION TO DEFENDANT SUTTER HEALTH'S MOTION TO DISMISS RELATOR'S THIRD AMENDED COMPLAINT |
| SUTTER VALLEY MEDICAL FOUNDATION, f/k/a Sutter Medical Foundation, f/k/a Sutter Gould Medical Foundation; | |
| SUTTER BAY HOSPITALS, f/k/a Sutter East Bay Hospitals, f/k/a Sutter Medical Center, Castro Valley, d/b/a Alta Bates Summit Medical Center, a/k/a Sutter Delta Medical Center, d/b/a Eden Medical Center; | |
| SUTTER MEDICAL GROUP, A CALIFORNIA CORPORATION; | |
| EAST BAY CARDIAC SURGERY CENTER MEDICAL GROUP; and | |
| STEPHEN K. LIU, M.D., PROFESSIONAL CORPORATION | |
| Defendants. | |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ...................................................................................................................1

I.    THE TAC ALLEGES SPECIFIC FACTS SHOWING SUTTER HEALTH'S
      CONTROL OF THE SUTTER ENTITIES ...............................................................1

II.   THE TAC SHOWS SUTTER HEALTH'S ACTIVE INVOLVEMENT IN THE
       FRAUDULENT SCHEME........................................................................................3

III.  THE ALLEGATIONS IN THE TAC ARE SUFFICIENT TO HOLD SUTTER HEALTH
      LIABLE ...............................................................................................................5

CONCLUSION ..............................................................................................................11

# TABLE OF AUTHORITIES

Cases                                                                                                    Page(s)

*Ormsby v. Sutter Health et al.*,
   444 F. Supp. 3d 1010 (N.D. Cal. 2020)......................................................................... 7, 10

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ....................................................................................... 9

*U.S., ex rel. Modglin v. DJO Glob. Inc.*,
   114 F. Supp. 3d 993 (C.D. Cal. 2015) *aff'd sub nom. United States v. DJO Glob., Inc.*,
   678 F. App'x 594 (9th Cir. 2017)................................................................................. 9

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
   498 F.Supp.2d 2562 (D. D.C. 2017)............................................................................. 6

*United States ex rel. Jones v. Sutter Health*,
   2021 WL 3665939 (N.D. Cal. Aug. 18, 2021) ............................................................... 9

*United States ex rel. Kuzma v. N. Arizona Healthcare Corp.*,
   2021 WL 120901 (D. Ariz. Jan. 13, 2021)................................................................. 8, 9

*United States ex rel. Martinez v. KPC Healthcare, Inc.*,
   2017 WL 10439030 (C.D. Cal. June 8, 2017) ............................................................... 7

*United States ex rel. Martino-Fleming v. South Bay Mental Health Centers*,
   540 F. Supp. 3d 103 (D. Mass. 2021)...................................................................... 6, 7, 9

*U.S. ex rel. Schaengold v. Mem'l Health, Inc.*,
   2014 WL 6908856 (S.D. Ga. Dec. 8, 2014) ............................................................... 7, 8

*United States ex rel. Silingo v. WellPoint, Inc.*,
   904 F.3d 667 (9th Cir. 2018) ..................................................................................... 10

*United States ex rel. Sirls v. Kindred Healthcare, Inc.*,
   469 F. Supp. 3d 431 (E.D. Pa. 2020).......................................................................... 6

*United States v. Corinthian Colleges*,
   655 F.3d 984 (9th Cir. 2011) ....................................................................................... 9

*United States v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) .................................................................................. 6, 8

*United States v. SouthEast Eye Specialists, PLLC*,
   2021 WL 5150687 (M.D. Tenn. Nov. 5, 2021)............................................................. 9

*United States v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) ........................................................................................... 10

<u>Statutes</u>

31 U.S.C. § 3279(a)(1)(A) ................................................................................................... 8

Laurie M. Hanvey ("Relator"), by and through her counsel of record, submits this Memorandum of in Opposition to Defendant Sutter Health's Motion to Dismiss Relator's Third Amended Complaint.

