UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br>Plaintiffs,<br>v.<br>SUTTER HEALTH, et al.,<br>Defendants. | Case No. 14-cv-04100-KAW<br><br>**ORDER DENYING DEFENDANT SUTTER HEALTH'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 181 |

Relator Laurie M. Hanvey filed the instant case against Defendants, asserting violations of the federal False Claims Act and the California False Claims Act. Relator alleges that Defendant Sutter Health, as well as Defendants Sutter Valley Hospitals, Sutter Bay Hospitals, and Sutter Bay Medical Foundation (collectively, "Sutter Health Affiliates") implemented a scheme where they knowingly entered into compensation arrangements in violation of the Anti-Kickback Statute ("AKS") and the Stark Law by paying or providing unlawful kickbacks, excessive compensation, free employees, and other illegal incentives to physicians who refer patients to Sutter Health and the Sutter Health Affiliates. (Third Amended Compl. ("TAC") ¶¶ 3, 5, 6.)

Pending before the Court is Sutter Health's motion to dismiss. (Sutter Health Mot. to Dismiss, Dkt. No. 181.) The Court previously granted Sutter Health's motion to dismiss, finding that Relator failed to explain Sutter Health's role. (Nov. 2, 2021 Dismissal Order at 6, Dkt. No. 172.) Thus, the Court could not find that Sutter Health "committed actions that are the basis for liability, or that [it was] liable for actions taken by the other Sutter Health Entities."[1] (*Id.*) The

---

[1] The Court also found that Relator failed to explain the role of Sutter Bay Medical Foundation. (Nov. 2, 2021 Dismissal Order at 6.) Relator does not seek to amend the complaint with regard to Sutter Bay Medical Foundation. (Rel.'s Opp'n at 1 n.1, Dkt. No. 187.)

Court, however, gave Relator one final chance to amend and explain Sutter Health's role and relationship with the other entities. (*Id.*)

On December 8, 2021, Relator filed the operative complaint. On January 7, 2022, Sutter Health filed a motion to dismiss, asserting that Relator failed to allege sufficient facts as to its role in the alleged scheme. (Sutter Health Mot. to Dismiss at 1, Dkt. No. 181.) On February 22, 2022, Relator filed her opposition. (Rel.'s Opp'n, Dkt. No. 187.) On March 18, 2022, Sutter Health filed its reply. (Sutter Health Reply, Dkt. No. 188.)

On March 31, 2022, the Court deemed this matter suitable for disposition without a hearing pursuant to Civil Local Rule 7-1(b), and vacated the April 7, 2022 hearing. Having reviewed the parties' filings and relevant legal authority, the Court DENIES Sutter Health's motion to dismiss.

The Court finds that Relator has adequately pled Sutter Health's role. Specifically, Relator alleges that Sutter Health is "the parent of a health care delivery system that includes centralized support groups such as the General Counsel's Office and Compliance departments . . . ." (TAC ¶ 15.) Sutter Health adopted a system-wide compliance program with which its affiliate hospitals, including the Sutter Health Affiliates, were required to comply. (TAC ¶ 101.) Each affiliate hospital was to appoint a compliance liaison who would work directly with, and under the supervision of, Sutter Health's Chief Risk Officer. (TAC ¶ 101.) Each affiliate hospital also had personnel from Sutter Health's General Counsel's Office, who were responsible for legal matters. (TAC ¶ 103.) All physician contracts between an affiliate hospital and a physician entity had to be approved by Sutter Health's legal department, General Counsel's Office, and Compliance Office. (TAC ¶¶ 97, 105.) Likewise, audits of compliance with the terms of the physician contracts were reviewed by Sutter Health's Compliance Office and General Counsel's Office. (TAC ¶ 105.) Finally, Sutter Health's Shared Services Department handled all billing, coding, payroll, and payment of vendor expenses, as well as all claims for reimbursement to governmental and private payors. (TAC ¶ 107.)

Additionally, Relator alleges that while she was employed by Sutter Valley Hospitals as a compliance officer, she reported directly to Sutter Health's Chief Compliance Officer. (TAC ¶

97.) The Chief Compliance Officer oversaw regulatory compliance for all affiliate hospitals, and reported to Sutter Health's General Counsel. (TAC ¶¶ 97, 102.) In 2014, Chief Compliance Officer Steven Ortquist resigned. (TAC ¶ 102.) Before leaving, Mr. Ortquist told Relator he had been instructed by Sutter Health that the Compliance Department needed to be more "friendly" to the affiliate hospitals, including being more lenient in approving physician contracts regardless of violations of the AKS and Stark Law. (TAC ¶ 102.) Relator also worked with the General Counsel's Office and learned that the office sought fair market value evaluations from third-party evaluators for physicians providing services to the affiliate hospitals. (TAC ¶ 103.) The General Counsel's Office, however, withheld from the evaluators all of the compensation being paid to those physicians, allowing Sutter Health to get a favorable analysis. (TAC ¶ 103.)

