UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiffs,<br><br>      v.<br><br>SUTTER HEALTH, et al.,<br><br>            Defendants. | Case No.  14-cv-04100-KAW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 293, 294, 297 |

On September 10, 2014, Relator Laurie M. Hanvey filed the instant case against Defendants, asserting violations of the False Claims Act and California False Claims Act. (Compl., Dkt. No. 1.)  On December 8, 2021, the operative complaint was filed against Defendants Sutter Health, Sutter Valley Hospitals, Sutter Valley Medical Foundation, and Sutter Bay Hospitals (collectively, "Sutter Health"), as well as Defendants Sutter Medical Group ("SMG"), East Bay Cardiac Surgery Center Medical Group ("East Bay Cardiac"), and Stephen K. Liu, M.D. Professional Corporation[1] ("Liu PC"). (Third Amend. Compl. ("TAC"), Dkt. No. 175.)

Pending before the Court is: (1) Defendants' motion for summary judgment, (2) SMG's supplemental motion for summary judgment, and (3) East Bay Cardiac's supplemental motion for summary judgment.  Having considered the parties' filings, the relevant legal authorities, and the arguments made at the August 28, 2024 hearing, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment, GRANTS SMG's supplemental motion for summary judgment, and DENIES East Bay Cardiac's supplemental motion for summary judgment.

---

[1] On July 25, 2024, Liu PC was dismissed from the case pursuant to the parties' stipulation.  (Dkt. No. 344.)

## I.    BACKGROUND

The instant case concerns Sutter Health's alleged scheme where it knowingly entered into compensation arrangements in violation of the Anti-Kickback Statute ("AKS") and the Physician Self-Referral Law ("Stark Law") by paying or providing unlawful kickbacks, excessive compensation, free employees, and other illegal incentives to SMG, East Bay Cardiac, Liu PC, California Emergency Physicians Medical Group ("CEPMG"), and Sacramento Cardiovascular Surgeons Medical Group ("Sac Cardio") (collectively, "Physician Groups").  (TAC at 3-4.) Relator further alleges that Defendant Sutter Health then knowingly submitted and/or caused others to submit false and fraudulent claims related to services rendered to patients referred to it by the Physician Groups, again in violation of the AKS and Stark Law.  (TAC at 3-4.)

On May 17, 2024, Defendants filed a joint motion for summary judgment.  (Defs.' MSJ, Dkt. No. 294.)  SMG and East Bay Cardiac also filed supplemental motions for summary judgment.  (SMG MSJ, Dkt. No. 293; East Bay Cardiac MSJ, Dkt. No. 297.)  On June 7, 2024, Relator filed a consolidated opposition.  (Rel.'s Opp'n, Dkt. Nos. 312, 334 (unredacted).)  The United States filed a statement of interest regarding Defendants' motions for summary judgment. (United States St., Dkt. No. 306.)  On June 28, 2024, Defendants filed their replies in support of their motions for summary judgment.  (SMG Reply, Dkt. No. 323; East Bay Cardiac Reply, Dkt. No. 324; Defs.' Reply, Dkt. No. 325.)   Additionally, on June 12, 2024, Sutter Health filed motions to exclude the testimony of Relator's experts.  (Mot. to Exclude McNamara, Dkt. No. 313; Mot. to Exclude Pratt, Dkt. No. 314; Mot. to Exclude Sokolove, Dkt. No. 315.)

Given the number of compensation arrangements at issue, each with their own separate facts and evidence, as well as the overlapping nature of the motions, the Court organizes this order as follows.  First, the Court will articulate the statutory framework that applies in this case, which will address the parties' disputes regarding the proper legal standard for causation and scienter. Second, the Court will describe each compensation arrangement at issue and apply the statutory framework.  The Court will address Sutter Health's motions to exclude the testimony of Relator's experts in a separate order; any expert opinions cited in this order, however, were either unchallenged or not excluded.

## II.    LEGAL STANDARD

A party may move for summary judgment on a "claim or defense" or "part of... a claim or defense." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250.  "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S. at 254.  "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted).  The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the

dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

### III.    DISCUSSION

#### A.    Statutory Framework

##### i.    The Anti-Kickback Statute ("AKS")

The AKS prohibits the knowing and willing "payment, receipt, offering, or solicitation of renumeration to induce business that is reimbursable under a federal health care program."  *United States v. Pfizer, Inc.*, 188 F. Supp. 3d 122, 133 (D. Mass. 2016); *see also* 42 U.S.C. § 1320a-7b(b).  "Put more plainly, no one may pay another with the intent to receive a medical referral in return."  *Stop Ill. Health Care Fraud, LLC v. Sayeed*, 100 F.4th 899, 904 (7th Cir. 2024).  Thus, the AKS is violated if "one purpose of the payment [is] to induce future referrals, even if the payments were also intended to compensate for professional services."  *United States v. Hong*, 938 F.3d 1040, 1048 (9th Cir. 2019).

First, the AKS requires the offering, paying, soliciting, or receiving of "any renumeration."  Payments over the fair market value ("FMV") can be inferred as "intend[ing] to induce referrals."  *Kuzma v. N. Ariz. Healthcare Corp.*, 607 F. Supp. 3d 942, 947 (D. Ariz. 2022).  That said, even a FMV payment can be an improper renumeration "if there is also an illegal purpose (i.e., inducing Federal health care program business)."  *United States v. Crescendo Bioscience, Inc.*, No. 16-cv-02043-TSH, 2020 U.S. Dist. LEXIS 90940, at *23 (N.D. Cal. May 23, 2020) (internal quotation omitted).  The AKS provides for certain safe harbors "as exclusions from the definition of 'renumeration,' including a safe harbor for personal services contracts."  *Pfizer*, 188 F. Supp. 3d at 133.  To qualify for this safe harbor, the agreement must, among other requirements, set forth that "[t]he aggregate compensation paid to the agent . . . is consistent with fair market value in arms-

4

length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under" a Federal healthcare program.  42 C.F.R. § 1001.952(d).

Second, the renumeration must be in exchange for referrals.  A referral is not limited to the recommendation that a patient "seek care from a particular entity"; rather, courts have found a referral to include "a doctor's authorization to receive medical care, even when the doctor is not the one choosing the provider of that care."  *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015), *approved by Hong*, 938 F.3d at 1048; *see also Kuzma v. N. Ariz. Healthcare Corp.*, 607 F. Supp. 3d 942, 952 n.4 (D. Ariz. 2022) (explaining that the "referrals" at issue were the surgeries performed by the doctors at the defendants' hospital facilities).  Moreover, "a kickback need not be successful to violate the AKS: The statute does not require evidence of a 'quid pro quo' in the sense that each bribe must successfully generate referrals."  *United States ex rel. Witkin v. Medtronic, Inc.*, Civil Action No. 1:11-cv-10790-IT, 2024 U.S. Dist. LEXIS 81710, at *39 (D. Mass. Mar. 31, 2024) (internal quotation omitted).

Third, the AKS requires that the defendant "knowingly and willfully" offer or accept renumeration.  Defendants argue that to satisfy this heightened requirement, Defendants must have had actual knowledge and the "intent to violate the law or to do something purposely that the law forbids."  (Defs.' Reply at 23-24.)  Courts, however, have found that the AKS "clarifies that the Government is not required to prove actual knowledge of the [AKS] or specific intent to violate it. Instead, the Government must prove that the defendant willfully committed an act that violated the [AKS]."  *United States v. St. Junius*, 739 F.3d 193, 210 (5th Cir. 2013) (finding that the government was only required to prove that the defendant had willfully solicited or received money for referring Medicare patients, even if she did not know it was a violation of the AKS).  Notably, in *Hong*, the Ninth Circuit considered the propriety of jury instructions on both actual knowledge and deliberate ignorance "[f]or the 'knowingly and willingly' part of the health care fraud elements[.]"  938 F.3d at 1046.  While the Ninth Circuit ultimately did not decide whether the deliberate ignorance instruction was given in error, it is notable that the Ninth Circuit did not question whether deliberate ignorance would have satisfied the "knowingly and willingly"

1    element.  *See id.* at 1047.  Instead, the Ninth Circuit explained that the deliberate ignorance

2    instruction was "only relevant if the jury rejects the government's evidence of actual knowledge,"

3    and would have considered whether there was sufficient evidence to allow a jury to find deliberate

4    ignorance even if the jury rejected the government's evidence of actual knowledge.  *Id.* at 1046.

5              **ii.    The Stark Law**

6              The Stark Law "generally prohibits a physician from referring Medicare patients to entities

7    in which the physician has a prohibited 'financial interest.'"  *Ebeid ex rel. United States v.*

8    *Lungwitz*, 616 F.3d 993, 1000 (9th Cir. 2010).  The Stark Law also prohibits hospitals from

9    submitting claims for services provided pursuant to a prohibited referral.  *See* 42 U.S.C. §

10   1395nn(a)(1)(B).  "Compliance with the Stark Law is a condition precedent to reimbursement of

11   claims submitted to Medicare," and when an entity "fail[s] to satisfy that condition, the

12   government owe[s] it nothing."  *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 386

13   (4th Cir. 2015).

14             Once a relator demonstrates that an entity submitting claims has a financial relationship

15   with a referring physician, the defendant bears the burden of showing that a statutory exception

16   applies.  *See Drakeford*, 792 F.3d at 374.  Here, Defendants assert the "personal services

17   arrangements" exception.  (*See* Defs.' MSJ at 10.)  Under this exception, Defendants must show

18   that "[t]he aggregate services covered by the arrangement do not exceed those that are reasonable

19   and necessary for the legitimate business purposes of the arrangement(s)," and that "[t]he

20   compensation to be paid over the term of each arrangement is set in advance, does not exceed fair

21   market value, and . . . is not determined in a manner that takes into account the volume or value of

22   any referrals or other business generated between the parties."  42 C.F.R. § 411.357(d).

23             East Bay Cardiac asserts that referrals do "'not includ[e] any designated health service

24   personally performed or provided by the referring physician,'" and therefore any "surgeries that

25   were personally performed by EBC physicians would not count as 'referrals.'"  (EBC MSJ at 10

26   (quoting 42 C.F.R. § 411.351.)  As the United States explains, however, when physicians provide

27   patient care services to hospital patients, they may bill Medicare for their "professional services,"

28   *i.e.*, performing procedures and interpreting test results.  (United States St. at 8.)  The hospital, in

United States District Court
Northern District of California

turn, may also submit a separate claim for the "technical" or "facility" component of those services, *i.e.*, the furnishing of equipment and non-physician staff. (*Id.*) Thus, even if the surgery was personally performed by the referring physician, the hospital's claim for technical or facility fees related to that surgery would be the result of the referral actionable under the Stark Law. *See Drakeford*, 675 F.3d at 406-07.

