UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                        Plaintiffs,<br><br>         v.<br><br>SUTTER HEALTH, et al.,<br><br>                        Defendants. | Case No.  14-cv-04100-KAW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE RELATOR'S EXPERTS' OPINIONS**<br><br>Re: Dkt. Nos. 313, 314, 315 |

On September 10, 2014, Relator Laurie M. Hanvey filed the instant case against Defendants, asserting violations of the False Claims Act and California False Claims Act. (Compl., Dkt. No. 1.)  On December 8, 2021, the operative complaint was filed against Defendants Sutter Health, Sutter Valley Hospitals, Sutter Valley Medical Foundation, and Sutter Bay Hospitals (collectively, "Sutter Health"), as well as Defendants Sutter Medical Group ("SMG"), East Bay Cardiac Surgery Center Medical Group ("East Bay Cardiac"), and Stephen K. Liu, M.D. Professional Corporation ("Liu PC"). (Third Amend. Compl. ("TAC"), Dkt. No. 175.)

Pending before the Court is: (1) Sutter Health's motion to exclude the opinions of Kathleen McNamara, (2) Sutter Health's motion to exclude the opinions of Jerry Pratt, and (3) Sutter Health's motion to exclude the opinions of Stanley J. Sokolove.  Having considered the parties' filings, the relevant legal authorities, and the arguments made at the August 28, 2024 hearing, the Court GRANTS IN PART and DENIES IN PART Defendants' motions to exclude.

## I.     BACKGROUND

The instant case concerns Sutter Health's alleged scheme where it knowingly entered into compensation arrangements in violation of the Anti-Kickback Statute ("AKS") and the Physician Self-Referral Law ("Stark Law") by paying or providing unlawful kickbacks, excessive

compensation, free employees, and other illegal incentives to the SMG, East Bay Cardiac, Liu PC, California Emergency Physicians Medical Group ("CEPMG"), and Sacramento Cardiovascular Surgeons Medical Group ("Sac Cardio") (collectively, "Physician Groups"). (TAC at 3-4.) Relator further alleges that Defendant Sutter Health then knowingly submitted and/or caused others to submit false and fraudulent claims related to services rendered to patients referred to it by the Physician Groups, again in violation of the AKS and Stark Law. (TAC at 3-4.)

On May 17, 2024, Defendants filed a joint motion for summary judgment. (Defs.' MSJ, Dkt. No. 294.) Thereafter, Sutter Health filed the instant motions to exclude the testimony of Relator's experts. (Mot. to Exclude McNamara, Dkt. No. 313; Mot. to Exclude Pratt, Dkt. No. 314; Mot. to Exclude Sokolove, Dkt. No. 315.) On July 15, 2024, Relator filed her oppositions to Sutter Health's motions to exclude. (Opp'n re McNamara, Dkt. No. 328; Opp'n re Pratt, Dkt. No. 329; Opp'n re Sokolove, Dkt. No. 330.) On July 22, 2024, Sutter Health filed their replies in support of their motions to exclude. (Reply re Pratt, Dkt. No. 340; Reply re Sokolove, Dkt. No. 341; Reply re McNamara, Dkt. No. 342.)

## II.    LEGAL STANDARD

In determining whether expert testimony is admissible under Federal Rule of Evidence 702, the district court is charged with performing "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). This inquiry is "a flexible one," and "[i]ts overarching subject is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95.

## III.    DISCUSSION

### A.    Motion to Exclude Kathleen McNamara

Kathleen McNamara was retained by Relator to evaluate whether certain arrangements between Sutter Health and the Physician Groups were commercially reasonable and/or consistent with fair market value ("FMV"). (*See* McNamara Report, Dkt. No. 335-12.) Ms. McNamara has

forty years of experience in healthcare consulting, specializing in Medicare and Medicaid compliance, FMV examinations, commercial reasonableness reviews, and healthcare reimbursement.  (*Id.* at 2.)  Sutter Health challenges the following opinions.

### i.   Sac Cardio Physician Assistant Services

First, Ms. McNamara asserts that Sac Cardio was "double-dipping," or double-billing by billing government payors for the physician assistant services that Sutter Health was already compensating Sac Cardio. (McNamara Report at 6, 15.)  Sutter Health argues that this is an improper opinion because it is a finding of fact based on the record.  (Mot. to Exclude McNamara at 7.)  The Court agrees.  Whether Sac Cardio was double-billing is a question of fact for a jury to determine based on the evidence, and Relator does not explain how Ms. McNamara's specialized experience would be helpful in making this factual determination.  At the hearing, Relator acknowledges that Ms. McNamara should not be testifying as to whether double billing occurred, and that she generally cannot weigh credibility or draw conclusions from the facts in the record.  Thus, the Court will exclude this opinion.  In excluding this opinion, however, the Court does *not* exclude Ms. McNamara's opinion that double-billing (if it occurred) would be commercially unreasonable.

Second, Ms. McNamara opines that Sutter Health was either aware or deliberately ignorant of Sac Cardio's double-billing.  (McNamara Report at 15.)  Sutter Health contends this is an improper opinion about Sutter Health's state of mind.  (Mot. to Exclude McNamara at 8.)  In general, "[e]xpert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case.  The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury."  *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013).  As with Ms. McNamara's opinion about Sac Cardio's double-billing, Ms. McNamara's opinion does not appear to be based on her experience, but on her interpretation of the factual evidence, namely a March 2011 e-mail exchange between Sac Cardio's office manager and a Sutter Health employee.  (*See* McNamara Report at 15-16.)  Thus, the Court will exclude

United States District Court
Northern District of California

1   this opinion.

2   Third, Ms. McNamara opines that Sutter Health should have "verified one way or the other

3   whether the groups were inappropriately billing for the services of the [mid-level practitioners]."

4   (McNamara Report at 17.)  While Sutter Health argues that Ms. McNamara did not provide a basis

5   for this opinion, Mc. McNamara explained in her deposition that hospitals generally want to make

6   sure they are not overcompensating physician groups in the form of stipends.  (Mot. to Exclude

7   McNamara at 10; McNamara Dep. at 124:4-6, Dkt. No. 313-4.)  Given her experience in

8   compliance and healthcare reimbursement, it is not apparent that this opinion would not be

9   supported by her experience.  The Court will not exclude this opinion.