**PRELIMINARY STATEMENT**

In its decision of November 2, 2021, this Court, in relevant part, held that Relator had failed to adequately plead her claims against Sutter Health and Sutter Bay Medical Foundation.[1] On December 8, 2021, Relator filed her Third Amended Complaint ("TAC") further delineating claims against Sutter Health. Contrary to Sutter Health's contentions, the TAC sets forth in detail how Sutter Health controlled all the Sutter entities both in general and specifically with regard to each of the arrangements that are the subject matter of this action. Sutter Health's memorandum virtually ignores the numerous factual allegations detailing how Sutter Health approved all the subject contracts that constituted illegal referral payments and kickbacks and actively concealed their true nature.

Sutter Health's contention that the TAC does not allege Sutter Health's knowledge of the nature of the subject relationships or their commercial reasonableness is simply false. The TAC alleges that knowledge and the basis for that knowledge in detail, including the fact that all the arrangements were reviewed and approved by Sutter Health's General Counsel's Office and Compliance Office. The TAC also includes the names of many of the relevant individuals and their relationships to the other Sutter entities to show how Sutter Health controlled the other entities and directed the other entities to enter into the Sutter contracts.

**ARGUMENT**

## I.   THE TAC ALLEGES SPECIFIC FACTS SHOWING SUTTER HEALTH'S CONTROL OF THE SUTTER ENTITIES.

Numerous specific allegations in the complaint set forth the control Sutter Health exercised over each of the Sutter entities.

---

[1] Sutter Health, in its Memorandum of Law, erroneously states that the Court dismissed the claims with regard to Sutter Valley Medical Foundation. Defendant Sutter Health's Notice of Motion and Motion to Dismiss Relator's Third Amended Complaint; Memorandum of Points and Authorities in Support Thereof ("Sutter Br."), at 3. That is incorrect; the order applied to Sutter Bay Medical Foundation. *See* Dkt. 172 at 17. Relator does not seek to amend its complaint with regard to Sutter Bay Medical Foundation.

Sutter Health is the parent of a health care delivery system that includes Sutter Valley Hospitals, Sutter Valley Medical Foundation and Sutter Bay Hospitals.  It provides centralized support services to all its subsidiaries through a General Counsel's Office, a Compliance Office and a Shared Services Department.  TAC at ¶¶ 15, 103 and 107.  Sutter Health exerts control over the operations of the subsidiary organizations through overlapping corporate governance.  During the calendar years 2010-2014, Sutter Health's Chief Executive Officer, Patrick Fry, was a member of the board of trustees of Sutter Valley Hospitals, a member of the board of trustees of Sutter Bay Hospitals, and a member of the board of trustees of Sutter Valley Medical Foundation. *Id*. at ¶ 98.

In addition, Sutter Health and its affiliates and subsidiaries all report consolidated financial statements and Sutter Health and its subsidiaries have integrated and comingled business operations. Sutter Health's executives and directors control the financial and compliance operations of the subsidiaries and affiliates.  *Id*. at ¶ 99.  All budgets for each of the Sutter Hospitals are approved by the Chief Financial Officer of Sutter Health who reports directly to the CEO of Sutter Health.  *Id*. at ¶ 106. In addition, Sutter Health comingles its funds with its subsidiaries.  *Id*. at ¶ 100.

In 1996, Sutter Health adopted a system-wide compliance policy purportedly "to maintain ethical business practices and to comply with all rules and regulations with regard to our business." Sutter Health directed that all Sutter Health affiliates including Sutter Valley Hospitals, Sutter Valley Medical Foundation and Sutter Bay Hospitals comply with this purported compliance policy.  *Id*. at ¶ 101.  The board of directors of Sutter Health designated operational responsibility for the compliance program to the Sutter Health President and CEO, with the Sutter Health board maintaining oversight of the program through its board's Governance Committee.  *Id*. The Sutter Health President and CEO was directed to appoint a chief risk officer for Sutter Health who would oversee the compliance program and ensure compliance by all the affiliates. *Id.* Each affiliate hospital was directed to adopt by-laws to ensure compliance with Sutter Health's compliance program and to name that affiliate CEO as the compliance officer for that affiliate.  *Id*.  Each affiliate CEO was to appoint a liaison who would work directly with, and under the supervision of, the Sutter Health Chief Risk Officer. *Id*.  Each affiliate compliance officer was directed to report all compliance matters to the Sutter Health Chief Risk Officer

on a monthly basis. *Id*.