Thus, contrary to Sutter Health's assertion that Relator is merely relying on its general parental relationship with its affiliates to hold Sutter Health liable, Relator explains Sutter Health's own involvement in the alleged scheme. *Contrast with United States ex rel. Martinez v. KPC Healthcare Inc.*, Case No. 8:15-cv-1521-JLS-DFM, 2017 WL 10439030, at *6 (C.D. Cal. June 8, 2017) (dismissing parent corporation where the complaint only alleged that the parent company "owned, operated, directed, and conspired with" the hospital). Specifically, Sutter Health's employees were responsible for reviewing and approving the physician contracts at issue in this case. (TAC ¶¶ 97, 105.) This includes contracts that the Court found were alleged to contain problematic terms from which an improper purpose could be inferred, such as the two-fold increase in call coverage compensation to Sacramento Cardiovascular Surgeons Medical Group, Inc. ("SCSMG") in 2010, the provision of physician assistants to SCSMG in 2006, the two-fold increase between June 2007 and February 2009 to East Bay Cardiac Surgery Medical Group ("East Bay Cardiac"), and the quadrupling of call coverage rates to Dr. Stephen Liu between September 2008 and April 2014. (Mar. 17, 2021 Dismissal Order at 22, 25, 26, Dkt. No. 131.) Sutter Health also allegedly took an active role in preventing third-party evaluators from conducting accurate fair market value evaluations by hiding information. (TAC ¶ 103.) Finally, Sutter Health was allegedly involved in submitting claims for reimbursement by Medicare, including claims in connection with the allegedly fraudulent financial relationships at issue. (TAC

¶ 107.) In short, at issue is not just the affiliate hospitals' actions, but Sutter Health's own actions in approving contracts that it knew or should have known were problematic, getting favorable market value evaluations, and submitting claims. *See United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62 (D.D.C. 2007) (finding that parent company could be held liable where there was evidence that the parent company was directly involved in finalizing cost reports and billing the government, as well as reviewing cost reports that included amendments restating costs by hundreds of thousands of dollars). This is adequate at the pleading stage.

Sutter Health points to *United States v. Corinthian Colleges* to argue that monitoring and approving illegal contracts is insufficient to satisfy pleading requirements. (Sutter Health Mot. to Dismiss at 8.) There, the Ninth Circuit found that the allegation that the individual defendants "monitored and approved of the illegal recruiter compensation practices as a means to obtain targeted enrollment levels for the respective Corinthian campuses" was, by itself, insufficient. 655 F.3d 984, 998 (9th Cir. 2011). The Ninth Circuit explained that there were no additional details as to the individual defendants' involvement, and no allegation that the individual defendants were involved in making false statements to the United States government. *Id.* Here, however, Relator does more than simply allege that Sutter Health monitored and approved the illegal contracts. Again, Relator alleges that Sutter Health approved contracts that it knew or should have known were problematic, that it prevented evaluators from conducting accurate fair market value evaluations, *and* that it submitted claims for reimbursement. This is similar to allegations that the Ninth Circuit did find were sufficient as to another defendant alleged to have falsely certified that Corinthian was in compliance with recruiter compensation prohibitions and failed to perform legally required evaluations to determine if Corinthian's practices were legal. *Id.* at 999.

Finally, to the extent that Sutter Health argues that Relator has failed to identify specific individuals or transactions, the Court previously found that Relator was not required to do so. (*See* Mar. 17, 2021 Dismissal Order at 18-19 (citing *United States v. United Healthcare Ins. Co. (Swoben)*, 848 F.3d 1161, 1180-81 (9th Cir. 2016)).) Rather, it was sufficient that Relator "identified the parties involved in the alleged fraud, when the fraud occurred, and how the fraud

4

1 was perpetuated, including the contracts and problematic terms from which an improper purpose
2 can be inferred." (*Id.*)

3       Relator has provided sufficient information to allow Sutter Health "to prepare a responsive
4 pleading." *Swoben*, 848 F.3d at 1180. Accordingly, the Court DENIES Sutter Health's motion to
5 dismiss. The Court SETS a case management conference for **June 21, 2022** at 1:30 p.m.; the
6 parties' joint case management conference statement is due by **June 14, 2022**.

7       IT IS SO ORDERED.

8 Dated: April 21, 2022

                                     KANDIS A. WESTMORE
                                     United States Magistrate Judge