### iii.    The False Claims Act ("FCA")

"The FCA imposes significant civil liability on any person who . . . (A) 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval,' (B) 'knowingly makes, uses, or causes to be used, a false record or statement material to a false or fraudulent claim,' or (C) 'conspires to commit a violation of [the FCA]." *Winter ex rel. United States v. Garden Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1114 (9th Cir. 2020) (quoting 31 U.S.C. § 3729(a)(1)). To establish a FCA claim, a plaintiff must demonstrate: "(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Id.* (internal quotation omitted).

#### a.    Falsity

The FCA "is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) (internal quotation omitted). Thus, a claim "can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment." *Id.* at 1171. Specific to this case, FCA liability may exist when a medical provider falsely certifies compliance with the AKS or Stark Law in connection with the submission of Medicare and Medicaid claims. *See Frazier ex rel. United States v. IASIS Healthcare Corp.*, 392 Fed. Appx. 535, 537-38 (9th Cir. 2010).

#### b.    Scienter

"Liability under the FCA is established only when the defendant 'knowingly' presents a false or fraudulent claim for payment." *Godecke ex rel. United States v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1211 (9th Cir. 2019). "Knowingly," in turn, is defined as: "(1) actual knowledge

7

1   of the information; (2) deliberate ignorance of the truth or falsity of the information; or (3)

2   reckless disregard of the truth or falsity of the information." *Id.* There is no requirement of

3   "specific intent to defraud," and liability can be found even in "the ostrich type situation where an

4   individual has buried his head in the sand and failed to make simple inquiries which would alert

5   him that false claims are being submitted." *Id.*

6             c.  Materiality

7       "Under the [FCA], a falsehood is material if it has 'a natural tendency to influence, or be

8   capable of influencing, the payment or receipt of money or property.'" *United States ex rel.*

9   *Campie v. Gilead Sciences. Inc.*, 862 F.3d 890, 904-05 (9th Cir. 2017) (quoting 31 U.S.C. §

10   3729(b)(4)).  As the Court previously found, "courts have repeatedly held violation of the AKS

11   and Stark Law to be material, often as a matter of law."  (3/17/21 Dismissal Order at 33-34, Dkt.

12   No. 131 (citing cases).)

13             d.  Causation

14       Finally, the parties dispute what is required to demonstrate causation where the FCA action

15   is premised on an AKS violation.[2]  Relying on the Sixth and Eighth Circuits, Defendants argue

16   that Relator must demonstrate "but for" causation -- specifically, that "[D]efendants would not

17   have included particular 'items or services' but for the illegal kickbacks." *United States ex rel.*

18   *Cairns v. D.S. Med. LLC*, 42 F.4th 828, 836 (8th Cir. 2022); *United States ex rel. Martin v.*

19   *Hathaway*, 63 F.4th 1043, 1052-53 (6th Cir. 2023) (requiring "but-for" causation).  These Circuits

20   rely on a 2010 amendment to the AKS, which states that "any claim that includes items or services

21   resulting from a violation of this section constitutes a false or fraudulent claim" under the FCA.

22   42 U.S.C. § 1320a-7b(g).  Pointing to the "resulting from" language, the Sixth and Eighth Circuits

23   looked to the Supreme Court's finding that "a nearly identical phrase, 'results from,' in the

24   Controlled Substances Act . . . 'impose[d] a requirement of actual causality: [*i.e.*,] but-for

25   cause[.]'" *Cairns*, 42 F.4th at 834 (quoting *Burrage v. United States*, 571 U.S. 204, 210-11

26   (2014)); *see also Martin*, 63 F.4th at 1052 ("The ordinary meaning of 'resulting from' is but-for

27

28   _____

[2] The parties do not appear to dispute that the Stark Law imposes no additional causation
requirement.  (*See* Rel.'s Opp'n at 10 n.9.)

United States District Court
Northern District of California

causation.").

As the United States and other courts have explained, however, "[p]rior to the 2010 AKS amendment, courts have consistently held that compliance with the AKS (or the lack thereof) was 'material' to the government's decision to pay a given claim based on the theory that the government's payment was contingent on the submitting entity's express or implied certification that it had complied with the AKS." *Guilfoile v. Shields*, 913 F.3d 178, 191 n.12 (1st Cir. 2019) (collecting cases); *see also Frazier*, 392 Fed. Appx. at 537-38. Pointing to legislative history, the United States explains the 2010 amendment was added to "'strengthen whistleblower actions based on medical care kickbacks,'" making clear "'that all claims resulting from illegal kickbacks are false or fraudulent, even when the claims are not submitted directly by the wrongdoers themselves.'" (United States St. at 3 (quoting 155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009) (Sen. Kaufman); *see also Guilfoile*, 913 F.3d at 191 n.12 ("The legislative history suggests that the 2010 amendment was intended to codify the link between AKS violations and false claims within the meaning of the FCA[.]"). Thus, courts outside the Sixth and Eighth Circuit have rejected applying *Burrage*'s but-for causation requirement as "inconsistent with the drafters' intentions," finding that "[s]uch a requirement would hamper [FCA] cases under that provision even though Congress enacted it to strengthen whistleblower actions based on medical care kickbacks and stated that healthcare fraud is relatively difficult to prove and correct." *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96-97 (3d Cir. 2018); *see also United States ex rel. Witkin v. Medtronic, Inc.*, Civil Action No. 1:11-cv-10790-IT, 2024 U.S. Dist. LEXIS 81710, at *56 (D. Mass. Mar. 31, 2024) (finding that the AKS "strongly indicates that but-for causation is *not* the appropriate standard," and that a more stringent causation standard "would also run counter to Congress' expressly stated intent in adding Section 1320a-7b(g)—to strengthen whistleblower actions—to simultaneously increase the causation bar for bringing such an action").

At the hearing, the United States pointed out that in *Burrage*, the Supreme Court acknowledged that "courts regularly read phrases like 'results from' to require but-for causality" "[w]here there is no textual or contextual indication to the contrary." 571 U.S. at 212. Thus, considering the context of the 2010 AKS amendment through legislative history strongly

9

demonstrates that this is not a situation where the Court should automatically read in a but-for causality.  This is particularly the case where *Burrage* was decided **after** the 2010 AKS amendment; in short, the drafters could not have been aware of how the Supreme Court would interpret "results from" to impose a but-for causation.  Moreover, it is notable that "the AKS can impose criminal liability on entities who receive remuneration even where no referral is ever made." *Witkin*, 2024 U.S. Dist. LEXIS 81710, at *56.  Thus, "[i]t would be counterintuitive for the statute to define illegal remuneration under an indirect causation standard in the criminal context (e.g., an AKS violation) but ascribe a more stringent causation standard in the civil context (e.g., an associated FCA violation)." *Id.*; *see also Greenfield*, 880 F.3d at 96 ("imposing but-for causation in this context would lead to the incongruous result whereby a defendant could be convicted of criminal conduct under the [AKS] for paying kickbacks to induce medical referrals, but would be insulated from civil [FCA] liability for the exact same conduct, absent additional proof that each medical decision was in fact corrupted by the kickbacks."); *United States ex rel. Fitzer v. Allergan, Inc.*, No. 1:17-cv-00668-SAG, 2022 U.S. Dist. LEXIS 152099, at *30 (D. Md. Aug. 23, 2022) (same).  Finally, the United States correctly points out that applying a "but-for" causation standard would lead to absurd results: "For instance, if a device company gave a doctor suitcases of cash intending to induce his use of the company's devices, but that doctor (perhaps fearing prosecution, revocation of medical license, or even loss of future patients) claimed that he would have selected that company's devices regardless, the device company could argue that there is no FCA liability." (United States St. at 5-6 n.3.)  Such a result is directly at odds with the purpose of § 1320a-7b(g), which again was to *strengthen* whistleblower actions.

Accordingly, the Court will not apply a "but-for" causation standard.  Rather, all that is required is a "link," and courts have found a sufficient causal link "in cases where the doctor who actually received the alleged kickback then uses the defendant's services[.]" *Kuzma*, 607 F. Supp. 3d at 956; *see also United States v. Abbott Lab'ys, Inc.*, 622 F. Supp. 3d 920, 933 (S.D. Cal. 2022) (finding sufficient link between the kickback and reimbursement claim where the relator alleged that the defendant assisted the doctor with free marketing and advertising assistance for the purpose of inducing use of its devices).

United States District Court
Northern District of California

### B.   Compensation Arrangements

Again, at issue are Sutter Health's compensation arrangements with the following Physician Groups: (1) Sac Cardio, (2) SMG, (3) East Bay Cardiac, (4) Liu PC, and (5) CEPMG.

#### i.   Sac Cardio

Sac Cardio was a physician organization owned by three surgeons: Dr. Michael Ingram, Dr. Robert Kincade, and Dr. James Longoria.  (Rel.'s Opp'n at 16.)  Its surgeons practiced out of Sutter Medical Center – Sacramento.  Relator asserts that from July 1, 2006 through November 30, 2014,[3] the compensation arrangements between Sutter Health and Sac Cardio -- which included physician assistant ("PA") leasing, medical directorships, and call coverage -- were commercially unreasonable and/or in excess of FMV.  (*Id.*; *see also* TAC ¶ 3(A).)

##### a.   Physician Assistant Leasing Arrangements

Starting around 2004, Sutter Health "leased" PAs from Sac Cardio.  (*See* Carpinello Decl., Exh. 5, Dkt. No. 335-5.)  This leasing arrangement effectively operated as a "pass-through," in which Sac Cardio employed the PAs and Sutter Health paid Sac Cardio for them.  (Carpinello Decl., Exh. 4 at 31:5-7, Dkt. No. 335-4.)  Such leasing arrangements are a common way to augment a hospital's existing staffing, as physician groups are oftentimes better equipped than hospitals to recruit and retain specialty PAs.  (Ohta Decl., Exh. 17 ("Odom Report") ¶ 29, Dkt. No. 295-17.)

###### 1.   Double-Billing

Relator challenges the leasing arrangements in two ways.  First, Relator asserts that Sac Cardio "double-billed" by billing the Government for services performed by its PAs even though Sutter Health was paying the PAs' salaries.  (Rel.'s Opp'n at 17.)  Relator points to the opinion of her expert, Stanley Sokolove, for the opinion that where "there was no expense incurred by Sac Cardio," there was "no valid reason to submit a claim to [the Centers for Medicare and Medicaid Services ('CMS')]."  (Sokolove Report at 9, Dkt. No. 335-6.)