10   Finally, Ms. McNamara analyzes the physician assistant arrangement between Sutter

11   Health and Sac Cardio, and concludes that Sac Cardio profited in some years from this

12   arrangement.  (McNamara Report at 15, Exh. A.)  Sutter Health argues this opinion is neither

13   relevant nor reliable because the Stark Law does not contain any requirement as to profitability.

14   (Mot. to Exclude McNamara at 11.)  Whether the Stark Law contains any requirements as to

15   profitability is beside the point; the issue is whether the leasing arrangement overcompensated Sac

16   Cardio, which Relator then argues makes the leasing arrangement commercially unreasonable

17   and/or above the FMV.  Sutter Health also argues that Ms. McNamara's "analysis is based on

18   factors like taxes and benefits that neither the group nor the hospital could assess in advance," but

19   does not explain how this makes her methodology unreliable.  (*Id.*)  The Court will not exclude

20   this opinion.

21   ii.   **Sac Cardio Call Coverage Services**

22   Ms. McNamara opines that Sac Cardio did not actually provide a back-up or secondary

23   surgeon, as contemplated under the call coverage agreements.  (McNamara Report at 20.)  Sutter

24   Health again argues this is an improper factual conclusion that should be determined by a jury.

25   (Mot. to Exclude McNamara at 12.)  The Court agrees.  As above, Ms. McNamara's opinion

26   appears to be a factual conclusion based on her assessment of the evidence in the record, namely

27   deposition testimony by Dr. Ingram that "there was no official second call guy."  (McNamara

28   Report at 20.)  Relator does not explain how this relies on Ms. McNamara's specialized

United States District Court
Northern District of California

4

knowledge or how it would be helpful to a jury.  The Court therefore will exclude this opinion.  Again, however, this does not mean that Ms. McNamara's conclusions about whether the failure to provide a back-up or secondary surgeon would render the call coverage agreement commercially unreasonable.

Ms. McNamara also opines that the 2010 FMV analysis of Sac Cardio's call coverage was problematic.  The draft FMV report justified a daily call rate up to $1,760 based on 6 to 7 call events per week, whereas the final FMV report justified a daily call rate up to $2,640 based on 27 to 36 call events per week.  (McNamara Rebuttal Report at 4, Dkt. No. 339-22.)  Sutter Health contends this opinion should be excluded because "Ms. McNamara deployed no expertise in arriving at this conclusion."  (Mot. to Exclude McNamara at 13.)  The Court disagrees.  Ms. McNamara explained that this was a significant increase, especially given the lack of documentation to verify the information.  (McNamara Rebuttal Report at 4.)  Ms. McNamara's experience in FMV analyses would inform her analysis, including whether documentation is typically provided for such an increase.  The Court will not exclude this opinion.

### iii.    Sac Cardio Medical Director Services

Ms. McNamara opines that "certain Medical Director time entries submitted by the Sac Cardio . . . physicians were not credible and should not have been approved by Sutter."  (McNamara Report at 8.)  Ms. McNamara's opinion was based on a review of the time sheets, in which she found that "the Sac Cardio surgeons recorded large amounts of time each month for potentially clinical tasks such as supervising nurses in the ICU, OR, and telemetry unit, as well as, for a period of time, supervising Dr. Daren Danielson, another fully credentialed cardiothoracic surgeon."  (McNamara Report at 25.)

Sutter Health seeks to exclude this opinion because Ms. McNamara did not conduct analysis that she testified would be necessary to determine if they were, in fact, clinical tasks.  (Mot. to Exclude McNamara at 14.)  Specifically, at her deposition, Ms. McNamara testified that she was not certain whether the tasks were clinical or administrative, and that supervising nurses could be administrative.  (McNamara Dep. at 209:12-21.)  Ms. McNamara stated she would need to look at medical records during that time to see what they were recording during that day.

1    (McNamara Dep. at 210:1-4.)  Relator does not state that she did so, thus the basis for her opinion

2    that Sutter Health should not have approved these medical director entries is unclear.  (Opp'n re

3    McNamara at 16.)  While courts have permitted Ms. McNamara to testify about accurate time

4    reporting and the importance of verifying reporting, the problem here is that Ms. McNamara's

5    opinion that Sutter Health should not have approved the time entries seems to be based on her

6    speculation that the entries at issue *could* be clinical.  Relator also points to Dr. Ingram's proposal

7    that Sutter Health increase the group's medical director hours from 20 to 57 hours per month, but

8    it is unclear how Ms. McNamara's experience assists a fact finder in an analysis of this proposal.

9    The Court will exclude this opinion.

10              **iv.   Dr. Roberts's Medical Director Services**

11        Ms. McNamara opines that the monthly hours paid for Dr. Roberts's medical director

12    services were commercially unreasonable, and that his administrative time records were not

13    credible.  (McNamara Report at 7.)  Ms. McNamara also opined that given Dr. Roberts's high

14    clinical hours, Sutter Health should have reviewed his medical director time records "with a

15    suspicious eye."  (McNamara Report at 7-8.)  Ms. McNamara explained that physicians who

16    spend more than 50% of their time performing administrative services do not have robust clinical

17    practices.  (McNamara Report at 23.)  In contrast, Ms. McNamara found that Dr. Roberts's

18    contracted administrative hours increased by 39% from 87 hours per month in 2013 to 121 hours

19    per month in 2014; during that time, his professional collections were near the 90th percentile in

20    2013 and the 75th percentile in 2014 compared to other interventional cardiologists.[1]  (McNamara

21    Report at 23.)  Ms. McNamara reviewed Dr. Roberts's administrative time records from 2014, and

22    found that nearly 30% of his medical director time occurred in the cath lab where he also routinely

23    performed billable procedures.  (McNamara Report at 23-24.)

24        Sutter Health seeks to exclude this opinion because Ms. McNamara admitted that she did

25    not know how many hours Dr. Roberts worked.  (Mot. to Exclude McNamara at 15; *see also*

26

27    ―――――――――――――

28    [1] Ms. McNamara also asserted that Dr. Roberts spent 52% of his time in 2013 and 73% of his time in 2014 performing administrative services.  (McNamara Report at 23.)  This, however, was based on Ms. McNamara's assumption that Dr. Roberts would have worked 2,000 hours, which is the average annual workload.  (McNamara Dep. at 179:1-6.)  Relator does not rely on this analysis.