Each Sutter hospital has personnel from the Sutter Health's General Counsel's Office who are responsible for legal matters for that particular hospital. *Id*. at ¶ 103. The Sutter Health employee at the General Counsel's Office who was responsible for Sutter Valley Hospitals when Relator was employed there was Penny Westfall. *Id*. Relator was in regular contact with Ms. Westfall concerning audit and compliance matters. *Id*. Relator was also in regular contact with Brenna Arceo, who was General Counsel for Sutter Medical Center where Relator was employed. *Id*. Ms. Arceo reported to Ms. Westfall. *Id*.

Relator was employed by Sutter Valley Hospitals as the Chief Compliance Officer of Sutter Medical Center but reported directly to the Chief Compliance Officer of Sutter Health, a position occupied by Steven Ortquist and then by Ginger Chappell during Relator's tenure at Sutter Health. *Id*. at ¶¶ 97, 102. Ortquist was replaced by Chappell because he was instructed by Sutter Health that the compliance department needed to be more "friendly" to the Sutter entities' administrations. *Id*. at ¶ 102. Relator worked on a daily basis with the Sutter Health Compliance Office, either with Ortquist or Chappell, or with Barbara Martinson, who was the Regional Compliance Officer at Sutter Health who oversaw Relator's facilities and reported to Ortquist or Chappell. *Id*. at ¶ 104.

## II.  THE TAC SHOWS SUTTER HEALTH'S ACTIVE INVOLVEMENT IN THE FRAUDULENT SCHEME.

The TAC also describes how Sutter Health specifically caused the other Sutter entities to induce referrals through various arrangements with physicians, all of which were approved by Sutter Health, Sutter Health's active involvement in preventing the detection of the scheme, and Sutter Health's involvement in the submission of the false claims.

For example, all physician contracts between Sutter Health's subsidiary hospitals and any of the physician practices went through the Sutter Health legal department and the Sutter Health Compliance Department with support from Sutter Health-employed attorneys assigned to the various subsidiary hospitals and the compliance officers such as Relator. *Id*. at ¶ 97. During the relevant period of time, all contracts and arrangements with physicians and physician's groups, including the contracts

1    at issue here, were approved by Sutter Health's General Counsel's Office and the Sutter Health

2    Compliance Office. *Id.* at ¶ 105. No physician contract could be entered into by any of the hospitals

3    without such prior approval. *Id.* Any audits of the terms of any physician compensation contract

4    entered into by a hospital were reviewed and approved by the Sutter Health Compliance Office and the

5    Sutter Health General Counsel's Office. *Id.* Through Relator's contacts with the General Counsel's

6    Office, she learned that that office sought fair market value evaluations from third-party evaluators of

7    the contracts of various physicians providing services to the Sutter hospitals, but knowingly misled

8    those evaluators by withholding from those evaluators some of the compensation being paid to the

9    physicians. *Id.* at ¶103. In doing so, Sutter Health's General Counsel's Office prevented the evaluators

10   from learning of, and potentially blowing the whistle on, the illegal contracts with the physicians.

11         The control that Sutter Health exerted over the individual hospitals is illustrated by the way the

12   relationship with Sacramento Cardiovascular Surgeons Medical Group, Inc. ("SAC Cardio") was

13   handled. In 2013, Relator raised questions concerning the propriety of payments to SAC Cardio,

14   noting, *inter alia*, that the doctors' timesheets did not properly document the services for which they

15   were to be paid, that the Physician Assistants had grossly overbilled, and that the timesheets reflected

16   billing for non-work items, such as vacations. *Id.* at ¶¶ 131-33. As a result, the payments were withheld

17   pending audit review. *Id.* at ¶ 133. Relator brought these overpayments to the attention of Rick Harrell,

18   the cardiovascular line administrator for Sutter Valley Hospitals. *Id.* at 134.