---

[3] In October 2019, Defendant Sutter Health entered into a settlement with the United States relating to its submission of claims to Medicare resulting from referrals by Sac Cardio between September 1, 2012 through September 30, 2014 (the "Settlement Period").  (TAC ¶ 158.)

11

1  The parties dispute whether Relator has presented evidence that Sac Cardio did, in fact,

2  double-bill, and that the billing related to services performed under the leasing arrangement with

3  Sutter Health.  The Court finds there is sufficient evidence to create a question of fact as to

4  whether Sac Cardio double-billed.  For example, Dr. Ingram testified: "[W]e understood that it

5  was okay to bill for the PAs's services in order to make up for the shortfall for the salaries we

6  were trying to pay them.  We never got paid enough, and we were having to pay out of pocket to

7  make up for the difference."  (Carpinello Decl., Exh. 4 at 31:9-14, Dkt. No. 335-4.)  Dr. Ingram

8  further explained that although the contract between Sac Cardio and Sutter Health was later

9  modified to include a provision that Sac Cardio could not bill for the PAs, Sac Cardio was not

10  aware of it so they billed when they should not have.  (Carpinello Decl., Exh. 4 at 31:15-19,

11  31:25-32:4, Dkt. No. 335-4.)  In other words, Dr. Ingram was testifying as to an ongoing practice

12  in which Sac Cardio felt both permitted and obliged to bill for the PA services despite the

13  agreement with Sutter Health because Sac Cardio believed Sutter Health was not paying them

14  enough.  Dr. Longoria likewise testified that: "We've always billed for assistantship in the

15  operating room."  (Carpinello Decl., Exh. 8 at 126:19-20, Dkt. No. 335-8.)  Sutter Health argues

16  that Relator has no evidence of specific billings for the PAs during the relevant time period, or that

17  any billing would have been for services performed under the agreements between Sutter Health

18  and Sac Cardio.  (Defs.' MSJ at 38.)  Viewing this evidence in the light most favorable to Relator,

19  however, a reasonable jury could find, for example, that Dr. Ingram was not just testifying as to

20  general practices; he was testifying about the contracts with Sutter Health specifically.

21  Sutter Health argues that even if Sac Cardio double-billed, Sutter Health neither knew nor

22  intended for Sac Cardio to do so.  (Defs.' MSJ at 39.)  Sutter Health points to testimony by

23  Cardiac service line administrator, Margaret Mette, who testified that she explained to Sac Cardio

24  that they could not bill for services that the hospital was already paying them to do.  (*See* Ohta

25  Decl., Exh. 1 at 43:23-44:9, 45:8-21, Dkt. No. 295-1.)  Relator, in turn, points to an August 2008

26  e-mail from Coordinator of the Sutter Heart & Vascular Institute, Dene Franklin, acknowledging

27  that the amounts paid to Sac Cardio was to cover for costs of PA services "not covered by

28  insurance reimbursement.  I.e. insurance does not reimburse the groups enough to cover the costs

United States District Court
Northern District of California

for the individuals[.]" (Carpinello Decl., Exh. 7, Dkt. No. 335-7.)  While Sutter Health appears to question whether Ms. Franklin had insight into the relevant contracts, it is notable that Ms. Mette was cc'd on the e-mail and did not contradict Ms. Franklin.  (*See* Defs.' Reply at 18.)  Thus, this e-mail at least creates a dispute of material fact as to whether Sutter Health knew or meant for Sac Cardio to bill insurers for PA services, as it acknowledged that insurance was not sufficiently reimbursing Sac Cardio.

Moreover, Relator points to its expert opinions to argue that Sutter Health should have known that Sac Cardio was double-billing. (Rel.'s Opp'n at 18.)  Specifically, Mr. Sokolove opines that Sutter Health "should have taken affirmative steps to ensure Sac Cardio was not billing for the [PA] services." (Sokolove Report at 9.)  For example, Mr. Sokolove opines that the failure of Sutter Health's Compliance Department to identify Sac Cardio's double-billing "was likely due, at least in part, to inadequate documentation of [PA] activities," noting that Sutter Health did not require any PA time reporting before 2011. (Sokolove Report at 11-12.)  Thus, the Court concludes that a jury could find that Sutter Health should have known that Sac Cardio was double-billing, such that there could be FCA liability.  *See Godecke*, 937 F.3d at 1211 (explaining that FCA liability can be found even in "the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted").

### 2.  Overcompensation

Second, Relator challenges the leasing arrangement as commercially unreasonable and above FMV because it routinely overcompensated Sac Cardio. (Rel.'s Opp'n at 20.)  Relator points to her expert opinions.  Mr. Sokolove analyzed Sac Cardio's Schedule of Personnel Expenses – Income Tax Basis and Income Statement for 2007 through 2009, and found that Sac Cardio received more from Sutter Health than it paid to its PAs, even including payroll taxes and benefits. (Sokolove Report at 13, Appx. A.)  Likewise, Kathy McNamara, a CPA with 40 years of healthcare experience, reviewed the PAs' W2 wages, estimated benefits, and related taxes, and opined that Sutter Health overpaid Sac Cardio by over $200,000 between 2007 and 2014. (McNamara Report, Exh. A, Dkt. No. 335-12.)  Considering the evidence in the light most

1    favorable to Relator, the Court finds there is a genuine issue of material fact as to whether Sutter

2    Health overcompensated Sac Cardio for the PAs.

3                                           3.   FMV

4         Sutter Health argues that the PA leasing agreement falls within FMV, such that there is no

5    Stark Law or AKS violation.  (Defs.' MSJ at 37-38, 40.)  Sutter Health contends that the leasing

6    agreements were supported by either a contemporaneous FMV assessment or one prepared by its

7    expert, Amit Payan.  Relator, however, argues that the FMV assessments are fundamentally

8    flawed because they do not account for the double-billing.  Thus, this creates a factual dispute as

9    to whether Sutter Health's FMV analyses were correct, as well as whether the leasing agreements

10   would have fallen within FMV.

11                                    b.   Director Agreements

12        Starting around 2006, Sutter Health contracted with Sac Cardio's three surgeons for

13   medical director services.  "Medical director arrangements are commonly established when

14   medical leadership and supervision is needed to institute, organize, or progress a particular

15   specialty or subspecialty area of medicine."  (Odom Report ¶ 39.)  Medical director duties are

16   broad, and can include developing policies and procedures, developing clinical care pathways and

17   protocols, supervising the team, pursuing or maintaining designations or certifications, developing

18   department budgets, and facilitating coordination with other departments.  (Odom Report ¶ 40.)

19        Relator asserts that the medical directorships here were not genuine, but instead had near-

20   identical hourly compensation and monthly compensable hours despite having different job duties.

21   (Rel.'s Opp'n at 25-26.)  In support, Relator points to the expert opinion of Dr. Jerry Pratt.  (Pratt

22   Report, Dkt. No. 335-29.)  The Sac Cardio surgeons were compensated between 12 to 40 hours

23   per month between 2006 and 2014.  (Pratt Report at 4.)  Dr. Pratt opines, however, that the Sac

24   Cardio surgeons had too many compensable hours for their medical director positions, given the

25   types of programs they oversaw.  (Pratt Report at 4.)  Specifically, he asserts that the hours were

26   consistent with the time it takes for a medical director to start a new program from scratch,

27   pointing to his own experience and explaining that it took him 8 to 10 hours per month in

28   meetings and training sessions for only 2 to 3 months, before his administrative burden decreased

United States District Court
Northern District of California

to 1 to 2 hours per month over the next year, and then 1 to 2 hours per quarter thereafter.  (Pratt Report at 4-5.)  Dr. Pratt also raises concerns with how each of the medical director positions allowed for the same number of hours; for example, Dr. Pratt explains that Dr. Kincade's Heart Transplant and VAD Directorship should require more administrative time than Dr. Longoria's Surgical Ablation Directorship because "[t]he complexity of a heart transplant/VAD program with its associated state and federal requirements, the training and education and other associated factors [would] far exceed the demands of overseeing a nonregulated atrial fibrillation program." (Pratt Report at 5.)  Dr. Pratt also opines that as a general matter, Sutter Health employed too many medical directors, with "nearly every cardiologist and cardiovascular surgeon [being] paid to be a Medical Director of something."  (Pratt Report at 10.)  Dr. Pratt notes that the titles overlapped significantly, and that in his experience, a Heart Institute requires far fewer medical directors to be successful.  (Pratt Report at 10-11.)

In addition to the hours, Relator challenges the hourly rate, pointing to the compensation increasing from $150 to $350.  (Rel.'s Opp'n at 27.)  Dr. Pratt opines that while it is common for surgeons to request more compensation, "I have rarely seen compensation for non-clinical services increase this dramatically all at once."  (Pratt Report at 6.)  Likewise, the compensable hours were increased; for example, when Sac Cardio's office manager, Dee Sanchez, noted in August 2008 that she "cannot get the medical directorships to add up to 650K," Ms. Mette responded that they would modify the contracts to achieve the amount.  (Carpinello Decl., Exh. 32, Dkt. No. 335-2.)  A few days later, Dr. Ingram's monthly hours were increased from 12 to 17, and Dr. Kincade's monthly hours were increased from 15 to 19.  (Ohta Decl., Exhs. 90, 93.)  While Sutter Health argues that such evidence is "irrelevant," taking the facts in a light most favorable to Relator, a jury could conclude that the hourly increase was not related to Sutter Health's need but to satisfy Sac Cardio's monetary requests.  (*See* Defs.' Reply at 20.)