United States District Court
Northern District of California

United States District Court
Northern District of California

McNamara Dep. at 179:12-14.)  Rather, Ms. McNamara was relying on the dollar amount of Dr. Roberts's collections, not the clinical hours required.  (*Id.* at 15 n.5.)  Thus, it is unclear how Ms. McNamara could conclude that the medical director agreement was commercially unreasonable, as her opinion appears to be based on Dr. Roberts spending more than 50% of his time performing administrative services when she does not know how many hours he actually worked or the percentage of time he spent on administrative services versus clinical work.  In opposition, Relator points to Dr. Roberts's work relative value units ("wRVUs"), but it does not appear Ms. McNamara relied on this in her analysis.  (*See* McNamara Report at 23-24.)  While Ms. McNamara noted in Exhibit G that Dr. Roberts's wRVUs was 12,000 in 2013 and 2014, she provides no explanation for how this affected her analysis.  The Court will therefore exclude this opinion.

As to Ms. McNamara's opinion that Dr. Roberts's time sheets were not credible, this appears to be based solely on the fact that Dr. Roberts logged medical director time that was spent in the cath lab.  (*See* McNamara Report at 23-24.)  It is not clear what part of Ms. McNamara's experience would allow her to opine that time spent in the cath lab should be assumed to be clinical time, nor is it clear how Ms. McNamara came to this conclusion or how it is based on her experience.  Similarly, Ms. McNamara's opinion that Sutter Health should have reviewed Dr. Roberts's records "with a suspicious eye" appears to be a conclusory statement.  The Court will exclude these opinions.

### v.   East Bay Cardiac Call Coverage Services

Ms. McNamara opined that Sutter Health's call coverage arrangement with East Bay Cardiac was commercially unreasonable because the physicians did not fulfill the coverage services required by the contracts.  (McNamara Report at 22.)

Sutter Health argues that Ms. McNamara's finding that the physicians did not perform the coverage required is again a factual conclusion that usurps the jury's factfinding function.  (Mot. to Exclude McNamara at 17.)  The Court likewise agrees; Ms. McNamara is effectively reviewing the evidentiary record and coming to a factual conclusion as to whether it was possible for East Bay Cardiac to provide the coverage services required.  Relator again does not cite any special

knowledge or experience that would assist a jury in making its own conclusions based on the same records.  The Court will therefore exclude Ms. McNamara's opinion that the physicians did not fulfill their coverage services.  As above, this does not prevent Ms. McNamara from opining as to whether a failure to provide the coverage required by the contracts would make the call coverage arrangement commercially unreasonable.

### vi.   East Bay Cardiac Data Collection Services

Ms. McNamara opined that Sutter Health's payment to East Bay Cardiac for data collection services exceeded FMV.  (McNamara Report at 18.)  Applying a cost and market approach, Ms. McNamara opined that the FMV for the data collection services ranged from $71,960 to $112,360, whereas the amount actually paid by Sutter was over $300,000.  (McNamara Report at 19.)

Sutter Health seeks to exclude Ms. McNamara's analysis because her calculations were based on the assumption that data collection would take fifteen minutes.  (Mot. to Exclude McNamara at 19; *see also* McNamara Report, Exh. C.)  In so doing, Ms. McNamara credited Dr. Pratt's estimate that fifteen minutes was reasonable.  (*Id.*)  Sutter Health does not otherwise challenge Ms. McNamara's methodology and calculations.

As discussed below, the Court will not exclude Dr. Pratt's opinion about how long data collection should take.  The Court finds that Ms. McNamara could premise her calculations on Dr. Pratt's opinion.  This does not, of course, preclude Defendants from challenging Ms. McNamara's assumption, or from presenting evidence that East Bay Cardiac's physicians spent significantly longer periods of time on data collection.  A jury can then determine whether they would credit East Bay Cardiac's physicians or Dr. Pratt.

### vii.   East Bay Cardiac Medical Director Services

Ms. McNamara opines that the medical director time entries submitted by East Bay Cardiac were not credible and should not have been approved.  (McNamara Report at 8.)  In support, Ms. McNamara points to Dr. Khan routinely recording medical director hours for time spent in month Medical Executive Committee meetings, even though he was separately being compensated for that time.  (McNamara Report at 25.)

1      Sutter Health argues this opinion should be excluded because Ms. McNamara only

2  identified a single issue of duplicative billing.  (Mot. to Exclude McNamara at 20.)  While Sutter

3  Health asserts this is a "lone and isolated issue," Relator points out that this happened routinely.

4  (Opp'n re McNamara at 22.)  Ms. McNamara could therefore reasonably use this example in

5  concluding that the medical director time entries were not credible.  The Court will not exclude

6  this opinion.[2]

7      **viii.    CEPMG Physician Assistant Services**

8      Ms. McNamara opines that CEPMG was also double-billing by billing payors for

9  physician assistant services that were also being subsidized by Sutter Health.  (McNamara Report

10  at 15.)  Ms. McNamara explains that "[i]nherent in Medicare's reimbursement method is the

11  notion that the physician is incurring practice expenses."  (McNamara Report at 14-15.)  Thus,

12  when "Sutter subsidized the majority of the costs associated with the [mid-level practitioners] . . .

13  it was inappropriate for the practices to bill Medicare for the services provided by the [mid-level

14  practitioners]."  (McNamara Report at 15.)

15      Sutter Health argues that this opinion should be excluded because Ms. McNamara

16  improperly lumps together Sac Cardio and CEPMG, even though CEPMG's agreement was

17  different in that it explicitly allowed CEPMG to bill for clinical services while providing for a

18  $60.33 hourly stipend.  (Mot. to Exclude McNamara at 21.)  In reviewing Ms. McNamara's report,

19  it is unclear how Ms. McNamara came to the conclusion that CEPMG was double-billing.  At

20  most, Ms. McNamara points to the fact that CEPMG billed for physician assistants and mid-level

21  practitioners, but she fails to explain why these amounts would be improper or more than the

22  practice expenses that CEPMG incurred.  It is, after all, wholly possible that CEPMG incurred

23  costs even after Sutter Health paid the stipend, and thus could still bill.  Ms. McNamara's failure

24  to analyze these issues makes her opinion speculative.  The Court will therefore exclude Ms.