19         Shortly thereafter, Relator met with Malcolm Macleod, an employee of Sutter Health's Shared

20   Services Department to discuss the payments. *Id.* at 135. Relator shared her conclusion that the doctors

21   were improperly billing with Rick Harrell, who then reported this information directly to his superiors

22   at Sutter Health. *Id.* at 136.

23         In response, one of the SAC Cardio physicians contacted Sutter Health's CEO Patrick Fry

24   directly to complain about the withheld payments. The physician believed that contacting the Sutter

25   Health CEO would get action and he was right. Fry promptly ordered the General Counsel of Sutter

26   Health "to immediately release [funds] to SAC CARDIO." *Id.* at ¶ 139. Sutter Health's Vice President

27   of Finance ordered Sutter Health's Accounts Payable Department to immediately issue a check to SAC

28

Cardio despite the compliance issues being raised. *Id.* at ¶ 140. Significantly, all these steps were taken at the Sutter Health level, without any involvement of hospital personnel. Attorneys employed by Sutter Health's General Counsel's Office, Brena Arceo and Hillary Isaacson, were fully aware that Sutter Health had paid SAC Cardio to subsidize the SAC Cardio physicians' assistants. *Id.* at ¶ 142.

All claims made to government payors were handled by the Shared Services Department of Sutter Health. *Id.* at ¶ 107. And for each of the years at issue, the various hospitals submitted cost reports at the direction of Sutter Health. These cost reports were false and known to be false by Sutter Health and it took no steps to end the arrangements. *Id.* at ¶ 241.

The complaint further describes that each of the individual contractual relationships with the with physician practices was entered into with the knowledge and direction of Sutter Health: *See* ¶¶ 109, 120, 121, 122, 123, 125, 126, 129, 143, 145, 146, 158, 161, 162, 163, 166, 167, 168, 169, 170, 171, 172, 173, 174, 176, 177, 178, 179, 180, 181, 182, 183, 184, and 185.

In sum, the TAC alleges in detail that all the challenged arrangements alleged in the TAC were entered into with the full knowledge, direction and consent of Sutter Health through its CEO, General Counsel's Office, Compliance Office and Shared Services Department. Further, the compliance departments of each of the subject hospitals were overseen and were in constant contact with both the General Counsel's Office and the Compliance Office for Sutter Health itself. None of the relevant contracts could have been entered into without explicit prior approval from Sutter Health. When its subsidiary hospitals attempted to take action to correct these illegal contracts, Sutter Health actively intervened to prevent it, by interfering with third-party evaluations, and by forcing its subsidiary to resume what it knew to be illegal payments. Thus, Sutter Health was fully aware of, and took an active role in directing, all the fraudulent acts alleged in the TAC.

## III.   THE ALLEGATIONS IN THE TAC ARE SUFFICIENT TO HOLD SUTTER HEALTH LIABLE.

Numerous courts have held that a parent corporation can be held liable if it directly assisted a subsidiary in committing the acts that resulted in the filing of false claims.

The Ninth Circuit has made it clear that "[t]he FCA reaches any person who knowingly *assisted*

*in* causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (emphasis in original). Thus, where a parent corporation directly and knowingly assists in the fraudulent scheme, it is liable.

In *United States ex rel. Sirls v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 454 (E.D. Pa. 2020) the court held that the parent corporation could be held liable for the conduct of the subsidiary if it was "directly involved in submitting false claims or causing them to be submitted to the government," quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62 (D. D.C. 2017). In *Sirls*, the plaintiff alleged that the parent directly participated in the violations by controlling each nursing home and causing the nursing homes to commit the fraudulent acts of recruiting extremely ill patients and then intentionally understaffing the facilities and also "centrally control[ing] the claims and reimbursement process at each nursing home." *Id.* Similarly here, the TAC alleges that all the relevant contracts were examined and approved by Sutter Health and that Sutter Health directly controlled each of the subsidiary entities' improper relationships with the doctors, determined the rate of compensation, and controlled the submission of false claims related to the relevant physician contracts.