As with the PA leasing agreements, Sutter Health argues that the medical director positions fall within the FMV reports, pointing to the hourly rates approved at the time as well as Mr. Payan's expert report.  (Defs.' MSJ at 41-42.)  Even if the hourly rates, however, were ultimately within the FMV, there is still a dispute as to whether the number of compensable hours was

15

United States District Court
Northern District of California

appropriate.  Further, Relator argues that the medical director positions fall outside the FMV because there is evidence that the Sac Cardio surgeons were not performing the administrative work for which they were paid.  (Rel.'s Opp'n at 31.)  For example, Relator points to the physicians block-billing double-digit administrative hours on a single day with boilerplate descriptions, including the Sac Cardio doctors recording 25 hours of administrative time on a single day.  (*See* Carpinello Decl., Exh. 39 (Dr. Ingram billing 25 hours for "supervision of nurses" on January 31, 2012), Dkt. No. 335-38; Exh. 40 (Dr. Kincade billing 25 hours for "supervision of nurses" on January 1, 2012), Dkt. No. 335-40; Exh. 41 (Dr. Longoria billing 25 hours for "supervision of nurses" on January 1, 2012), Dkt. No. 335-41.)  Relator also points to Sutter Health administrator Rick Harrell's June 2014 e-mail, stating: "reviewing timesheets, on 5/9 there are 16 hours on a single day for Ingram. Can you give me another date so I can split the hours?"  (Carpinello Decl., Exh. 46, Dkt. No. 335-46.)  While Sutter Health argues that this "handful of minor errors" is insufficient to support a finding that Sac Cardio lied about its hours or that Sutter Health knew about it, it is evidence that creates a dispute of material fact.  Thus, the Court finds that there is a dispute as to whether the medical directorships fell within the FMV, and thus whether they were a violation of the AKS and Stark Law.

### c.   Call Coverage

Starting in 2008, Sac Cardio provided cardiothoracic surgery call coverage at Sutter Medical Center - Sacramento.  Sutter Health argues that the rates paid fell within independent third-party FMV appraisals. Specifically, the July 2008 and July 2009 call coverage agreements paid $1,140 per shift, which was supported by a Healthworks FMV report calculating a FMV range of $608 to $1,140 per shift.  (*See* Ohta Decl., Exh. 101, Dkt. No. 299-5.)  The August 2010 call coverage agreement paid $2,500 per 24-hour shift, which was supported by a HCAI FMV report calculating a FMV range of $2,090 to $2,640 per shift.  (Ohta Decl., Exh. 111, Dkt. No. 299-15.)  Relator, in turn, challenges both how the call coverage actually worked in practice and the information given to the FMV appraisers.  (Rel.'s Opp'n at 32-33.)

### 1.   Services Rendered

Relator argues that under "Title 22," California requires three surgeons to be physically

United States District Court
Northern District of California

present whenever a procedure is performed that requires the use of a cardiopulmonary bypass machine.  (Rel.'s Opp'n at 33.)  Many cardiothoracic surgery practices, including Sac Cardio, have a partial waiver, such that they only need to staff two surgeons and a PA.  (*Id.*)  Thus, Relator contends that Sutter Health was effectively paying Sac Cardio to have two surgeons and one PA on call at all times.  (*Id.*)  Relator, however, asserts that Sac Cardio only staffed one on-call surgeon each day, as reflected in Sac Cardio's on-call schedule that it provided to Sutter Health each month.  (*See* Carpinello Decl., Exh. 49 (listing one surgeon for each day of coverage from October to December 2010), Dkt. No. 336-2; Exh. 50 (listing one surgeon for each day of coverage from April to June 2012), Dkt. No. 336-3.)  When asked whether there were two doctors and a PA that would be on call for every 24-hour period, Dr. Ingram testified that he "forgot when the second guy actually got paid to be on call to be put on the list," and that he "would call one of the other guys to see if they could come in and help."  (Carpinello Decl., Exh. 4 at 140:13-23, Dkt. No. 335-4.)  He also testified "there was no official second call guy."  (Carpinello Decl., Exh. 4 at 141:4-5, Dkt. No. 335-4.)  Sutter Health argues that this does not mean there was no second physician, but the evidence would at least suggest a dispute of fact as to the issue of whether Sac Cardio did in fact staff two surgeons, as they were required to in order to satisfy Title 22 and, presumably, Sutter Health's coverage needs.

Relator also asserts that Sac Cardio was effectively being paid to have PAs available, even though the PAs were already being paid for under the leasing agreement.  (Rel.'s Opp'n at 34-35.)  Relator contends that none of the FMV appraisals considered this issue.  Indeed, the HCAI appraisal notes the leasing agreement, and "assumes that the payments under Agreement for any coverage provided by Contractor using one of Contractor's PAs do not overlap with any payments or services rendered under the separate leased services arrangement."  (Carpinello Decl., Exh. 52 at 3, Dkt. No. 336-5.)  Sutter Health argues this is not relevant, but Relator appears to be arguing that by paying Sac Cardio to have PAs available for call coverage (as required by Title 22), Sutter Health was paying Sac Cardio for the PAs for a second time.

Taken together, this would appear to create a question of whether the FMV considered how Sac Cardio actually operated, including whether it was providing the staffing necessary under

1    Title 22.

2              2.   Information to Appraisers

3         Relator argues that the FMV reports underlying Sac Cardio's call coverage arrangements

4    are themselves suspect.  With respect to the 2010 FMV assessment, the July 2010 draft assessment

5    justified a call coverage rate of up to $1,760 per day.  (Carpinello Decl., Exh. 53 at 3, Dkt. No.

6    336-6.)  Based on estimated information provided by the hospital, Sac Cardio's physicians were

7    expected to respond to an average of six to seven call events per week, of which three would

8    require a physician's immediate presence at the hospital.  (Carpinello Decl., Exh. 53 at 18, Dkt.

9    No. 336-6.)  On July 23, 2010, Ms. Mette wrote a memorandum to CEO Thomas Gagen,

10   explaining that Sac Cardio was "requesting an increase in the daily call rate from $1100 to

11   $2000," and that "[t]hey have indicated that they will not continue to provide call to the program

12   unless the rate is $2000/day."  (Carpinello Decl., Exh. 54 at 1, 2.)  Ms. Mette also noted that the

13   FMV "identifies that the maximum rate is $1760/day based on the data that was supplied to the

14   FMV appraiser."  In August 2010, the final assessment justified a call coverage rate of up to

15   $2,090 to $2,640 per day.  (Ohta Decl., Exh. 111 at 3, Dkt. No. 299-15.)  In so finding, the final

16   assessment found that based on estimated information provided by the hospital, Sac Cardio's

17   physicians were now expected to respond to an average of 27 to 36 call events per week, with

18   eleven to sixteen requiring a physician's immediate presence.  (Ohta Decl., Exh. 111 at 17, Dkt.

19   No. 299-15.)  The assessor noted, however, that it "was not provided with any source

20   documentation to verify this information."  (Ohta Decl., Exh. 111 at 17 n.26, Dkt. No. 299-15.)

21   Thereafter, Sac Cardio and Sutter Health entered into a call coverage agreement for $2,500 per

22   day.  (Ohta Decl., Exh. 106 at 3, Dkt. No. 299-10.)

23        Sutter Health argues that this change is of no import, asserting that the original report was

24   merely using "placeholder data."  (Defs.' Reply at 22.)  Sutter Health, however, provides no

25   evidence in support of its assertion that the original data was "placeholder data."  Considering this

26   evidence in a light most favorable to Relator, the Court finds that a jury could find that the

27   significant change between the July and August 2010 FMV assessments were suspect, particularly

28   when combined with the July 2010 memorandum acknowledging that Sac Cardio would not

United States District Court
Northern District of California

provide coverage at the rate the draft FMV report had found.

Relator also argues that when the call coverage agreement was renewed in 2012, Sutter Health commissioned another FMV appraisal, which ultimately justified a call coverage rate of "$2,160 to $2,910 per 24-hour period, for three primary on-call physicians." (Carpinello Decl., Exh. 48 at 7, Dkt. No. 336-1.) Relator, however, points out that given its Title 22 waiver, Sac Cardio never had to provide three physicians. (Rel.'s Opp'n at 37.) Sutter Health does not respond to this point. At the very least, when considering this FMV appraisal and the 2010 FMV assessments, a jury could find that the FMV appraisals were not accurate and did not support the call coverage arrangements. This, in turn, affects the analysis of whether there was a Stark Law violation, as the personal services exception requires that compensation not exceed FMV.

### d.   Conclusion

Taken together, the Court finds there are significant disputes of material fact that defeat summary judgment as to the compensation arrangements between Sutter Health and Sac Cardio.[4] A jury could find that the compensation arrangements were problematic and/or outside of FMV, such that they were in violation of the Stark Law or AKS. From there, any claims submitted by Sutter Health to the Government for services performed by Sac Cardio would be false, including if Sutter Health falsely certified compliance with the AKS or Stark Law. *See Frazier*, 392 Fed. Appx. at 537-38. Those claims would also be adequately linked to the compensation arrangements at issue, such that there would be causation. *See Kuzma*, 607 F. Supp. 3d at 956; *Abbott Lab'ys, Inc.*, 622 F. Supp. 3d at 933. Additionally, there was evidence that Sac Cardio threatened to cease providing services unless Sutter Health met their financial demands. (*See* Carpinello Decl., Exh. 54 at 2 (stating that Sac Cardio had "indicated that they will not continue to provide call to the program unless the rate if $2000/day"), Dkt. No. 336-7; Exh. 55  at 1 (noting that "[c]ase volume drops due to burned relationships, contractual issues"), 2 (quoting Dr.

---

[4] Relator also points to evidence and actions from the Settlement Period as supporting their claim that the compensation arrangements were intended to induce referrals. (*See* Rel.'s Opp'n at 38-41.) Because the Court finds there is sufficient evidence from the period at issue in this case, the Court does not consider that evidence. The Court also makes no determination at this time whether such evidence is relevant.

United States District Court
Northern District of California

1   Longoria as stating, "By the way, if we stop working, your place shuts down. Period."), Dkt. No.

2   336-8.)   Finally, there is also evidence of scienter, as Relator has presented evidence that Sutter

3   Health knew or should have known that the compensation arrangements were problematic.

### ii.    SMG and Dr. David K. Roberts

5   Dr. Roberts is an interventional cardiologist employed by SMG, an independent medical

6   group that contracts with Sutter Health to staff Sutter Health's clinics, hospitals, and facilities.

7   (Rel.'s Opp'n at 43; SMG MSJ at 2; Roberts Decl. ¶ 1, Dkt. No. 293-1.)   Relator asserts that

8   between March 1, 2013 through November 30, 2014, Dr. Roberts's medical directorship

9   agreements were improper because Dr. Roberts was expected to perform 87 to 121 hours of

10  service per month, despite continuing to maintain a full-time medical practice.   (TAC ¶ 3(B).)

11  From 2005 to 2008, Dr. Roberts was Medical Director of the Cardiac Catheterization Lab

12  ("Cath Lab"), a role that required 19.5 hours per month at an hourly rate of $150.   (*See* McNamara

13  Report, Exh. F.)   From 2008 to 2013, Dr. Roberts was Director of the Sutter Heart Institute, a role

14  that required 69 hours per month at an hourly rate of $362.   (*See* McNamara Report, Exh. F.)   In

15  2013, Dr. Roberts was promoted to Director of the Regional Service Line, a role that required 87

16  hours per month at an hourly rate of $296.   (*See* McNamara Report, Exh. F.)   In 2014, Dr.