25  McNamara's opinion that CEPMG was double-billing.

26

27  _____

[2] In the reply, Sutter Health raises new arguments challenging this opinion, such as Ms.
McNamara only relying on timesheets from 2014.  (Reply re McNamara at 12.)  The Court need

28  not "consider arguments raised for the first time in a reply brief."  *Grupo Gigante S.A. de C.V. v.
Dallo & Co.*, 119 F. Supp. 2d 1083, 1103 n.15 (C.D. Cal. 2000).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    To the extent, however, that Sutter Health argues that Ms. McNamara cannot opine as to

2  whether Medicare would allow a physician group to bill for services that they did not have to pay

3  for, the Court finds that Ms. McNamara has adequate experience to give such an opinion.  (Mot. to

4  Exclude McNamara at 21-22.)  Further, exclusion of Ms. McNamara's opinion that CEPMG was

5  double-billing does not preclude Ms. McNamara from testifying as to whether double-billing

6  would be commercially reasonable or whether it affected her belief that CEPMG was being

7  overfunded by Sutter Health.

8            **ix.    Liu PC Call Coverage Agreement**

9    Finally, Ms. McNamara opines that the call coverage arrangement between Liu PC and

10  Sutter Health between 2008 and 2014 was inconsistent with FMV.  (McNamara Report at 7.)  Ms.

11  McNamara explained that because Liu PC was a one-physician practice, it had to subcontract to

12  locum tenens physicians to satisfy its 24/7/365 call obligations.  (McNamara Report at 7.)  The

13  FMV assessment used to justify the call coverage arrangement expressly assumed that Liu PC was

14  not profiting on the work of these locum tenens physicians.  (McNamara Report at 7.)  Ms.

15  McNamara, however, found that Liu PC routinely generated profits from its subcontracting.

16  (McNamara Report at 7, 26, Exh. K.)

17    Sutter Health argues that Ms. McNamara's opinion must be excluded because she did not

18  take into consideration that Liu PC was required to pay $250/hour when a locum tenens physician

19  was called in.  (Mot. to Exclude McNamara at 23.)  Ms. McNamara, however, explained that she

20  did not consider this amount because Liu PC would be able to bill payors for these services.

21  (McNamara Dep. at 232:6-11.)  Ms. McNamara further explained she was focused on the stand-by

22  cost, not the cost of actually having to go in if coverage was required.  (McNamara Dep. at

23  232:13-15.)  While Sutter Health may disagree with this analysis, this does not warrant exclusion

24  of the opinion; Sutter Health can challenge whether the $250 should have been included on cross-

25  examination.  The Court will therefore not exclude the opinion.

26            **B.    Motion to Exclude Dr. Pratt**

27    Jerry Pratt, M.D., was retained to opine about the compensation paid by Sutter Health for

28  non-clinical services, including medical directorships, call coverage, and data collection services.

United States District Court
Northern District of California

1   (Pratt Report at 3, Dkt. No. 335-29.)  Dr. Pratt has 24 years of experience in cardiothoracic surgery

2   and over 16 years of experience as a medical director or chief of service line.  (Pratt Report at 1.)

3   He has created cardiothoracic surgery programs at David Grant Medical Center, which included

4   creating a new service line, designing a cardiovascular operating room, creating a cardiac

5   intensive care unit, and creating training programs.  (*Id.* at 2.)  Dr. Pratt also started a general

6   thoracic surgery practice, minimally invasive coronary and valve surgery program, and surgical

7   atrial fibrillation program at Ascension Borgess Medical Center.  (*Id.*)

8           **i.**    **Lack of Relevant Experience, Knowledge, or Reliable Methodology**

9         As a general matter, Sutter Health asserts that Dr. Pratt should be excluded because he

10  lacks relevant experience.  (Mot. to Exclude Pratt at 4.)  First, Sutter Health argues that Dr. Pratt

11  performed administrative services within his employment with a hospital, but is opining as to the

12  relationships between hospitals and physician groups who perform surgeries at the hospital but are

13  not employed by those hospitals.  (*Id.* at 5-6.)  Thus, Sutter Health asserts that Dr. Pratt cannot

14  opine as to how arrangements between Sutter Health's facilities and private physician groups

15  operated, including how administrative, call coverage, and PA leasing agreements should be

16  structured.  (*Id.*)  The Court disagrees.  Dr. Pratt's opinions are focused not on how private

17  practices work or how negotiations would occur, but on surgical practice and related

18  administrative duties.  For example, he is able to draw on his experience as a medical director who

19  created a general thoracic surgery practice, specialty surgical programs, a cardiothoracic surgery

20  program, and the inception of a cardiac ICU unit and training programs to opine as to what is

21  required for other similar programs.  (*See* Pratt Report at 1-2.)  Such experience satisfies the

22  reliability inquiry.  *See Zavislak v. Netflix, Inc.*, No. 5:21-CV-1811-EJD, 2024 WL 2884649, at

23  *14 (N.D. Cal. June 7, 2024) ("the Ninth Circuit has recognized that testimony based on

24  'knowledge and experience' that is not contingent upon a particular methodology or technical

25  framework may satisfy the reliability inquiry").

26        Second, Sutter Health argue that Dr. Pratt's comparisons are speculative because he did not

27  investigate the actual circumstances of the agreements at issue.  (Mot. to Exclude Pratt at 7.)

28  Beyond this conclusory assertion, however, Sutter Health provides no evidence that Dr. Pratt

1  failed to investigate the agreements at issue.  (*See id.*)  There is no demonstration that Dr. Pratt did

2  not review the relevant case documents.  (*See* Opp'n re Pratt at 3.)

3          ii.     **Sac Cardio Medical Directorships**

4          Dr. Pratt opines that the Sac Cardio medical directorships had too many compensable

5  hours given the types of programs at issue.  (Pratt Report at 4.) Specifically, he asserts that the

6  hours were consistent with the time it takes for a medical director to start a new program from

7  scratch, pointing to his own experience and explaining that it took him 8 to 10 hours per month in

8  meetings and training sessions for only 2 to 3 months, before his administrative burden decreased

9  to 1 to 2 hours per month over the next year, and then 1 to 2 hours per quarter thereafter.  (Pratt

10 Report at 4-5.)  Dr. Pratt also raises concerns with how each of the medical director positions

11 allowed for the same number of hours; for example, Dr. Pratt explains that Dr. Kincade's Heart

12 Transplant and VAD Directorship should require more administrative time than Dr. Longoria's

13 Surgical Ablation Directorship because "[t]he complexity of a heart transplant/VAD program with

14 its associated state and federal requirements, the training and education and other associated

15 factors [would] far exceed the demands of overseeing a nonregulated atrial fibrillation program."