Similarly, in *Hockett*, the relator alleged that the parent corporate official instructed the employee at the subsidiary to file fraudulent cost reports to the government and that the parent was directly involved in correspondence that was the central part of consummating the fraud. There were also allegations that the parent corporate officials were in regular contact with the officials at the subsidiary with regard to the subject matter of the fraud. *See Hockett*, 498 F. Supp. 2d at 63 ("The frequency and level of detail of this communication support an inference that the corporate employees were aware of what was happening at IPH."); *id.* ("Further, the parent's review of the cost reports could lead a reasonable jury to infer that the parent acted with reckless disregard of the truth of the submissions made to the government.").

In *United States ex rel. Martino-Fleming v. South Bay Mental Health Centers*, 540 F. Supp. 3d 103, 130 (D. Mass. 2021), the court held that the private equity firm that owned a mental health center

could be held liable under the False Claims Act for the health center's inadequate supervision of uncertified workers because the equity fund was aware of the health center's actions and took no steps to end the practices. The court found that the equity fund was aware of the illegal policies at the time it acquired the clinic and rejected recommendations to bring the clinic into regulatory compliance. *Id.* The equity fund "had the power to fix the regulatory violations which caused the presentations of false claims but failed to do so." *Id.*

Finally, in *Ormsby v. Sutter Health et al.*, 444 F. Supp. 3d 1010, 1019 (N.D. Cal. 2020), the court upheld claims against Sutter Health and a subsidiary Palo Alto Medical Foundation ("PAMF") noting that "Sutter and PAMF control hospitals and physician foundations throughout California. The plaintiffs alleged that Sutter and PAMF knowingly submitted thousands of false claims related to the Medicaid Part C program." The complaint alleged that Sutter Health and PAMF prepopulated Medicare Advantage beneficiaries' medical records with diagnostic codes before the physician saw the patients and had non-physician coders review Medicare Advantage patients' medical records and retroactively add codes that the physician supposedly missed or change the codes to reflect more severe conditions. *Id.* at 1053. In this way, Sutter Health was able to maximize its Advantage Plan payments because it distorted the medical condition of the patients in the plan. *Id.* The relator alleged that senior officials at Sutter Health told employees at PAMF that they were "leaving millions of dollars on the table" from "subpar coding." *Id.* at 1023. Although parent liability was not specifically addressed in the decision, the court emphasized the continued and direct involvement of Sutter Health officials in the underlying scheme perpetrated by its subsidiaries. *Id.* at 1082-85. The same is true in this case, where Sutter Health officials conceived, participated in, and directed the scheme to submit false claims by its subsidiaries.

Neither *United States ex rel. Martinez v. KPC Healthcare, Inc.*, 2017 WL 10439030 (C.D. Cal. June 8, 2017) nor *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, 2014 WL 6908856 (S.D. Ga. Dec. 8, 2014), cited by Sutter Health, support its position. In *Martinez*, the relator merely alleged that certain nonhospital defendants "owned, operated, directed, and conspired with the hospital while the alleged false claims were submitted to Kaiser and the government." 2017 WL 10439030, at *6 (internal

MEMORANDUM IN OPPOSITION TO THE MOTION TO DISMISS OF SUTTER HEALTH

quotations omitted).  No particulars with regard to the role of the nonhospital defendants were alleged except that they simply owned and operated, and allegedly conspired with, the hospital that committed the wrongful acts.  Similarly, in *Schaengold*, the government alleged only that various hospital organizations "operated as a unitary health system that was controlled and operated through a centralized leadership and management team," and that the members and officers of the board of directors of the parent company were the same as the subsidiary. 2014 WL 6908856, at *11. These allegations alone were also found to be insufficient to hold the related entities liable.  This case, of course, is entirely different, where Relator alleges in detail how Sutter Health directly and unequivocally controlled all relevant decisions made by all subsidiary entities.

Sutter Health also cites language in *Schaengold* to the effect that the parent in that case could not be liable because the parent had no direct involvement in the submission of cost reports to the government. Sutter Br., at 5-6. But the parent's lack of involvement in the submission of the cost reports was critical in *Schaengold* because the government's theory of liability for reverse false claims was that the defendants were submitting false cost reports to conceal their obligation to refund overpayments.  Since the submission of the false reports constituted the fraudulent acts, the court held that the parent's lack of involvement in the submission of those cost reports defeated any claim of liability against the parent.  *Schaengold*, 2014 WL 6908856, at *11.  In this case, Sutter Health was in fact directly involved with the submission of cost reports as well as the false claims identified in the TAC.  TAC at ¶¶ 38, 48, 107.