17  Roberts's contract was modified to require 121 hours per month at an hourly rate of $270.   (*See*

18  McNamara Report, Exh. F.)

19  Again, at issue in this case are the 2013 and 2014 medical director agreements.   (*See* TAC

20  ¶ 3(B).)   Relator makes the following arguments for why Dr. Roberts's medical directorship

21  agreements was commercially unreasonable and inconsistent with FMV.

22  First, Relator argues that between 2005 and 2014, Dr. Roberts's medical director time

23  increased from 19.5 hours per month to 121 hours per month.   (Rel.'s Opp'n at 43.)   Relator cites

24  no authority that an increase alone can demonstrate that a compensation arrangement was

25  commercially unreasonable.   Instead, the evidence in the record shows that Dr. Roberts took on

26  additional positions, including his selection as the Medical Director of the Regional Service Line

27  in 2013.   (Roberts Decl. ¶ 3.)   Dr. Roberts states -- and Relator does not dispute -- that the position

28  was posted, and that he was selected after an interview process.   (Roberts Decl. ¶ 3.)   Dr. Roberts

United States District Court
Northern District of California

further explains that this "position was created to integrate cardiovascular care across Sutter Health's facilities in California's Central Valley," which included "assessing the abilities and needs of each facility and determining how those could be leveraged and coordinated across the entire service line[.]" (Roberts Decl. ¶ 7.)  During this time, Dr. Roberts was also still responsible for the Heart Institute Medical Director and Cath Lab Director responsibilities, which included planning for the merger of two campuses, developing a structural heart program, setting up a STEMI protocol to transport patients between facilities, and continuing to develop the cath lab. (Roberts Decl. ¶¶ 9-10.)  In short, there is undisputed evidence that Dr. Roberts took on additional responsibilities, and Relator provides no legal authority, evidence, or argument to suggest that these responsibilities would not require the increase in Dr. Roberts's medical director time.

Second, Relator argues that Dr. Roberts could not have worked as a full-time interventional cardiologist after his medical director hours increased.  (Rel.'s Opp'n at 44.)  For example, Dr. Roberts produced a clinical output of 12,287 work relative value units ("wRVUs") in 2012, around the 75th percentile of clinical productivity for his specialty.  (*Id.*; Roberts Decl. ¶ 22.)  His clinical output decreased to 9,581 wRVUs in 2013 and 8,705 wRVUs in 2014, slightly above the median of clinical productivity for his specialty.  (Rel.'s Opp'n at 44; Roberts Decl. ¶ 22.)  Additionally, Dr. Roberts was on call for ten days in April 2013.  (Carpinello Decl., Exh. 70, Dkt. No. 336-2.)  Based on this, Relator concludes that "[t]he only way for this math to add up is for Dr. Roberts to be Superman, working the hours of nearly two full-time employees," *i.e.*, approximately 75 hours per week.  (Rel.'s Opp'n at 44.)  This assertion does not create a question of fact; it is not impossible for Dr. Roberts to work 75 hours per week.  Indeed, Dr. Roberts attests to such in his declaration.  (Roberts Decl. ¶ 21 ("I estimate that in 2013 and 2014, I was working approximately 75 hours per week on administrative and clinical work.)

In the alternative, Relator argues that Dr. Roberts did not actually perform the administrative work he said he did because "Dr. Roberts' time records show a significant portion of his Medical Director time was actually time he spent in the Cath Lab performing procedures for which he was separately compensated."  (Rel.'s Opp'n at 44.)  Relator questions why Dr. Roberts would need to spend 30% of his medical director time in the Cath Lab, but provides no evidence

United States District Court
Northern District of California

1    to contradict Dr. Roberts's declaration that he was required to spend time in the Cath Lab

2    performing day to day operational tasks, reviewing the charts of all TAVR patients with the

3    TAVR team, holding monthly educational cath conference for the staff, and training nurses and

4    technicians in the cath lab.  (Roberts Decl. ¶¶ 10-11.)  Dr. Roberts also explains that he would

5    carry out many of his medical director duties while in or near the cath lab, including making calls,

6    sending e-mails, and other communications.  (Roberts Decl. ¶ 12.)  In contrast, Relator complains

7    that Dr. Roberts had a number of entries indicating Supervision/Education at the cath lab, which

8    did not include any narrative detail except the names of the assistants.  (Rel.'s Opp'n at 46; *see*

9    *also* Carpinello Decl., Exh. 76, Dkt. No. 336-29.)  It is unclear how this shows that Dr. Roberts

10   was lying about the hours he spent.  In light of the evidence in the record, Relator's bare assertion

11   that Dr. Roberts was actually recording clinical time as medical director time based solely on Dr.

12   Roberts recording 30% of his medical director time in the Cath Lab does not create a material

13   dispute of fact.  Likewise, the fact that Dr. Roberts's time entries could have included more detail

14   does not contradict the evidence in the record.  (Rel.'s Opp'n at 45-46.)

15        Relator also argues that Dr. Roberts acknowledged that since 2018, his medical

16   directorship has only required 48 hours per month.  (Rel.'s Opp'n at 46; Roberts Decl. ¶ 22.)

17   Based on this, Relator suggests that Dr. Roberts could have performed his administrative duties in

18   48 hours in 2013 and 2014, demonstrating that he was overcompensated.  Again, this alone is

19   insufficient absent evidence that Dr. Roberts had the same tasks in 2013 and 2014 that he has

20   since 2018.  Notably, Relator's own expert, Dr. Pratt, noted that the hours to develop a program

21   would be more than the hours to maintain a program, which would appear to explain the decrease.

22   (Pratt Report at 4-5.)

23        Finally, Relator contends that Dr. Roberts's medical directorship was duplicative of other

24   medical directors within the Sutter Heart Institute.  (Rel.'s Opp'n at 46-47.)  In support, Relator

25   points to a January 2010 draft FMV appraisal, which included language that the hospital should

26   consider whether the medical administrative positions were duplicative.  (Carpinello Decl., Exh.

27   79 at 1, 7, Dkt. No. 336-32.)  Relator also asserts -- without evidence -- that Sutter Health told the

28

appraiser to ignore the issue of duplication.[5]  (Rel.'s Opp'n at 46-47.)  Relator, however, fails to explain how a 2010 suggestion that the hospital should consider whether medical administrative positions were duplicative automatically means that Dr. Roberts's 2013 and 2014 medical directorship *specifically* was duplicative.

Accordingly, the Court finds that Relator has failed to raise a dispute of material fact as to whether the compensation arrangements between Dr. Roberts and Sutter Health were commercially unreasonable and/or inconsistent with FMV.  The Court finds that summary judgment is warranted as to these arrangements.

### iii.   East Bay Cardiac

East Bay Cardiac is an independent physician organization owned by Dr. Junaid Khan and Dr. Russell Stanten.  (East Bay Cardiac MSJ at 2; Rel.'s Opp'n at 50.)  Relator asserts that from February 4, 2009 through November 30, 2014, the compensation arrangements between Sutter Health and East Bay Cardiac were commercially unreasonable and excessive.  (Rel.'s Opp'n at 50; TAC ¶ 3(C).)  East Bay Cardiac was compensated pursuant to a "bundled" agreement, which encompassed exclusive 24/7/365 cardiovascular surgery call coverage at Alta Bates Summit Medical Center ("Alta Bates"), Dr. Khan's Cardiovascular Service Line Medical Directorship, and data collection services.  (Rel.'s Opp'n at 50.)

Throughout the years, the compensation in the bundled agreement increased.  The June 2007 bundled agreement compensated East Bay Cardiac a maximum of $500,000 per year, including a maximum of $15,000 for Dr. Khan's medical directorship and $485,000 for call coverage and data collection.  (Ohta Decl., Exh. 50 at 7, Dkt. No. 296-16.)  On October 29, 2008, East Bay Cardiac sent a letter to Alta Bates CEO Warren Kirk, stating that they "'believe we have been undervalued and under appreciated."  (Ohta Decl., Exh. 52 at 1, Dkt. No. 296-18.)  East Bay Cardiac requested a  meeting to discuss certain issues, including needing their stipend "to be

---

[5] At the hearing, Relator pointed to evidence that was submitted in connection to an entirely separate motion filed on August 12, 2024 -- more than **two months** after their opposition was filed, almost a month after Defendants' reply was due, and several days after the original hearing was set in this case.  This is not appropriate, and the Court will not consider evidence that was not provided with the opposition.

doubled to provide us with stable, adequate income and to allow hiring and retention of the clinical support staff needed to service and active cardiac and thoracic practice." (Ohta Decl., Exh. 52 at 2, Dkt. No. 296-18.)  East Bay Cardiac further requested that any contract should last ten years, and that "the failure to achieve a long-term working agreement on these points will lead to a loss of security to us and to you." (Ohta Decl., Exh. 52 at 2, Dkt. No. 296-18.)

In February 2009, Sutter Health executed a new agreement, which compensated East Bay Cardiac $1 million per year. (Ohta Decl., Exh. 54 at 7, Dkt. No. 296-20.)  The February 2009 agreement included increasing Dr. Khan's medical director duties to a minimum of forty hours per month. (Ohta Decl., Exh. 54 at 2, Dkt. No. 296-20.)  Sutter Health obtained an FMV opinion from Sinaiko, which found that the $1 million annual compensation was within FMV. (Ohta Decl., Exh. 53, Dkt. No. 296-19.)