16 (Pratt Report at 5.)  Dr. Pratt also opines that as a general matter, Sutter Health employed too

17 many medical directors, with "nearly every cardiologist and cardiovascular surgeon [being] paid

18 to be a Medical Director of something."  (Pratt Report at 10.)  Dr. Pratt notes that the titles

19 overlapped significantly, and that in his experience, a Heart Institute requires far fewer medical

20 directors to be successful.  (Pratt Report at 10-11.)  In contrast to Dr. Pratt's experience, the Sac

21 Cardio surgeons were compensated between 12 to 40 hours per month between 2006 and 2014.

22 (Pratt Report at 4.)

23          Sutter Health contends this opinion is baseless because it is based solely on his own

24 experience starting surgical programs at the Ascension Borgess Heart Institute.  The Court

25 observes that Dr. Pratt's experience is not so limited, as he created programs at David Grant

26 Medical Center, which required working with UC Davis Medical Center, Sutter Medical Center,

27 and Sac Cardio.  (Pratt Report at 2.)  Still, to the extent Sutter Health asserts that the programs

28 started by the Sac Cardio physicians are significantly different from the programs Dr. Pratt created

United States District Court
Northern District of California

and/or worked on, that is an issue that can be challenged before a jury; Dr. Pratt's experience would still be relevant to determining how much time would be reasonable to spend on the duties assigned to the Sac Cardio physicians.

Sutter Health also points to Dr. Pratt not having to separately track his hours because he was employed by the hospital, but it is unclear how this makes his opinions unreliable; while Dr. Pratt may not remember the exact specific hours he spent in starting a program, his general point remains: once a program is established, the expected number of hours would decrease.  (Mot. to Exclude Pratt at 9.)  The Court finds this opinion admissible.

### iii.    Sac Cardio Call Coverage Arrangements

Dr. Pratt opines that Sac Cardio's "call coverage arrangements were unreasonable to the extent they assumed a frequent staffing level in excess of one surgeon plus one Physician Assistant."  (Pratt Report at 6.)  Specifically, it appears there was a November 2012 FMV report that assumed that Sac Cardio would provide three full-time cardiothoracic surgeons for call coverage, which Dr. Pratt asserts is not realistic for two reasons.  (*Id.* at 7.)  First, while Title 22 requires three surgeons to be physically present for certain cardiovascular procedures, Sac Cardio had a variance that permitted Sac Cardio to only staff two physicians and one physician assistant. (*Id.*)  This seems to be in conflict with Dr. Pratt's focus on the reasonableness of assuming a staffing level in excess of *one* surgeon, given that *two* surgeons were required by Title 22. Second, Dr. Pratt appears to assume that it is not reasonable to expect a three-surgeon group to provide three full-time surgeons for call coverage.  (*Id.*)  Again, it is unclear how this supports his opinion about the reasonableness of assuming a staffing level in excess of *one* surgeon; even if Sac Cardio could not provide three full-time surgeons, Dr. Pratt does not appear to opine that they could not provide two (which would still be in excess of one surgeon).  In short, Dr. Pratt's opinion seems to be based on facts that are not in-line with his conclusion. The Court will exclude this opinion.

### iv.    Sac Cardio Physician Assistant Leasing Arrangement

Dr. Pratt opines that Sutter Health and Sac Cardio should have known that services performed by the leased physician assistants could not be billed to third-party payors.  (Pratt

United States District Court
Northern District of California

1

Report at 8.)  Sutter Health contends that Dr. Pratt has no basis for this opinion because he never

2

billed payors for himself or in an administrative role at a hospital.  (Mot. to Exclude Pratt at 11.)

3

Dr. Pratt, however, drew on his experience as a cardiothoracic surgeon, explaining that there is "a

4

general understanding amongst cardiothoracic surgeons that who pays for the services bills for the

5

services."  (Pratt Dep. at 148:20-22, Dkt. No. 314-4.)  It is unclear why more is needed; even if

6

Dr. Pratt never directly performed billing services, this does not mean that he lacks knowledge as

7

to how billing works.  The Court will allow this opinion.

8

**v.    Dr. Roberts's Medical Directorship**

9

Dr. Pratt opines that "the Medical Director compensation paid by Sutter Health to Dr.

10

Roberts was unreasonable because the quantity of administrative hours was not feasible."  (Pratt

11

Report at 9.)  Specifically, Dr. Pratt explains that Dr. Roberts's compensable hours were such that

12

Dr. Pratt originally thought "he was a full-time administrator," but then later found that Dr.

13

Roberts was "a highly productive interventional cardiologist during this time, performing

14

hundreds of procedures per year while also taking regular call coverage."  (Pratt Report at 9.)

15

Sutter Health challenges this opinion as lacking any reliable methodology.  Specifically,

16

Dr. Pratt points to Dr. Roberts's clinical cases for 2012, the year *prior* to the arrangements at

17

issue.  (Mot. to Exclude Pratt at 12.)  While Relator argues this only goes to the weight of Dr.

18

Pratt's testimony, it is unclear how Dr. Pratt can find that the arrangements at issue are not feasible

19

based on the hours worked by Dr. Roberts *prior* to the arrangements.  The Court will exclude this

20

opinion.

21

Dr. Pratt also questions the hours Dr. Roberts logged, pointing to his own experience of

22

working 20 hours per month as a Medical Director.  (Pratt Report at 10.)  Unlike with Sac Cardio,

23

Sutter Health points to specific testimony that Dr. Pratt did not consider the number of facilities

24

under Dr. Roberts's purview, the number of people within Dr. Roberts's purview, whether new

25

programs were under development, and the patient population at issue.  (Mot. to Exclude Pratt at

26

12-13.)  Dr. Roberts also provided a declaration in which he explained the work he was

27

performing during the relevant time period, which included merging two campuses and moving an

28

entire cardiac program to a different hospital, vetting and purchasing devices, launching a mitral

United States District Court
Northern District of California

clip program, and dealing with a cath lab that was breaking down.  (Roberts Decl. ¶¶ 9-10, 14, Dkt. No. 293-1.)  In other words, there are specific projects that Dr. Roberts worked on that Dr. Pratt apparently did not consider, rendering his opinion unreliable.  Thus, the Court will exclude this opinion.