In any event, it is well established that a defendant can be held liable under the False Claims Act if it was directly involved in the fraudulent scheme even if it did not submit the false claims itself. The False Claims Act creates liability for any person that "presents, or causes to be presented" a false or fraudulent claim. 31 U.S.C. § 3279(a)(1)(A).  As the Ninth Circuit has stated in *Mackby* "a person need not be the one who actually submitted the claim forms in order to be liable."  *Mackby*, 261 F.3d at 827.  To that end, "the FCA holds a defendant liable if it pursues a scheme that ultimately results in the submission of a false claim, even if the defendant does not participate in the actual submission of the claim." *United States ex rel. Kuzma v. N. Arizona Healthcare Corp.*, No. CV18-8041-PCT-DGC,

2021 WL 120901, at *5 (D. Ariz. Jan. 13, 2021); *see also Martino-Fleming v. S. Bay Mental Health Centers*, 540 F. Supp. 3d at 118 ("If a person knowingly participates in a scheme that, if successful, would ultimately result in the submission of a false claim to the government, he has caused those claims to be submitted."); *United States v. SouthEast Eye Specialists, PLLC*, No. 3:17-CV-00689, 2021 WL 5150687, at *15 (M.D. Tenn. Nov. 5, 2021) (*citing Kuzma*).

Sutter Health further cites to *U.S., ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1024 (C.D. Cal. 2015), *aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017), and *United States ex rel. Jones v. Sutter Health*, No. 18-CV-02067-LHK, 2021 WL 3665939, at *8 (N.D. Cal. Aug. 18, 2021), for the proposition that "merely stating that a defendant had knowledge of an alleged scheme is insufficient to state an FCA claim against that defendant." Sutter Br. at 7. These cases are inapposite, as in both cases the relator made no factual allegation whatsoever other than to state that the defendant had knowledge. While it is true that the TAC states that the subsidiaries' actions were done "with the knowledge of and at the direction of SUTTER HEALTH," the TAC also explains in detail Sutter Health's knowledge of and approval of the illegal contracts, Sutter Health's active steps to prevent detection of the illegality of the contracts, and Sutter Health's intervention to continue payment of the contracts after having been alerted to the illegality of the contracts. There is more than enough in the TAC to demonstrate that Sutter Health had knowledge of the fraud.

Sutter Health's citation to *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011), similarly misses the mark. In *Corinthian Colleges*, the complaint alleged that the individual defendants monitored and approved compensation arrangements, but set forth no facts from which the court could infer that defendants knew the arrangements were illegal. *Id.* at 997-98. That is the opposite of the situation here. The TAC alleges that Sutter Health not only knew of, but also actively encouraged, the illegal payments, and further that Sutter Health was the entity that actually submitted the claims it knew were false.[2]

Sutter Health further asserts that, "Relator sets forth no fact to even suggest Sutter Health's

---

[2] Sutter Health's citation to *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007), Sutter Br. at 7-8, simply does not support its argument on any level. *Swartz* was a group pleading case in which plaintiff did not level any specific allegations at two defendants **at all**. That is clearly not the case here.

MEMORANDUM IN OPPOSITION TO THE MOTION TO DISMISS OF SUTTER HEALTH

knowledge of commercial reasonableness, value, intent to induce referrals, or arrangement stacking, or any knowledge of the medical director and call coverage arrangements.  Instead, taking Relator's allegations as true at this stage of the proceedings, the SAC Cardio arrangements were entered into and managed solely at the hospital level." Sutter Br. at 6.  Sutter Health also asserts that, "Relator similarly fails to assert a single factual allegation against Sutter Health as to any of the additional schemes set forth in the TAC." *Id.*