In February 2011, Sutter Health and East Bay Cardiac entered into a new agreement, which increased compensation to $142,560 for medical director services, $602,250 for coverage, and $311,340 for data collection services, or a total of $1,056,150 per year. (Ohta Decl., Exh. 55 at 8-9, Dkt. No. 296-21.)  In September 2012, Sutter Health employee Steve O'Brien observed that he expected contract negotiations with East Bay Cardiac would be "contentious again since (1) they are paid at the top of their FMV in all three categories of coverage and (2) last year when we started to look at a new FMV for the data portion, it seemed like it might actually go down from the year before." (Carpinello Decl., Exh. 87, Dkt. No. 337-8.)  In February 2014, Sutter Health and East Bay Cardiac entered into another new agreement, which increased compensation to an annual maximum of $108,000 for administrative services ($300/hour), $862,000 for coverage, and an annual maximum of $385,000 for data collection services ($1,000/patient), for a total of $1,355,000. (Carpinello Decl., Exh. 91 at 8-9.)  A February 2014 FMV report calculated FMV ranges of $280 to $354 for up to 40 hours per month of medical director services, $1,573,150 to $2,233,800 for call coverage, and $982 to $1,312 per patient for data collection services. (Ohta Decl., Exh. 69, Dkt. No. 298-14.)

a. Data Collection

Relator challenges East Bay Cardiac's compensation for data collection, arguing that the

United States District Court
Northern District of California

FMV analyses were based on problematic assumptions regarding how long data collection took. (Rel.'s Opp'n at 53.)  East Bay Cardiac's physicians were members of the Society of Thoracic Surgeons ("STS") and related state professional associations, which impose data collection and reporting requirements on their members to evaluate and improve patient surgical outcomes.  (*Id.*)

From 2011 on, East Bay Cardiac's data collection payments exceeded $300,000 per year. The FMV analyses relied on East Bay Cardiac's reporting on how long the physicians spent on data collection.  In January 2011, Sutter Health requested an estimate of physician time on data collection; East Bay Cardiac's practice manager estimated thirty hours per month.  (Carpinello Decl., Exh. 92, Dkt. No. 312-93.)  In response, Dr. Khan told their practice manager "No further data until we talk.  Let him know my concern is that for FMV, we want to talk directly with firm responsible, otherwise I see a huge problem occurring." (Carpinello Decl., Exh. 92, Dkt. No. 338-2.)  A few days later, Dr. Khan asserted that the physicians spent seventy hours a month on data, complaining that "providing this data **without context is a waste of my time and yours**," and that they "do not accept the fact that this data is needed to initiate the FMV process."  (Ohta Decl., Exh. 58, Dkt. No. 298-3.)

Relying on East Bay Cardiac's data, the 2011 FMV based its analysis on East Bay Cardiac spending 5.5 hours per case on data collection, with two hours spent by its physicians.  (Carpinello Decl., Exh. 88 at 36, Dkt. No. 337-9.)  This resulted in a FMV from $263,109 to $311,340. (Carpinello Decl., Exh. 88 at 36, Dkt. No. 337-9.)  The 2014 FMV based its analysis on East Bay Cardiac spending 7.75 hours per patient on data collection, with 2.5 hours spent by its physicians. (Ohta Decl., Exh. 69, Exh. G, Dkt. No. 298-14.)

The parties dispute whether the time spent by East Bay Cardiac's physicians on data collection was reasonable.  Defendants point to Dr. Khan's testimony, in which he stated that they "spent a ton of time on data" and estimated that data collection could "be as short as half an hour" while other cases "would take three hours."  (Ohta Decl., Exh. 70 at 139:15-16, 139:25-140:3.) Likewise, Dr. Stanten acknowledged that they "put more effort into this than most physicians," but that their efforts resulted in "numerous 3 star rankings (out of 3) from the STS for better than expected results."  (Stanten Decl. ¶ 19.)  Relator, in turn, points to the opinion of Dr. Pratt, who

likewise has been a participant in the STS database since 2008.  (Rel.'s Opp'n at 53-54.)  Dr. Pratt estimates that STS data collection takes a maximum of fifteen minutes of physician time per case, not multiple hours.  (Pratt Report at 15-16.)  Leo Dominguez, the Sutter Health administrator who oversaw East Bay Cardiac, also observed in January 2012 that "6 to 9 hours seems so high to me." (Ohta Decl., Exh. 60, Dkt. No. 298-5.)  Likewise, in March 2012, Alta Bates Administrative Director Merrilee Newton noted that other programs stated they spent 2.5 hours per patient, including administrator time.  (Carpinello Decl., Exh. 94, Dkt. No. 338-4.)

The Court finds there is a genuine dispute of material fact as to the time spent by East Bay Cardiac's physicians on data collection, as well as whether Sutter Health should have known that the time was reasonable.  While Defendants argue there is no evidence that Dr. Khan or Dr. Stanten lied, Dr. Pratt's expert opinion and Sutter Health's own finding that other programs spent significantly less time on data collection per patient creates a question of credibility that a factfinder should determine.  Again, this then affects whether Sutter Health's FMV analyses were inflated, and thus whether the compensation for data collection was within FMV.

### b.   Call Coverage

Next, Relator challenges whether East Bay Cardiac was overpaid for 24/7/365 call coverage at Alta Bates.  The 2009 FMV analyses assumed call coverage of 1.87 full-time equivalent ("FTE") cardiothoracic surgeons and 1.85 FTE general surgeons; Relator argues it was unreasonable to assume East Bay Cardiac had nearly four full-time physicians to staff call coverage when the group only had two full-time surgeons.  (Rel.'s Opp'n at 52; Carpinello Decl., Exh. 86 at 13, Dkt. No. 337-7.)  In December 2011, East Bay Cardiac took on additional coverage at Eden Medical Center ("Eden") for approximately half the year, which required two thoracic surgeons to be available.  (Rel.'s Opp'n at 56.)  Dr. Pratt opined that this was unreasonable because if a call event occurred simultaneously at Alta Bates and Eden, both surgeons would need to be able to attend, effectively requiring that both Dr. Khan and Dr. Stanten be on call every single day that coverage was provided at Eden Medical Center.  (Pratt Report at 12-13.)  Relator, however, contends that East Bay Cardiac only staffed one surgeon at both Alta Bates and Eden on the same night, pointing to the July 2012 call schedule that listed Dr. Stanten as primary call at

United States District Court
Northern District of California

1   both Alta Bates and Eden on July 1, 9, 10, 13, 14, and 15, and Dr. Khan as primary call at both

2   Alta Bates and Eden on July 11, 12, and 23-29.  (Carpinello Decl., Exh. 98, Dkt. No. 338-8; Exh.

3   99, Dkt. No. 338-9.)  Thus, Relator argues that Sutter Health was compensating East Bay Cardiac

4   for having two surgeons available each night, but that in practice East Bay Cardiac would only

5   staff one surgeon, making the compensation unreasonable.  (Rel.'s Opp'n at 56-57.)

6          Defendants respond that East Bay Cardiac was assisted by at least eight other

7   cardiothoracic surgeons who would share call coverage duties under their oversight.  (Ohta Decl.,

8   Exh. 61 (Stanten Decl.) ¶¶ 8, 10, Dkt. No. 298-6; Ohta Decl., Exh. 70 (Khan Depo.) at 290:17-

9   291:7 (asserting that there were a dozen thoracic surgeons over the years who helped provide

10  coverage), Dkt. No. 298-15.)  Relator, in turn, contends there is no documentary evidence showing

11  that such arrangements actually existed, such as contracts, time sheets, and call schedules.  (Rel.'s

12  Opp'n at 57.)  The evidence in the record, however, shows that Dr. Stanten and Dr. Ohta were

13  assisted by other surgeons with call coverage.  As Relator has not presented any evidence that

14  contradicts this, there is no genuine dispute of material fact as to whether East Bay Cardiac

15  provided the coverage required by the contracts.[6]

16          In the alternative, Relator asserts that Dr. Khan lied about his call coverage burden, which

17  Sutter Health provided to its FMV appraisers, resulting in overhigh FMV reports.  Specifically,

18  Relator points to a March 2011 draft FMV report, which stated that the hospital reported that East

19  Bay Cardiac would be expected to respond to an average of five to eight call events per week, of

20  which one or two would require their presence at the hospital.  (Carpinello Decl., Exh. 88 at 24,

21  Dkt. No. 337-9.)  When asked about this, Dr. Khan responded, "totally wrong. instead of week, it

22  should be day."  (Carpinello Decl., Exh. 89, Dkt. No. 337-10.)  The 2014 FMV then relied on

23  numbers comparable to Dr. Khan's assertion, which the appraiser regarded as a rate that was

24  "extremely high."  (Ohta Decl., Exh. 69 at 25.)  Notably, Dr. Pratt explained that this rate would

25  be "a greater call burden than I have ever seen, even in a populous metro area like Oakland."

26

27  _____

28  [6] Relator points to the December 2012 call coverage agreement prohibiting East Bay Cardiac's on-call surgeon from taking simultaneous call coverage at any other hospital, but provides no evidence that East Bay Cardiac failed to comply after this contract was signed.

1   (Pratt Report at 12.)  Rather, Dr. Pratt stated that a busy on-call volume would be three to five call

2   events per week, many of which would be short phone calls that could be handled by physician

3   assistants or nurse practitioners.  (Pratt Report at 12.)  The Court finds that as with the data

4   collection estimates, this creates a question of credibility as to whether the number of call events

5   was accurate, which then affects the accuracy of the FMV report.

6                           c.   Administrative Positions

7          Finally, Relator asserts that in addition to the bundled arrangements' compensation to Dr.

8   Khan for ten to forty hours of medical directorship work, Sutter Health separately compensated

9   Dr. Khan and Dr. Stanten for numerous administrative positions.  (Rel.'s Opp'n at 57-58.)  These

10  positions included Dr. Khan being compensated between $18,000 to $21,600 per year as a

11  Physician Consultant on the Sutter Health Cardiovascular Surgery Committee between 2007 and

12  2011, up to $54,000 and $93,600 per year as a Physician Champion of the Electronic Health

13  Records Project in 2011 and 2012, and up to $42,500 per year as Vice President of the Medical

14  Staff in 2012 and $85,000 per year in 2014.  (Carpinello Decl., Exhs. 101-106, Dkt. Nos. 338-11,

15  338-12, 338-13, 338-14, 338-15, 338-16.)  Dr. Stanten was also compensated up to $122,400 in

16  2011 as the Chairperson of the Oncology Committee and the Co-Medical Director of the Lung

17  Cancer Program, up to $54,000 and $93,600 per year as a Physician Champion of the electronic

18  Health Records Project in 2011 and 2012, and up to $37,500 per year as a Subject Matter Expert

19  of the Electronic Health Records Project in 2012 and 2014.  (Carpinello Decl., Exhs. 110-115,

20  Dkt. Nos. 338-20, 339-1, 339-2, 339-3, 339-4, 339-5.)  Dr. Pratt, in turn, opines that these many

21  positions were not reasonable because the duties were overlapping or already encompassed in

22  other existing contracts; for example, Dr. Khan's medical director duties already included

23  administrative work related to the Electronic Health Records Project.  (Pratt Report at 14.)  Dr.