### vi.   SHVI Medical Directorships

Dr. Pratt opined that "Sutter Health employed far too many Medical Directors within the Sutter Heart & Vascular Institute and within the regional service line."  (Pratt Report at 10.)  Dr. Pratt explained that based on his review, it appeared every cardiologist and cardiovascular surgeon was paid to be a medical director.  (Pratt Report at 10.)  In contrast, Dr. Pratt points to his own experience, in which his current hospital employs 26 cardiologists and two to three cardiovascular surgeons, of which there are six medical directors.  (Pratt Report at 11.)  Dr. Pratt also opines that in his experience, a Heart Institute requires far fewer Medical Directors to be successful.  (Pratt Report at 10-11.)

Sutter Health argues that Dr. Pratt did not review every medical director agreement, although it acknowledges that Dr. Pratt did review the agreements of the physicians at issue in this litigation.  (Mot. to Exclude Pratt at 13.)  Sutter Health further contends that his own institute has a different size and scope, such that it is unclear his experience is relevant.  (*Id.*: *see also* Reply re Pratt at 7.)  Ultimately, however, the issue is not the total number of medical directors, but whether it would be reasonable for almost every cardiologist and cardiovascular surgeon to be a paid medical director.  Given Dr. Pratt's experience, he can reasonably testify that it is not normal for this to occur.  Defendants, in turn, can cross-examine Dr. Pratt as to the specifics of the Sutter Heart & Vascular Institute, including whatever factors they believe would warrant having almost every cardiologist and cardiovascular surgeon be a paid medical director.

### vii.   East Bay Cardiac Call Coverage

Dr. Pratt opines that the frequency of call events reported by East Bay Cardiac was unrealistic for cardiothoracic surgery.  (Pratt Report at 12.)  Dr. Pratt states that East Bay Cardiac reported receiving five to eight call events per day, one to two of which required the on-call physician to come into the hospital.  (Pratt Report at 12.)  Dr. Pratt explains, however, that this is a

United States District Court
Northern District of California

1  greater call burden than he has ever seen, even in populous metro areas like Oakland.  Rather, he

2  explains that a busy on-call volume would be three to five call events per day, many of which

3  would be short phone calls that could be handled by physician assistants or nurse practitioners.

4  (Pratt Report at 12.)

5      Sutter Health argues that Dr. Pratt made no attempt to confirm if his facilities were

6  comparable to the facility at issue, but Dr. Pratt's opinion is not so limited.  (Mot. to Exclude Pratt

7  at 14.)  Rather, Dr. Pratt also pointed to more populous metro areas like Oakland to explain why

8  the call volume was unrealistic.  The Court will therefore permit this opinion.

9      Dr. Pratt also opines about whether it was reasonable for Sutter Health to pay East Bay

10  Cardiac for full-time cardiothoracic call coverage and half-time thoracic call coverage, as well as

11  whether it was appropriate for East Bay Cardiac's call coverage to exclude a component of

12  payment related to indigent care.  (Pratt Report at 12, 16-17.)  Sutter Health challenges both

13  opinions, to which Relator does not respond.  (Mot. to Exclude Pratt at 14-15; Opp'n re Pratt at

14  10.)  Thus, Relator has waived these arguments, and the Court will exclude these opinions.

15          **viii.    East Bay Cardiac Data Collection Time**

16      Finally, Dr. Pratt opines that "the amount of data collection time reported by Dr. Khan and

17  Dr. Stanten was far in excess of what is actually required from cardiothoracic surgeons."  (Pratt

18  Report at 16.)  Specifically, East Bay Cardiac's physicians reported spending 76 hours per month

19  on data collection, in addition to 88 hours per month by physician assistants and 48 hours per

20  month from its data manager.  (Pratt Report at 15.)  This amounted to physicians spending over 2

21  hours per case on data collection.  (Pratt Report at 15.)  Dr. Pratt stated that he has participated in

22  the same data collection, and that it should take fifteen minutes of physician time per case, not

23  multiple hours.  (Pratt Report at 15.)  Dr. Pratt explains how data collection typically works and

24  the amount of time required.  (Pratt Report at 15-16.)

25      Sutter Health contends that Dr. Pratt's opinion should be excluded because it relies solely

26  on his experience serving on a team with a full-time employed data manager.  (Mot. to Exclude

27  Pratt at 15.)  It appears, however, that East Bay Cardiac also had a data manager who spent 48

28  hours per month on data collection; moreover, Dr. Pratt stated that the data manager worked for

numerous departments, rather than only supporting Dr. Pratt's department. (Pratt Report at 15.) Sutter Health also contends that Dr. Pratt testified that he was not opining that Dr. Khan and Dr. Stanten were "lying" about their hours. (Mot. to Exclude Pratt at 15-16.) It is unclear why this affects the reliability of Dr. Pratt's opinion, which is that based on his experience performing similar functions, it should have taken less time than what was reported. The Court will not exclude this opinion.

### C.   Motion to Exclude Stanley J. Sokolove

Stanley J. Sokolove was retained to opine as to whether Sutter Health behaved consistent with the Centers for Medicare & Medicaid Services' ("CMS") guidance, practices, and regulations. (Sokolove Report at 5, Dkt. No. 335-6.) Mr. Sokolove has worked in the healthcare industry for over fifty years, including employment with CMS for sixteen years. (*Id.* at 2.) From 2000 through 2002, Mr. Sokolove served as an administrative law judge ("ALJ") with CMS, issuing decisions to resolve program payment issues related to Medicare cost reports, as well as methodologies promulgated by CMS to calculate the Medicare Disproportionate Share Hospital payment percentage in the Medicare allowable formula. (*Id.* at 3-4.) From 2003 to 2015, Mr. Sokolove served as a Chief Financial Officer Technical Monitor Compliance Manager, providing oversight of banking, finance, and internal controls. (*Id.* at 2.) Mr. Sokolove was also responsible for implementing the Office of Inspector General audit findings affecting hospitals, physicians, dialysis facilities, and therapy providers, including the collection of improper claim submissions. (*Id.* at 2-3.)

### i.   Improper Legal Opinion

First, Sutter Health challenges Mr. Sokolove's opinions as to whether Sutter Health's arrangements were inconsistent with CMS guidance, practices, and regulations as an improper legal opinion. (Mot. to Exclude Sokolove at 4.) Specifically, Sutter Health points to Mr. Sokolove's opinion that certain compensation arrangements were "inconsistent with CMS guidance, practices, and regulations." (*Id.* (citing Sokolove Report at 22-23).) Likewise, at the hearing, Defendant's counsel urged the Court to look at page five of Mr. Sokolove's report, which explained the scope of Mr. Sokolove's work to consider "[w]hether Sutter Health behaved

17

United States District Court
Northern District of California

1    consistent with CMS guidance, practices, and regulations" as to certain compensation

2    arrangements.  (Sokolove Report at 5.)