These assertions are demonstrably false.  Clearly, with regard to the SAC Cardio arrangement, it is alleged that that arrangement, like all the others, was specifically approved by the Sutter Health General Counsel's Office and the Compliance Office.  Further, the TAC sets forth in detail how the Sutter Health CEO had the power to intervene and exercise that power to override any audit concerns raised at the hospital level.   Similarly, with regard to all the other arrangements, the TAC amply alleges that each arrangement was reviewed and approved by the General Counsel's Office and Compliance Office and that no arrangement could be entered into without its express approval.  Relator is not required to prove her entire case in the TAC.  All she needs to do is allege sufficient evidence to establish a reasonable basis to believe that, in fact, Sutter Health was directly involved in all of these schemes.  Relator has sufficiently alleged that Sutter Health directed the relevant hospitals to enter into the illegal contracts, knowing that these contracts violated the Stark and Anti-Kickback Laws.  The TAC alleges the means by which Sutter Health knew of, and directed, the fraudulent acts.  The TAC does not need to repeat and reallege the same means with regard to each of the individual fraudulent relationships.  In any event, "[t]here is no flaw in pleading. . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *Ormsby*, 444 F. Supp. 3d at 1082-83 (citing *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1168 (9th Cir. 2016)); *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) ("A good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts.").

In sum, Relator alleges that Sutter Health created, participated in, and directed a system-wide scheme to make referral payments to physicians disguised as directorships, call coverage arrangements,

and reimbursements for physicians' assistants. Sutter Health was at all times aware of these agreements, having reviewed and approved each one. Sutter Health's management also took steps to prevent these agreements from being discovered—by interfering with third-party evaluations—and actively stepped in to reinstate payment of the illegal kickbacks. Sutter Health also submitted claims for reimbursement to Medicare, Medicaid, and other government payors through its Shared Services Department. Taken as true, as they must be at this stage, these facts are more than sufficient to allege a violation of the False Claims Act against Sutter Health.

## <u>CONCLUSION</u>

For all the foregoing reasons Relator respectfully requests that Sutter Health's Motion to Dismiss be denied.

Respectfully submitted,

Dated: February 22, 2022

**BOIES SCHILLER FLEXNER LLP**

*/s/ George F. Carpinello*
George F. Carpinello (Admitted *Pro Hac Vice*)
Joseph Starsia (Admitted *Pro Hac Vice*)
30 S. Pearl St. 11th Floor
Albany, NY 12207
Tel: (518) 434-0600
Fax: (518) 434-0665
gcarpinello@bsfllp.com
jstarsia@bsfllp.com

Sean P. Rodriguez (SBN 262437)
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel: (415) 293-6800
Fax: (415) 293-6899
srodriguez@bsfllp.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WILBANKS & GOUINLOCK, LLP**

Marlan B. Wilbanks (GA Bar No. 758223)
(Admitted *Pro Hac Vice*)
Susan S. Gouinlock (GA Bar No. 303217)
(Admitted *Pro Hac Vice*)
3490 Piedmont Road, NE, Suite 1010
Atlanta, Georgia  30305
Tel: (404) 842-1075
Fax: (404) 842-0559
mbw@wilbanksgouinlock.com
ssg@wilbanksgouinlock.com

**HIRST LAW GROUP, P.C.**

Michael A. Hirst (CA. Bar No. 131034)
Marisela Bernal (CA Bar No. 329589)
200 B Street, Suite A
Davis, CA 95616
Tel: (530) 756-7700
Fax: (530) 756-7707
michael.hirst@hirstlawgroup.com
marisela.bernal@hirstlawgroup.com

**WITHROW, MCQUADE & OLSEN, LLP**

Scott C. Withrow (GA. Bar No. 772330)
(Admitted *Pro Hac Vice*)
3379 Peachtree Road, NE, Suite 970
Atlanta, Georgia  30326
Tel: (404) 814-0200
Fax: (404) 814-0009
swithrow@wmolaw.com

*Attorneys for Relator*

## <u>CERTIFICATE OF SERVICE</u>

I, George F. Carpinello, hereby certify that on the 22nd day of February, 2022, I served the forgoing document on all counsel of record via ECF.

*/s/ George F. Carpinello*
George F. Carpinello

MEMORANDUM IN OPPOSITION TO THE MOTION TO DISMISS OF SUTTER HEALTH