24  Pratt also opined that having both Dr. Khan and Dr. Stanten be Physician Champions in the same

25  program was "clearly overlapping and appear to duplicate payments for the same duties."  (Pratt

26  Report at 14.)  In response, Defendants appear to argue that Dr. Pratt's opinion is insufficient, but

27  cite no authority in support.  At the very least, Dr. Pratt's opinion that these positions were

28  overlapping and should therefore not have been separately compensated creates a question of fact

United States District Court
Northern District of California

28

United States District Court
Northern District of California

1   as to whether East Bay Cardiac's compensation for its administrative duties was commercially

2   reasonable and/or within FMV.

3       Relator also argues that Dr. Khan double-counted his administrative time, including

4   admitting in February 2012 that he had been recording his Medical Executive Committee time

5   towards his Cardiovascular Department Medical Directorship "for the last ten years." (Carpinello

6   Decl., Exh. 100, Dkt. No. 338-10.)  Regardless, Sutter Health continued to approve Dr. Khan's

7   medical director timesheets reflecting time for the Medical Executive Committee, including in

8   September 2014.  (Carpinello Decl., Exh. 108 , Dkt. No. 338-18.)  Additionally, in March 2012,

9   Mr. Dominguez noted that Dr. Khan was including entries for time in which he was compensated

10  in other capacities, and was told "He's a pain…. go ahead and approve."  (Carpinello Decl., Exh.

11  109, Dkt. No. 338-19.)  In response, Defendants point out that in both examples, Dr. Khan had

12  worked far more hours than the monthly maximum anyway, such that approval of the timesheet

13  was still appropriate.  (Defs.' Reply at 16.)  For example, Dr. Khan claimed 42.5 hours in the

14  September 2014 time sheet, but could only be paid for a maximum of 30 hours per month.  (*Id.*)

15  Likewise, the March 2012 e-mail explained that Dr. Khan had already worked "many more hrs

16  than required 40 hrs."  (*Id.*)  Thus, it is not apparent from the record before the Court that Dr.

17  Khan was actually *compensated* for double-counting his administrative time.

18      Regardless, as stated above, there are disputes of material fact concerning the medical

19  directorship compensation, such that there is a question of fact as to whether this portion of the

20  compensation arrangements was commercially reasonable and/or within FMV.

21          d.  Conclusion

22      Taken together, the Court again finds there are significant disputes of material fact that

23  defeat summary judgment as to the compensation arrangements between Sutter Health and East

24  Bay Cardiac.  A jury could find that the compensation arrangements were problematic and/or

25  outside of FMV, such that they were in violation of the Stark Law or AKS.  From there, any

26  claims submitted by Sutter Health to the Government for services performed by East Bay Cardiac

27  would be false, including if Sutter Health falsely certified compliance with the AKS or Stark Law.

28  *See Frazier*, 392 Fed. Appx. at 537-38.  Those claims would also be adequately linked to the

compensation arrangements at issue, such that there would be causation.  *See Kuzma*, 607 F. Supp. 3d at 956; *Abbott Lab'ys, Inc.*, 622 F. Supp. at 933.  There are also temporal links between East Bay Cardiac's demand for additional money "in order to maintain our Cardiac and Thoracic Surgery programs" in October 2008, followed shortly by the doubling of East Bay Cardiac's compensation in February 2009.  (*See* Ohta Decl., Exh. 52 at 1-2, Dkt. No. 296-18; Exh. 54 at 7, Dkt. No. 296-20.)  Likewise, in January 2012, Mr. Dominguez stated Dr. Khan "came into my office, he is very upset, he wants to cancel coverage of the cath lab.  I explained the FMV is done, we cannot pay him more now….", which was followed by a $300,000 increase in compensation in February 2014.  (Carpinello Decl., Exh. 116, Dkt. No. 339-6.)  Finally, there is also evidence of scienter, as Relator has presented evidence that Sutter Health knew or should have known that the compensation arrangements were problematic.

### iv.   Liu PC

Liu PC is a one-physician professional corporation operated by Dr. Stephen K. Liu, an interventionalist radiologist.  (Rel.'s Opp'n at 63.)  Relator asserts that from September 1, 2008 through November 30, 2014, the compensation arrangements between Sutter Health and Liu PC were commercially unreasonable and excessive.  (TAC ¶ 3(D).)

Between 2008 and March 2014, Liu PC provided 24/7/365 call coverage at Memorial Medical Center – Modesto ("MMC").  From April 2014 on, Liu PC provided non-exclusive call coverage.  In 2008, Liu PC's call coverage rate was $500/shift.  (Ohta Decl., Exh. 108 at 4, Dkt. No. 299-12.)  Defendants' expert, Amit Payan, opines that this was well below the FMV rate for that period.  (Payan Report at 27, Dkt. No. 295-18.)  In 2010, Liu PC's call coverage rate increased to $1,000 per shift.  (Ohta Decl., Exh. 7 at 4, Dkt. No. 295-7.)  Mr. Payan likewise opines that this is within FMV for that time period.  (Payan Report at 27.)  In 2012, Liu PC's call coverage increased to $1,200 per shift.  (Ohta Decl., Exh. 20 at 6, Dkt. No. 295-20.)  A March 2012 FMV report found that the FMV of such services ranged from $1,490 to $1,940.  (Ohta Decl., Exh. 22 at 5, Dkt. No. 295-22.)  In 2014, Sutter Health ended its exclusive arrangement with Liu PC and entered into a non-exclusive call coverage agreement, which paid $2,000 per shift.  (Ohta Decl., Exh. 28 at 6, Dkt. No. 295-28.)  A March 2014 FMV report found that the

United States District Court
Northern District of California

1   FMV of such services ranged from $1,960 to $2,400 per 24-hour period.  (Ohta Decl., Exh. 29 at

2   6, Dkt. No. 295-29.)

3          Relator challenges the FMV reports as being based on unbelievable information provided

4   by Dr. Liu.  (Rel.'s Opp'n at 64.)  Specifically, in January 2012, Dr. Liu asserted that he worked

5   10.2 hours on Saturdays and six hours on Sundays at MMC, in addition to staying in the hospital

6   until 8 p.m. most weekdays.  (Ohta Decl., Exh. 25, Dkt. No. 295-25.)  Dr. Liu also asserted that he

7   received 2 to 5 calls from the ER and 3 to 8 calls for inpatient care per day, and that 80% of these

8   calls have to be addressed immediately or on the same day.  (Ohta Decl., Exh. 25, Dkt. No. 295-

9   25.)  Dr. Liu further stated that he performed over 3,600 cases in 2011, whereas the "average full

10  time interventionalist radiologist would already be considered busy if he or she were doing over

11  1,000 cases a year." (Ohta Decl., Exh. 25, Dkt. No. 295-25.)   Relator also notes that the FMV

12  appraiser noted that Dr. Liu's reported volume of call events was "high" in 2012 and "very high"

13  in 2014.  (Ohta Decl., Exh. 22 at 4 n.9, Dkt. No. 295-22; Exh. 29 at 4 n.7, Dkt. No. 295-29.)

14  Relator, however, points to nothing in the record that would contradict Dr. Liu's assertions.

15  Unlike with East Bay Cardiac, for example, Relator does not point to an expert opinion that opines

16  Dr. Liu's reported call events are so high that they are effectively improbable.  Further, while

17  Relator asserts that this is yet another "physician professed to be Superman, handling 3.5 times the

18  average workload," Relator provides no information about its feasibility beyond this bare

19  assertion.  (Rel.'s Opp'n at 64.)  Moreover, Relator fails to explain how this affected the FMV

20  analysis, which was apparently premised on the number of call events rather than the number of

21  cases Dr. Liu claimed to perform.  Thus, the Court finds that Relator fails to raise a genuine

22  dispute of material fact as to whether the FMV reports were inaccurate because they relied on his

23  self-reporting about the expected number of call events.

24         Relator further challenges the call coverage arrangements, arguing that Dr. Liu improperly

25  generated a profit from his subcontracting with physicians.  (Rel.'s Opp'n at 64.)  As an initial

26  matter, Relator raises the reasonable question of why Sutter Health would enter into an exclusive

27  24/7/365 call coverage agreement with a one-physician group, given that it was "physically

28  impossible for Dr. Liu to handle every single call coverage shift by himself."  (Rel.'s Opp'n at 64-

United States District Court
Northern District of California

31

65.)  Instead, Liu PC would subcontract with temporary *locum tenens* physicians to handle certain

call shifts.  As Defendants' own expert opines, however, contracting with *locum tenens* "is

typically a more expensive and only temporary solution."  (Payan Report at 29.)  Moreover, the

2012 and 2014 FMV reports assumed that "any compensation paid to Relief Physicians will be at

an equivalent rate (or greater) to the contracted compensation rate that Contractor will receive,

such that Contractor is not financially profiting from the services of Relief Physicians, assuring

that Contractor is not acting as a staffing agency."  (Ohta Decl., Exh. 22 at 3, Dkt. No. 295-22; *see

also* Exh. 29 at 3 ("HAI's analysis assumes that in the event any Contractor elects to enter into

sub-contractor arrangements to fulfill its obligations . . . materially all of the monies received from

Hospital under the Agreement would be passed through to such sub-contracted physician for the

portion of Services rendered by the subcontractor."), Dkt. No. 295-29.)

Despite this assumption, Relator asserts that Liu PC profited from the call coverage

arrangements from 2010 to 2014, earning between $1,650 to $7,250 per week.[7]  (McNamara

Report, Exh. K.)  Relator states this occurred because while Sutter Health was increasing Liu PC's

call coverage rate, Liu PC was not proportionately increasing the rates it paid to the subcontracted

physicians.  (Rel.'s Opp'n at 65.)  Thus, Relator argues that the call coverage arrangements were

not commercially reasonable because Liu PC was profiting from the *locum tenens* arrangements,

contrary to the FMV reports' assumptions.

Sutter Health responds that even if Relator could show that Liu PC was improperly

profiting from the *locum tenens* arrangements, it was not aware of this profiting.  (Defs.' Reply at

4.)  Relator contends that given the FMV appraisals required that Liu PC not earn a profit, it

should have reviewed Liu PC's subcontractor agreements to ensure compliance with this

prohibition on profiting when it increased the coverage rates.  (Rel.'s Opp'n at 66.)  Combining

the FMV analyses' assumption that Liu PC would not earn a profit and the substantial increases in

the compensation rate, particularly the $800 increase in 2014, the Court finds there is a reasonable

---

[7] Ms. McNamara reviewed the *locum tenens* arrangements, determining the total weekly call
amount received by Dr. Liu and the weekly payments made to the *locum tenens* physicians to
determine the net income or loss before patient billings.