3           The specific opinions and pages cited by Sutter Health, however, do not include any legal

4    opinions.  They are general statements that do not cite to any specific statutes or legal authority.

5    Simply stating "guidance, practices, and regulations" does not automatically transform an opinion

6    into a legal opinion, and Sutter Health provides no authority to the contrary.  Rather, it appears

7    that Sutter Health is asking that the Court review the entirety of Mr. Sokolove's report and sua

8    sponte determine which portions of it are improperly relying on binding statutes, judicial opinions,

9    or attorney opinions, or proposing statutory and regulatory interpretations.  *See United States v.*

10   *Omnicare, Inc.*, No. 1:11-cv-01326-NLH-AMD, 2023 U.S. Dist. LEXIS 58236, at *23- (D.N.J.

11   Mar. 31, 2023) (rejecting expert testimony as improper legal opinions or encroaching on the

12   court's duty to explain the law to the jury where the expert explained the AKS and relied on

13   Department of Justice guidance, prior court opinions, and out-of-district case law); *Haas v.*

14   *Travelex Ins. Servs. Inc.*, 679 F. Supp. 3d 962, 967 (C.D. Cal. 2023) (rejecting expert report that

15   "reads like a legal brief"); *United States ex rel. Miller v. Manpow, LLC*, No. 2:21-cv-05418-VAP-

16   ADSx, 2023 U.S. Dist. LEXIS 231323, at *27 (C.D. Cal. Nov. 22, 2023) (rejecting expert

17   testimony on the meaning of statutes or regulations, such as the definitions and purposes of

18   statutory PPP loan requirements, the intent behind PPP regulations promulgated by the Small

19   Business Administration, and the SBA's requirements in providing loan forgiveness).  This is not

20   the Court's role.  It is Sutter Health's role to identify the *specific* pages and sections that Sutter

21   Health believes constitute an improper legal opinion, and to explain as such, likely by identifying

22   the specific statutes, regulations, or otherwise that Mr. Sokolove is purportedly interpreting.[3]  A

23   general argument challenging Mr. Sokolove's ultimate conclusions (which do not identify any

24   specific legal authority) is insufficient, and puts the burden on the Court to make arguments for the

25   _____

26   [3] Ironically, Sutter Health proceeds to complain that Mr. Sokolove does not identify specific
     guidance, practices, or regulations at issue.  (Mot. to Exclude Sokolove at 6.)  Further, while
27   Sutter Health complained at the hearing that Mr. Sokolove opined that Sutter Health violated 42
     C.F.R. § 410.26, the only apparent referral to § 410.26 is a footnote, referring to an explanation
28   that Physician Assistants can be W-2 employees, leased employees, or independent contractors.
     (Sokolove Report at 8 n.7.)

parties.

Accordingly, the Court will deny this portion of Sutter Health's motion without prejudice. Sutter Health may challenge *specific* opinions by Mr. Sokolove as improper legal opinions in a motion in limine, which must be clearly identified.  As a general matter, however, the Court observes that it is unclear how Mr. Sokolove's opinion about whether CMS would reimburse the claims is a legal opinion. The Court finds *Omnicare, Inc.* instructive; there, the district court rejected the expert opinion's as to whether the AKS would render claims non-reimbursable because it relied on case law.  2023 U.S. Dist. LEXIS 58236, at *29.  The district court, however, permitted testimony as to how CMS would respond if it detected erroneous prescriptions, including possibly demanding adjustments for those claims or excluding the pharmacy from future participation in federal healthcare programs.  *Id.* at *27.  Again, Sutter Health does not suggest that Mr. Sokolove is relying upon case law here, and opinions as to whether CMS would reimburse the claims seem more akin to those permitted by *Omnicare, Inc.  See also United States v. Roque*, No. 18-cr-00373-LHK, 2022 U.S. Dist. LEXIS 6399, at *6 (N.D. Cal. Jan. 12, 2022) (permitting expert testimony as to whether Medicare pays for health services if the referrals for those services were obtained through kickbacks).

### ii.    Physician Assistant Arrangements

Sutter Health next argues that Mr. Sokolove's opinions should be excluded because he does not identify the applicable guidance, practice, or regulation at issue.  (Mot. to Exclude Sokolove at 6.)  Specifically, Sutter Health points to Mr. Sokolove's opinions regarding reimbursement to Sac Cardio and CEPMG for Physician Assistants.  Sutter Health argues that his analysis is based on inapplicable guidance, namely the "Incident To" guidance, as Mr. Sokolove admitted in his deposition that any services performed in a hospital would not have been subject to the "Incident To" guidance.  (*Id.* at 7.)  Relator responds that Mr. Sokolove was only asserting that "the only permissible way Sac Cardio *could have* billed for the PAs would be for 'Incident To' services," but that even billing under the "Incident To" guidance would not have been permissible. (Opp'n re Sokolove at 13.)

The Court agrees that opinions based on the "Incident To" guidance must be excluded, as

there is no dispute that this guidance is inapplicable.  That said, this does not mean Mr. Sokolove's opinion must be excluded in its entirety.  Mr. Sokolove's opinion is not based solely on his reliance on the "Incident To" guidance; he also opines that Sutter Health should have known about the alleged double-billing if it had taken certain steps to ensure compliance.  For example, Mr. Sokolove points to how CMS works with large hospitals to ensure impermissible billing does not occur, including requiring hospitals perform extensive internal auditing functions and educating hospitals about the dangers of aggressive billing.  (Sokolove Report at 10-11.)  Mr. Sokolove also points to the Affordable Care Act's requirement that hospitals establish compliance programs, and Sutter Health's awareness of CMS's oversight mechanisms.  (*Id.* at 11.)  In short, it is not apparent that Mr. Sokolove's opinions are reliant solely on the "Incident To" guidance, such that they must be excluded in their entirety.