1  question of why Sutter Health did not make the necessary inquires to ensure that the FMV

2  analyses were met.  While Dr. Liu had indicated a need for an increase in 2010 due to the higher

3  costs of *locum tenens* physicians, there is no evidence of any other similar request.  Thus, it is not

4  clear why Sutter Health "failed to make simple inquiries which would alert [them] that false

5  claims are being submitted."  *Godecke*, 937 F.3d at 1211.

6  　　　　Taking all these facts into consideration, the Court further finds a reasonable jury could

7  find there is a connection between the compensation arrangements and referrals.  Dr. Liu was one

8  of the highest recipients of Medicare reimbursement for a radiologist.  (*See* Carpinello Decl., Exh.

9  121, Dkt. No. 339-11.)  Sutter Health, in turn, entered into an exclusive arrangement for 24/7/365

10  call coverage with Liu PC, despite only having a single physician.  This effectively required that

11  Liu PC enter into *locum tenens* arrangements, creating the risk of profiting that Sutter Health never

12  inquired into despite its FMV analyses assuming the lack of any profitability.  This, combined

13  with the significant increases in compensation and Ms. McNamara's opinion that Dr. Liu did, in

14  fact, profit from the call coverage arrangements, could raise the inference that Sutter Health

15  entered into these agreements in order to obtain Dr. Liu's referrals.  Any claims submitted by

16  Sutter Health from such a referral would thus be illegal and in violation Sutter Health's asserted

17  compliance with the AKS and Stark Law.

18  　　　　**v.　CEPMG**

19  　　　　CEPMG is an independent physician group that provides emergency department coverage

20  services.  At issue is the 2011 Coverage Services Agreement covering CEPMG's provision of

21  exclusive emergency department coverage services at Memorial Hospital Los Banos ("Los

22  Banos").  Under this compensation arrangement, Sutter Health paid CEPMG $60.33 for each hour

23  worked by CEPMG's mid-level practitioners (*i.e.*, physician assistants and nurse practitioners), as

24  well as an annual $300,000 "Disproportionate Share Subsidy" ("DSS").  (Rel.'s Opp'n at 68; Ohta

25  Decl., Exh. 48 at 6-7, Dkt. No. 296-14.)

26  　　　　The 2011 Coverage Services Agreement is not supported by a contemporaneous FMV

27  report.  Mr. Payan, however, analyzed the compensation arrangement and opined that it was

28  around $130,000 below FMV based on CEPMG's projected collections or $170,000 below FMV

United States District Court
Northern District of California

based on CEPMG's actual collections.  (Payan Report at 31; Ohta Decl., Exh. 109 ("Payan Supp. Report") at 3, Dkt. No. 299-13.)

Relator challenges the $60.33/hour payment for CEPMG's mid-level practitioners.  (Rel.'s Opp'n at 68.)  Per the 2011 Coverage Services Agreement, CEPMG was still permitted to bill and collect all charges for the professional component of medical services, including services by the mid-level practitioners.  (Ohta Decl., Exh. 48 at 7.)  Relator contends, however, that because Sutter Health was paying the majority of the expenses associated with the mid-level practitioners, CEPMG should not have billed for the mid-level practitioners at all.  Similarly, Relator argues that the $300,000 DSS was unjustified.  (Rel.'s Opp'n at 70.)  Relator contends that although the DSS was intended to compensate CEPMG for treating a disproportionate share of uninsured or underinsured patients, there is no evidence showing that the DSS was necessary.  (Rel.'s Opp'n at 70.)  Relator points to Mr. Sokolove's opinion that the DSS could have resulted in an overpayment due to the lack of all appropriate documentation relating to the care of low-income patients by CEPMG, and that the documentation required by Sutter Health was not sufficient to ensure that the DSS did not exceed allowable uncompensated care costs.  (Sokolove Report at 20, 22.)  Ms. McNamara, in turn, opines that when considering CEPMG's actual collections, mid-level practitioner subsidy, and DSS payment, CEPMG was over-subsidized by over $1 million between 2011 and 2014.  (McNamara Rebuttal Report, Exhibit A.)

The Court finds that Relator has not provided enough information to create a genuine dispute of material fact that there was a FCA violation.  As an initial matter, the Court finds that Ms. McNamara's opinion that CEPMG was over-subsidized does create a dispute as to whether the compensation arrangements were FMV and/or commercially unreasonable.  That said, Relator fails to demonstrate how this is connected to referrals,[8] or that Sutter Health had scienter.  For example, Relator argues that Sutter Health was paying the majority of the expenses associated with mid-level practitioners, such that CEPMG should not have been permitted to bill for the work

_____

[8] At the hearing, Sutter Health argued that there are no referrals at issue because patients are not typically referred to the emergency room.  As Relator pointed out, however, a referral can relate to the treatment that a doctor decides on, which may require hospital services or whether a patient should be admitted.

performed by the mid-level practitioners.  (Rel.'s Opp'n at 69.)  Relator, however, cites no

evidence that Sutter Health was paying the majority of the mid-level practitioner's expenses.

Likewise, while Relator points to statements by CEPMG's physicians that they liked the stipend

and thereafter doubled their use of mid-level practitioners, Relator fails to explain how Sutter

Health knew or intended for this provision to benefit CEPMG.  (*See* Carpinello Decl., Exh. 127,

Dkt. No. 339-17; McNamara Report at 17.)  Indeed, even Relator acknowledges that once Sutter

Health realized the uncapped hourly stipend was problematic, it imposed a cap in the January 2015

Coverage Services Agreement, which would strongly suggest that they did *not* intend for the

stipend to be abused or a way for CEPMG to profit from the compensation arrangement.

Likewise, it is unclear what evidence there is that the DSS was meant to incentivize referrals.

Rather, Ms. McNamara acknowledged during her deposition that a subsidy would make sense

because Sutter Health "would be hard pressed if they had a big indigent care population to recruit

physicians to be emergency room physicians there if it was only for professional collections . . .

[b]ecause the physicians wouldn't get paid in those circumstances typically."  (McNamara Depo.

at 64:11-24.)

        In its opposition, Relator argues that CEPMG maintained internal data showing its

"Admission % Per Month," and that this information was provided in relation "to the 'Emergency

Medicine Support Payment' that Relator alleges violated the AKS."  (Rel.'s Opp'n at 71-72.)  It is

completely unclear what this "Emergency Medicine Support Payment" is; Relator's only reference

to this payment in the opposition is this sentence.  In any case, it is not apparent how tracking

"Admission % Per Month" would demonstrate a connection to referrals.  In the alternative, Relator

appears to suggest that there was a separate scheme between Sutter Health and CEPMG's affiliate,

Galen Inpatient Physicians, in which CEPMG would increase inpatient admissions and Galen

would provide physicians to treat patients admitted as inpatients.  (Rel.'s Opp'n at 72.)  Relator

provides no evidence that Galen is an affiliate of CEPMG or when Galen's relationship with

Sutter Health occurred.  Further, the "evidence" Relator provides in support of its theory is a

financial analysis that includes a calculation for "Increased Annual Gross Income from increased

referrals."  (Rel.'s Opp'n at 72 (citing Carpinello Decl., Exh. 135, Dkt. No. 339-25).)  It is unclear

how this single line referring to increased annual gross income evidences this alleged scheme. Relator also points to testimony by Dr. Gokli, the then-CEO of Los Banos, stating that the "goal was not having to transfer patients that could be cared for locally . . . with one or two hour transfers.  For higher quality, safety, better healing, we wanted to provide care in their own back yards." (Rel.'s Opp'n at 72; Carpinello Decl., Exh. 134 at 157:5-10, Dkt. No. 339-24.)  Again, it is unclear how this testimony is related to the compensation arrangements with CEPMG.  There is no information when this occurred, such that the Court could connect it with the 2011 Coverage Services Agreement. It is not the Court's responsibility to make these connections for Relator.

The Court concludes that Relator has not demonstrated there is a triable question of fact as to CEPMG.  Rather, like Relator's arguments regarding Dr. Roberts, her claims appear either unsupported or insufficient to demonstrate that there was any link between the 2011 Coverage Services Agreement and referrals, or that Sutter Health had scienter.  Accordingly, the Court finds that summary judgment is warranted as to these arrangements.

### C.    Reverse False Claims

The FCA's "reverse false claims provision" "creates liability for one who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325. 335-36 (9th Cir. 2017) (internal quotation omitted).  Additionally, Medicare payment recipients have an independent legal duty to "report and return" overpayment within 60 days of the overpayment being identified. 42 U.S.C. §§ 1320a-75(d)(1), (2).  "Thus, under the statute's plain meaning, a Medicare fee-for-service payment recipient has violated [the FCA] if it fraudulently bills the government and then knowingly fails to return the overpayment within sixty days of the identification of the overpayment."  *United States ex rel. Martinez v. KPC Healthcare, Inc.*, Case No. 15-cv-1521-JLS-DFM, 2017 WL 10439030, at *6 (C.D. Cal. June 8, 2017).

As an initial matter, Defendants argue that "[b]ecause Relator cannot show any violations of the AKS or Stark Law--and therefore cannot show that false claims were submitted to the

government--her reverse false claims similarly fail." (Defs.' MSJ at 48.) As discussed above, Relator has created a question of fact of a violation of the AKS or Stark Law as to Sac Cardio, East Bay Cardiac, and Liu PC. In the alternative, Defendants contend that there is no evidence that Defendants were on notice of a potential overpayment. (Defs.' MSJ at 48.) As the Court previously explained, however, if Defendants "knew that the financial arrangements were improper, it would be on notice that any payments made from the tainted claims were an overpayment." (3/17/21 Dismissal Order at 22.) The Court denies summary judgment on Reverse False Claims liability with respect to the compensation arrangements between Sutter Health and these entities.

### D. Conspiracy and California False Claims Act

Defendants argue that for the same reasons as above, "the evidence does not support Relator's assertion that any Sutter Defendant and any Physician Group agreed to exchange renumeration for patient referrals." (Defs.' MSJ at 49.) Likewise, Defendants contend that "[f]or the same reasons that Relator cannot establish a violation of the federal FCA, she cannot meet her burden to prove her state claims." (Defs.' MSJ at 50.) Again, the Court disagrees as to Sac Cardio, East Bay Cardiac, and Liu PC. The Court denies summary judgment on the conspiracy claim and California False Claims Act as to the compensation arrangements between Sutter Health and these entities.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment and Defendant SMG's supplemental motion for summary judgment as to the compensation arrangement between Sutter Health and SMG. The Court denies Defendants' motions for summary judgment as to the remaining compensation arrangements.

IT IS SO ORDERED.

Dated: September 6, 2024

KANDIS A. WESTMORE
United States Magistrate Judge