### iii.    CEPMG Indigent Care Subsidy

Mr. Sokolove analyzed Sutter Health's "Disproportiante Share Subsidy" payments to CEPMG, in which Sutter Health compensated CEPMG $300,000 for its treatment of a disproportionate number of hospital patients who lack a third-party payment source or whose third-party payor reimbursement is insufficient to cover the costs of services.  (Sokolove Report at 17.)  Sutter Health contends that Mr. Sokolove's opinions regarding this subsidy must be excluded because he assumed that Sutter Health had "effectively allocated some of its [Disproportionate Share Hospital] reimbursement to CEPMG as stated in the 2011 contract."  (Mot. to Exclude Sokolove at 8; Sokolove Report at 20.)  Sutter Health argues this is an "outlandish assumption." (*Id.*)  It is unclear why this is an "outlandish assumption."  As Mr. Sokolove explains, the Social Security Act provides additional Medicare payments to hospitals serving a significantly disproportionate number of low-income patients; such hospitals qualify for Medicare Disproportionate Share payment adjustments.  (Sokolove Report at 17-18.)  Notably, Sutter Health does not actually assert that the Disproportionate Share Subsidy to CEPMG was not related to Sutter Health's Disproportionate Share Hospital reimbursement.

In the alternative, Sutter Health argues that Mr. Sokolove does not identify the specific statutes, regulations, rules, or guidance governing how a hospital can spend such a subsidy.  (Mot.

to Exclude Sokolove at 8-9.)  This seems to be a separate issue from Mr. Sokolove's opinion, which is that the payments to CEPMG were not supported by documentation, and how the failure to document could affect patient care.  (Sokolove Report at 20-21.)  The Court will allow this opinion.

Relatedly, Sutter Health seeks to exclude Mr. Sokolove's opinions about the CEPMG subsidy and its potential effect on CEPMG's strategy.  (Mot. to Exclude Sokolove at 10.)  Sutter Health argues that these opinions are speculative.  Mr. Sokolove, however, explained why he believed the magnitude of the subsidy could incentivize CEPMG to admit MediCal patients and increase the disproportionate patient percentage, which in turn could result in a higher Disproportionate Share Hospital reimbursement.  (Sokolove Report at 2-21.)  Mr. Sokolove also pointed to the lack of appropriate documentation, and drew from his own experience with CMS. (Sokolove Report at 21-22.)  The Court will allow this opinion.

### iv.    Sac Cardio's Physician Assistant Arrangement

Mr. Sokolove opines that "CMS would have disallowed Sac Cardio's claims submitted for Physician Assistant reimbursement had it known Sutter Health was paying the underlying expenses associated with these employees through a noncompliant financial arrangement." (Sokolove Report at 7.)  Sutter Health argues that this opinion must be excluded because it improperly assumes that there was no expense incurred by Sac Cardio in employing the physician assistants.  (Mot. to Exclude Sokolove at 9.)

First, Sutter Health complains that Mr. Sokolove only analyzed three of the seven years at issue in this litigation.  (Mot. to Exclude at 9.)  The analysis of these three years found that Sac Cardio was ultimately overpaid for its physician assistants.  (Sokolove Report, Exh. A.)  Sutter Health does not challenge Mr. Sokolove's methodology, nor does it explain how Mr. Sokolove's analysis is so affected by analyzing three of the seven years at issue that his entire opinion is unreliable.

Second, Sutter Health argues that it is speculative that CMS would not have paid any claims submitted by Sac Cardio for services rendered by the physician assistants if it had known that Sac Cardio incurred no costs for those physician assistants.  (Mot. to Exclude at 9.)  Such

opinions appear to be based on Mr. Sokolove's experience with CMS, and can be challenged at cross-examination rather than excluded in their entirety.  The Court will allow this opinion.

### v.   Audit Processes

Finally, Sutter Health seeks to exclude Mr. Sokolove's referral to various audit processes as being irrelevant under Rule 403.  (Mot. to Exclude Sokolove at 12-13.)  Mr. Sokolove referred to these audit processes to explain how CMS monitors physician and hospital reimbursement, as well as how hospitals should ensure their financial arrangements comply with CMS reimbursement requirements.  As Relator points out, Sutter Health has put its compliance at issue given its assertions that it did not or should not have known of problematic billing practices.  For example, Sutter Health argues that even if Sac Cardio double-billed for its physician assistants, Sutter Health neither knew nor intended for Sac Cardio to do so.  (Defs.' MSJ at 39.)  Relator, in turn, points to Mr. Sokolove's explanation of the industry-standard compliance practices that would have allowed Sutter Health to identify the double-billing if implemented.  Such opinions have been permitted by other courts.  *See United States v. Adebimpe*, 819 F.3d 1212, 1216 (9th Cir. 2016) (discussing the testimony of a Medicare expert about a medical equipment supplier's authority to disagree with a prescription, the adequacy of medical documentation received by the medical supplier, and whether the medical supplier should have obtained additional documentation); *United States v. Strange*, 23 Fed. Appx. 715, 717 (9th Cir. 2001) (finding it "entirely appropriate" for an expert to testify as to Medicare regulations and reimbursement procedures).  This testimony is also relevant, as Sutter Health has argued that it did not know about the double-billing.  (Def.'s MSJ at 39; *see also Godecke*, 937 F.3d at 1211 (explaining that FCA liability can be found even in "the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted").  The Court finds that such opinions are relevant and admissible.

### IV.   CONCLUSION

For the reasons stated above, the Court will exclude the following opinions:

(1)   Ms. McNamara's opinion that Sac Cardio was double-billing;

(2)   Ms. McNamara's opinion that Sutter Health was either aware or deliberately ignorant

of Sac Cardio's double-billing;

(3)   Ms. McNamara's opinion that Sac Cardio's administrative time records were not credible;

(4)   Ms. McNamara's opinion that Dr. Roberts's medical director services were commercially unreasonable;

(5)   Ms. McNamara's opinion that Dr. Roberts's administrative time records were not credible;

(6)   Ms. McNamara's opinion that East Bay Cardiac was not fulfilling the call coverage services required;

(7)   Ms. McNamara's opinion that CEPMG was double-billing;

(8)   Dr. Pratt's opinion that Sac Cardio's call coverage arrangements were unreasonable;

(9)   Dr. Pratt's opinion that the medical director compensation paid to Dr. Roberts was unreasonable because the quantity of administrative hours was not feasible;

(10)  Dr. Pratt's opinion that it was reasonable for Sutter Health to pay East Bay Cardiac for full-time cardiothoracic call coverage and half-time thoracic call coverage;

(11)  Dr. Pratt's opinion that it was appropriate for East Bay Cardiac's call coverage to exclude a component of payment related to indigent care; and

(12)  Mr. Sokolove's opinions based on the "Incident To" guidance.

IT IS SO ORDERED.

Dated: September 9, 2024

KANDIS A. WESTMORE
United States Magistrate Judge